Exhibit B
Disclosure Statement in Support of
Amended Joint Plan of Liquidation dated November 27, 2002
For National Forge Company and National Forge Components, Inc.

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | | |
|---|---|---|
| In re: | ) | Jointly administered at |
| | ) | Bankruptcy Case No. 02-10488 |
| NATIONAL FORGE COMPANY, *et al.*, | ) | |
| | ) | Chapter 11 |
| Debtors. | ) | |
| | ) | |

DISCLOSURE STATEMENT IN SUPPORT OF
AMENDED JOINT PLAN OF LIQUIDATION
DATED NOVEMBER 27, 2002,
FOR NATIONAL FORGE COMPANY AND
NATIONAL FORGE COMPONENTS, INC.

David A. Murdoch
Pa I.D. No. 00239
Kristin L. Anders
Pa. I.D. No. 74497
Eric T. Moser
Pa I.D. No. 84014
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

Guy Fustine
Knox McLaughlin Gornall & Sennett, P.C.
120 West Tenth Street
Erie, PA 16501

Attorneys for the Debtors,
National Forge Company and
National Forge Components, Inc.

**Counsel for the Union**

Ira Weinstock, Esquire
Ira Weinstock, P.C.
800 North 2nd Street, Suite 100
Harrisburg, PA 17120

**United States Trustee**

Office of the U.S. Trustee
Attn: Joseph Fornari, Esquire
970 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15219

2. **Hearing on Confirmation**

The Bankruptcy Court has set **February 28, 2003 at 10:30 a.m.** for a hearing (the "Confirmation Hearing") to determine whether the requisite number of Creditors has accepted the Plan and whether the other requirements for confirmation of the Plan have been satisfied. The Confirmation Hearing will be held at 717 State Street, Erie, PA 16501 before the Honorable Judge Warren W. Bentz. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

## III. HISTORY, ORGANIZATION, AND ACTIVITIES OF NFC AND COMPONENTS

A. **Preliminary Statement**

NFC and Components are engaged in the business of manufacturing heavy, precision-machined, forged steel components of high metallurgical quality. Among other things, NFC manufactures crankshafts for diesel locomotives and power generation systems, pipe molds for use in centrifugal casting of ductile pipe, and hard target warhead casings for use by the United States armed forces. Components is in the business of reconditioning crankshafts. As of the Petition Date, NFC employed approximately 500 people, including both hourly workers and salaried employees. Components had and currently has only one employee.

Shortly before the commencement of the Cases, due to a combination of extended weak export prices for pipe molds caused by the strong U.S. dollar, a sudden drop in demand for crankshafts due to weakness in the markets for locomotives and stationary power generation, and delays in defense spending, NFC experienced a rapid decline in liquidity. In December 2001, NFC embarked on a strategy to reduce annual employment expenses by approximately $6 million. The strategy included a deadline of February 15, 2002, to negotiate a significant reduction in wages and benefits with NFC's organized labor force. These negotiations were unsuccessful, and the Debtors commenced the Cases on March 6, 2002.

The Cases were initiated to enable a restructuring of the Debtors' financial affairs so as to enable the Debtors to continue as a viable business enterprise well into the 21st century and beyond. As discussed further below, following discussions with their secured lenders and as a condition of the continued availability of DIP Financing, the Debtors agreed to formulate a plan that would provide for a going-concern sale of all or substantially all of the Assets of NFC and Components.

**B.    Description of the Debtors and Their Non-Debtor Affiliates**

    **1.    Corporate Structure of the Debtors and Non-Debtor Affiliates**

Holdings is a Delaware holding company, wholly owned by an Employee Stock Ownership ("ESOP") Trust. Holdings owns one hundred percent (100%) of the stock of NFC, a Pennsylvania corporation with its principal plant located in Irvine, Pennsylvania. NFC, in turn, owns one hundred percent (100%) of the stock of Components, also a Pennsylvania corporation. NFC also owns one hundred percent (100%) of the stock of National Forge Europe ("NFE"), a UK corporation. NFE, in turn, owns one hundred percent (100%) of the stock of Mitchell, Shackleton & Co., Ltd., a UK corporation ("Mitchell"). Holdings, NFC, and Components are the Debtors in the Cases. NFE and Mitchell are non-debtor affiliates of the Debtors (the "Non-Debtor Affiliates").

    **2.    History**

NFC was founded in 1915 as the National Forge and Tool Company ("NFTC") in Erie, Pennsylvania, specializing in boring close tolerance holes in long pieces of steel. In 1917, NFTC moved to its present location in Irvine, Warren County, Pennsylvania.

In 1984, NFTC acquired Mitchell, a manufacturer of machined metal parts located in Manchester, England. Mitchell products include large crankshafts used in power generation and marine engines, and shafts used in large electric generators.

In 1995, NFTC's owners sold most of NFTC's assets, including the Mitchell assets, to a group of NFTC managers and an ESOP Trust, and NFC and Holdings were formed. In May of 1999, Holdings completed a recapitalization that resulted in the consolidation of all of its equity into a single class of stock, with the ESOP Trust becoming the sole shareholder of Holdings' outstanding shares.

In 1997, NFC founded Components as a wholly owned subsidiary to serve the crankshaft aftermarket. Components employs only one individual, and is located in Wheatland, Pennsylvania.

In 1998, NFC formed NFE to facilitate the purchase of Northwest Forgemasters Ltd. ("Northwest Forgemasters"), a value-added producer of large metal forgings located in Manchester, England. Subsequently, in 2001, NFC consolidated the operations of Northwest Forgemasters and Mitchell onto a single location in Manchester, England under the name of Mitchell.

-11-

3. **Products and Customers**

    a. **Products**

NFC's primary product is large crankshafts for diesel engines for use in locomotives, stationary and marine electrical power generators, and marine propulsion applications. NFC, Components, and Mitchell also provide reconditioning services for crankshafts.

NFC's second major product is pipe molds used in the centrifugal casting of ductile and cast iron metal pipes. NFC is one of seven worldwide providers of pipe molds to the pipe manufacturing market, and is the only non-captive domestic supplier.

In addition to crankshafts and pipe molds, NFC provides the metal casing assemblies for penetrating warheads used in airborne ordnance ("Penetrators"). The casing protects the explosive device and allows the bomb to penetrate the target set before the bomb explodes. These bombs are used to destroy underground or other hardened military structures. Since the Gulf War, Penetrators, particularly those outfitted with precision guidance systems, have been key strategic weapons in the arsenal of the U.S. military.

Miscellaneous products include such products as paper rolls for boxboard, metal rolls for strip and sheet steel production, gun barrels for cannon artillery, machined forgings used in oilfield exploration and turbine rotors used in power generation. NFC's shipments of these products represent holdover relationships with customers from a time when these products represented a more significant portion of NFC's business.

    b. **Customers**

Across all product lines, the majority of NFC's domestic sales are made directly to customers.

Crankshaft customers consist of engine builders, re-builders, and aftermarket brokers. Limited amounts of crankshaft product are sold to distributors for use by independent and captive reconditioning operations. NFC relies on direct sales due to the high level of custom engineering and testing required by its customers.

Approximately thirty percent (30%) of NFC's crankshaft sales are to foreign customers. NFC sells to customers in twenty-nine nations, principally through local representatives and agents. NFC considers its presence particularly strong in Europe, the Middle East, India, and the Far East. The NFC trademark is registered in sixteen countries.

NFC's pipe mold customers include ductile and cast iron pipe manufacturers and machine builders of pipe manufacturing equipment. NFC calls directly on more than sixty ductile and cast iron pipe makers worldwide who produce the iron pipes that require its type of molds. Approximately 45% of this segment's sales are to foreign customers.

The U.S. Air Force and Navy are the main customers for Penetrators; however, some foreign nations with U.S. export approval are also customers. NFC believes that it is the sole source supplier on its current contracts for Penetrators known as BLU-109 (8 ft./2,000 lb.) and BLU-113 (12 ft./5,000 lb.).

### 4. Management and Key Employees

E. Roger Clark, Chairman, President and CEO of NFC, has been with the company since 1994 and has been its CEO since 1995. Prior to his employment with NFC, Mr. Clark was President and CEO of Kanthal Corporation. Mr. Clark has an MBA from George Washington University, and BSBA from Xavier University.

Maurice J. Cashman, Vice President, Treasurer, Secretary, and CFO of NFC, has been with the company since 1980 and has been its CFO since 1995. Prior to his employment with NFC, Mr. Cashman was Vice President of Equibank, NA. Mr. Cashman has an MBA from Pennsylvania State University and a BS in Mechanical Engineering from the University of Pittsburgh.

Robert A. Kaemmerer, Assistant Treasurer and Assistant Secretary of NFC, has been with the company since 1987 and has been its Assistant Treasurer and Assistant Secretary since 1994. Prior to his employment with NFC, Mr. Kaemmerer was Risk Manager of TLI Inc. Mr. Kaemmerer has an MBA degree from Gannon University and a BA degree from Benedictine College.

Dana A. Beyeler, Vice President and Director of Marketing and Quality of NFC, has been with the company since 1977 and has been its Vice President and Director of Marketing since 1997. Prior to his employment with NFC, Mr. Beyeler was a sales representative for Owens Corning Fiberglass. Mr. Beyeler has an MBA degree from St. Bonaventure University and a B.A. degree from Muskingam College.

### C. Debt Structure and Pre-Petition Financing

#### 1. Secured Debt

Prior to the Petition Date, the Debtors were indebted to Chase, as agent for itself and NCB and Fleet, under an Amended and Restated Credit Agreement, dated April 6, 1998 (the "Pre-Petition Credit Agreement"). Loans under the Pre-Petition Credit Agreement were secured by valid, perfected, first priority liens and security interests granted by the Debtors to Chase as agent. As of the Petition Date, the Debtors were liable to Chase and the other Banks in the aggregate amount of $14,923,876.13, and at least in the aggregate amount of 1,481,688.49 UK Sterling Pounds. This debt included revolving loans, term loans, and Letters of Credit issued for

-13-

the benefit of NFC and all guaranteed by Holdings and Components; accrued fees and unpaid interest; and term loans, revolving loans, and Letters of Credit issued for the benefit of NFE, all guaranteed by the Debtors and secured by the Debtors' assets. As of the Petition Date, the Debtors were in default on these loans, although the Banks had granted a waiver through April 30, 2002, of certain defaults as of December 30, 2001.

2. **Unsecured Debt**

As of the Petition Date, NFC and Components estimated that they owed approximately $51 million in unsecured debt to various entities.

3. **Equity Interests**

The ESOP Trust owns one hundred percent (100%) of the stock of Holdings. Holdings owns one hundred percent of the stock of NFC. NFC owns one hundred percent (100%) of the stock of Components, as well as one hundred percent (100%) of the stock of Non-Debtor affiliate NFE. NFE, in turn, owns one hundred percent (100%) of the stock of Non-Debtor Affiliate Mitchell.

## IV. THE REORGANIZATION CASES

A. **Events Precipitating the Debtors' Chapter 11 Filings**

In the period preceding the Petition Date, the Debtors found themselves to be operating in a difficult economic environment. There were limited prospects for growth in the markets requiring the Debtors' principal product lines; the existing market was very competitive and well developed, denying the Debtors the opportunity to improve profit margins through price increases; and the demand for the Debtors' products was cyclical. In addition, beginning in the fall of 2001, the Debtors' management began to recognize an imminent liquidity crisis due to a combination of factors, including: (i) extended weak export prices for pipe molds caused by the strong U.S. dollar, (ii) a sudden drop in demand for crankshafts due to weakness in the markets for locomotives and stationary power generation, (iii) delays in defense spending, and (iv) volatility in energy markets due to sudden deregulation, which caused a sudden spike in natural gas prices that NFC was unable to pass on to its customers.

In response to these conditions, the Debtors retained Cornerstone Capital Advisers, Ltd. ("Cornerstone") as restructuring and reorganization consultants. Cornerstone proposed a plan (the "Restructuring Plan") providing for a series of employment cost reductions. Anticipating an imminent default on loan agreements with its secured lenders, NFC presented the Restructuring Plan to its lenders, who agreed to waive pending defaults through April 30, 2002, in order to give NFC time to realize the cost savings afforded by the Restructuring Plan.

Following presentation of the Restructuring Plan to NFC's Board of Directors, management, and employees, a series of meetings were held between NFC and the Independent Union of National Forge Employees (the "Union") to negotiate the employment cost reductions required to be made in the collective bargaining agreement between NFC and the Union (the