Exhibit C
Presentation to
National Forge Company Holdings, Inc.'s Board of Directors

**National Forge Company Holdings, Inc.**
**S Corporation**
**December 22, 1998**

*Presentation To Board of Directors*

A48

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................... 1

TAXES PAID/PROJECTED TAXES ............................................................................................ 2

DEFINITION OF S CORPORATION ........................................................................................ 3

REQUIREMENTS OF AN S CORPORATION .......................................................................... 3

ADVANTAGES OF S CORPORATION ...................................................................................... 4

DISADVANTAGES OF AN S CORPORATION ........................................................................ 4

WHY NOW FOR BECOMING AN S CORPORATION ............................................................. 5

NEW DISTRIBUTION RULES ................................................................................................... 5

MAURICE J. CASHMAN MEMO TO E. ROGER CLARK ..................................................... 6

STOCK VALUE CHART ................................................................................................................ 8

PROCESS FOR S CORPORATION ELECTION ..................................................................... 9

PROPOSED CORPORATE RESOLUTION FOR BOARD OF DIRECTORS OF NATIONAL FORGE
COMPANY HOLDINGS, INC. ................................................................................................... 10

LETTER FROM MICHAEL A. HART, KIRKPATRICK & LOCKHART LLP ....................... 14

LETTER FROM DAVID WINSKO, PRICEWATERHOUSECOOPERS LLP ......................... 16

ADDING S CORPORATION STATUS TO ESOP SPELLS TAX RELIEF ............................. 18

S CORPORATION ESOPS – NEW ESOPS INCENTIVES IN THE 1997 TAX ACT ..................... 25

ESOPS FOR S CORPORATIONS ............................................................................................... 29

S CORPORATIONS AND ESOPS ............................................................................................. 39

ASSOCIATION SURPRISED BY S CORP. SURVEY ............................................................. 41

AMSTED CONSIDERS CHANGE IN CORPORATE STRUCTURE TO GAIN TAX SAVINGS ................ 43

G:\FILES\CASHMAN\SCORP\BRDBK.DOC                          i

## Introduction

**S Corporation**

The ability of an ESOP Company electing the S Corporation tax status started officially on January 1, 1998. Prior to that date, I had been reading various articles on the subject and talking to a number of National Forge Company's advisors as well as other professionals. An S Corporation does not pay any corporate income taxes, but the individual shareholders pay taxes on the corporate profits based on their individual income tax rates per their percentage of ownership within the company.

The biggest stumbling block that I have incurred in order to be able to convert to an S Corporation is that an IRA cannot be a shareholder. All but one of our hard dollar investors has an IRA as the method in which they bought their stock in National Forge Company Holdings, Inc. These investors would need to be bought out in order to become an S Corporation.

The apparent benefit of an S Corporation in a 100% owned company by an ESOP became very attractive because no federal or Pennsylvania State Income Taxes would need to be paid. In other words the ESOP Company would become tax exempt and all of this cash would remain in the company for additional repayment of debt and/or capital expenditures. In fiscal years of 1996 and 1997, National Forge Company Holdings, Inc. paid $3,748,000 in taxes. (See following page for additional information.)

The details of an S Corporation as they relate to National Forge Company Holdings, Inc. and the increase in stock value follow in this report. I believe that after reading these materials and gaining a better understanding of the subject material, you too will find it most inviting from an economic standpoint.

MJC/pdc

A50

**Taxes Paid/Projected Taxes**

### National Forge Company Holdings, Inc.
### Total Domestic Income Taxes

**(000s Omitted)**

| | |
|---|---|
| Actual FY 1996 | $2,139 |
| Actual FY 1997 | $1,609 |
| Preliminary FY 1998 | $600 |
| Projected Bank Plan FY 1999 | $248 |
| Projected Bank Plan FY 2000 | $387 |
| Projected Bank Plan FY 2001 | $1,545 |
| Projected Bank Plan FY 2002 | $1,435 |
| Projected Bank Plan FY 2003 | $1,302 |

A51

## Definition of S Corporation

- An S Corporation is not subject to federal income tax. Instead, the shareholders of the corporation are subject to tax on the corporation's income, whether it is distributed to them as dividends or retained in the corporation. An important tax advantage of this treatment is that only one tax is imposed on the earnings of the S Corporation.

- When National Forge Company Holdings, Inc. becomes 100% owned by the ESOP Trust, then no Federal and Pennsylvania Corporate Income Taxes need to be paid by the ESOP Trust or the participants within the ESOP Trust. The ESOP participant, upon retirement, will take a distribution in cash when eligible. That cash can be put into an IRA on a tax deferred basis or the taxes can be paid in the year of distribution as ordinary income.

## Requirements of an S Corporation

- The corporation may not have more than 75 shareholders.

- All shareholders must be US citizens or US residents, and they must be natural persons, estates, or certain types of trusts (including, effective as of January 1, 1998, employee benefit trusts).

- The corporation may have only one class of stock outstanding. However, different voting rights are permitted for different shares of stock.

A52

## Advantages of S Corporation

- S Corporation form allows most corporate earnings to escape federal income tax at the corporate level.

- In addition to avoiding tax at the corporate level, S Corporation pro rata share of income attributable to ESOP shares avoid taxation at the individual level until they are actually distributed to ESOP participants. The ESOP participant, upon retirement, will take a distribution in cash when eligible. That cash can be put into an IRA on a tax deferred basis or the taxes can be paid in the year of distribution as ordinary income.

- Potential increase in stock value due to increased cash flow.

- An ESOP Trust counts as one shareholder.


## Disadvantages of an S Corporation

- Section 1042 benefit is not available to S Corporation shareholders. Section 1042 allows tax deferral (by rollover treatment) on the sale of qualified employer securities to an ESOP if qualified replacement property is acquired within a specified time period.

- Generally, built-in gains existent at the time of conversion to S status are taxed at the corporate level if underlying assets are sold within ten years of conversion.

- Generally, LIFO recapture existent at the time of conversion to S status is taxed at the corporate level. National Forge would have to pay approximately $1,000,000 in taxes payable over four years at $250,000 per year.

- S Corporation restricts flexibility with respect to number and type of shareholders and classes and availability of stock. Only one class of stock is permitted.

- Losses can't be carried over and/or back to other taxable years.

- Limited to 75 shareholders.

A53

## Why Now For Becoming an S Corporation

- Effective January 1, 1998, Corporations, which sponsor employee stock ownership plans, become eligible for the first time to make the election to be treated as an S Corporation for federal income tax purposes.

- The Small Business Job Protection Act of 1996 brought about this change. This act provided that an ESOP would be treated as a single shareholder, rather that providing that each participant in the plan would be treated as a shareholder. However, the 1996 Act contained a number of additional provisions that substantially diminished the attractiveness of an ESOP for an S Corporation. Some of these limitations were removed by the Taxpayer Relief Act of 1997.

- Our outside advisors want us to act now in order to take advantage of any tax savings. Also the tax law may change in the future and thereby prevent National Forge Company Holdings, Inc. from becoming an S Corporation.

## New Distribution Rules

- Generally, participants in an ESOP are entitled to demand that their benefits be distributed to them in the form of stock of the sponsoring employer. This raises the possibility of an involuntary termination of an S election made by an ESOP company. This could arise in either of two ways. First, a participant might request that the shares of employer stock allocated to his or her account be rolled over to an IRA. An IRA is not eligible to own shares of an S corporation. Second, over time, if enough participants in the plan elect to take benefits in the form of employer shares, the 75 shareholder limit might be exceeded. These problems have been resolved by the Taxpayer Relief Act of 1997, which permits an S Corporation that sponsors an ESOP to require the participants in the plan to take their benefits in the form of cash. National Forge will need to change to the new distribution rules, as our plan now allows for a distribution of stock and/or cash to the individual.

A54

Maurice J. Cashman Memo to E. Roger Clark

# NATIONAL FORGE COMPANY®

Employee Owned

## Memorandum

December 9, 1998

TO:     E. Roger Clark

FROM:   Maurice J. Cashman

RE:     **S Corporations**

In order to evaluate the economic potential for National Forge Company to become an S Corporation, I had Valuemetrics, Inc. perform two different Valuations. I used the FY 1998 year end valuation forecast (the blue line on the enclosed graph) and changed this forecast model from a C corporation to an S Corporation (the red line on the enclosed graph).

The new forecast of being an S Corporation includes the assumptions of borrowing $5,887,000 and using $387,000 in cash to repurchase all hard dollar investors. All deferred taxes were written off, as well as paying $1,000,000 of LIFO recapture taxes over a four-year period of time at $250,000 per year. This shows a negligible increase in value for the initial year ($49.42 [C Corp] vs. $49.51 [S Corp]).

Although the tax shields of LIFO, NFIP (intellectual property subsidiary) and NF Export are removed, the differential in valuations between the C Corporation and S Corporation grow as a result of the increased cash flow of not paying taxes which more than offset the lost tax shields.

The S Corporation Fair Market Value is based on the S Corporation being purchased by a third party which would be a C Corporation and would not be able to give full value to an S Corporation's cash flow because of its own tax structure.

The S Corporation Economic Value (the yellow dots) uses the full cash flow on the basis of not paying any federal income taxes or Pennsylvania Corporate income taxes. This study demonstrates the immediate economic value of an S Corporation of $68.75/share versus $49.42 for a C Corporation.

You may ask, "Why do the hard dollar investors need to be paid off?" The answer is simply that only one of the hard dollar investors did not use an IRA as his vehicle to invest into National Forge Company Holdings, Inc. An IRA is not allowed to be a shareholder in the

A55

S Corporation. I have talked to a number of professionals around the country, and each one has told me that these investors must be paid out and there is no other alternative.

For companies where the ESOP owns all of the outstanding shares, such as National Forge Company Holdings, Inc., the opportunity for the tax deferral will be and is very appealing.

In order to purchase National Forge Company, we put an ESOP trust together, put in an initial equity from the hard dollar investors and preferred stock issued from the seller, and granted warrants to the lenders. We have repurchased the preferred stock and warrants in April, 1998. Now to take advantage of being an S Corporation and becoming a 100% ESOP owned company, we must repurchase the hard dollar investors' shares of stock.

I not only make this recommendation as the Chief Financial Officer of National Forge Company Holdings, Inc., but also as the Trustee of the ESOP Trust. The facts and circumstances warrant this action as demonstrated by the Valuemetrics valuation of National Forge Company Holdings, Inc. as an S Corporation being more valuable to its shareholder – The ESOP Trust.

MJC/pdc

7

A56



8

A57

## Process for S Corporation Election

On Monday, December 14, 1998, Roger Clark, Robert Kaemmerer and Maurice Cashman met with Kathleen Hendrickson, Charles Smith and Michael Hart of Kirkpatrick & Lockhart to discuss the legal process of becoming an S Corporation.

The initial step in the procedure would be to have the Board of Directors of the National Forge Company Holdings, Inc. pass a resolution that would allow the Company to do the following:

1. Make an offer to buy out all of the hard dollar investors at $49.42/share. If the buyout offer would be unsuccessful to all of the Class B Stockholders, then those who do not elect to participate can be cashed out through a squeeze-out merger.

2. Permit the borrowing of up to $6,000,000 from a financial institution to buy out the hard dollar investors (Class B shares).

3. Amend the Employee Stock Ownership Plan to eliminate the right of ESOP participants to demand distribution in the form of National Forge Company Holdings, Inc. stock. Therefore, participants would receive cash and/or a note at the time of distribution.

4. File an S Corporation election form with the IRS after the Class B Shareholders are paid out.

After the Board of Directors' approval process, the ESOP Trustees will need to:

1. Amend the Employee Stock Ownership Plan in the same form as the Board of Directors.

2. File an S Corporation election form with the IRS after the Class B Shareholders are paid out.

Financing will have to be approved from a financial institution. This will be followed by a redemption offer to the hard dollar investors for $49.42/share. If the redemption offer is not approved unanimously, then those who do not elect to participate can be cashed out through a squeeze-out merger.

The funding from the financial institution would be finalized and the Class B Shares would be redeemed.

The S Corporation will make a filing with the IRS electing its tax year to be July 1 through June 30. The first full year of an S Corporation would commence July 1, 1999.

A58

# Proposed Corporate Resolution for Board of Directors of National Forge Company Holdings, Inc.

WHEREAS, pursuant to the Small Business Job Protection Act of 1996 and the Taxpayer Relief Act of 1997, employee stock ownership plans are permitted to be shareholders in corporations taxed under Subchapter S of the Internal Revenue Code of 1986, as amended ("Subchapter S Corporations"); and

WHEREAS, senior management, in consultation with PricewaterhouseCoopers LLC, the Company's professional accounting firm; Kirkpatrick & Lockhart LLP, the Company's legal counsel; and Valumetrics, Inc., the Company's professional valuation advisor (collectively, the Company's "Professional Advisors"), has studied the financial, tax and other implications of causing the Company to elect to be taxed as a Subchapter S Corporation, including the requirements that a Subchapter S Corporation have no more than one class of outstanding stock and no more than 75 shareholders; and

WHEREAS, the Board of Directors of the Company has considered the results of that study and the advice of the Company's Professional Advisors and considers it to be prudent and in the best interests of the Company, its shareholders, and its employees to:

    (i)    redeem or cash out through a merger the shares of Class B Common Stock of the Company held by certain management shareholders (individually or through their individual retirement accounts) (the "Management Shareholders") so that, following such redemption or merger, the National Forge Company Holdings, Inc. Employee Stock Ownership Plan (the "ESOP") would be the sole shareholder of the Company;

    (ii)    borrow funds sufficient to enable the Company to complete the redemption or merger;

A59

(iii)   amend the ESOP to provide that distributions from the ESOP to participants therein may be made only in the form of cash and not in the form of Company stock; and

(iv)   cause the Company to elect to be taxed as a Subchapter S Corporation.

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the President and Chief Executive Officer of the Company and the Vice President, Chief Financial Officer and Secretary of the Company (the "Designated Officers") are each authorized, on behalf of the Company, to offer to redeem from the Management Shareholders, the shares of Class B Common Stock of the Company held by such Management Shareholders and/or their individual retirement accounts, on such terms and conditions as the Designated Officers may deem appropriate (the "Redemption Offer") (such Redemption Offer to be conclusively evidenced by the execution and delivery of the offering materials); provided, however, that such Redemption Offer shall be conditioned upon (i) (a) acceptance of the Redemption Offer by all Management Shareholders and in respect of all outstanding shares of Class B Common Stock of the Company ("Unanimous Acceptance"), or (b) in the absence of Unanimous Acceptance, approval by the Company's shareholders of a merger of the Company as hereinafter described (the "Merger"), and (ii) obtaining all necessary consents to the foregoing redemption and/or the Merger.

FURTHER RESOLVED, that in the event of a Unanimous Acceptance of the Redemption Offer, the Designated Officers are hereby authorized and directed, on behalf of the Company, to redeem the shares of Class B Common Stock held by the Management Shareholders and/or their individual retirement accounts pursuant to the terms and conditions of the Redemption Offer.

FURTHER RESOLVED, that in the event of less than Unanimous Acceptance of the Redemption Offer, each Designated Officer is hereby authorized and directed, on behalf of the Company, to take any and all actions necessary or appropriate to effectuate a merger of the Company with another corporation (organized and established by one or both of the Designated

A60

Officers), with the Company designated as the surviving corporation (the "Merger"), for the sole purpose of (i) causing each outstanding share of Class B Common Stock of the Company to be exchanged for an amount of cash equal to the fair value of such Class B Common Stock, and (ii) causing all of the outstanding shares of Class A Common Stock of the Company to be exchanged for shares of the surviving corporation.

FURTHER RESOLVED, that each Designated Officer is hereby authorized and directed to borrow, on behalf of the Company, from Chase Manhattan Bank or another reputable lender, on terms and conditions deemed advisable by either or both of such Designated Officers, funds sufficient to enable the Company to complete the Redemption Offer and/or Merger (such borrowing to be conclusively evidenced by the execution and delivery of a promissory note) and to obtain from Chase Manhattan Bank such approvals of or consents to the Redemption Offer and/or Merger and Subchapter S Corporation election, and any such other approvals or consents, as the Designated Officers may determine to be necessary or advisable.

FURTHER RESOLVED, that, conditioned upon the consummation of the Redemption Offer and/or the Merger, each of the Designated Officers is hereby authorized and directed, on behalf of the Company, to (i) file Form 2553 with the Internal Revenue Service, designating thereon a July 1 to June 30 tax year, effective for the tax year beginning July 1, 1999, and to obtain necessary shareholder consents in connection therewith, on or before the due date for such filing, and (ii) complete such other filings, make such other elections and take such other actions in connection with the federal income tax status of the Company's direct and indirect subsidiaries as such Designated Officer may deem to be necessary or appropriate.

FURTHER RESOLVED, that each of the Designated Officers is hereby authorized and directed, on behalf of the Company, to amend the ESOP to provide that distributions from the ESOP to ESOP participants shall be made only in the form of cash and may not be made in the form of Company stock (such amendment to be conclusively evidenced by the execution and delivery of an amendment to the ESOP).

FURTHER RESOLVED, that each of the Designated Officers is hereby authorized and directed, on behalf of the Company, to execute and deliver all such documents and instruments and to take or cause to be taken all such further action, as he shall deem necessary or advisable in order to carry into effect the purposes and intent of any and all of the foregoing resolutions.

A62

KIRKPATRICK & LOCKHART LLP

# MEMORANDUM

| | |
|---|---|
| **TO:** | Maurice J. Cashman (via Fax) |
| **FROM:** | Michael A. Hart |
| **DATE:** | December 9, 1998 |
| **SUBJECT:** | Summary of Tax Advantages of S Corporation Election |

I have attached a one-page summary of the federal income tax advantages and disadvantages of a Subchapter S election for a 100%-owned ESOP company, which, I understand from Kathy Hendrickson, you requested. Please do not hesitate to call me with any comments or questions you may have.

MAH/vlw-p
Enclosure
cc:    Kathleen D. Hendrickson

14

## FEDERAL INCOME TAX ADVANTAGES AND DISADVANTAGES
## OF A SUBCHAPTER S ELECTION FOR A 100% ESOP-OWNED COMPANY

PRIMARY ADVANTAGE

- Tax-Free Corporate Income: A Subchapter S corporation does not pay federal income tax. Rather, the corporation's income is "passed through" to its shareholders who pay ordinary federal income tax on their pro-rated portions of the income. In a 100% ESOP-owned company, the only shareholder—the ESOP—is tax-exempt; accordingly, 100% of the corporation's income is passed through to a tax-exempt shareholder and no federal income tax is paid with respect to the corporation's income. Unlike other Subchapter S corporations, which must make partial distributions of income to enable their shareholders to pay their pro-rated shares of the corporation's income, the 100% ESOP-owned Subchapter S corporation does not need to make similar distributions to the ESOP. This improves the corporation's cash flow, thereby freeing up cash for other corporate uses, such as capital investment or debt service, all of which, theoretically, improve the value of the corporation's stock. Increases in the value of the corporation's stock increase the value of the benefits that ESOP participants receive under the ESOP when their employment terminates.

POSSIBLE DISADVANTAGES

Although a Subchapter S corporation generally does not pay corporate-level federal income tax, it may be required to pay certain taxes under special circumstances:

- Built-In Gains Tax: A Subchapter S corporation that disposes of any asset during the ten-year period following the conversion to Subchapter S status must pay a "built-in gains" tax. Generally, the tax is determined by reference to the highest marginal corporate income tax rate applicable to a C corporation and the amount of the gain "built into" the asset at the time of the Subchapter S conversion (i.e., the fair market value of the asset at the time of the Subchapter S conversion less the adjusted basis of the asset at that time).

- LIFO Recapture Tax: Corporations that value inventories on the "LIFO" method must pay a LIFO recapture tax upon conversion to a Subchapter S corporation. The tax due is determined by reference to the difference between the value of the corporation's inventory under the LIFO method and the value of the corporation's inventory under the FIFO method at the time of the Subchapter S conversion. The excess is treated as taxable income ratably over the four year period beginning in the last Subchapter C corporation year.

15

# PRICEWATERHOUSE(COOPERS 🏢

PricewaterhouseCoopers LLP
600 Grant Street
Pittsburgh PA 15219
Telephone (412) 355 6000

December 14, 1998

Mr. Maurice J. Cashman
Chief Financial Officer
National Forge Company Holdings, Inc.
One Front Street
Irvine, Pennsylvania 16329

Dear Maury:

**Re: Election to be taxed as a Subchapter S Corporation**

As we have discussed over the past year, an ESOP company such as National Forge Company is well suited to enjoy substantial income tax benefits if it were to elect to be taxed as a Subchapter S Corporation. S Corporations generally do not pay corporate or Pennsylvania income taxes. Rather, the income is summarized at the corporate level and each shareholder's pro-rata portion of the Company's income is reported to the shareholder for inclusion on its federal and state income tax return. Because an ESOP is a tax-exempt entity for both federal and Pennsylvania purposes, the amount of National Forge Company income allocable to the ESOP would not be subject to current federal and Pennsylvania income tax.

ESOP participants will be taxed on the cash distributions received from the ESOP. Assuming such distributions are received upon normal retirement, the amount received by the ESOP participant would be taxed for federal purposes as retirement income. (Pennsylvania does not currently tax retirement income.)

The federal tax rate applicable to National Forge's annual income is 34%; therefore, the Company currently pays federal income tax of $340,000 per $1 million of taxable income. If the Company were 100% owned by the ESOP, it would not be required to make current federal and Pennsylvania tax payments. Cash that was otherwise used to pay federal and Pennsylvania tax could be retained in the business for other business purposes, such as to pay down debt or fund capital expansion.

However, as we have also discussed, there are currently certain structural impediments that must be overcome to fully enjoy these benefits. These include eliminating ineligible S-Corporation shareholders (e. g. Individual Retirement Accounts) and restructuring certain legal entities that are currently members of the National Forge Company Holdings consolidated group. Furthermore, to the extent there are any eligible non-ESOP shareholders remaining after the S-Corporation election, these shareholders will be required to include their pro-rata share of Company earnings on their individual tax returns, paying tax at the rates applicable to their personal situation. It is common for such shareholders to expect cash distributions from the Company to pay such tax. Since cash distributions must be pro-rata to shareholdings, partial ESOP ownership will not be as effective as complete ESOP ownership to achieve the cash savings discussed above.

16

A65

# PRICEWATERHOUSE COOPERS 🄫

Mr. Maurice J. Cashman
Page 2
December 14, 1998

As you can appreciate, the foregoing is a broad summary of the anticipated future tax benefits that may be derived from an ESOP making an S-Corporation election. It does not address issues such as the cost of conversion, federal and state corporate tax that may be applicable to the Company as a result of the conversion, or revisions that may be required to existing plan documents to obtain and preserve these benefits.

I would be happy to provide further information or discuss the merits of proceeding with whomever you desire. Please do not hesitate to call.

Sincerely,

David A. Winsko

17

A66

SEYFARTH, SHAW, FAIRWEATHER & GERALDSON

# M A N A G E M E N T
# A L E R T

September 16, 1998

# Adding S Corporation Status to ESOP Spells Tax Relief

Legislation enacted by Congress in the past two years now enables S Corporations to dramatically reduce their federal income taxes through the implementation of an Employee Stock Ownership Plan, or "ESOP." This article explores and explains the changes to the Internal Revenue Code (the "Code") and compares the benefits of ESOP ownership in S Corporations to that of C Corporations.

The impact of these new tax rules is due to the unique status of S Corporations under the Code. An S Corporation does not pay federal income tax directly. Instead, its shareholders pay federal income tax on their share of the S Corporation's income. Accordingly, under the new rules, if all of the outstanding shares of an S Corporation are owned by an ESOP, zero federal income tax is payable upon the income of the S Corporation because an ESOP is not subject to federal income tax on its share of an S Corporation's income.

## How To Qualify for S Corporation Status

The Code imposes a number of restrictions upon corporations seeking S status, including requirements that an S Corporation:

- be limited to 75 shareholders (however, a husband and wife are treated as just one shareholder and an ESOP is also treated as just one shareholder);

- may have only one class of stock; and

- cannot have a corporation or a non-resident alien as a shareholder.

Additionally, a corporation which elects to be treated as an S Corporation generally must adopt a calendar year as its taxable year, although fiscal years are permitted if a corporation's natural business year is a fiscal year or if the principle shareholders have the same fiscal year as the S Corporation.

The Code also imposes limitations upon when a corporation may make its election for S Corporation status. In particular, an S election must be made either prior to the start of the taxable year or within two-and-a-half months thereafter.

Furthermore, if a corporation uses the "last in first out" method ("LIFO") of computing its inventory for federal income tax purposes and the corporation has a LIFO reserve on the date of conversion, the corporation will be subject to a "LIFO recapture tax" upon its conversion to S status. This tax may be substantial and is payable over a period of four years beginning with the taxable year in which the election first becomes effective.

Lastly, a C Corporation making an S election triggers the "built-in gain" rule. Under this rule, if a corporation sells assets within ten years of becoming an S Corporation, the excess of the fair market value of the corporation's assets over

18

Copyright © 1998 Seyfarth, Shaw, Fairweather & Geraldson
All Rights Reserved

the tax basis of those assets (determined as of the first day of the first taxable year in which the S ction becomes effective) will be subject to taxation at the highest corporate rate. After the initial ten-year period, the "built-in gain" tax no longer applies. Generally, the most significant item of "built-in gain" is the corporation's good will.

In an asset purchase, the purchaser can amortize (deduct) good will ratably over 15 years, thereby providing a tax advantage to a purchaser in buying assets of a business rather than stock of a corporation. Because there will either be no tax or a lower tax on an asset sale by an S Corporation than by a C Corporation (which is taxed on 100% of any gain in an asset sale), an S Corporation will provide a potentially larger net return to its shareholders in an asset sale than is available to shareholders of a C Corporation.

## Sale of Stock to ESOP

As a general rule, shareholders who sell their stock in an S Corporation to an ESOP are taxed pon any capital gains from the transaction. Thus, so long as the stock was held more than 12 months, the current maximum federal tax rate on the gain is 20%.

There is one advantage to a sale of the stock of a C Corporation to an ESOP over the sale of stock of an S Corporation. Under Section 1042 of the Code, a shareholder may elect to defer gain on the sale of C Corporation stock to an ESOP by investing the sale proceeds in "qualified replacement property" (stocks or bonds of United States companies) within a specified period and otherwise satisfying the requirements of Section 1042. Among the other requirements to qualify for deferral of gain under Section 1042 are:

- the ESOP must own at least 30% of the stock of the corporation immediately after the sale; and

- the stock sold must have been held for at least three years prior to sale and the stock sold cannot have been acquired through exercise of stock options or as

compensation subject to the rules under Section 83 of the Code.

While Section 1042 does not apply to the sale of stock of an S Corporation to an ESOP, because the tax rate on capital gains has been reduced to 20% the benefit of deferral of gain has been reduced. Once the qualified replacement property is sold, the deferred gain on the sale of the stock to the ESOP is subject to capital gain tax unless the purchaser holds the qualified replacement property until his or her death. If the qualified replacement property is held until death, the tax basis of the qualified replacement property is stepped up to fair market value which eliminates any gain on the sale of such property up to the fair market value at death.

It should be noted that the built-in gain rule (see above) does not apply to any corporation which has been an S Corporation for the entire period of its existence. Accordingly, conversion of an S Corporation to C status to obtain the benefit of deferring gain on the sale of the corporation's stock to an ESOP under Section 1042 of the Code must be carefully considered. The conversion will cause the built-in gain rule to become applicable if the corporation subsequently converts back to S Corporation status following the sale. In addition, the subsequent reconversion back to S status ordinarily cannot occur for a period of five years following the prior termination of the corporation's S status. Finally, it should be noted that none of the shares of stock sold in a section 1042 transaction can be allocated to the ESOP accounts of the seller or members of his or her family, or to shareholders who own more than 25% of the stock of the corporation or members of the family of such large stockholders.

## Delaying Subchapter S Election To Obtain the Benefits of Deferral Gain

Under Section 1042 of the Code, the deferral gain on the sale of stock to an ESOP followed by the investment of the proceeds from this sale (or an amount equivalent to the proceeds within a specific time period) in "qualified replacement

property" is not available for sales of stock of an S Corporation to an ESOP. Accordingly, individual shareholders who wish to make sure that they will achieve a nontaxable sale through the deferral of gain under Section 1042 may prefer to have the corporation defer the S election until after the Section 1042 sale has been completed. While the statute is not completely clear on the issue, it is believed that as long as the corporation is a C Corporation for the entire taxable year of the selling shareholders, they should not be precluded from obtaining the benefits of deferral of gain under Section 1042 notwithstanding the fact that the corporation makes an S election in the following taxable year.

To be cautious, a company would be well-advised to not make an S election until after the taxable year in which the replacement property is purchased by the selling shareholders. Under these circumstances, the company remains a C Corporation during the entire taxable years in which any portion of the transactions necessary to effect the tax deferred exchange are consummated. Consequently, there should be no basis for the Internal Revenue Service to seek to disqualify the selling shareholders from the benefits of Section 1042 if an S election is made in the subsequent taxable year. This is particularly true if a majority of the shares of stock of the corporation are owned by an ESOP.

## Permitted Contributions to an ESOP by an S Corporation

Section 404(a)(3) of the Code provides that a deduction for a contribution to an ESOP is limited to 15% of the aggregate compensation paid to participants in the ESOP. Under Section 404(a)(7) of the Code, a corporation may deduct contributions to retirement plans up to an amount equal to 25% of the compensation paid in a taxable year to participants in the plans if a corporation establishes both a defined contribution plan and a defined benefit plan for the beneficiaries of the plans.

Because a money purchase pension plan generally is treated similarly to a defined benefit pen-

sion plan, this treatment allows for the more liberal deduction of 25% of compensation for contributions to a money purchase plan and a profit sharing plan or stock bonus plan. While Section 404(a)(9) of the Code permits a contribution to an ESOP to be deducted up to an amount equal to the sum of 1) 25% of the compensation paid to the participants where the contributions are used to repay the principal portion of a loan incurred for the purpose of acquiring stock of the employer and 2) interest on the loan, these rules do not apply to an S Corporation.

*Section 4975(e)(7) of the Code defines an ESOP as:*

- a defined contribution plan which is a stock bonus plan qualified under Section 401(a) of the Code, and

- a stock bonus and a money purchase plan, both of which are qualified under Section 401(a) of the Code to invest primarily in qualifying employer securities.

Accordingly, it appears that by adopting an ESOP which includes a money purchase plan feature (for example, 10% of compensation), the corporation may deduct an amount up to 25% of the aggregate compensation paid to the participants in the ESOP, notwithstanding the fact that it is an S Corporation. Thus, there is no difference between a C Corporation and an S Corporation with respect to the amount of allowable deductible contributions to an ESOP with a money purchase plan feature. However, interest payable on any loan incurred for the purpose of purchasing qualifying employer securities is included in the 25% of compensation limitation if the employer corporation is an S Corporation, while such interest is excluded if the employer is a C Corporation.

## S Corporation Dividends v. C Corporation Dividends

For a C Corporation, dividends paid on stock held by an ESOP are deductible if passed through to participants in cash within a specified period, or if used to repay debt incurred by the ESOP to purchase the stock. This deduction is

20

SEYFARTH, SHAW, FAIRWEATHER & GERALDSON

addition to the 25% of compensation plus interest deductions applicable to C Corporation leveraged ESOPs.

However, dividends paid on S Corporation stock held by an ESOP are not deductible. In addition, there is some question about whether dividends paid on allocated S Corporation stock may be used to repay ESOP acquisition indebtedness.

## Fiduciary Obligation of Trustee

Under the Employee Retirement Income Security Act ("ERISA"), the assets of every ESOP must be held by a trustee, who acts as a fiduciary to all ESOP participants. Indeed, the advantages of conversion to an ESOP-owned S Corporation are so compelling, the trustee of an ESOP-owned C Corporation may have a fiduciary obligation to make an S election.

If a C Corporation was otherwise eligible to make the conversion, the advantages of converting to S status would include the absence of federal income tax on its net income and the reduction or elimination of state income tax. As aforementioned, the only significant tax problem which could arise from such a conversion would be the requirement that, to the extent that the corporation was calculating inventory on the LIFO method, any LIFO reserve becomes subject to corporate tax payable over four years (as described above).

Nevertheless, unless the income tax payable due to the LIFO reserve is substantially greater than the income tax which would be imposed if the corporation continued as a C or taxable corporation, it is likely that there would be little justification for failing to make an S election -- the savings in income tax which would accrue to the ESOP participants would be too significant. In addition, even a sale of assets by an S Corporation subject to tax on "built-in gains" would ordinarily be lower than the tax which would have been imposed on the sale of the assets and business by the same corporation if it were a C Corporation on the date of sale.

Although the ESOP trustee's fiduciary duty thus probably requires conversion from a 100% ESOP-owned C Corporation to an S Corporation, the circumstances are different if the ESOP does not own all of the stock of the C Corporation. That is, if the ESOP owns less than 100% of the stock of the C Corporation, the corporation will be unable to make the conversion unless the non-ESOP shareholders consent to the S Corporation election. In such a situation, an ESOP trustee should not face any liability for the failure to convert the C Corporation into an S Corporation if non-ESOP shareholders refuse to convert to an S Corporation.

## Income Tax Advantages and Disadvantages of Conversion to S Status with ESOP as Part Owner

While there are tax advantages to the non-ESOP shareholders as well as to the ESOP shareholders when a corporation elects S Corporation status, there can also be certain tax disadvantages. The following are some pros and cons:

- Higher Potential Tax Rate on S Corporation Income -- The maximum tax rate imposed on the income of C Corporations is lower than the maximum tax rate imposed on the shareholders of S Corporations on their share of the distributed net income of an S Corporation. In general, the maximum federal income tax rate on the net taxable income of an C Corporation is 35%, while the maximum federal income tax rate on the net income of shareholders of a S Corporation can reach 39.8%. Though there can be a slightly higher tax imposed on the net income of an S Corporation than on a C Corporation, the total income tax payable on an S Corporation's income will be far less if an ESOP is a substantial shareholder because it need not pay income tax on its share of the income of the S Corporation.

A70

Assuming the individual shareholders of an S Corporation have a combined federal and state income tax bracket of 40%, one would expect the S Corporation to make a distribution of 40% of the net income to the individual shareholders to cover their tax liabilities. Accordingly, the ESOP would also receive a distribution of 40% of the net income of the S Corporation allocated to the ESOP as a shareholder. Thus, the ESOP will receive a non-taxable distribution which can be invested by the ESOP for the benefit of the participants. However, as described below, this distribution can be also used for the purchase of shares from vested terminated ESOP participants or additional shares from the S Corporation thereby providing additional funds to the S Corporation to enable it to make further acquisitions through the purchase of additional stock from the S Corporation.

* **Fringe Benefits Paid by C Corporation Non-Taxable to Shareholders** -- Another benefit of a C Corporation over an S Corporation occurs where individual shareholders own stock of an S Corporation. In an S Corporation, a shareholder who owns more than 2% of the stock is treated as if he is a partner in a partnership. Thus, the value of certain fringe benefits (such as accident or health insurance) provided to a more-than-2% shareholder are included in the shareholder's gross income unless there is a specific exclusion of the benefit. However, in a C Corporation, an employee shareholder is not taxed on any fringe benefits, and the cost of those benefits is fully deductible from the corporation's income. It appears that shares allocated to a participant's ESOP account are not deemed to be owned by the participant for purposes of the 2% shareholder rule.

* **Tax Benefits of S Election for Individual Shareholders** -- Under the S Corporation rules, the tax basis of the stock owned by its shareholders is increased by their pro rata share of the corporation's undistributed net income. Thus, for example, if 60% of the net income of the S Corporation was not distributed to its shareholders, each shareholder would increase its tax basis of the shares owned by its proportionate share of the net income. While this would be of no benefit to the ESOP -- because it would not pay income tax on the sale of the shares of the S Corporation -- it could be of benefit to the individual shareholders.

For example, if a corporation's net income was $1,200,000 for 5 consecutive years and each year it distributed $480,000 of that income to its shareholders, and if the individual shareholders owned 50% of the stock of the S Corporation, the tax basis in their stock would increase at the rate of $360,000 per year (50% X $720,000). Accordingly, in 5 years, the individual shareholders would obtain a potential federal income tax savings of $360,000 ($360,000 X 5 years = $1,800,000 multiplied by 20% tax rate) on the sale of their shares. This is yet another benefit to an S Corporation and mitigates the inability to utilize the deferral of gain rules under Code Section 1042.

* **Benefit to ESOP from S Election** -- The excess cash received by the ESOP each year in the form of dividends from the S Corporation can be used to purchase additional shares in the S Corporation from the selling shareholders taxable at favorable capital gain rates. This cash can also be used to provide funds for satisfying the corporation's repurchase obligation upon the separation of employee participants in the ESOP. Thus, this cash (which can accumulate free of taxes) can eliminate or reduce the need of the corporation or the ESOP to borrow funds to purchase additional

22

stock from the individual shareholders or satisfy repurchase obligations. This in turn will provide the corporation with more net income to conduct operations and expand its business.

A C Corporation's obligation to pay corporate income tax on its net income makes it far less likely that it will also declare dividends equal to 40% of the corporation's net income before taxes, since that would substantially reduce the company's funds for operations and growth.

## Additional Compensation for Employee Shareholders and Management of an ESOP-Owned Corporation

Even if the all stock of an S Corporation is sold to an ESOP, nothing prevents the corporation from granting reasonable stock options, restricted stock, or phantom stock to provide the management or selling employee shareholders with additional incentives for the growth and increased value of the S Corporation business. Additionally, a selling shareholder, or member of his or her family, who sells stock of an S Corporation to an ESOP may be a participant in that ESOP if he or she is employed by the S Corporation. This provides the selling shareholder or a member of his or her family who is employed by the corporation with retirement benefits represented by his or her share of the S Corporation stock owned by the ESOP. Consequently, the sale of even 100% of the stock of the corporation to an ESOP does not preclude the selling shareholders who are employed by the S Corporation from continuing to participate in the growth in the value of the S Corporation's business, though the percentage interest in that growth would be reduced to the participating interest in the ESOP owned by the selling shareholders.

## Acquisitions by S Corporation Owned in Whole or in Part by an ESOP

An ESOP's part or total ownership of an S Corporation does not preclude the S Corporation from acquiring the stock of another corporation or the assets of a business. Of course, where the ESOP shareholder is required to approve the acquisition, the fiduciary standards imposed on the ESOP trustee by virtue of ERISA will have to be rigorously applied. If a merger or consolidation is involved, pass-through voting to ESOP participants on allocated stock will also be required.

The rules for S Corporations have been further modified to permit acquisitions of 80% or more of the stock of another corporation without disqualifying the corporation's S election. Prior to 1998, an S Corporation could not be a member of an affiliated group of corporations as defined under the consolidated income tax rules and regulations. That is, an S Corporation could not own 80% or more of the stock of another corporation (which would necessarily be a C Corporation) without forfeiting its S election. Accordingly, prior to 1998, this rule effectively limited stock acquisitions by S Corporations to 79% of the outstanding stock of a target corporation.

Beginning in 1998, however, an S Corporation is not limited in any respect to the percentage of stock of another corporation which it is eligible to own. Accordingly, an S Corporation owned in whole or in part by an ESOP can now purchase up to 100% of the stock of a target corporation without affecting the corporation's S election. However, as long as the acquired target corporation is a C Corporation, it would continue to have to pay federal income tax on its taxable income.

In addition, S Corporations are permitted to acquire 100% of the stock of a target corporation and make a Qualified S Subsidiary election if the target is eligible to be treated as an S Corporation. This election causes the target corporation to be deemed liquidated for federal income tax purposes, but presumably to still

23

retain its separate existence as a corporation for business purposes. If the Qualified S Subsidiary election is made, the target company's assets, business, liabilities, income, deductions and credits are deemed to be owned or realized by the purchasing S Corporation, and are included in a single federal income tax return. This permits an S Corporation to file what could be viewed as consolidated federal income tax return with its Qualified S Subsidiary corporation.

Because this election is treated as a constructive liquidation of the Qualified S Subsidiary, there should be a carryover of the basis of the assets of the Qualified S Subsidiary to the parent S Corporation under Section 334(b) of the Code. Consequently, there should not be a deemed election under Section 338 of the Code to treat the purchase of the stock as the purchase of assets which otherwise could trigger taxable gain under Section 338 of the Code by the target corporation on a deemed sale of its assets.

Alternatively, the S Corporation can elect to purchase the assets and business subject to certain liabilities of a target corporation through the formation of a subsidiary which it elects to treat as a Qualified S Subsidiary. The effect of this is to treat all of the acquired assets, business and liabilities as those of the S Corporation for federal income tax purposes, but presumably still enjoy the benefits of insulating the S Corporation from liabilities to which it does not wish to be subject.

Finally, it is noteworthy that an ESOP which owns stock of an S Corporation can facilitate the purchase of the stock or the assets and business of a target corporation by purchasing additional stock of the S Corporation for cash. The S Corporation can then use the funds to acquire the stock or assets and business of the target corporation.

ESOP acquisition of 100% of the stock of an S Corporation provides substantial tax advantages to the shareholders as well as to the non-shareholder participants in the ESOP. The new tax advantages provided to S Corporations when used in conjunction with an ESOP should provide greater retirement benefits to participants in the ESOP than they would have obtained in the context of a C Corporation. The individual shareholders of an S Corporation should also benefit from the significant tax advantages from ownership of the corporation by an ESOP. These results present a powerful incentive to adopt S Corporation status in conjunction with ESOP ownership.

*For further information on the tax benefits of combining S Corporations with ESOPs, please contact Seyfarth, Shaw, Fairweather, & Geraldson partners, Greg Brown at (312) 269-8940 or e-mail: browngr@seyfarth.com or Robert Paley at (312) 269-8836 or e-mail: paleyro@seyfarth.com.*

A73


# S CORPORATION ESOPs
## New ESOPs Incentives in the 1997 Tax Act

by Luis Granados,
Attorney at Law
McDermott, Will & Emery

*"Repeal of the unrelated business tax will put ESOP participants in an even better position than that enjoyed by other S corporation shareholders."*

Congress has now made it practical for Employee Stock Ownership Plans (ESOPs) to become owners of S corporation stock. Combining ESOP tax advantages with the single-tax structure of an S corporation should produce interesting planning opportunities for a number of closely held businesses.

Last year, Congress enacted the Small Business Job Protection Act, which for the first time permitted S corporations to have a qualified plan trust (including an ESOP trust) as a shareholder, effective January 1, 1998. There were technical flaws in the bill, however, which made it nearly impossible for most employers to take advantage of this provision. The Taxpayer Relief Act of 1997, enacted by Congress in July, corrects these flaws. At the same time, it makes advantageous changes in the method of taxation of ESOPs that hold S corporation stock.

The 1997 bill makes the following three changes:

- The prohibited transaction provisions of the Internal Revenue Code and ERISA are amended to permit plans sponsored by S corporations to utilize the sale of employer securities prohibited transaction exemption, that had previously been available only to C corporations. Without this change, most common ESOP stock purchase transactions would have been prohibited for S corporation ESOPs.
- An S corporation ESOP may deny participants the right to demand their distributions in the form of stock, in the same manner as a corporation whose articles or bylaws restrict ownership of its stock to current employees. Without this change, any former employee could have terminated the corporation's sub-chapter S status simply by demanding his distribution in stock and then transferring that stock to an IRA, which is not a permitted holder of S corporation stock.
- The "unrelated business" tax that the 1996 law had imposed on the ESOP's share of the S corporation's earnings is repealed, effective January 1, 1998. This change achieves the single level of tax regime for ESOP participants that other S corporation shareholders enjoy, as discussed further below.

Unfortunately, the new law does not remove the 1996 rules to the effect that S corporation ESOPs are ineligible for special ESOP tax benefits such as tax-free rollover in section 1042 of the Internal Revenue Code, dividend deductions in section 404(k), and increased deduction limits in

A74

# How S Corporation ESOPs Works

An S corporation is a corporation for state law purposes that generally is not required to pay eral corporate income tax. (Many but not all states accord S corporations similar treatment.) Instead, its owners must pay tax on their proportionate share of the S corporation's income. This means that S corporation income is not subject to the two layers of tax applicable to other corporate income: a tax on corporate earnings payable once by the corporation, and a second tax payable by the shareholders when those earnings are distributed as dividends or liquidation proceeds. Instead, S corporation income is only subject to one layer of tax, imposed on the shareholders at the time the corporation earns its income. In many cases, the S corporation will make a distribution to its shareholders in an amount at least sufficient to enable them to pay the tax they owe on their share of the S corporation's income.

To qualify for S corporation status, a corporation has to satisfy a number of rules, such as a limit on its number of shareholders (now increased to 75) and a limit on the types of classes of stock that it can issue. In the past, one of these rules was that only natural persons and certain types of trusts are permitted to be owners of S corporation stock; tax-exempt qualified plan trusts were not included. Effective January 1, 1998, qualified plan trusts, including ESOP trusts, will be eligible to be S corporation shareholders. The trust will count as one shareholder for purposes of the 75 shareholder limitation, regardless of how many participants it represents.

The repeal of the unrelated business tax will put ESOP participants in an even better position than that enjoyed by other S corporation shareholders, because of the taxation deferral aspect of ialified plans. Suppose an S corporation is owned 50% by an ESOP and 50% by an individual, and it has $1 million of earnings for 1998. The individual will owe a tax on his $500,000 share of the corporation's earnings on his 1999 tax return, but the ESOP will owe nothing, because it is a tax exempt entity. Presumably, either the value of the ESOP's stock will be increased to reflect its share of the earnings, or those earnings will be distributed to the ESOP, so that when participants receive their ultimate taxable distributions they will pay their tax on their share of the 1998 earnings. The date of that tax payment could be many years off, however, since participants have the right to roll their ESOP distributions directly into an IRA. Moreover, distributions from the ESOP or IRA in many cases will be made after the individual's retirement, when he or she is in a much lower tax bracket.

Many existing ESOP companies may want to consider electing S corporation status once the new law becomes effective. Particularly for those that are 100% ESOP-owned, or nearly so, electing S corporation status could eliminate most or all corporate income tax payments with few significant adverse effects. Companies that are less than 100% ESOP-owned, or are considering establishing an ESOP, will have to consider the possible tradeoffs for electing S corporation status, including the elimination of the possibility of future section 1042 transactions providing tax deferral for the seller of stock to the ESOP, and some loss of flexibility in their capital structure and ownership composition. It does seem clear, though, that there is no bar to having an ESOP do a large section 1042 transaction and then having its sponsor elect S corporation status in the following year. Thus, C corporation owners who were considering an ESOP section 1042 sale at some point in the future may want to accelerate the timing of their transaction, to be able to take advantage of subchapter S status as soon as possible thereafter.

26

A75

# Considerations in Electing S Corporation Status

The decision whether to elect S corporation status has a number of ramifications that must be discussed thoroughly with your legal and accounting advisors. Here are some key points to consider:

- An S corporation may not have more than 75 shareholders, with the ESOP trust counting as one shareholder. Certain types of persons, such as C corporations, may not be shareholders of an S corporation. If you have too many shareholders, or an impermissible shareholder, you may want to consider a redemption or other transaction to bring you within this rule.

- A shareholder's agreement will almost certainly be desirable, to prevent an individual shareholder from making a transfer to an impermissible shareholder that would terminate your S corporation status.

- An S corporation may have only one class of stock. An exception to this rule is available if the corporation has both voting common and nonvoting common, but there is no exception for the types of convertible preferred stock or super-common stock that are often used in ESOP transactions. If you have such a class outstanding, you may want to re-think whether maintaining it is really necessary, in light of the advantages that could be derived from electing S corporation status.

- There is a general rule stating that if an S corporation becomes a C corporation, it may not re-elect S corporation status for the next five years. However, a special provision in the 1996 law states that any termination of S corporation status that occurred before December 31, 1996 shall not be considered for purposes of this restriction. Thus, if you gave up your S corporation status to do an ESOP transaction prior to December 31, 1996, you are free to re-elect S corporation status in 1998.

- Certain particular tax benefits may be lost upon conversion to S corporation status. For example:

  - For the 10-year period following its conversion to S corporation status, the corporation will be subject to a "built-in gains" tax on the disposition of any asset which it held on the day of its S corporation election. This tax, which is in addition to the tax payable by the shareholders, is imposed on the gain that had accrued in the asset prior to the corporation's conversion to S status. Corporations on the cash method of tax accounting may owe built-in gains tax on the amount of their accounts receivable as of the date of their S corporation election.

  - A "LIFO recapture tax" must be paid by a C corporation on the LIFO method when it converts to S corporation status. Certain fringe benefits for 2% or more shareholders are excludable from their income if they are employed by C corporations, but not if they are employed by S corporations. Net operating losses incurred while a C corporation are suspended during the period of time the corporation is an S corporation (except that such losses may be applied against corporate level LIFO recapture or built-in gains tax. Absent special circumstances, S corporations must operate on a calendar tax year. If you are now on a fiscal year, you may not automatically have a short C corporation year ending December 31, 1997, with your first S corporation year commencing January 1, 1998. Instead, you may have to wait until the beginning of your fiscal year commencing in 1998, and convert to S corporation status at that time. You will have a short S corporation year ending December 31, 1998, and be on a full calendar year thereafter. There is a chance the IRS will grant relief on this point, as it did earlier this year for some similar situations in Notice 97-20, but so far it has not done so.    27

A76

● The inability of an S corporation to use the increased deduction limit under section 404(a)(9) for ESOP contributions used to repay a loan is a drawback, because it limits the amount that may be paid into the ESOP annually to service its debt. There are some ways to work around this restriction, though. For example, the ESOP can be designed as a combination stock bonus plan and money purchase pension plan, and thus be eligible for a 25% of compensation deduction instead of the 15% of compensation deduction that normally applies. (The special ESOP rule for annual additions under section 415(c)(6) remains available for S corporation ESOPs.) Moreover, even though dividends paid to an ESOP are not tax deductible under section 404(k), dividends paid on unallocated shares may still be used to make payments on an ESOP loan, and will not count against the contribution or annual addition limitations. In some cases, depending on the level of accumulated earnings and profits and current earnings, dividends on allocated shares might also be used for loan payments. The fact that the dividends are not deductible will be less of a disadvantage where the company has a large ESOP, since the tax liability of its shareholders will be small in any event.

This article was prepared by Luis Granados of McDermott, Will & Emory's ESOP Practice Group. Members of the group include: Boston: Andrew C. Liazos, Stephen C. Plosza - Chicago: Paul J. Compernolle, Alan J. Hawksley, Jared Kaplan, William W. Merten, Helen H. Morrison, Susan P. Schaefer - Los Angeles: John E. Curtis, Jr. - Washington: Luis Granados, Paul M. Hamburger, Stephen Pavlick, David E. Rogers, Larry E. Shapiro, Jan C. Stewart.

### Biography of Luis Granados
Luis Granados is a partner with the law firm of McDermott, Will & Emery, a firm with one of the largest ESOP and employee benefits practices in the country. As an ESOP specialist for over 15 .ars, Mr. Granados provides legal advisory services for a wide range of plan design and transactional issues associated with business planning, corporate finance and employee benefits. A former Executive Director of the ESOP Association, Mr. Granados has also been actively involved with legislative and regulatory reforms involving ESOPs, including the development of the new Subchapter-S provisions of the 1997 Tax Act.

For more information contact Luis Granados at email lgranados@mwe.com.

Return to Top of Page

Back to Table of Contents

| Leading Companies | Equity Solutions | Resource Library |
|---|---|---|
| Home | About the F.E.D. | Join Our Mailing List |

©1997 Foundation for Enterprise Development and the authors and their entities. All rights reserved.

A77

# ESOPs for S Corporations

David Ackerman
McBride Baker & Coles
Chicago, Illinois

The ESOP Association
The 1998 Two Day ESOP Conference
November 5 & 6
Las Vegas, Nevada

29

A78

# ESOPs for S Corporations

Effective January 1, 1998, corporations which sponsor employee stock ownership plans ("ESOPs") became eligible for the first time to make the election to be treated as an "S corporation" for federal income tax purposes. An S corporation is not subject to federal income tax. Instead, the shareholders of the corporation are subject to tax on the corporation's income, whether it is distributed to them as dividends or retained in the corporation. An important tax advantage of this treatment is that only one tax is imposed on the earnings of an S corporation. Regular or "C corporations" are subject to a "double tax" -- once at the corporate level and again at the shareholder level when the after-tax corporate earnings are distributed to the shareholders. Until now, a trust forming a part of an employee benefit plan was not an eligible shareholder for an S corporation. This rule was changed by the Small Business Job Protection Act of 1996 (the "1996 Act").

Because so many closely-held corporations have made the S election, the removal of the restriction on employee benefit trusts as permitted shareholders of an S corporation was an important development. However, the 1996 Act contained a number of additional provisions which substantially diminished the attractiveness of an ESOP for an S corporation. Some of ese limitations were removed by the Taxpayer Relief Act of 1997 (the "1997 Act").

The purpose of this paper is to summarize the new rules relating to S corporation ESOPs, as set forth both in the 1996 Act and in the 1997 Act, and to provide a brief analysis of situations where either an ESOP may be appropriate for an S corporation or where an existing ESOP company might benefit from making the S election. To provide context for this discussion, a brief summary of how S corporations are taxed and the benefits of the S election is presented at the conclusion of this paper.

## THE NEW TAX LAWS

### Authorization of S Corporation ESOPs

The 1996 Act eliminated the prohibition on ownership of S corporation stock by employee benefit plan trusts. In addition, the 1996 Act provided that this kind of trust would be treated as a single shareholder, rather than providing that each participant in the plan would be treated as a shareholder. This is of critical importance because of the 75-shareholder limit for S corporations. These new rules become effective in tax years beginning after December 31, 1997.

30

## Repeal of Unrelated Business Income Tax

C. .gress included in the 1996 Act a provision that shares of an S corporation held by an employee benefit trust would be treated as an interest in an "unrelated trade or business", with the result that the trust's share of the S corporation's income would be taken into account in computing the trust's unrelated business income tax ("UBIT"). This raised a number of difficult issues. For example, consideration had to be given to how the trust would pay its tax. Presumably, the plan sponsor would provide the funds necessary to pay the taxes. This raised the question whether the funding of the taxes, whether by direct payment or by means of contributions to the plan, would constitute "contributions" subject to the tax-deduction limitation and to the limits on annual additions to participants' accounts. Additionally, the prudence of the acquisition of stock of an S corporation might be subject to challenge because the plan could acquire virtually any other investment assets without incurring tax on the income generated by those assets. These issues have been eliminated by the 1997 Act, which has repealed the application of the unrelated business income tax to ESOPs that hold stock of an S corporation.

## New Distribution Rules

Generally, participants in an ESOP are entitled to demand that their benefits be distributed to them in the form of stock of the sponsoring employer. This raises the possibility of an involuntary termination of an S election made by an ESOP company. This could arise in either two ways. First, a participant might request that the shares of employer stock allocated to his or her account be rolled over to an individual retirement arrangement (an "IRA"). An IRA is not eligible to own shares of an S corporation. Second, over time, if enough participants in the plan elect to take their benefits in the form of employer shares, the 75-shareholder limit might be exceeded. These problems have been resolved by the 1997 Act, which permits an S corporation which sponsors an ESOP to require the participants in the plan to take their benefits in the form of cash.

## Denial of Special ESOP Tax Incentives

The 1996 Act included three provisions which substantially diminish the advantages of an ESOP for an S corporation: (1) an individual shareholder of an S corporation will not qualify for the tax deferral upon the sale of his or her stock to an ESOP that is available to individual shareholders of a C corporation; (2) the increased limits for tax deductions for contributions to a leveraged ESOP, when used to pay principal and interest on an exempt loan to the plan, are not available for S corporations; and (3) S corporations are not entitled to deduct cash dividends paid on stock held by a leveraged ESOP that are used to pay principal or interest on the loan used to acquire the stock or that are passed through to the participants in the plan. Although there were proposals to repeal these provisions as part of the 1997 Act, and thereby extend to S corporation ESOPs all of the tax incentives provided for C corporation ESOPs, these proposals

195908-1

31

A80

were not included in the final legislation. Thus, although S corporations now are eligible to sponsor ESOPs, they are subject to important limitations with respect to the use of their ESOPs t   do not apply to C corporations.

## PLANNING OPPORTUNITIES UNDER THE NEW LAW

### Income Tax Deferral

The repeal of the UBIT provisions of the 1996 Act opens up possibilities for significant tax savings for ESOP companies. This can be illustrated most dramatically by considering a corporation all of the stock of which is owned by an ESOP. If that corporation makes the S election, there will be no current tax on its annual income. The corporation will not be subject to tax under the general S corporation rules and, although the income will be passed through to its sole shareholder (the ESOP), no shareholder-level tax will be imposed because the ESOP is a tax-exempt entity. In effect, the income tax will be deferred until the participants in the ESOP receive their benefits (and they may further defer their tax liability by rolling their benefits over into IRAs).

Where an ESOP company has shareholders in addition to the ESOP, tax savings still will be available by making the S election, but the S election may have a negative impact on the corporation's cash flow. This is because, in most cases, S corporation shareholders must   hdraw sufficient funds to cover payment of their taxes on the corporation's income. If tax distributions are required to be made to the shareholders other than the ESOP, an equivalent distribution also will have to be made to the ESOP, even though it will incur no tax liability, because otherwise the economic rights associated with the ESOP's shares will be different from those associated with the other shares. This, of course, would violate the one-class-of-stock rule for S corporations and result in termination of the S election. The potentially adverse impact of the S election on an ESOP company's cash flow can be illustrated by the following example:

> EXAMPLE: Assume that an S corporation sponsors an ESOP that owns 30 percent of its outstanding shares and that its taxable income for 1998 is $1 million. There will be allocated to the shareholders other than the ESOP $700,000 of the corporation's income, upon which they will incur a tax liability of approximately $280,000. If the corporation distributes this amount to the other shareholders, it will be required to distribute an equivalent amount to the ESOP, or $120,000. After the distributions, the S corporation will have retained earnings of $600,000. If the corporation was a C corporation, the total tax liability would be $340,000, and the corporation would be able to retain $660,000 after taxes (assuming no dividends are declared), or $60,000 more than in the S corporation case.

This example illustrates that the S election may be disadvantageous for a rapidly-growing ESOP  mpany that needs to retain earnings to fund future expansion. On the other hand, the S

195908-1

32

A81

election still might be advantageous under various circumstances. For example, the S election would be advantageous where the corporation could declare dividends in an amount in excess of the shareholders' tax liability because it did not need to retain most of its earnings. The S election also would be advantageous if the cash distributed to the ESOP could be used to fund other corporate obligations. This might be the case where the cash distributed to the ESOP could be used to pay down an ESOP loan (and thereby reduce the amount of required company contributions to the plan) or to fund the corporation's share repurchase liability or where the corporation could sell more shares to the ESOP and then use the sale proceeds to provide funds for other business needs.

Another situation where the S election would be advantageous would be where the individual shareholders are willing to pay the tax on their share of the corporation's income out of their own personal funds. This might be feasible in a situation where the ESOP owns most, but not all, of the outstanding shares. If the individual shareholders have substantial personal wealth in addition to their company stock, or if they are employed by the corporation and their compensation can be increased to cover the taxes, it may be possible for the corporation to avoid the payment of dividends.

## Should ESOP Companies Make the S Election?

The question whether existing ESOP companies should make the S election can only be determined on a case-by-case basis, depending on each company's particular facts and circumstances. For companies where the ESOP owns all or substantially all of the outstanding shares, the opportunity for the tax deferral described above will be very appealing. For other ESOP companies, where the individual shareholders likely will require distributions to cover the taxes on their share of the corporation's income if the S election is made, the question whether the S election will be advantageous will depend largely on how the distributions to the ESOP will be used. The practical requirement to make distributions sufficient to cover the tax liabilities of the other shareholders may limit the appeal of the S election for some ESOP companies, particularly those where the ESOP holds a minority interest in the company.

The failure of Congress to extend to S corporations the same ESOP tax incentives that are available to C corporations also will limit the number of ESOP companies that make the S election. Most importantly, where individual shareholders of an ESOP company are planning to arrange tax-deferred sales of some or all of their shares to the ESOP in the future, the S election will be unattractive. However, it may be possible for a shareholder who desires to arrange for a tax-deferred sale to an ESOP to obtain the best of both worlds by arranging for the sale to close in a year when the plan sponsor is a C corporation and for the S election to made effective for a later year. However, a problem will remain for business owners who desire to arrange for two or three-stage ESOP buy-outs. If an S election is made after the first ESOP sale, subsequent sales of stock to the ESOP will not qualify for the tax deferral, unless the S election is first terminated. Once an S election is terminated, it cannot be reinstated for five years.

195908-1

A82

The attractiveness of the S election for an ESOP company also may be reduced by the fact that the limit on the amount that can be contributed to a leveraged ESOP by an S corporation is lower than the amount that can be contributed by a C corporation. This problem can be alleviated by combining an S corporation ESOP with a money purchase pension plan and taking advantage of the increased contribution limit available for this type of combination of plans.

Finally, the fact that dividends paid on stock held by an S corporation ESOP are not deductible will be disadvantageous where it is necessary to pay dividends on the ESOP stock in order to make ESOP loan payments. However, this will be less of a disadvantage where most of the stock of the corporation is owned by the ESOP, since the ESOP will not be subject to tax on the dividends that it receives and the tax liability of the remaining shareholders will be relatively small.

### Should S Corporations Adopt ESOPs?

Until now, shareholders of S corporations who desired to implement ESOPs were forced to choose between the benefits of an ESOP and the benefits of the S election. This choice often has turned on the shareholders' plans for business succession. Where a sale of the business has been contemplated, the avoidance of a double tax often has made the S election more attractive than an ESOP. On the other hand, where shareholders are seeking to transfer ownership to family members or to existing management groups, the opportunity to arrange for a tax-deferred e to an ESOP, and to finance the transaction on tax-advantaged basis, often has outweighed the benefits of the S election.

In most cases the same analysis will continue to apply for S corporation shareholders contemplating an ESOP. However, now there will be some situations where the S election can be maintained and an ESOP can be adopted. Most notably, this will be the case where a tax-deferred sale to an ESOP is not a critical component of the new plan. This would be the case where the ESOP is being established to serve primarily as an employee benefit plan and not as a means of providing liquidity for current shareholders.

In some cases, shareholders of S corporations have built up significant tax bases in the shares of their S corporations, and sales of their shares to an ESOP might be attractive even without the opportunity for a deferral of the capital gains tax. An S corporation shareholder's basis in his or her shares is increased by his or her share of the corporation's income and is reduced by distributions. To the extent that an S corporation has retained earnings, the shareholders will have increased tax bases in their shares. Where an S corporation shareholder has a high basis in his or her shares, the shares can be sold at a reduced capital gain. The less the amount of the gain, the less important the tax-deferral election becomes.

195908-1

34

## THE S CORPORATION ELECTION

### Taxation of S Corporations and Their Shareholders

The primary effect of the S election is that all items of an S corporation's income and loss are passed through to the corporation's shareholders. There is allocated to each shareholder his or her proportionate share of each item of corporate income, deduction, loss, and credit. The S corporation itself generally will not be subject to federal income tax. However, three exceptions to this general rule may apply to corporations that convert from C corporation status to S corporation status. First, the corporation may be subject to tax on its "built-in" gains existing at the time of the conversion. Second, upon the conversion, a corporation which uses the LIFO inventory method must include in income, over a four-year period, the excess of the value of its inventory determined on a FIFO basis over its value determined on a LIFO basis. Third, a corporation that makes the S election may be subject to tax on "excess net passive income".

A shareholder's basis in his or her stock of an S corporation is increased by his or her share of the corporate income and is decreased by distributions received by the shareholder from the corporation and by his or her share of the corporation's items of loss and deduction. A shareholder's basis in stock of an S corporation may not be reduced below zero. Distributions from S corporations to their shareholders generally are tax-free to the extent of the shareholders' bases in their stock. A shareholder will be subject to tax on any distribution to the extent that it exceeds his or her stock basis.

### Eligibility to Make S Election

Speaking generally, the following requirements must be met by a corporation in order for it to be eligible to make the S election:

(1)     The corporation may not have more than 75 shareholders.

(2)     All shareholders must be U.S. citizens or U.S. residents, and they must be natural persons, estates, or certain types of trusts (including, effective as of January 1, 1998, employee benefit trusts).

(3)     The corporation may have only one class of stock outstanding. However, different voting rights are permitted for different shares of stock.

In addition, the following types of corporations are ineligible to make the S election: financial institutions which use the reserve method of accounting for bad debts; insurance companies; certain so-called "possession corporations" (corporations which derive most of their income from sources within a possession of the United States); and domestic international sales corporations (DISCs).

195908-1

A84

T    Advantages of S Corporation Election

1. *Avoidance of Double Tax.*  An important tax advantage of the S election is that only one tax is imposed on the earnings of an S̃ corporation.  C corporations are subject to a "double tax" -- once at the corporate level and again at the shareholder level when the after-tax corporate earnings are distributed to the shareholders.  Many closely-held C corporations have been able to avoid the double tax by distributing earnings to their shareholders in the form of tax-deductible compensation.  However, this is not a complete answer to the double-tax problem for corporations whose earnings exceed the amount that can be deemed to be "reasonable" compensation or for corporations that have shareholders that are not actively involved in the conduct of their business operations.  No deductions will be allowed to a corporation for salaries or bonuses paid to shareholder-employees that are in excess of a reasonable amount, with the result that the excessive "compensation" will be treated as a nondeductible dividend for federal income tax purposes.

2. *Tax Savings on Sale or Liquidation of a Business.*  Shareholders of a C corporation are subject to a double tax upon a sale of their corporation's assets or a liquidation of their corporation.  First, the corporation will pay a tax on the difference between the sale or liquidation proceeds and its basis in its assets, and then the shareholders will pay an additional tax on the distribution of the after-tax proceeds.  The effect may be illustrated by the following example:

> EXAMPLE:  Assume that a liquidating corporation sells its assets in 1998 at a gain of $1,000,000 and that the shareholders' aggregate bases for their stock equals the corporation's basis for its assets.  A 34-percent corporate tax will be imposed upon the gain, leaving the corporation with after-tax profits of $660,000.  Upon the distribution of the proceeds to the shareholders, an additional tax in the amount of $132,000 will be imposed (20 percent of $660,000), leaving the shareholders with after-tax proceeds of $528,000.

If the corporation in the above example was an S corporation, only one tax would be imposed.  The tax would be imposed upon the shareholders at a maximum rate of 20 percent, with the result that the total tax would be $200,000, as compared to $472,000, and the after-tax profit available to the shareholders would be $800,000, as compared to $528,000.  The comparison in tax results may be summarized as follows:

195908-1

36

A85

**Tax on Sale of Appreciated Property and Liquidation  ($1 Million Taxable Gain)**

C Corporation

| | | |
|---|---|---|
| Corporate Gain | $1,000,000 | |
| Corporate Tax | -  340,000 | |
| After-Tax Corporate Profit | 660,000 | |
| Tax on Distribution Less Basis (20% x $660,000) | -  132,000 | |
| After-Tax Profit | $528,000 | |
| Effective Tax Rate [($1,000,000 – $528,000)/$1,000,000] | = | 47.2% |

S Corporation

| | | |
|---|---|---|
| Corporate Gain | $1,000,000 | |
| Corporate Tax | -        0 | |
| After-Tax Corporate Profit | 1,000,000 | |
| Tax on Distribution Less Basis (20% x $1,000,000) | -  200,000 | |
| After-Tax Profit | $800,000 | |
| Effective Tax Rate [($1,000,000 – $800,000)/$1,000,000] | = | 20.0% |

To limit the benefits that can be obtained by converting a C corporation to an S corporation, Congress has enacted a corporate-level tax on S corporations that formerly were C corporations. This tax is imposed on any gain that arose prior to the effective date of the S election ("built-in" gain) and that is recognized by the S corporation within ten years after the conversion by reason of a sale or distribution of its assets.

3. *Pass-Through of Losses*.  Just as the earnings of an S corporation are "passed through" and taxed to its shareholders, so generally are its losses.  The shareholders may apply these losses to reduce their income from other sources.  Losses of a C corporation may be used only to offset prior or future corporate income.

4. *Other Benefits*.  Other benefits of the S election include the following:  avoidance of the corporate alternative minimum tax; elimination of the risks of a challenge by the IRS to the amount of compensation paid to shareholders; avoidance of the accumulated earnings tax; and the availability of the cash method of accounting.

**Disadvantages of S Corporation Election**

1. *Shareholder Limitations*.  An S corporation may have no more than 75 shareholders. This may require a corporation to closely monitor and control the distribution of its stock.  In addition, some investors may be frustrated by the limitations on the kinds of trusts that may hold stock of an S corporation.

195908-1

A86

2. *One-Class-of-Stock Limitation.*  The one-class-of-stock limitation restricts planning options for the capital structure of an S corporation.  For example, no preferred stock can be i    ed by an S corporation to outside investors.

3. *Prohibition of Loans from Tax-Qualified Plans.*  Officers and employees of S corporations who own more than five percent of the corporation's stock are prohibited from borrowing money from tax-qualified retirement plans sponsored by their corporations.

4. *Limitation on Other Benefits.*  Persons who own two percent or more of the outstanding shares of an S corporation may not exclude from their income the value of fringe benefits that are provided to them.  Examples of these types of benefits include group term life insurance, certain health and accident plans, death benefits, and meals and lodging reimbursement.

## CONCLUSION

It is still too early to generalize regarding the likely impact of the new laws regarding S corporation ESOPs.  The new laws just went into effect on January 1, 1998.  While the new ESOP provisions make significant progress toward attainment of the goal of enabling S corporations to sponsor ESOPs, the most significant ESOP tax incentives available to C corporations remain unavailable to S corporation.  The question whether ESOP companies should make the S election, or whether S corporations should adopt ESOPs, must be analyzed on a case-by-case basis.  The answer will depend upon the facts and circumstances affecting each particular company and its owners.

195908-1

A87

## S-CORPORATIONS AND ESOPS

Effective January 1, 1998, an S-corporation may establish and maintain an ESOP and a corporation that maintains an ESOP may make an S-election. A detailed discussion of S-corporations is beyond the scope of this Booklet. Stated simply, however, an S-corporation is a corporation that has elected to be taxed as a partnership. The main economic advantage of an S-corporation is the elimination of double taxation to the S-corporation's stockholders. The S-corporation does not pay corporate income tax at the corporate level, but the individual stockholders pay income tax on their proportionate share of the S-corporation's income. Since an ESOP is a tax-exempt entity, there is no tax on its proportionate share of the income, except to the extent that all or a portion of that income is distributed to the ESOP, in which case, the tax on the amount distributed is deferred until benefits are distributed to ESOP participants.

Certain ESOP tax-advantages that are generally available to C-corporations (i.e., corporations that have not elected S-corporation status), are not available to S-corporations:

(1) Gain realized on the sale of S-corporation stock to an ESOP is not eligible for the Section 1042 tax deferral described in the "Nonrecognition of Gain on Sale of Employer Securities to an ESOP" section of this Booklet.

(2) Dividends received by an ESOP on shares of an S-corporation held by the ESOP are not deductible to the corporation. However, the income represented by the dividends is not taxed at the corporate level. The ESOP may use the dividends received on the S-corporation stock to repay an ESOP loan which was used to acquire the stock on which the dividends are paid or to acquire more stock.

(3) The expanded 25% of payroll deduction available for leveraged ESOPs is not available with respect to an ESOP maintained by an S-corporation. The S-corporation may, however, obtain a 25% of payroll deduction by establishing an ESOP that is a combination stock bonus-money purchase plan. This would require a mandatory annual contribution equal to 10% of payroll and a discretionary annual contribution of up to 15% of payroll.

There are numerous requirements a corporation must satisfy in order to be eligible to make an S-corporation election. Three of these requirements are particularly relevant to corporations that sponsor ESOPs. First, the corporation may not have more than 75 shareholders (the ESOP is considered a single shareholder); second, the corporation may have only one class of stock; and third, the corporation's shareholders must generally be individuals (although ESOPs and certain other estates and trusts are also permitted to be shareholders of S-corporations). It should be noted that an ESOP maintained by an S-corporation is not required to give participants the right to receive benefits in the form of employer securities.

There are numerous factors that will influence whether a particular corporation should remain an S-corporation when it establishes an ESOP or make an S-corporation election if it already maintains an ESOP. For example, the amount of built-in gains the corporation would have, the possibility of a LIFO recapture, the inability to carry over net operating losses from a year when a corporation was a C-corporation to years when the corporation is an S-corporation and the percentage of the corporation owned by the ESOP.

In summary, the maintenance of an ESOP no longer automatically eliminates an S-election as one of the tax planning tools available to a corporation. Whether an S-election is appropriate

39

for a particular corporation, however, depends upon the facts and circumstances of that particular situation and can be determined only after a detailed analysis.

## VOTING ESOP SHARES AND TENDER OFFERS

One of the most frequently asked questions concerning ESOPs is, "Who votes the shares held by the ESOP?" This is particularly important for a private company since the shares in the ESOP frequently control the election of a majority of the members of the Board of Directors.

### VOTING ALLOCATED SHARES

The law requires that participants in private company ESOPs be allowed to direct the manner in which the employer securities allocated to their individual accounts are voted only with respect to certain matters. Those matters are the approval or disapproval of a corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution or a sale of substantially all of the company's assets. The ESOP rules do not create a voting right; rather, they just govern who exercises the right if it exists. Therefore, even with respect to the enumerated matters, the ESOP participants are entitled to vote only if the applicable corporate law requires a shareholder vote. Of course, it is permissible to design the ESOP so as to give the participants a more expansive right to vote the shares with respect to other matters.

On matters that are not subject to the mandatory voting pass-through described above, such as the election of directors, the right to vote allocated shares does not have to be passed through to participants. If the right to vote is not passed through to participants, the right to vote is retained by a plan fiduciary. The ESOP document can entrust this right to vote to the ESOP trustee in its discretion, or it can establish a committee (often comprised of members of management) to direct the trustee how to vote the shares.

For public company ESOPs, participants must be allowed to direct the manner in which the employer securities allocated to their individual accounts are voted on all matters requiring a shareholder vote.

### VOTING UNALLOCATED SHARES

The responsibility for voting with respect to unallocated shares held in an ESOP suspense account must rest with an ESOP fiduciary. The ESOP generally assigns the responsibility for unallocated shares in accordance with one of the following three methods:

* The ESOP trustee is given the right to vote shares in its discretion;

* A committee (often comprised of management employees) is established to vote the shares; or

* The ESOP is designed to permit the ESOP participants to direct the trustee with respect to the vote of the shares.

### TENDER OFFERS

Unlike the right to vote shares, neither the IRC nor ERISA specifically addresses who gets to respond to a tender offer. However, as a general principle, the right to determine whether to sell or retain ESOP assets resides with the ESOP fiduciary. The practice that has developed is that with respect to private companies, the right to respond to a tender offer is retained by the ESOP Trustee or ESOP Committee, and with respect to public companies, the right is passed through to the ESOP participants.

A89

inside
November 1998



The Voice of The ESOP Association

## Association Surprised By S Corp. Survey

Even though a survey shows about half of 90-percent or more employee-owned companies have converted from C Corporation status to S Corporation status in 1998, the number is lower than anticipated.

According to a survey by The ESOP Association, fifty-one percent of the 100-percent or near-100 percent ESOP companies surveyed said they had converted from C to S status since Jan. 1, 1998, when the S Corp. ESOP law took effect.

The ESOP Association mailed 124 surveys in September to member companies that were more than 90-percent employee owned. Seventy-six surveys were returned to the association, for a response rate of 61 percent. Thirty-

nine respondents replied that they had made the conversion, or 51 percent of respondents.

J. Michael Keeling, president of The ESOP Association, said even though a majority of respondents said they made the switch, he expected the number to be higher.

"Despite the impression I get when traveling around the country that nearly every 100-percent employee-owned company converted from C to S Corp. status, our data shows that a significant number of companies have not made the switch," Keeling said. "I would have predicted the number that converted would have been higher, around 80 percent."

Keeling said the number of companies that switch from C to S

*(Please see SURVEY, page 6)*

### The ESOP Association S Corp. Survey

**51%** (39) **Yes**, since Jan. 1, 1998, our company converted from C Corp. status to S Corp status.

**49%** (37) **No**, we have not converted from C Corp status to S Corp status.

*Mailed to 90 percent or more employee-owned member companies. Response rate: 61 percent.*

A90

(SURVEY, from page 1)
status may increase in the coming months, because the opportunity for the change only took effect last January.

"The general consensus is that if you are 100-percent employee owned, you convert from C to S status for the tax advantages," Keeling said.

Respondents to the surveys gave varying reasons why they had not converted:

- "our deferred taxes would have to be paid upon conversion, wiping out the other advantages"
- "tax benefits would not warrant a change right now"
- "we traditionally set annual bonuses to reduce our tax liability"
- "we have a very small taxable income"

The law that allowed S Corporations to sponsor ESOPs, the Taxpayer Relief Act of 1997, was passed by Congress on July 31 of that year. The President signed the act into law on Aug. 5, 1997. The law took effect on Jan. 1, 1998.●

42

A91

ESOP UPDATE

## AMSTED CONSIDERS CHANGE IN CORPORATE STRUCTURE TO GAIN TAX SAVINGS

Under the Taxpayers Relief Act of 1997, AMSTED has the opportunity to change its corporate tax status.

By electing to become an S corporation under the IRS code, AMSTED can eliminate federal and most state income taxes, although foreign income taxes would still be paid. Currently AMSTED pays federal income taxes at a rate of 35 percent on its U.S. income.

The elimination of federal and most state income taxes is possible because corporate income of S corporations is taxed at the shareholder level, and the major shareholder of AMSTED, the ESOP, is a tax-exempt organization.

As is currently the case, when ESOP participants receive the value of their shares after retirement or termination they will be subject to the same tax rules as in the past.

AMSTED's future net income would increase after adoption of S corporation status because of the elimination of federal income taxes. According to leading ESOP valuation experts, the immediate impact on AMSTED's share value would be negligible at the time of adoption. However, as the tax savings are realized, the share price should be favorably impacted.

Of course, the other factors affecting share price such as operating performance, the outlook for the company's products, the general stock market conditions and the performance of companies with businesses comparable to AMSTED will continue to be the more dominant factors in the company's valuation.

In order to elect S corporation status, the company must obtain the approval of the ESOP Trustee and meet other requirements. The timing of the change is expected to be October 1, 1998. Additional information will be provided to ESOP participants as it develops.

43

A92