IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

In re:

NATIONAL FORGE COMPANY, et al.,

                 Debtor.
--------------------------------------------------------------
OFFICIAL COMMITTEE OF UNSECURED           Civil No. 04-21 Erie
CREDITORS OF NATIONAL FORGE
COMPANY,

                 Plaintiff,

and

OFFICIAL COMMITTEE OF RETIREES
OF NATIONAL FORGE COMPANY,

                 Intervenors,

v.

E. ROGER CLARK, both Individually and as
an Officer and Director of National Forge
Company, et al.,

                 Defendants.
_____

*Opening Brief of Defendants E. Roger Clark, Maurice J. Cashman, Dana Beyeler and Robert A. Kaemmerer in Support of their Motion for Entry of an Order Granting Summary Judgment*

                                      Douglas A. Campbell
                                      PA I.D. No. 23143
                                      Erik Sobkiewicz
                                      PA I.D. No. 56836
                                      CAMPBELL & LEVINE, LLC
                                      1700 Grant Building
                                      Pittsburgh, PA  15219
                                      Telephone:  (412) 261-0310

                                      Counsel for Defendants E. Roger
                                      Clark, Maurice J. Cashman, Dana
                                      Beyeler and Robert A. Kaemmerer

TABLE OF CONTENTS

PAGE

Table of Authorities ...................................................................................................................ii

Introductory Statement............................................................................................................... 1

Statement of Facts...................................................................................................................... 1

Standard for Summary Judgment............................................................................................... 6

Argument ................................................................................................................................... 6

As a Matter of Law, Bankruptcy Code § 546(e)
Bars the Plaintiffs' Fraudulent Transfer
Claims Against the Moving Defendants .................................................................................... 6

    A.    The Payments Made to the Moving Defendants Are Protected
          "Settlement Payments" under Bankruptcy Code § 101(51A)............................ 7

    B.    The Settlement Payments Were Made by or to a Financial Institution ............... 9

As to the Remaining Counts of the Complaint,
the Plaintiffs Fail to State a Claim ........................................................................................... 12

Conclusion ............................................................................................................................... 14

TABLE OF AUTHORITIES

PAGE

Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)...............................................................6

In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,
878 F.2d 742 (3d Cir. 1989).........................................................................................................8

Big Apple BMW, Inc. v. BMW of North America, Inc.,
974 F.2d 1358 (3d Cir. 1992) ......................................................................................................6

CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69 (1987) ...............................................13

First National City Bank v. Banco Para El Comercio,
462 U.S. 611 (1983)...................................................................................................................13

In re Hechinger Inv. Co. of Del., 274 B.R. 71 (Bankr. D. Del. 2002).......................................11

Kaiser Steel Corp. v. Charles Schwab & Co.,
913 F.2d 846 (10th Cir. 1990) ............................................................................................7, 8, 9

Kaiser Steel Corp. v. Pearl Brewing Co.,
952 F.2d 1230 (10th Cir. 1991) ...............................................................................................8, 9

Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941)................................13

In re Loranger Mfg. Corp., 324 B.R. 575 (Bankr. W.D. Pa. 2005) ..........................................10

In re Resorts Int'l, Inc.,
181 F.3d 505 (3d Cir.), cert. denied, 528 U.S. 1021 (1999) ............................................7, 8, 10

Saldana v. Kmart Corp., 260 F.3d 228 (3d Cir. 2001)................................................................6

Sameric Corp. of Delaware, Inc. v. City of Philadelphia,
142 F.3d 582 (3d Cir. 1998) ........................................................................................................6

In re VF Brands, Inc., 282 B.R. 134 (Bankr. D. Del. 2002) .....................................................10

Statutes

11 U.S.C. § 546(e) ...............................................................................................................passim

11 U.S.C. § 550............................................................................................................... 10, 11

11 U.S.C. § 101(51A) ..................................................................................................... 7, 8,

11 U.S.C. § 101 (49)(A) ....................................................................................................... 7

11 U.S.C. § 101 (22) ...................................................................................................... 9, 10

13 Pa.C.S.A. § 4215(a) ....................................................................................................... 11

15 Pa.C.S.A. § 1551(b)(1) ............................................................................................. 12, 13

15 Pa.C.S.A. § 1551(b)(2) ............................................................................................. 12, 13

15 Pa.C.S.A. § 1553(a) ................................................................................................. 12, 13

15 Pa.C.S.A. § 4145(a) ....................................................................................................... 13

## Other Authorities

5 Lawrence P. King, et al., eds., COLLIER ON BANKRUPTCY
¶ 550.01[1], at 550-53 (15th ed. 2003) ............................................................................ 8, 10

http:www.federalreserve.gov/releases/lbr/ ........................................................................... 9

INTRODUCTORY STATEMENT

Bankruptcy Code § 546(e) is an absolute bar to Counts I, II, III and VI of the Complaint. As for Counts IV and V, they are premised on a statute that has no application here. Accordingly, Defendants E. Roger Clark, Maurice J. Cashman, Dana Beyeler and Robert A. Kaemmerer (collectively, the "Moving Defendants") are entitled to summary judgment on all counts.

STATEMENT OF FACTS

In their Complaint, the Plaintiffs[1] describe a transaction that did not occur. The actual facts of how National Forge Company Holdings, Inc. (*not* National Forge Company) came to redeem its Class B shares are set forth below.

As of April 12, 1999 (that is, the date preceding the date on which the transactions at issue here closed), National Forge Company Holdings, Inc. ("Holdings"), a corporation organized under the laws of Delaware, owned all of the stock of National Forge Company ("NFC"), itself a corporation organized under the laws of Pennsylvania. [Ex. A, Cashman Decl. ¶2; A2.][2] Holdings as of that date had two classes of common stock: Class A, the issued shares of which were held exclusively by the National Forge Company Holdings, Inc. Employee Stock Ownership Plan (the "ESOP"), and Class B, the issued shares of which were held almost

---

[1] By Order dated June 8, 2005 [Document No. 19], the Court permitted the Official Committee of Retirees of National Forge Company to intervene in this action as a party plaintiff. In light of that Order, the Moving Defendants will refer to that Committee and the Official Committee of Unsecured Creditors of National Forge Company jointly as the "Plaintiffs."

[2] "A" followed by a number (or numbers) refers to the page numbers in the Appendix filed by the Moving Defendants with this Opening Brief.

exclusively by the individuals named as defendants in this action. [Ex. A. Cashman Decl. ¶2, A2.][3] [4]

Until 1997, qualified retirement plan trusts like the ESOP were not permitted to be shareholders in corporations that elected to be taxed under Subchapter S of the Internal Revenue Code of 1986 (the "IRC").[5] However, the Small Business Job Protection Act of 1996 and the Taxpayer Relief Act of 1997 amended the IRC by repealing that restriction. As a result of this change and because qualified retirement plan trusts were generally exempt from federal income tax, a corporation that was wholly owned by an employee stock ownership plan could avoid federal income tax by electing to be taxed under Subchapter S because all of the corporation's income would pass through to a tax-exempt shareholder.

The prospect of Holdings having no income tax liability understandably gained the attention of Holdings' board of directors, and on December 22, 1998, after receiving advice from Holdings' outside counsel, its accounting firm and its valuation expert as to the benefits of electing Subchapter S status, Holdings' full board unanimously approved Holdings making that

---

[3] Although the Plaintiffs allege that "NFC is a wholly owned subsidiary of NFC Holdings," Complaint ¶42, they go on to assert that "[t]he ownership of NFC was comprised of two classes of equity: Class A Common Stock owned by NFC Holdings Employees Stock Ownership Plan ("ESOP") Trust; and Class B Common Stock owned by officers and management employees of NFC." Complaint ¶44. Clearly, these paragraphs are inconsistent: if NFC was wholly owned by Holdings (and it was), NFC has only one shareholder, and that was Holdings. Holdings, in turn, had Class A and Class B shareholders. That the Plaintiffs misunderstood Holdings' corporate structure is surprising given that the Disclosure Statement which accompanied NFC's and National Forge Components, Inc.'s Amended Joint Plan of Liquidation dated November 27, 2002, not only described Holdings' corporate structure (including how Holdings was owned), but also noted that "[i]n May of 1999, Holdings completed a recapitalization that resulted in the consolidation of all of its equity into a single class of stock, with the [ESOP] becoming the sole shareholder of Holdings' outstanding shares. [Ex. B, NFC's and National Forge Components, Inc.'s Disclosure Statement in Support of Amended Plan of Liquidation dated November 27, 2002, A43.]

[4] The Complaint alleges in paragraph ¶53 that "[o]n June 29, *1999*, NFC Holdings issued 145,000 shares of Class B Stock to certain officers and employees of the Company for approximately $1,601,000. Holdings issued those shares in *1995*, not 1999.

[5] Subchapter S generally provides that, for federal income tax purposes, a corporation that has elected Subchapter S tax treatment does not pay federal or state income tax; rather, a Subchapter S's income "passes through" to its shareholders on a pro rata basis, and each shareholder pays state income tax with respect to his or her pro-rated share of the corporation's income.

2

election. [Ex. C, Presentation to Holdings' Board of Directors, A47-92; Ex. D, December 22, 1998 Resolution of Holdings' Board of Directors, A93-98.][6] However, because a corporation that elects Subchapter S status could have only one class of stock, Holdings could not eliminate its income tax liability until it eliminated the Class B shares (that is, the non-ESOP held shares). Given that employee stock ownership plans generally did not pay taxes, it made no sense to eliminate the Class A shares because those were held by the ESOP. Thus, the resolution that authorized Holdings to elect Subchapter S status also authorized it to eliminate the outstanding Class B shares by redeeming those shares at a price per share of $49.42. Holdings' board further directed that, in the event a Class B shareholder did not agree to the terms of the redemption, management was to take the steps necessary to merge Holdings into a new entity so that the outstanding Class B shares could be replaced with shares in the successor entity. [Ex. D, December 22, 1998 Resolution of Holdings' Board of Directors, A93-98.] (Through that merger, Holdings would come to have one class of stock and thus qualify for Subchapter S status.) The resolution further authorized Holdings to borrow the funds necessary to fund the redemption (and should it be necessary, the merger). [Ex. D, December 22, 1998 Resolution of Holdings' Board of Directors, A93-98.][7] Holdings subsequently sought and obtained the

---

[6] The Complaint alleges that it was NFC's board, not Holdings' board, which authorized the election to Subchapter S status. While Holdings' and NFC's boards were comprised of the same members, the allegation should name Holdings, not NFC. For what it is worth, NFC's board did, in fact, meet that day — to approve a resolution appointing successor trustees to several NFC retirement plans. [See Ex. E, December 22, 1998 Resolution of NFC's Board of Directors, A98-101.]

[7] Although it is not really relevant to the arguments that the Moving Defendants advance here, neither Holdings nor NFC granted any additional liens to the bank defendants in connection with the redemption, nor did Holdings and NFC ask the bank defendants to increase their existing credit facility. Rather, they asked only for authority to borrow up to $4 million that was *already* available under a 1998 facility to fund the redemption if the redemption could not be funded from cash flow. [Ex. A, Cashman Decl. ¶3, A3-4, A7-17.] Thus, the allegation in paragraph 46 of the Complaint "[i]n order to fund the Redemption [of Class B shares], on or about March 29, 1999, NFC, NFC Holdings, and National Forge Europe Limited, and the Lenders entered into Amendment No. 1 to the Amended and Restated Credit Agreement dated April 6, 1998 which allowed NFC to borrow an amount not to exceed [$4 million]" is simply wrong.

3

approval of the bank defendants to fund the redemption of the Class B shares. [Ex. A, Cashman Decl. ¶3, A3-4.]

As for the $49.42 price per share that Holdings offered its Class B shareholders, that price did not come about as a result of a wink from Holdings' board and a collective nod from the Class B shareholders. Rather, in a report dated December 14, 1998, Valuemetrics, Inc., a firm engaged by Holdings prior to the time its board of directors authorized the Class B redemption, concluded that the value per share of the Class A and Class B shares as of June 30, 1998 (that is, the end of fiscal year 1998) was $49.42. [Ex. F, December 14, 1998 Letter from Valuemetrics, Inc. to Messrs. Clark and Cashman, A101-144.][8]

There was a total of 116,347 Class B shares held by 26 shareholders, and all of them accepted Holdings' $49.42 per share redemption offer. To fund the redemption, NFC on April 13 1999, directed The Chase Manhattan Bank ("Chase")[9] to transfer $5,749,868.74 (that is, the aggregate value of the Class B shares) from an NFC operating account to a Holdings' account at Chase. [Ex. A, Cashman Decl. ¶4, A4.] On that same day, Holdings repurchased the outstanding Class B shares in one of two ways. For those 94,538 shares held in individual retirement accounts at National City Bank, Holdings directed Chase to wire transfer to National City Bank a single payment of $4,672,067.96 representing the aggregate value of the shares held in those accounts. [Ex. A, Cashman Decl. ¶5, A4-5.] National City Bank then distributed that $4,672,067.96 as follows:

---

[8] As of June 30, 1999, Valuemetrics, Inc. calculated the implied value of each Class A share in Holdings (the Class B shares having been redeemed) at $58.03, or $8.61 per share more than Holdings paid Class B shareholders pursuant to the redemption offer. See Exhibit G, Holdings Business Valuation as of June 30, 1999, A145-147. This increase in shareholder value certainly does not bode well for the Plaintiffs' contention that NFC was rendered insolvent as a result of the redemption.

[9] Defendant JP Morgan Chase is the successor to Chase.

4

| Class B Shareholder | Number of Shares Held | Amount Received |
|---|---|---|
| Antos, Daniel | 3,582 | $ 177,022.44 |
| Bailey, William D. | 4,474 | 221,105.08 |
| Beyeler, Dana A. | 4,474 | 221,105.08 |
| Brewster, Richard A. | 1,790 | 88,461.80 |
| Caldwell, James E. | 4,029 | 199,113.18 |
| Campbell, Larry | 4,474 | 221,105.08 |
| Cashman, Maurice J. | 8,277 | 409,049.34 |
| Clark, E. Roger | 14,125 | 698,057.50 |
| Confer, James C. | 2,687 | 132,791.54 |
| D'Alessandro, Richard | 4,474 | 221,105.08 |
| Harris, James B. | 1,690 | 83,519.80 |
| Jackson, Thomas H. | 1,330 | 65,728.60 |
| Kaemmerer, Robert A. | 4,034 | 199,360.28 |
| Khare, Ashok K. | 4,300 | 212,506.00 |
| Luppino, Carl J. | 1,531 | 75,662.02 |
| Mason, Clarence E. | 4,474 | 221,105.08 |
| Murphy, Harold | 2,629 | 129,925.18 |
| Novosel, Phillip R. | 2,687 | 132,791.54 |
| Olson, Charles R. | 3,613 | 178,554.46 |
| Ruhlman, James D. | 4,029 | 199,113.18 |
| Simons, Phillip R. | 2,239 | 110,651.38 |
| Turk Glenn E. | 5,567 | 275,121.14 |
| Young, Ronald L. | 2,239 | 110,651.38 |
| Zischkau, Barry | 1,790 | 88,461.80 |

[Ex. A, Cashman Decl. ¶5, A4-5.]

For a shareholder that held his or her shares outside of an individual retirement account, Holdings issued each such shareholder a check drawn on a Holdings' account at Chase. [Ex. A, Cashman Decl. ¶6, A5.] Those individuals and what they received are listed below:

| Class B Shareholder | Number of Shares Held | Amount Received |
|---|---|---|
| Cashman, Maurice J. | 672 | $ 33,210.24 |
| Clark, Deborah E. | 8,240 | 407,220.80 |
| Kaemmerer, Robert A. | 4,915 | 242,899.30 |
| Turk, Glenn E. | 1,591 | 78,627.22 |
| Jackson, Thomas H. | 3,144 | 155,376.48 |
| Khare, Ashok K. | 174 | 8,599.08 |
| Olson, Charles R. | 861 | 42,550.62 |
| Murphy, Harold | 58 | 2,866.36 |
| Harris, James B. | 549 | 27,131.58 |
| Luppino, Carl J. | 708 | 34,989.36 |
| Fissel, Donald | 897 | 44,329.74 |

5

[Ex. A, Cashman Decl. ¶6, A5.]

Thus, as a result of Holdings' redemption of the Class B shares, Holdings had a single shareholder: the ESOP. The story could, of course, continue. Based on these undisputable facts alone, however, the narrative can stop because, based on this record, the Moving Defendants are clearly entitled to summary judgment.

STANDARD FOR SUMMARY JUDGMENT

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998). When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). A court may not consider the weight or credibility of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. Id. However, a party opposing summary judgment must do more than just rest upon mere allegations, general denials or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). Moreover, a genuine dispute as to a factual issue exists only if the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

ARGUMENT

AS A MATTER OF LAW, BANKRUPTCY CODE
§ 546(e) BARS THE PLAINTIFFS' FRAUDULENT
<u>TRANSFER CLAIMS AGAINST THE MOVING DEFENDANTS</u>

Counts I, II, III and VI seek to use Bankruptcy Code § 544 to avoid both the payments

6

that the holders of Class B shares received in connection with Holdings' redemption of those shares and the liens claimed by the bank defendants. However, Bankruptcy Code § 546(e) provides that the trustee (or debtor in possession) may not avoid a transfer under § 544 that is a settlement payment, made by or to a financial institution before the commencement of the case.[10] Thus, the inquiry here requires that only two straightforward questions be answered: (i) were the payments that the Moving Defendants received settlement payments, and (ii) if so, were those payments made either by or to a financial institution. Because the answer to both questions is yes, the Moving Defendants are entitled to summary judgment on Counts I, II, III and VI.

A.   **The Payments Made to the Moving Defendants Are Protected "Settlement Payments" under Bankruptcy Code § 101(51A).**

Bankruptcy Code § 101(51A) defines a "settlement payment" to include "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 101(51A) (West 2005).[11] Although the definition is admittedly circular — defining a "settlement payment" as a "settlement payment" — it is nevertheless "extremely broad." Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 848-49 (10th Cir. 1990) ("Kaiser I"). See In re Resorts Int'l, Inc., 181 F.3d 505, 515 (3d Cir.), cert. denied,

---

[10] Section 546(e) provides:

> Notwithstanding section 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741 or 761 of this title, or a *settlement payment*, as defined in section 101 or 741 of this title, *made by or to a* commodity broker, forward contract merchant, stockbroker, *financial institution*, or security clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) (West 2005) (emphasis supplied).

[11] This definition is also repeated in Bankruptcy Code § 741(8). There is no question that the Class B shares constitute "securities." Bankruptcy Code § 101(49)(A), which defines "security," includes "stock" in the definition without limitation. See 11 U.S.C. § 101(49)(A).

7

528 U.S. 1021 (1999) "([i]n the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a transaction"); Kaiser Steel Corp. v. Pearl Brewing Co., 952 F.2d 1230, 1239 (10th Cir. 1991) ("Kaiser II") ("[T]here is no reason to narrow the plain concept of 'settlement' to a single type of securities transaction."); In re Bevill, Bresler & Schulman Asset Mgmt. Corp., 878 F.2d 742, 751-52 (3d Cir. 1989) (broad definition of settlement payment includes trades that are "normally regarded as part of the settlement process"); 5 Lawrence P. King, et al., eds., COLLIER ON BANKRUPTCY ¶ 546.06[2][b], at 546-49 ("[T]he term 'settlement payment' should be interpreted very broadly."). This "extremely broad" definition furthers Congressional intent that § 546(e)'s safe harbor promotes and ensures stability in the financial and securities markets. See Kaiser I, 913 F.2d at 848-49 ("[T]he legislative intent behind § 546 [is] to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions.") (citations omitted). See also Bevill, 878 F.2d at 751-52 (emphasizing legislative intent to ensure liquidity in government securities repo market in construing settlement payments broadly).

  Consistent with this purpose, courts have rejected debtors' attempts to attack securities settlement payments, even where those payments were not cleared through a centralized system. See Resorts Int'l, Inc., 181 F.3d at 515 (payment for securities made in conjunction with leveraged buyout is settlement payment, regardless of whether clearing agency was involved) (citations omitted); Kaiser II, 952 F.2d at 1239-40 ("While the leveraged buy out may not be a 'routine' securities trade. . .we cannot deny what in substance took place here. . . . In settlement of that transaction, the Kaiser Steel shareholders tendered their shares and received payment. These payments were 'settlement payments'.").

Thus, whether Holdings' redemption of the Class B shares was a "routine" securities transaction or not is irrelevant here. Indeed, it is not the nature of the transaction that is important, but the result. Here, Holdings offered to redeem its Class B shares, the offer was accepted by all of the holders of those shares, Holdings paid each shareholder for his or her shares by either wire transfer or by check and each shareholder surrendered his or her shares. Thus, "[w]hat occurred in this case was 'delivery and receipt of funds and securities,'" and that transaction constitutes a settlement payment. Kaiser I, 913 F.2d at 850 (citation omitted).

**B.     The Settlement Payments Were Made by or to a Financial Institution.**

The protections afforded by § 546(e) extend to settlement payments made to or from a financial institution. See Kaiser II, 952 F.2d at 1240 ("[t]he statute [§ 546(e)] exempts payments made 'by or to' a stockbroker, financial institution, or clearing house"). The term "financial institution" is defined in § 101(22) to include "a commercial or savings bank."[12] JPMorgan Chase, the successor to Chase, is a commercial bank.[13] See March 31, 2005 Federal Reserve Statistical Release (listing JPMorgan Chase as the largest domestically chartered insured

---

[12] Bankruptcy Code § 101(22) defines "financial institution" as:

> (A). . . (i) a Federal reserve bank or an entity (domestic or foreign) that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, or receiver or conservator for such entity and, when any such Federal reserve bank, receiver, conservator, or entity is acting as agent or custodian for a customer in connection with a securities contract, as defined in section 741 of this title, the customer; or (ii) in connection with a securities contract, as defined in section 741 of this title, an investment company registered under the Investment Company Act of 1940; and
>
> (B) includes any person described in subparagraph (A) which operates, or operates as, a multilateral clearing organization pursuant to section 409 of the Federal Deposit Insurance Corporation Improvement Act of 1991.

11 U.S.C. § 101(22) (West 2005).

[13] The Plaintiffs in their Complaint draw no distinction between Chase, the entity actually involved in the transfers they seek to avoid, and JP Morgan Chase, the successor entity. See Complaint ¶¶37 and 40.

9

commercial bank as March 31, 2005).[14] We know that Chase, at the direction of Holdings, on April 13, 1999 wired $4,672,067.96 to National City Bank in order to redeem those 94,538 Class B shares held by certain of the individual defendants in individual retirement accounts. [Cashman Decl., Ex. A, ¶5., A4-5.] That wire transfer constituted a settlement payment made <u>by</u> Chase. In re Loranger Mfg. Corp., 324 B.R. 575, 585 (Bankr. W.D. Pa. 2005) (finding that a settlement payment made by wire transfer to a shareholder constitutes a payment by a financial institution for purposes of § 546(e) so that plaintiffs' fraudulent transfer under § 544 is barred). Moreover, not only was that settlement payment on account of those 94,538 shares made by Chase, it was made <u>to</u> National City Bank, and National City Bank is itself a "financial institution" under Bankruptcy Code § 101(22). <u>See</u> September 30, 2001 Federal Reserve Statistical Release, <u>supra</u>, at page 9 (listing National City Bank as the 16th largest domestically chartered insured commercial bank as of March 31, 2005).

      Simply put, the $4,672,067.96 settlement payment made to National City Bank was both "made by [and] to. . . a financial institution." Resorts Int'l, 181 F.3d at 515 (transaction where debtor wired LBO payments to Chase Manhattan which then forwarded payments to Merrill Lynch which then paid individual defendant was settlement payment protected by § 546(e)). Accordingly, the payment that Chase made to National City Bank is, as a matter of law, immune from avoidance by the Plaintiffs. Moreover, because that payment is protected, so are the subsequent transfers that National City Bank made to the Moving Defendants' individual retirement accounts. In re VF Brands, Inc., 282 B.R. 134, 138 (Bankr. D. Del. 2002) ("Under section 550 of the Bankruptcy Code, in order to recover against a mediate or intermediate transferee, the claimant must establish that the transfer is a voidable fraudulent conveyance vis-á-vis the initial transferee."); King, <u>supra</u> ¶ 550.01[1], at 550-53 (15th ed. 2003) ("Section 550 of

---

[14] Available at http:www.federalreserve.gov/releases/lbr/ (website last visited on July 13, 2005).

the Bankruptcy Code permits a trustee (or debtor in possession), *after* avoidance of a transfer under the trustee's avoiding powers, to recover the property transferred or the value of the property transferred.") (emphasis supplied).

As for the settlement payments made to the Moving Defendants by check those, too, are protected by § 546(e)'s safe harbor. When the redeeming shareholders' checks were presented to Chase, Chase, as the payor bank, "finally paid" the items. 13 Pa.C.S.A. § 4215(a) (West 1999) ("An item *is finally paid* by a payor bank. . . .") (emphasis supplied).[15] Thus, payment on those checks was "made by" Chase. Because § 546(e) protects settlement payments "made by . . . a financial institution" and because JP Morgan Chase is unquestionably a "financial institution," supra, at page 10, the settlement payments paid by check are also immune from the Plaintiffs' challenge. "So long as a financial institution is involved, the payment is an unavoidable 'settlement payment.'" In re Hechinger Inv. Co. of Del., 274 B.R. 71, 87 (Bankr. D. Del. 2002). Accordingly, the settlement payments made on account of the 21,809 shares held by individual shareholders directly are likewise unavoidable.

Accordingly, because all of the settlement payments the Plaintiffs challenge were made by or to a financial institution (or, in the case of the wire transfers, made both by *and* to a financial institution), the transactions are fully protected by Bankruptcy Code § 546(e), and the

---

[15] Section 4125(a) provides in its entirety that:

> (a) When item is finally paid by payor bank.--An item is finally paid by a payor bank when the bank has first done any of the following:
>
>   (1) Paid the item in cash.
>   (2) Settled for the item without having a right to revoke the settlement under statute, clearinghouse rule or agreement.
>   (3) Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearinghouse rule or agreement.

13 Pa.C.S.A. § 4125(a).

transfers that the Plaintiffs challenge cannot, as a matter of law, be avoided.  Thus, as to Counts I, II, III and VI, the Moving Defendants are entitled to summary judgment.

## AS TO THE REMAINING COUNTS OF THE COMPLAINT, THE PLAINTIFFS FAIL TO STATE A CLAIM

Counts IV and V are premised on two provisions of Pennsylvania's Business Corporation Law, 15 Pa.C.S.A., §§ 101 et seq. (West 1995).  According to the Plaintiffs, Holdings' redemption of the Class B shares left Holdings both without the ability to pay its debts as they became due and insolvent, in violation of § 1551(b)(1) and (2) of the Pennsylvania Business Corporation Law (the "BCL"), respectively.[16]  Thus, argue the Plaintiffs, the Moving Defendants are liable to Holdings under BCL § 1553(a) for the total that the redeeming

---

[16] The portions of § 1551 relevant here read as follows:

> (a) General rule.--Unless otherwise restricted in the bylaws, the board of directors may authorize and a business corporation may make distributions. A provision in the articles setting forth a par value for any authorized shares or class or series of shares shall not restrict the ability of a corporation to make distributions.
>
> (b) Limitation.--A distribution may not be made if, after giving effect thereto:
>
>   (1) the corporation would be unable to pay its debts as they become due in the usual course of its business; or
>
>   (2) the total assets of the corporation would be less than the sum of its total liabilities plus (unless otherwise provided in the articles) the amount that would be needed, if the corporation were to be dissolved at the time as of which the distribution is measured, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

15 Pa.C.S.A. § 1551(a) and (b).

shareholders received.[17] The Moving Defendants are entitled to summary judgment on both Counts IV and V for one *very* straightforward reason: neither § 1551 nor § 1553 is applicable here.

Holding is organized under the laws of the State of Delaware. [Ex. A, Cashman Declaration ¶2; A3; Ex. H, Holdings' Restated Articles of Incorporation, A148-156.] As such, it is the Delaware General Corporation Law, not the BCL, which governs whether Holdings' redemption of the Class B shares was proper. Under the "internal affairs doctrine," a court must look to the law of the state of formation to resolve issues involving the internal affairs of a corporation. CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 89-93 (1987); First National City Bank v. Banco Para El Comercio, 462 U.S. 611, 621 (1983). Because this Court sits in Pennsylvania, it applies that state's conflict of law principles, Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941), and Pennsylvania has adopted the "internal affairs doctrine" by statute. See 15 Pa.C.S.A.§ 4145(a).[18] Accordingly, the BCL has no

---

[17] The relevant provision of § 1553 provides:

> (a) Directors.--Except as otherwise provided pursuant to section 1713 (relating to personal liability of directors), a director who votes for or assents to any dividend or other distribution contrary to the provisions of this subpart or contrary to any restrictions contained in the bylaws shall, if he has not complied with the standard provided in or pursuant to section 1712 (relating to standard of care and justifiable reliance), be liable to the corporation, jointly and severally with all other directors so voting or assenting, for the amount of the dividend that is paid or the value of the other distribution in excess of the amount of the dividend or other distribution that could have been made without a violation of the provisions of this subpart or the restrictions in the bylaws.

15 Pa.C.S.A. § 1553(a).

[18] Section 4145(a) of Title 15 states:

> (a) General rule.--The General Assembly hereby finds and determines that foreign domiciliary corporations substantially affect this Commonwealth. The courts of this Commonwealth shall not dismiss or stay any action or proceeding brought by a shareholder or representative of a foreign domiciliary corporation, as such, against the corporation or any one or more of the shareholders or representatives thereof, as such, on the ground that the corporation is a foreign

13

application here, and thus Counts IV and V fail to state a claim.  The Moving Defendants, therefore, are entitled to summary judgment on those counts.

CONCLUSION

It is time for the Court to end this case.  The facts regarding how the Class B shares came to be redeemed are indisputable, as is the place of Holdings' incorporation.  Based on the unassailable facts developed here, the only logical conclusion one can reach is that Counts I, II, III and VI of the Complaint are barred by § 544 and that Counts IV and V fail to state a claim. Accordingly, the Moving Defendants must be granted summary judgment.

Dated:  July 18, 2005              Respectfully submitted,


/s/ Erik Sobkiewicz
Douglas A. Campbell
PA I.D. No. 23143
Erik Sobkiewicz
PA I.D. No. 56836
CAMPBELL & LEVINE, LLC
1700 Grant Building
Pittsburgh, PA  15219
Telephone:  (412) 261-0310

Counsel for Defendants E. Roger Clark, Maurice J. Cashman, Dana Beyeler and Robert A. Kaemmerer

---

corporation for profit or that the cause of action relates to the internal affairs thereof, but every such action shall proceed with like effect as if the corporation were a domestic corporation. Except as provided in subsection (b) [(b) has been reserved], the court having jurisdiction of the action or proceeding shall apply the law of the jurisdiction under which the foreign domiciliary corporation was incorporated.

15 Pa.C.S.A. § 4145(a).