**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: ) | |
| ) | |
| NATIONAL FORGE COMPANY, *et, al.* ) | |
| ) | |
| Debtor. ) | |
| ) | |
| OFFICIAL COMMITTEE OF ) | |
| UNSECURED CREDITORS OF ) | |
| NATIONAL FORGE COMPANY, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| And ) | |
| ) | |
| OFFICIAL COMMITTEE OF RETIREES ) | |
| OF NATIONAL FORGE COMPANY, ) | |
| ) | |
| Intervenors ) | |
| ) | C.A. No.  04-21 ERIE |
| v. ) | |
| ) | |
| E. ROGER CLARK, *et al.* ) | |
| ) | |
| Defendants ) | |

**BRIEF IN OPPOSITION TO SUMMARY JUDGMENT OF DEFENDANTS E.
ROGER CLARK, MAURICE CASHMAN, DANA BEYELER AND ROBERT A.
KAEMMERER  AND JOINED BY REMAINING DEFENDANTS DANIEL
ANTOS, ET AL. AND J.P. MORGAN CHASE & CO., FLEET BUSINESS
CREDIT CORPORATION, AND NATIONAL CITY BANK OF PENNSYLVANIA**

David W. Lampl, Esquire
PA I.D. No. 28900
John M. Steiner, Esquire
PA I.D. No. 79390
525 William Penn Place, 30th Floor
Pittsburgh, Pennsylvania 15219
(412) 261-1600
Counsel for the Official Committee of
Unsecured Creditors

## TABLE OF CONTENTS

Page

Table of Authorities.............................................................................................ii

Factual Summary..............................................................................................2

Issues Presented...............................................................................................5

Argument.........................................................................................................5

    I.   SECTION 546(E) OF THE BANKRUPTCY CODE AS A
    MATTER OF LAW DOES NOT BAR THE PLAINTIFF'S
    FRAUDULENT TRANSFER CLAIMS AGAINST THE
    DEFENDANTS.............................................................................6

        A.  COUNT II OF THE PLAINTIFF'S COMPLAINT
        ASSERTS AN "ACTUAL FRAUD" CLAIM UNDER
        THE APPLICABLE STATE LAW SUBSTANTIALLY
        SIMILAR TO THE FEDERAL "ACTUAL FRAUD"
        CLAIM UNDER SECTION 548(A)(1)(A) OF THE
        BANKRUPTCY CODE, WHICH CLAIM IS EXPLICITLY
        EXCEPTED FROM THE SAFE HARBOR PROVISIONS
        OF SECTION 546(E).................................................6

        B.  AS A MATTER OF LAW, BANKRUPTCY CODE
        § 546(e) DOES OT BAR THE PLAINTIFF'S
        FRAUDULENT TRANSFER CLAIMS AGAINST THE
        MOVING DEFENDANTS. ALTERNATIVELY, THERE ARE
        MATERIAL ISSUES OF FACT SURROUNDING WHETHER
        THE STOCK CANCELLATION WAS A
        "SETTLEMENT PAYMENT" MADE "BY OR TO A
        FINANCIAL INSTITUTION" AND THUS, AS A MATTER
        OF LAW, BANKRUPTCY CODE SECTION 546(e) DOES
        NOT BAR THE PLAINTIFF'S FRAUDULENT TRANSFER
        CLAIMS AGAINST THE MOVING EFENDANTS.......................7

            i.  Did the Stock Cancellation constitute a "settlement
            payment" under Section 546(e)?.......................................8

            ii.  If the Stock Cancellation constituted a "settlement
            payment" under Section 546(e), was the settlement
            payment made "by or to a financial institution"?..................18

        C.   THERE ARE MATERIAL ISSUES OF FACT AS TO
        WHICH BOARD OF DIRECTORS AUTHORIZED THE

STOCK CANCELLATION AND WHICH OFFICERS
CARRIED OUT THE STOCK CANCELLATION.
ACCORDINGLY, AS A MATTER OF LAW, THE
COUNTS ASSERTING CLAIMS FOR BREACH
OF THE PENNSYLVANIA BUSINESS CORPORATION
LAW SHOULD NOT BE DISMISSED…………………………...…..21

Conclusion………………………………………………………………...….…24

## TABLE OF AUTHORITIES

**Page**

**CASES**

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d 742
(3d Cir. 1989)................................................................9,10,11,12,13,14,16

*In re Comark*, 971 F.2d 322, 325 (9th Cir. 1992)...............................13

*In re Grand Eagle Companies, Inc.*, 288 B.R. 484 (N.D. Ohio 2003).............15,16,20

*In re Hechinger Invest. Co. of Delaware*, 274 B.R. 71 (D. Del. 2002)........15,16,18,19,20

*In re Kaiser Steel Corp.*, 913 F.2d 846 (10th Cir. 1990)("Kaiser I")...........................9

*In re Kaiser Steel Corp.*, 952 F.2d 1230 (10th Cir. 1991)
("Kaiser II")...................................................................9,13,14,15,16,18

*In re Loranger Mfg. Corp*, 324 B.R. 575 (Bankr. W.D. Pa. 2005)................18,19,20

*In re Munford, Inc.*, 98 F.3d 604 (11th Cir. 1996)...................................15

*In re Resorts Int'l, Inc.,* 181 F.3d 505 (3d Cir. 1999),
cert. denied 528 U.S. 1021 (1999)...........................................*passim*

*Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348 (N.D. Tex. 1996)........................16

*Massachusetts v. Morash*, 490 U.S. 107 (1989) (*citing Pilot Life
Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987)....................................11

*Zahn v. Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998)..............................16

**STATUTES**

11 U.S.C. § 101(51A).....................................................................8

11 U.S.C § 546(e).......................................................................*passim*

11 U.S.C. § 546(f).....................................................................10,11,12

11 U.S.C. § 544.........................................................................6,11

11 U.S.C. § 548(a)(1)(A)...............................................................6,7

11 U.S.C. § 550.......................................................................17,24

11 U.S.C. § 741(8)......................................................................9

15 U.S.C. § 78q-1(a) ………………………………………...………………………..12,14

12 Pa.C.S.A § 5104..………………………………………….……………………… 6,7

12 Pa.C.S.A. § 5105.……………………………………………………...……..6

**OTHER**
H. Rep. No. 97-420………………………………...……..………………………..11,14

# IN THE UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                                              )
                                                    )
NATIONAL FORGE COMPANY, *et, al.*                   )
                                                    )
    Debtor.                      )
                                                    )
OFFICIAL COMMITTEE OF                               )
UNSECURED CREDITORS OF                              )
NATIONAL FORGE COMPANY,                             )
                                                    )
    Plaintiff                    )
                                                    )
  And                                       )
                                                    )
OFFICIAL COMMITTEE OF RETIREES                      )
OF NATIONAL FORGE COMPANY,                          )
                                                    )
    Intervenors                  )
                                                    )   C.A. No. 04-21 ERIE
     v.                      )
                                                    )
E. ROGER CLARK, *et al.*                            )
                                                    )
    Defendants                   )

## BRIEF IN OPPOSITION TO SUMMARY JUDGMENT OF DEFENDANTS E. ROGER CLARK, MAURICE CASHMAN, DANA BEYELER AND ROBERT A. KAEMMERER AND JOINED BY REMAINING DEFENDANTS DANIEL ANTOS, ET AL. AND J.P. MORGAN CHASE & CO., FLEET BUSINESS CREDIT CORPORATION, AND NATIONAL CITY BANK OF PENNSYLVANIA

AND NOW comes the Official Committee of Unsecured Creditors of National Forge Company, *et al.,* the Plaintiff, and the Official Committee of Retirees of National Forge Company, the Intervenor, (both the Committee and the Intervenor will be hereafter referred to collectively as the "Committee" or the "Plaintiff"), by and through their undersigned counsel,

and submits the within Brief in Opposition to Summary Judgment filed by the Defendants E. Roger Clark, Maurice Cashman, Dana Beyeler and Robert A. Kaemmerer ("E. Roger Clark, *et al.*") and Joined by Remaining Defendants Daniel Antos, *et al.,* and J.P. Morgan Chase & Co., Fleet Business Credit Corporation and National City Bank of Pennsylvania (the "Lenders", together with E.Roger Clark, *et al.* and Daniel Antos, *et al.* the "Defendants"), respectfully representing as follows:

## FACTUAL SUMMARY

Plaintiff filed a Complaint against the Defendants on January 31, 2003, seeking among other things, to bring claims for fraudulent transfers under the Pennsylvania Uniform Fraudulent Transfer Act ("PAUFTA") and for breach of the Pennsylvania Business Corporation Law. Plaintiff's claims against the Defendants arise out of a transaction pursuant to which National Forge Company ("NFC") and/or National Forge Company Holdings ("NFC Holdings"), authorized the redemption/cancellation of Class B Stock of NFC Holdings held by certain officers, directors and management employees of NFC and NFC Holdings for an amount totaling $5,749,868.74 (the "Stock Cancellation").

Based upon the factual allegations contained in the Plaintiff's Complaint and the factual allegations asserted by the Defendants in their Summary Judgment Motion, the following are the relevant circumstances surrounding the Stock Cancellation.

The Board of Directors of NFC and the Board of Directors of NFC Holdings were comprised of the same members and generally conducted joint board meetings. *See* Exhibits B and C to the Committee's Appendix to Brief in Opposition to Motion for Summary Judgment. Certain of the Defendants who received distributions from the Stock Cancellation sat on both NFC's and NFC Holdings' Board of Directors and were officers of NFC and NFC Holdings.

NFC Holdings is the one hundred percent (100%) owner of the stock of NFC. At the time of the Stock Cancellation, the ownership of NFC Holdings was comprised of two classes of equity: Class A Common Stock owned by NFC Holdings Employee Stock Ownership Plan ("ESOP") Trust; and Class B Stock owned by directors, officers and management employees of NFC and NFC Holdings – the Defendants.

On or about December 22, 1998, the Board of Directors of NFC Holdings and NFC held a meeting to allegedly consider, among other things, the approval of converting NFC Holdings, strictly a holding company, from a "C" corporation to an "S" corporation. During the same meeting, the Board of Directors of NFC Holdings and NFC approved the Stock Cancellation and the authorization to borrow funds sufficient to complete the Stock Cancellation. To that end, and in order to fund the Stock Cancellation, on or about March 29, 1999, NFC, NFC Holdings, National Forge Europe Limited, and the Lenders entered into Amendment No. 1 to Amended and Restated Credit Agreement dated April 6, 1998 which allowed NFC to borrow an amount not to exceed $4,000,000.00 (the "Loan") to accomplish the redemption/cancellation of the Class B Stock. *See* Exhibit A, D and E to the Defendants' Appendix. The Loan was to be secured by a lien upon substantially all the assets of NFC.

Upon information and belief NFC and NFC Holdings maintained operating accounts at Chase Manhattan Bank. On April 13, 1999, NFC directed Chase Manhattan Bank to transfer from its operating account into NFC Holdings' bank account at Chase Manhattan Bank the sum of $5,749,868.74. Or or about April 13, 1999, NFC and/or NFC Holdings redeemed/cancelled all outstanding shares of Class B Stock from the Defendants at a price of $49.42 per share (the "Distributions"). The Stock Cancellation totaled $5,749,868.74 of which approximately

$1,080,000 was paid directly to certain of the Defendants and approximately $4,670,000 million was paid to IRA accounts of certain of the Defendants.

Upon information and belief, NFC did not receive adequate consideration for the transfer of $5,749,868.74 to NFC Holdings. In point of fact, there appears to be no evidence of any consideration or legitimate business purpose (i.e. dividend payment, stock redemption, stock cancellation, etc.) provided by NFC Holdings to NFC to justify and warrant NFC's transfer of more than $5.7 million dollars to NFC Holdings, which money was then distributed to the Defendants. The officers and directors of NFC and NFC Holdings devised this scheme to redeem and/or cancel the Class B stock of NFC Holdings solely for their benefit and attempted to justify and legitimize the Stock Cancellation by converting NFC Holdings from a C-Corporation to an S-Corporation. At the time the Stock Cancellation was approved by the Board of Directors of NFC and/or NFC Holdings and subsequently carried out by the officers of NFC and/or NFC Holdings, the officers and directors of NFC and/or NFC Holdings knew NFC was ailing financially and that there equity interests were at serious risk.

On July 18, 2005, the Defendants filed a Motion for Summary Judgment (the "Motion") asserting two basic arguments that as a matter of law the Committee's Complaint should be dismissed. First, the Defendants assert that the "safe harbor" provision of Section 546(e) bar the fraudulent transfer claims asserted by the Committee in Counts I, II and III of its Complaint. 11 U.S.C § 546(e). As set forth below, the Committee asserts that applying this safe harbor provision to the facts of the instant matter is factually and legally inconsistent with Congressional intent behind the application of the safe harbor provisions of Section 546(e) and would lead to an absurd result. Second, the Defendants argue that the authority to make the Stock Cancellation was approved by the Board of Directors of NFC Holdings, a Delaware

4

Corporation, separately and independently of that of the Board of Directors of NFC, a Pennsylvania Corporation, and therefore Delaware law applies and the claims asserting breach of the Pennsylvania Business Corporation Law should be dismissed. As set forth below, the Committee asserts this argument is also without merit.

It must also be noted that no discovery has yet been conducted in this case, and the record remains largely undeveloped. Regardless of any positions advanced at this time, it is clear that the record in this matter is so undeveloped as to make Summary Judgment inappropriate at this time.

## ISSUES PRESENTED

I.    **AS A MATTER OF LAW, DOES SECTION 546(e) OF THE BANKRUPTCY CODE BAR THE PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS AGAINST THE DEFENDANTS.**

**SUGGESTED ANSWER: NO**

II.   **AS A MATTER OF LAW, SHOULD COUNTS IV AND V OF THE PLAINTIFF'S COMPLAINT ASSERTING CLAIMS FOR BREACH OF THE PENNSYLVANIA BUSINESS CORPORATION LAW BE DISMISSED.**

**SUGGESTED ANSWER: NO**

## ARGUMENT

The Committee submits that the interpretation of Section 546(e) goes to the heart of the analysis and argument set forth below, and therefore as a preliminary matter, the Committee sets forth the language of Section 546(e) as a backdrop to its argument. Section 546(e) states:

(e)    Notwithstanding section 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741 or 761 of this title, or a *settlement payment*, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, *financial institution,* or securities clearing agency, that is made before the commencement of the case, *except under section 548(a)(1)(A) of this title.*

11 U.S.C. § 546(e) (*emphasis added*).

**I.    SECTION 546(e) OF THE BANKRUPTCY CODE AS A MATTER OF LAW DOES NOT BAR THE PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS AGAINST THE DEFENDANTS.**

    **A.    COUNT II OF THE PLAINTIFF'S COMPLAINT ASSERTS AN "ACTUAL FRAUD" CLAIM UNDER THE APPLICABLE STATE LAW SUBSTANTIALLY SIMILAR TO THE FEDERAL "ACTUAL FRAUD" CLAIM UNDER SECTION 548(a)(1)(A) OF THE BANKRUPTCY CODE, WHICH CLAIM IS EXPLICITLY EXCEPTED FROM THE SAFE HARBOR PROVISIONS OF SECTION 546(e).**

In their first argument, the Defendants assert that the safe harbor provisions of Section 546(e) of the Bankruptcy Code completely bar the Plaintiff's fraudulent transfer claims raised pursuant to Section 544 of the Bankruptcy Code and Sections 5104 and 5105 of the Pennsylvania Uniform Fraudulent Transfer Act ("PAUFTA").   11 U.S.C. § 544; 12 Pa.C.S.A §§ 5104 and 5105.

Initially, the Committee notes that the safe harbor provisions of Section 546(e) would not act to protect the avoidance of a fraudulent transfer claim under Section 548(a)(1)(A) of the Bankruptcy Code, which is often referred to as an "actual fraud" claim.   Section 548(a)(1)(A) provides in relevant part:

> (a)(1)  The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, … , if the debtor voluntarily or involuntarily –
>
> > (A)  made such transfer or incurred such obligation with the actual intent to hinder, delay, or defraud any entity to which the debtor was or became, … indebted.

11 U.S.C. § 548(a)(1)(A).  In Count II of its Complaint the Committee asserts an "actual fraud" claim under Section 5104(a)(1) of the PAUFTA.  The elements of Section 5104 of the PAUFTA

are substantially similar to that of Section 548(a)(1)(A) of the Bankruptcy Code and state in relevant part:

> (a) General rule.—A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>     (1)    with the actual intent to hinder, delay or defraud any creditor of the debtor

12 Pa.C.S.A. § 5104(a)(1).

The Committee submits that any argument that Section 546(e) bars the actual fraud claim asserted under Section 5104(a)(1) of the PAUFTA and contained in Count II of the Plaintiff's Complaint fails. It is clear from the language of Section 546(e) that Congress did not intend to shield fraudulent transfer recipients from the avoidance powers of a trustee in cases of actual fraud. Thus, the Committee submits for this reason and the reasons set forth below, the Defendants' request for Summary Judgment as to Count II of the Plaintiff's Complaint should be DENIED.

**B.    AS A MATTER OF LAW, BANKRUPTCY CODE § 546(e) DOES NOT BAR THE PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS AGAINST THE MOVING DEFENDANTS. ALTERNATIVELY, THERE ARE MATERIAL ISSUES OF FACT SURROUNDING WHETHER THE STOCK CANCELLATION WAS A "SETTLEMENT PAYMENT" MADE "BY OR TO A FINANCIAL INSTITUTION" AND THUS, AS A MATTER OF LAW, BANKRUPTCY CODE SECTION 546(e) DOES NOT BAR THE PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS AGAINST THE MOVING DEFENDANTS.**

In determining the applicability of the safe harbor provisions of Section 546(e) to the fraudulent transfer claims asserted by the Committee in Counts I, II and III of its Complaint, the Committee submits that two questions must be answered in the affirmative by this Court before Section 546(e) would act to bar the Plaintiff's fraudulent transfer claims. First, did NFC's and/or NFC Holdings' (both privately held companies) simple stock redemption/cancellation of certain

of their Class B Stock held by their directors, officers and management employees constitute a "settlement payment" under Section 546(e). Second, and only if the answer to the first question is yes, was the "settlement payment" made "by or to a financial institution". As evidenced by the argument below, the Committee submits that the answers to both these threshold questions is no.

       **(i)    Did the Stock Cancellation constitute a "settlement payment" under Section 546(e)?**

In addressing the question of whether the Stock Cancellation constituted a "settlement payment" under Section 546(e), the Court must first look to the definition of settlement payment under the Bankruptcy Code. The Committee notes that the Defendants erroneously cite to Section 101(51A) of the Bankruptcy Code in support of their contention that the Stock Cancellation was a "settlement payment". The Defendants cite to Section 101(51A) and assert that "Bankruptcy Code § 101(51A) defines a 'settlement payment' to include a 'preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the *securities trade."* *See* Defendants Brief in Support pg. 7 (*emphasis added*). Actually, Section 101(51A) defines "settlement payment" as:

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, *or any other similar payment commonly used in the forward contract trade.*

11 U.S.C. § 101(51A) (*emphasis added*). Contrary to the Defendants' assertion, and as is clear from the language of Section 101(51A), the Committee submits that definition of "settlement payment" under Section 101(51A) of the Bankruptcy Code is not applicable in this case as there has been no assertion that the Stock Cancellation had anything to do with the "forward contract trade."

The Committee submits more appropriately, Section 741(8) of the Bankruptcy Code controls in this matter and defines "settlement payment" as:

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, *or any other similar payment commonly used in the securities trade.*

11 U.S.C. § 741(8) (*emphasis added*).  Thus, the focus must then turn on what Congress intended to encompass by the term "settlement payment" under Section 741(8) and its application and use in the context of the safe harbor provisions of Section 546(e).

In support of their argument that the Stock Cancellation constituted a "settlement payment" under Section 546(e), the Defendants direct this court to the holdings of *In re Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846 (10th Cir. 1990)("Kaiser I"); *In re Kaiser Steel Corp., v. Pearl Brewing Co.*, 952 F.2d 1230 (10th Cir. 1991)("Kaiser II"); *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d 742 (3d Cir. 1989); and *In re Resorts Intl'l, Inc.*, 181 F.3d 505 (3d Cir. 1999), *cert. denied*, 528 U.S. 1021 (1999).  However, these cases address the issue of "settlement payment" and its intended use by Congress in Section 546(e), each deals with a series of complex publicly traded securities transactions, either through complicated leveraged buyouts ("LBO") or transfers of securities to purchasers pursuant to federal government securities repurchase agreements and were afforded the protections of the national securities clearance and settlement system (discussed below).  The Committee submits that the facts and circumstances of the above cited cases are completely distinguishable from the facts and circumstances in the instant matter.  The transaction at issue in this case is not a complex security transaction between a publicly traded company and its shareholders.  Further, the Stock Cancellation at issue did not involve any third party intermediaries, including clearing

houses, disbursing agents, stock brokers, etc, but was a simple stock redemption/cancellation of a privately held corporation's Class B Stock.

In determining Congress's intent on drafting Section 546(e) and offering safe harbor to recipients of "settlement payments", the Third Circuits analysis in the case of *In re Bevill*, *supra*, is instructive.  In *Bevill*, a Chapter 11  trustee for securities dealer sought to avoid transfers of securities to purchasers pursuant to federal government securities repurchase agreements.  The United States District Court for the District of New Jersey, denied the repo purchasers' joint motion to dismiss, and certified questions for interlocutory appeal. The questions certified for appeal were: (i) whether section 546(f) of the Bankruptcy Code, 11 U.S.C. § 546(f), bars Chapter 11 trustee from utilizing sections 547 and 548 to recover securities or their proceeds from a repo participant; and (ii) whether section 559 of the Code, 11 U.S.C. § 559, bars a Chapter 11 trustee from claiming the proceeds of a repurchase agreement liquidated by a repo participant.  On appeal the Third Circuit held that prepetition transfers of securities by securities dealer to repo purchasers constituted "settlement payment" for purposes of Section 546(f) of the Bankruptcy Code precluding trustee from avoiding settlement payment transfers made prepetition by or to repo participant in connection with repurchase agreement.  *Id.* at 742 and 743.

In attempting to determine the congressional purpose of Section 546(f) (the sub-section of 546 that deals specifically with repurchase agreements) and the proper meaning of "settlement payment" under Section 546(f), the Third Circuit turned to the intent of Congress in drafting the 1982 amendments and the fashioning of Section 546(e).  The Third Circuit stated that Section 546(e) was "the model upon which section 546(f) of the 1984 amendments was based." *Id. at 747.*  In addressing Congressional intent behind Section 546(e), the Third Circuit noted:

> Although our major concern is with the 1984 amendments to the Bankruptcy Reform Act, we must first consider the 1982 amendments. At the time of their passage, Congress was

concerned about the volatile nature of the commodities and securities markets, and decided that certain protections were necessary to prevent "the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market." H.Rep. No. 97-420, 97th Cong., 2d Sess. 1 (1982) ("1982 House report"), U.S.Code Cong. & Admin.News 1982, p. 583. As stated in the House Report on the 1982 amendments:

> The Bankruptcy Code now expressly provides certain protections to the commodities market to protect against such a 'ripple effect.' One of the market protections presently contained in the Bankruptcy Code, for example, prevents a trustee in bankruptcy from avoiding or setting aside, as a preferential transfer, margin payments made to a commodity broker.
> *Id.*

Congress wanted to go further to protect margin payments and settlement payments made by and to participants in the securities market generally. Accordingly, it added a new subsection to 11 U.S.C. § 546:

> Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title. 11 U.S.C. § 546(e).

*Id.* at 747. *See also* Committee's Appendix Exhibit A (For the convenience of the Court, the Committee has attached to its Appendix as Exhibit A a copy of House Report 97-420).

The Third Circuit recognized in *Bevill* that "...at issue in this case is whether AMC's [the Debtor] pre-petition transfer of the securities to appellants constituted a "settlement payment" as contemplated by Congress [presumably under section 546(e) and 546(f)]." *Id.* at 749. The Third Circuit held that "In expounding on a statute, we [are] not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *citing, Massachusetts v. Morash*, 490 U.S. 107, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39

(1987)).  *Bevill*, 878 F.2d at 750.  To that end, the Third Circuit looked for guidance on the

Congressional intent in the Securities Exchange Act of 1934 noting:

> It is well understood in the securities market that the settlement process does not end with
> the purchaser's payment for the securities; rather, the process continues on to include the
> record transfer of the securities. Section 17A(a) of the Securities Exchange Act of 1934,
> ("1934 Act") 15 U.S.C. § 78q-1(a), mandating the establishment of a national securities
> clearance and settlement system, specifically recognizes that the transfer of record
> ownership of securities is an integral element in the securities settlement process. Section
> 17A(a)(1)(A)      of      the      1934      Act      provides      as      follows:
> The Congress finds that-(A) The prompt and accurate clearance and *settlement* of
> securities transactions, *including the transfer of record ownership and the safeguarding
> of securities and funds related thereto,* are necessary for the protection of investors and
> persons   facilitating   transactions   by   and   acting   on   behalf   of   investors.
> *15 U.S.C. 78q-1(a)(1) (emphasis supplied).*

*Id.* at 751.

In discussing the definition of "settlement payment" under Section 546(f), the Court

looked to the entire law, and to its object and policy.  Having done so, the Third Circuit found

that the repurchase transaction at issuer in *Bevill* and the application of Section 546(e) in

providing the transaction with safe harbor was consistent with Congress' intent in protecting the

national securities market from the adverse consequences of allowing a trustee to avoid such

transfers under the Bankruptcy Code.  A similarly detailed analysis here, however, would yield

the opposite result.

The Third Circuit again addressed the issue of the scope of Congressional intent behind

Section 546(e) in the case of *In re Resorts International, Inc.*, 181 F.3d 505 (3d Cir. 1990).  In

*Resorts*, the Third Circuit was faced with the question of whether the definition of "settlement

payment" could be extended to cover certain transfers arising out of a complex securities

transaction by way of a leveraged buyout.   In *Resorts*, the Third Circuit recognized its prior

analysis and holding in *Bevill* regarding the scope and reach of the term "settlement  payment" as

intended by Congress under Sections 546(e) and 546(f), but found that "*Bevill* did not consider

payments made pursuant to a leveraged buyout, and therefore does not definitively determine the outcome here [in *Resorts*]." *Id.* at 515.  The Third Circuit thus looked to other Courts who have addressed the application of Section 546(e) to LBO's.  In so doing, the Third Circuit noted:

> The only other court of appeals to directly address this question, however, followed a *Bevill* analysis and held that payments to shareholders as part of an LBO were "settlement payments" under the statute. *citing, In re Kaiser Steel Corp. v. Pearl Brewing Co.,* 952 F.2d 1230, 1230-40 (10th Cir. 1991)*; see also In re Comark,* 971 F.2d 322, 325 (9th Cir. 1992)*(citing Kaiser approvingly for the proposition that a "settlement is 'the completion of a securities transaction'").*

*Resorts*, 181 F.3d at 515.

Following the rationale and reasoning of *Kaiser, Bevill* and *Comark*, the Third Circuit held:

> Including payments made during LBO's within the scope of the definition [of settlement payment] is consistent with the broad meaning these cases [*Kaiser, supra*] discern.  A payment for shares during an LBO is obviously a common securities transaction, and we therefore hold that it is also a settlement payment for the purposes of Section 546(e).
> The Third Circuit ultimately held that from application of the plain language of Section

*Id.* at 515 and 516.

The Third Circuit further held:

> Despite the fact that payments to shareholders in an LBO are not the most common securities transaction, we see no *absurd result from the application of the statute's plain language* and will not disregard it.  We hold, therefore, that section 656 applies to the transaction and prevent its avoidance under section 548(a)(1)(B).

*Id.* at 516  (*emphasis added*).

The Courts in *Kaiser, Bevill* and *Resorts* utilized the same analysis finding that avoidance of large complex securities transactions that could gravely impact the national securities market is what Congress intended to protect against in fashioning Section 546(e).  The important aspect of *Resorts* is that the Third Circuit recognized that the scope and application of Section 546(e) needs to be analyzed on a case by case basis as demonstrated by the Third Circuit's

unwillingness to rigidly apply its rationale and holding in *Bevill* to the distinguishing characteristics of the stock transfer it was faced with in *Resorts*. Additionally, the Third Circuit applied the plain language of Section 546(e) in the *Resorts* case because it saw no absurd result in so doing. *See Resorts, supra.* As demonstrated below, a rigid application of the plain language of Section 546(e) the facts of the case at bar would lead to an absurd result. Thus, the Committee submits that this Court must look to the facts of this case in determining whether Congress intended to protect transferees from transactions of this type under Section 546(e) and not rigidly apply, as the Defendants would have this Court do, the rationale and holding of *Bevill* and *Resorts*.

To that end, the Committee submits that unlike *Bevill, Resorts* and *Kaiser*, the instant matter does not involve a security transaction of a publicly traded company that would require "protection to prevent the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market." *Bevill*, 878 F.2d at 747. There has been no legal or factual allegation by the Defendants that the Stock Cancellation at issue in this case invoke the protections of the national securities clearance and settlement system or the concerns and protections discussed by Congress in House Report No. 97-420, *See Bevill, supra; See also Committee's Appendix Exhibit A.* Further, there are material issues of fact as to whether the Stock Cancellation of these privately held companies was even subject to SEC regulations and subject to the national securities clearance and settlement system as discussed in *Bevill, Kaiser* and *Resorts*. 15 U.S.C. 78q-1(a)*; See Bevill, supra.* The Stock Cancellation was a very simple stock redemption/cancellation of Class B Stock held by directors, officers and management employees of NFC Holdings that would have absolutely no impact on the national securities market if avoided. Additionally, there remain factual issues as to whether the

14

recipients of the Distributions even presented their stock certificates to NFC or NFC Holdings in exchange for payment, or otherwise adhered to any other "settlement process" regarding the Stock Cancellation. As stated previously, there has been no legal or factual allegation by the Defendants that the Stock Cancellation at issue in this case invokes the protections of the national securities clearance and settlement system, which system Congress intended to protect under Section 546(e).

The Committee submits that to interpret the protections of Section 546(e) to shield the Defendants in the instant matter from fraudulent transfer claims leads to an absurd result. The Committee directs the Court's attention to the case of *In re Grand Eagle Companies, Inc. v. ASEA Brown Boveri, Inc.*, 288 B.R. 484 (N.D. Ohio 2003) as a case that is analogous to the instant matter. In *Grand Eagle* the Court was faced with the question of whether the definition of "settlement payment" and the applicability of Section 546(e) extended to securities transactions of privately held companies. The court summarized the analysis of *In re Kaiser Steel Corp.* to establish the function of the securities industry and the underlying Congressional intent behind § 546(e) as it related to the definition of settlement payments. *See Id.* at 492 – 494. After its analysis of *Kaiser,* the court stated:

> Against this backdrop, the protection of § 546(e) has been applied to the purchase and sale of stock of publicly traded companies. *Resorts Int'l, Inc.* (In re Resorts Int.'l, Inc.), 181 F.3d 505 (3d Cir. 1999); *Kaiser Steel Corp. v. Pearl Brewing Co.* (In re Kaiser Steel Corp.), 952 F.2d 1230 (10th Cir. 1991); *Official Comm. Of Unsec. Creditors v. Fleet Retail Fin. Group* (In re Hechinger Invest. Co. of Delaware), 274 B.R. 71 (D. Del. 2002). n12 In so doing, the intent of Congress to promote stable financial markets is achieved. However, against this same backdrop, it is unlikely that Congress intended the term "settlement payment" to encompass the payment made to ABB [the Defendant] in the April 2000 transaction.

*Id.* at 494. In note 12, the court referenced *Munford v. Valuation Research Corp.* (In re Munford, Inc.), 98 F.3d 604 (11th Cir. 1996) where the Eleventh Circuit applied the conduit

theory and declined to recognize a bank as a "transferee" under § 546(e) where the bank failed to acquire a beneficial interest in either the funds or shares of a pre-petition leverage buyout payment made to publicly-traded shareholders. *Id.* at note 12.   However, the court in *Grand Eagle* did not address the issue of whether the disbursing entity took a beneficial interest in the funds or acted as mere conduit, but rather addressed ABB's [the Defendant's] argument that § 546(e) applies to the transaction between the two private parties because a "settlement payment" is simply "the transfer of cash made to complete a securities transaction". In addressing this issue, the *Grand Eagle* Court held:

> Such a simplistic reading of § 546(e) ignores the meaning of the term "settlement payment" within the securities industry and would, essentially, convert that statutory provision into a blanket transactional cleansing mechanism for any entity savvy enough to funnel payments for the purchase and sale of privately held stock through a financial institution. *Cf. Zahn v. Yucaipa Capital Fund,* 218 B.R. 656 (D.R.I.1998) (holding that § 546(e) did not apply to the sale of non-publicly traded stocks because the stock transfers had no connection with the clearance and settlement system and allowing avoidance would have no impact upon such system); *Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348 (N.D.Tex.1996) (holding that § 546(e) did not apply to a strictly private stock transaction that did not implicate the clearance and settlement process)

*Id.* at 494.

Given that the facts and circumstances of *Grand Eagle* are more analogous to the facts and circumstances of the case at bar, at least with regard to the fact that the transaction at issue involved privately held companies, the Committee submits that this Court should be persuaded by *Grand Eagle* in its determination that the definition of "settlement payments" as used in Section 546(e) and as contemplated by Congress would not encompass and provide safe harbor to the Stock Cancellation currently before this Court.   None of the cases cited by the Defendants in support of their argument that the transfer at issue constituted a "settlement payment" (*Bevill, Kaiser, Resorts* and *Hechinger*) address the issue of Section 546(e) and its application to stock transactions of privately held companies.   As noted above, this Court must look to the

application of Section 546(e) on a case by case basis to ensure to capture the Congressional intent behind the safe harbor provisions of Section 546(e).

Further, in Paragraph 4 of the Declaration of Maurice J. Cashman in Support of Motion of Defendants E. Roger Clark, Maurice J. Cashman, Dana Beyeler and Robert A. Kaemmerer for Summary Judgment, Mr. Cashman states that on April 13, 1999, NFC directed Chase Manhattan Bank to transfer $5,749,868.74 from its operating account at Chase Manhattan Bank to a NFC Holdings bank account at Chase Manhattan Bank. See Defendants Appendix Exhibit, Paragraph 4, pg.3. There remains a material issue of fact as to why NFC transferred more than $5.7 million dollars to NFC Holding and what reasonably equivalent value was given to NFC in exchange. While the Defendants have alleged that the transfers from NFC Holdings to the individual shareholders were in settlement of their securities, there has been no allegation by the Defendants that the transfer of more than $5.7 million dollars from NFC to NFC Holdings was in settlement of a security covered by the safe harbor provisions of Section 546(e). As such, the remains factual issues of whether the initial transfer from NFC to NFC Holdings is subject to the safe harbor provisions of Section 546(e). Under Section 550 of the Bankruptcy Code a trustee may recover property or the value of the property that is the subject of a avoidable transfer from the initial transferee or any immediate or mediate transferee of such initial transfer. 11 U.S.C. § 550(a)(2). If in this case, the initial transfer is not subject to the protections of Section 546(e), the Committee may recover from the Defendants under Section 550 as subsequent transferee's without any consideration into whether the subsequent transfer is protected by Section 546(e).

For the reasons set forth above, the Committee submits that this Court should find that Stock Cancellation did not constitute a "settlement payment" as contemplated by Section 546(e), or at the very least, the Court should find there are material issues of fact as to whether the Stock

Cancellation constitutes a "settlement payment" as contemplated by Section 546(e). Therefore, the Defendants' Motion for Summary Judgment to Counts I, II and III should be DENIED.

> **(ii)    If the Stock Cancellation constituted a "settlement payment" under Section 546(e), was the settlement payment made "by or to a financial institution"?**

Assuming, arguendo, that the Stock Cancellation constituted a "settlement payment" under Section 546(e), the Court must now determine whether the settlement payment was made by or to a financial institution. Initially, the Committee notes that each of the cases cited by the Defendants in support of their argument that the payment was made by a financial institution (with the exception of *In re Loranger Mfg. Corp*, 324 B.R. 575 (Bankr. W.D. Pa. 2005)) dealt with complex publicly traded security transactions involving third party intermediaries (including brokers, disbursing agents, transfer agents, etc., whom the securities were presented to directly for payment) and the national securities clearance and settlement system. *See Resorts, supra.; Kaiser II, supra.; Hechinger, supra.* In these cases, the transferee defendants were required to present their security to a transfer agent, broker and/or disbursing agent in exchange for payment by said transfer agent, broker and/or disbursing agent. In each of these cases, the Courts found that such transfers were "settlement payments" made "by or to a financial institution" under Section 546(e).

In the case at bar, it is undisputed that the Defendants did not present their stock to Chase Manhattan Bank in exchange for payment. The allegation of the Defendants is that in exchange for their Class B Stock, the Defendants received payment from NFC and/or NFC Holding at a price of $49.42 per share. There was no disbursing agent, transfer agent, broker, or any other third party intermediary involved in the transaction. The payment came from either NFC or NFC Holding, both of whom are not "financial institutions," or any other entity identified in Section

546(e).  The Stock Cancellation was not subject to the national securities clearance and settlement system.

The Defendants would have this Court be persuaded by the reasoning and holding of the Court in *Loranger* that because the alleged fraudulent payments were received through a wire transfer drawn on the Debtor's bank account said payments were deemed to have been made "by a financial institution" for Section 546(e) purposes. *Loranger*, 324 B.R. at 585.

In *Loranger*, the Plaintiff, for reasons unknown, conceded that the payments received by the Defendants constituted a "settlement payment" as contemplated under Section 546(e). *Loranger*, 324 B.R. at 584.  Thus, the *Loranger* Court did not conduct any analysis, as this Court is being asked to do, into whether in fact the payment made on account of the security transfer at issue in *Loranger* was in fact a "settlement payment." *Id.*  As such, the *Loranger* Court moved directly into an analysis of the second condition of Section 546(e) and whether the settlement payment was made "by or to a financial institution." *Id.*  In arriving at a conclusion that the payments were made by a financial institution, the *Loranger* Court relied upon the holdings and analysis in *Resorts* and *Hechinger*.  However, rather than attempt to reconcile the distinguishing characteristics of the *Resorts* and *Hechinger* line of cases to the facts of *Loranger* (most importantly the fact that *Resorts* and *Hechinger* involved third party intermediaries to which the securities were presented in exchange for payment) the *Loranger* Court simply begins an analysis of: (i) whether PNC Bank, the institution were the Debtor's bank account was located was a financial institution; and (ii) whether payment by wire transfer from that account constituted payment "by a financial institution" for purposes of Section 546(e).  *Id.* at 584 and 585.

19

As stated above, the Committee submits that an analysis of the distinguishing characteristics of the *Resorts* and *Hechinger* line of cases is critical to a determination whether a "settlement payment" was made "by or to a financial institution" so as to afford the recipient of a potential fraudulent transfer the benefit of the safe harbor provisions of Section 546(e) as contemplated by Congress.  Contrary to the holding in *Loranger*, the decisions in *Resorts* and *Hechinger* do not stand for the rigid proposition that payments drawn on bank accounts constitute payment "by a financial institution" for purposes of Section 546(e).  In fact, neither court even addresses the issue.  *Resorts* and *Hechinger* stand for the proposition that in the event a third party intermediary is used in the transaction, such that the securities are presented to it in exchange for payment, then such payment can be found to have been made "by a financial institution."  This would be consistent with Congressional intent and the Court's concern in protecting the national securities clearance and settlement system.  Such a concern is not applicable in this case.

Because the *Loranger* Court failed to analyze the distinguishing characteristics of *Resorts* and *Hechinger* from the facts of *Loranger* in arriving at its conclusion, the Committee submits that this Court should not find *Loranger* persuasive.  The Committee submits that the reasoning and holding in *Loranger* is incomplete and misguided, and that following such reasoning and holding would only lead to absurd results.  For instance, and as discussed in *Grand Eagle, supra,* a savvy equity interest holder in a privately held company that is experiencing financial difficulty could devise a scheme to have the troubled company buy back his equity making sure only that the payment be drawn on the troubled company's bank account and then simply put the company into a bankruptcy proceeding.  In so doing, the transferee could shield himself or herself from a fraudulent transfer claim under the safe harbor provisions of Section 546(e).  This cannot be

what Congress intended in drafting Section 546(e), because it is tantamount to sanctioning actual fraud.

For this reason and the reasons stated above, the Committee submits that the Distributions received by the Defendants were not "settlement payments" made "by or to a financial institution" and therefore, should not be afforded the protection of the safe harbor provisions of Section 546(e). At the very least, there are unresolved material issues of fact as to whether the payments were made "by or to a financial institution" and therefore, the Defendants Motion for Summary Judgment as to Counts I, II and III should be DENIED.

**C.    THERE ARE MATERIAL ISSUES OF FACT AS TO WHICH BOARD OF DIRECTORS AUTHORIZED THE STOCK CANCELLATION AND WHICH OFFICERS CARRIED OUT THE STOCK CANCELLATION. ACCORDINGLY, AS A MATTER OF LAW, THE COUNTS ASSERTING CLAIMS FOR BREACH OF THE PENNSYLVANIA BUSINESS CORPORATION LAW SHOULD NOT BE DISMISSED.**

In the second argument in support of their Summary Judgment Motion, the Defendants assert that Counts IV and V to the Plaintiff's Complaint alleging claims against the officers and directors of NFC and NFC Holdings for breach of the Pennsylvania Business Corporation Law should be dismissed as a matter of law because the transferor of the payment was NFC Holdings, a Delaware corporation, and thus, Delaware law, not Pennsylvania law, controlled the actions of the officers and directors. The Committee submits that this argument fails for the following reasons.

As previously stated, and as admitted to by the Defendants in their Motion for Summary Judgment, the Boards of Directors for NFC and NFC Holdings were the same. The Committee avers that the Boards of Directors of NFC and NFC Holdings did not act autonomously or separately. As an example, attached to the Committee's Appendix as Exhibit B are the materials

provided to board member Harry D. Rosequist at a January 27, 1999 Board of Directors Meeting. (the "Board Documents"). As evidenced by the Board Documents, specifically copies of the Minutes, the general board meetings of NFC and NFC Holdings were held concurrently. The Minutes of the December 22, 1998 Board Meeting (the meeting at which the Defendants allege the Stock Cancellation was approved) attached to the Board Documents and approved at the January 1999 Board Meeting are titled "National Forge Company Holdings, Inc. and National Forge Company" and specifically indicate that the "meeting of the Board of Directors of National Forge Company Holdings, Inc. and National Forge Company was held concurrently and convened at the Corporate Boardroom at National Forge Company, Irvine, Pennsylvania, on December 22, 1998 at 11:00 a.m." *See* Committee's Appendix Exhibit B and Exhibit C. (For the Court's convenience, the Committee has attached to the Appendix as Exhibit C a separate copy of the December 22, 1998 Minutes.).

The resolutions contained in the December 22, 1998 Minutes authorizing the Stock Cancellation do not specifically indicate which board is resolving to authorize the Stock Cancellation. As NFC is a Pennsylvania company, the Committee submits that to the extent the directors of NFC resolved to approve the Stock Cancellation, Pennsylvania law applies. Additionally, NFC clearly made a transfer, whether to NFC Holdings or directly to the Defendants, of over $5.7 million dollars. The Committee asserts that the actions of the officers and directors of NFC who authorized the transfer more than $5.7 million dollars of NFC's money to NFC Holdings or the Defendants with no reasonably equivalent value being exchanged are subject to scrutiny under Pennsylvania law.

The Committee would ask the Court to take special note that the Defendants' copies of the December 22, 1998 Board Meeting Minutes marked as Exhibit D and E to the Defendants'

Appendix are inconsistent with Exhibit B and C to the Committee's Appendix. *See* Committee's Appendix Exhibits B & C and Defendants' Appendix Exhibits D & E. Curiously, the title to the December 22, 1998 Minutes provided by the Defendants deletes any reference to National Forge Company. Further, the first paragraph of the Defendants copy of the December 22, 1998 Minutes appears to have deleted any reference that the Board of Directors meeting of NFC and NFC Holding was being held concurrently. *See* Defendants' Appendix Exhibits D & E. The Defendants further contend that the December 22, 1998 meeting of the Boards of Directors of NFC and NFC Holdings were held separately. In support of that contention, the Defendants attach two (2) separate sets of Minutes. In light of the discrepancies between the Board Documents – submitted to the Committee well in advance of this litigation by an individual with no interest in this matter – and the Defendants' Appendix Exhibits D & E, it would appear that the Minutes attached to the Defendants' Appendix are not accurate and may have been altered. Further, Exhibit E to the Defendants' Appendix appears to be nothing more than a copy of the last two (2) pages of the December 22, 1998 Minutes, or Exhibit D to the Defendants' Appendix. *See* Exhibit D and E to the Defendants' Appendix. If in fact NFC held its own Board Meeting on December 22, 1998, why does Exhibit E not appear official (i.e. no date and time, no indication of parties present, no signature page, etc.)? Further, if separate meetings were conducted, why is the exact resolution of the alleged NFC December 22, 1998 Minutes and contained in Exhibit E to the Defendants' Appendix also contained in the last two pages of the NFC Holdings December 22, 1998 Minutes and attached as Exhibit D to the Defendants' Appendix?

The Committee submits that there are material issues of fact as to which Board of Directors was acting at the time the Stock Cancellation was approved. The Committee should be entitled to conduct discovery into this matter and the matter concerning the potential altered

documents submitted by the Defendants. For the reason set forth above, the Committee submits that the Defendants' Motion for Summary Judgment as to Counts V and VI of the Plaintiff's Complaint should be dismissed.

Finally, on August 15, 2005, the Committee filed a Motion for Leave to Amend Complaint to, among other things, allege claims against officers and directors for breach of Delaware law. On August 17, 2005, this Court entered an Order permitting the Committee to file such Amended Complaint. Accordingly, the Motion for Summary Judgment as to Counts V and VI is now moot.

## CONCLUSION

As a matter of law, the safe harbor provisions of Section 546(e) do not extend to cases of actual fraud. As a matter of law, the payments made on account of the Stock Cancellation at issue in this case do not constitute a "settlement payment" under Section 546(e) and thus, the Defendants are not entitled to the safe harbor provisions of Section 546(e). Alternatively, there is at least a material issue of fact as to whether the payments are "settlement payments" as that term is used in Section 546(e). As a matter of law, the payments made on account of the Stock Cancellation at issue in this case were not made "by a financial institution" as contemplated under Section 546(e) and thus, the Defendants are not entitled to the safe harbor provisions of Section 546(e). Alternatively, there is at least a material issue of fact as to whether the payments were made "by a financial institution" as contemplated by Section 546(e). There is a material issue of fact as to why NFC transferred to NFC Holdings approximately $5.7 million dollars and what reasonably equivalent value was exchanged. There is a material issue of fact of whether the Committee may recover against the Defendants as subsequent transferee's of the initial avoidable transfer between NFC and NFC Holdings under Section 550 of the Bankruptcy Code.

There exists a material issue of fact as to which Board of Directors authorized the Stock Cancellation. Further, the issue of whether Pennsylvania law or Delaware law governs the actions of the Defendants was rendered moot by this Court's order permitting the Committee to file an Amended Complaint to include claims for breach of Delaware law.

For the above reasons, the Committee submits that the Defendants' Motion for Summary Judgment should be DENIED in its entirety.

Respectfully submitted,

LEECH TISHMAN FUSCALDO & LAMPL, LLC

David W. Lampl, Esquire
PA I.D. No. 28900
John M. Steiner, Esquire
PA I.D. No. 79390
525 William Penn Place, 30th Floor
Pittsburgh, Pennsylvania 15219
(412) 261-1600
Counsel for the Official Committee of
Unsecured Creditors