## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | ) |
| | ) |
| NATIONAL FORGE COMPANY, *et, al.* | ) |
| | ) |
| Debtor. | ) |
| | ) |
| OFFICIAL COMMITTEE OF | ) |
| UNSECURED CREDITORS OF | ) |
| NATIONAL FORGE COMPANY, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| And | ) |
| | ) |
| OFFICIAL COMMITTEE OF RETIREES | ) |
| OF NATIONAL FORGE COMPANY, | ) |
| | ) |
| Intervenors | ) |
| | ) C.A. No. 04-21 ERIE |
| v. | ) |
| | ) |
| E. ROGER CLARK, *et al.* | ) |
| | ) |
| Defendants | ) |

**APPENDIX TO BRIEF IN OPPOSITION TO SUMMARY JUDGMENT OF
DEFENDANTS E. ROGER CLARK, MAURICE CASHMAN, DANA BEYELER
AND ROBERT A. KAEMMERER  AND JOINED BY REMAINING
DEFENDANTS DANIEL ANTOS, ET AL. AND J.P. MORGAN CHASE & CO.,
FLEET BUSINESS CREDIT CORPORATION, AND NATIONAL CITY BANK
OF PENNSYLVANIA**

## APPENDIX TABLE OF CONTENTS

1. Exhibit A…………………House Report 97-420…………...…………….....A-00001

2. Exhibit B……………….....Board Documents………………………………....A-00007

3. Exhibit C…………………National Forge Company Holdings, Inc.
   National Forge Company - Minutes of
   a Regular Meeting of the Board of
   Directors held December 22, 1998………………..A-00172

egment of the

' the Standing
report S. 2240

1

IAN

ederal agencies
we should con-
the actual bene-
xible and com-
e with flexitime
me federal em-
ial work hours,
s unable to con-
working sched-
vide services for
ien agency em-
ier or not we are
ividuals in gov-
tionally, I think
ne indicates that
iis is interesting
flexitime would
een no appreci-
ion the merit of
rmanent author-

· B. RUDMAN.

BANKRUPTCY ACT AMENDMENTS
P.L. 97-222

# BANKRUPTCY ACT AMENDMENTS

*P.L. 97-222, see page 96 Stat. 235*

House Report (Judiciary Committee) No. 97-420,
Jan. 25, 1982 [To accompany H.R. 4935]

Cong. Record Vol. 128 (1982)

## DATES OF CONSIDERATION AND PASSAGE

House February 9, 1982

Senate July 13, 1982

No Senate Report was submitted with this legislation.

## HOUSE REPORT NO. 97-420

[page 1]

The Committee on the Judiciary to whom was referred the bill (H.R. 4935) to amend title II, United States Code, to correct technical errors, and to clarify and make substantive changes, with respect to securities and commodities, having considered the same. report favorably thereon without amendment and recommend that the bill do pass.

### I. Purpose

H.R. 4935 would make a number of technical, clarifying and substantive changes in the provisions of the Bankruptcy Code affecting commodity and securities brokers. Several of the amendments are intended to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries.

### II. Summary of Bill

The commodities and securities markets operate through a complex system of accounts and guarantees. Because of the structure of the clearing systems in these industries and the sometimes volatile nature the markets, certain protections are necessary to prevent the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market.

The Bankruptcy Code now expressly provides certain protections to the commodities market to protect against such a "ripple effect." One of the market protections presently contained in the Bankruptcy Code, for example, prevents a trustee in bankruptcy from avoiding or setting aside, as a preferential transfer, margin payments made to a commodity broker (see 11 U.S.C. Sec. 764(c)).

[page 2]

The thrust of several of the amendments contained in H.R. 4935 is to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market. The amendments will ensure that the avoiding powers of a trustee are not construed to permit margin or settlement payments to be set aside except in cases of fraud and that, except as otherwise

583

EXHIBIT A

A - 00001

## LEGISLATIVE HISTORY
P.L. 97-222

provided, the stay provisions of the Code are not construed to prevent brokers from closing out the open accounts of insolvent customers or brokers. The prompt closing out or liquidation of such open accounts freezes the status quo and minimizes the potentially massive losses and chain reactions that could occur if the market were to move sharply in the wrong direction.

The bill provides that, in the case of the commodities trading industry, the contractual right to liquidate a commodities contract or forward contract may not be stayed, avoided, or limited in any bankruptcy proceeding brought under title 11. In the case of the securities industry, the contractual right of a broker or clearing agency to liquidate a securities contract may not be stayed, avoided, or otherwise limited in any bankruptcy proceeding unless an order affecting such right is authorized under the provisions of the Securities Investor Protection Act or any statute administered by the Securities and Exchange Commission.

H.R. 4935 also would clarify present law that insider claims are subordinate to public customer claims in commodity firm bankruptcies. Additionally, customer creditors of a bankrupt commodities broker are expressly given the right to participate in the election of a trustee in bankruptcy.

### III. BACKGROUND

Due to the structure of the clearing system in the commodities industry and the sometimes volatile nature of the commodities market, the Bankruptcy Code (92 Stat. 2549; Public Law 95–598), as enacted in 1978, expressly provides certain protections to the commodities market to insure the stability of the market. These protections are intended to prevent the insolvency of one commodity firm from spreading to other brokers or clearing agencies and possibly threatening the collapse of the market.

On July 23 and September 17, 1981, the Subcommittee on Monopolies and Commercial Law held oversight hearings on the operation of the Bankruptcy Code with respect to the commodities and securities trading industries. The Subcommittee heard testimony from Philip McB. Johnson, Chairman of the Commodity Futures Trading Commission, Bevis Longstreth, Commissioner of the Securities and Exchange Commission, Theodore H. Focht, General Counsel of the Securities Investor Protection Corporation, and representatives of numerous commodities and securities brokers and clearing organizations. H.R. 4935 was introduced on November 10, 1981 as a result of these hearings.

On November 20, 1981, the Subcommittee reported the bill by voice vote with no amendments. The full Committee ordered the bill favorably reported by voice vote on December 8, 1981.

[page 3]

### IV. PROVISIONS

Section 1(a) provides a definition for "securities clearing agency" and makes conforming redesignations of subsequent definitions.

Section 1(b) amends section 101(36)(A)(xii) of title 11, as to redesignated, to clarify that an investment contract or certificate of interest or participation is within the scope of the definition of a "security" if it is required to be the subject of a Securities Act registration statement whether or not such a registration statement has been filed.

584

A - 00002

-ued to prevent
it customers or
i open accounts
ssive losses and
o move sharply

; trading indus-
ies contract or
ed in any bank-
of the securities
ring agency to
ed, or otherwise
r affecting such
urities Investor
Securities and

sider claims are
m bankruptcies.
modities broker
tion of a trustee

imodities indus-
ities market, the
i), as enacted in
modities market
s are intended to
reading to other
g the collapse of

ee on Monopolies
operation of the
i securities trad-
om Philip McB.
ing Commission,

Exchange Com-
ie Securities In-
es of numerous
anizations. H.R.
of these hearings.
the bill by voice
ed the bill favor-

clearing agency"
lefinitions.
tle 11, as to redes-
rtificate of inter-
on of a "security"
egistration state-
s been filed.

# BANKRUPTCY ACT AMENDMENTS
## P.L. 97-222

Section 1(c) conforms the name of a type of contract excluded from the definition of "security" ("forward commodity contract") to the terminology used in other provisions of title 11 ("forward contract") by deleting the word "commodity".

Section 1(d) clarifies, and makes stylistic changes in, the definition of "stockbroker".

Under Section 2, the exception contained in section 103(d) of title 11 is deleted since the section to which it refers, section 764(C), is deleted. The original reference in section 103(d) to "Section 746(c)" was a typographical error; the reference should have been to "Section 764(c)."

Section 3(a) clarifies that the automatic stay of section 362(a) is applicable upon the filing of an application under the Securities Investor Protection Act of 1970 (15 U.S.C. § 78eee(a)(3)).

Section 3(b) clarifies that the exceptions to the automatic stay are applicable upon the filing of an application under the Securities Investor Protection Act of 1970 (15 U.S.C. § 78eee(a)(3)).

Section 3(c) is intended to clarify that, despite the automatic stay of section 362(a), a commodity broker, forward contract merchant, stockbroker, or securities clearing agency may set off a claim for a margin or settlement payment arising out of commodities contracts, forward contracts, or securities contract against cash, securities or other property which it is holding to margin, guarantee, or secure such contracts, notwithstanding the bankruptcy of the party for whose account such cash, securities, or property is held. This section does not permit a setoff which would be unlawful under any applicable law or regulation.

Section 4 creates a new Section 546(d). This amendment is made simultaneously with the repeal of section 764(c) of title 11. Section 546(d), together with provisions of section 548, prohibits a trustee from avoiding a transfer that is a margin payment to a commodity broker or forward contract merchant or is a settlement payment made by a clearing organization, except where the transfer was made with intent to hinder, delay, or defraud other creditors and was not taken in good faith.

The new section 546(d) reiterates the provisions of current section 764(c). The new section also encompasses both stockbrokers and securities clearing agencies.

Section 5 amends section 548(d)(2)(B) of title 11 to clarify that all margin payments are taken for value to the full extent of such margin payments.

Section 6(a) adds a new section 555 to title 11 to provide that the exercise of a contractual right of a stockbroker or securities clearing

[page 4]

agency to cause the liquidation of a securities contract, because of a condition of the kind specified in section 365(e)(1) of title 11, shall not be stayed, avoided, or otherwise limited in any proceeding under title 11 by a court or administrative agency, unless such order is authorized under the provisions of the Securities Investor Protection Act or any statute administered by the Securities and Exchange Commission. The prompt liquidation of an insolvent's position is generally desirable to minimize the potentially massive losses and chain reaction of insolvencies that could occur if the market were to move sharply in the wrong direction.

585

A - 00003

## LEGISLATIVE HISTORY
### P.L. 97-222

Section 6(a) also adds a new section 556 to title 11 to state that the contractual right of a commodity broker or forward contract merchant to cause the liquidation of a commodity contract, because of a condition of the kind specified in section 365(e)(1) of title 11, shall not be stayed, avoided, or otherwise limited by a court in any proceeding under title 11. As used in section 556, the terms "variation" and "maintenance" margin payments should be construed in conformity with their use in the definition of the term "margin payment" in section 761(45). Section 556 does not impose upon a trustee any statutory duty to make variation or maintenance margin payments. As used in this section, the right to liquidate a commodity contract is only the right to close out an open position. For example, the right to liquidate does not constitute the right to transfer cash, securities, or property held with respect to such contracts, except to the extent otherwise provided in his title.

Section 6(b) adds two new items to the analysis of sections for Chapter 5 of title 11.

Section 7 clarifies that customers of debtors under subchapters III or IV are entitled to participate in the election of the trustee.

Section 8(1) makes stylistic changes.

Section 8(2) redesignates sections 741(5) and 741(6) as sections 741(6) and 741(9), respectively.

Section 8(3) provides a definition of the term "margin payment".

Section 8(4) makes several stylistic changes.

Section 8(5) provides definitions of the terms "securities contract" and "settlement payment".

Section 8(6) corrects a spelling error.

Section 9 clarifies that the filing of an application by the Securities Investor Protection Corporation for a protective decree with respect to the debtor stays all Title 11 proceedings involving the debtor, even if commenced under Chapter 11.

Section 10 makes a stylistic change.

Section 11 makes a stylistic change.

Section 12(a) makes several stylistic changes.

Section 12(b) makes a stylistic change.

Section 12(c) corrects a typographical error.

Section 13 makes a stylistic change.

Section 14 makes stylistic changes, deletes an erroneous cross reference, and adds a provision dealing with a limitation on the trustee's avoiding powers consistent with parallel provisions in section 764 applicable to commodity broker liquidations.

[page 5]

Section 15 makes a stylistic change.

Section 16 makes certain clarifying changes and corrects an erroneous cross reference.

Section 17(a) makes several stylistic clarifying changes.

Section 17(b) amends section 764(b) of title 11 to extend the time within which specified transfers or liquidations may be made in an involuntary case. Under the present section, transfers or liquidations must be made before five days after the filing of the petition in order to be eligible for protection by the Commodity Futures Trading Commission from avoidance by the trustee. As amended, the section will prevent a trustee from avoiding transfers or liquidations made before

586

11 to state that the
;ard contract mer-
itract, because of a
1) of title 11, shall
urt in any proceed-
ns "variation" and
:ued in conformity
.n payment" in sec-
·ustee any statutory
.yments. As used in
:ontract is only the
.e right to liquidate
urities, or property
ctent otherwise pro-

f sections for Chap-

ler subchapters III
the trustee.

741 (6) as sections

nargin payment".

'securities contract"

on by the Securities
decree with respect
ing the debtor, even

·roneous cross refer-
tion on the trustee's
sions in section 764

es and corrects an

.1 to extend the time
may be made in an
isfers or liquidations
the petition in order
utures Trading Com-
ided, the section will
idations made before

## BANKRUPTCY ACT AMENDMENTS
P.L. 97-222

five days after the order for relief, provided such transfers or liquidations are approved by the Commodity Futures Trading Commission.

Section 17(c) repeals section 764(c) of title 11. As explained above, new Section 546(d) incorporates the provisions of current Section 764(c) and makes certain clarifying changes.

Section 18 makes a conforming change. The substitution of the phrase "commodity contract" for the word "commitment" conforms the language of Section 765(b) to that used in the rest of Title 11.

Section 19(a) makes a clarifying change.

Section 19(b) amends section 766(b) of title 11 to make clear the trustee's responsibility to close out, or liquidate, any open commodity contract prior to the last day of trading in such contract, irrespective of whether such contract is "actively traded as of the date of filing of the petition."

Section 19(c) makes several clarifying changes.

Section 19(d) amends section 766(h) of title 11 to implement the intent of the Bankruptcy Code that a customer net equity claim based on a proprietary account may not be paid unless all customer net equity claims which are not based on proprietary accounts have been paid in full.

Under Section 20(a), Section 19 of the Commodity Exchange Act, 7 U.S.C. § 24, is redesignated as Section 20 because there are currently two sections designated as Section 19.

Section 20(b) clarifies that the Commodity Futures Trading Commission is authorized to promulgate regulations to govern the appropriate handling of commodity contracts which are not specifically identifiable to a particular customer.

## V. INFORMATION SUBMITTED PURSUANT TO RULES

### A. BUDGET STATEMENT

Clause 2(1)(3)(B) of rule XI of the Rules of the House of Representatives is inapplicable because the instant legislation does not provide new budgetary authority or increased expenditures.

### B. COST

The Committee concurs with the estimate provided by the Congressional Budget Office and adopts that estimate as the cost estimate of the Committee for the purposes of clause 7 of House Rule XIII.

[page 6]

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., January 18, 1982.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary,*
*House of Representatives, Washington, D.C.*

DEAR MR. CHAIRMAN : Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has reviewed H.R. 4935, a bill to amend title 11, United States Code, to correct technical errors, and to clarify and make substantive changes, with respect

587

A - 00005

## LEGISLATIVE HISTORY
P.L. 97–222

to securities and commodities, as ordered reported by the House Committee on the Judiciary, December 8, 1981.

Based on this review, it is expected that no additional cost to the government would be incurred as a result of enactment of this bill.

Sincerely,

ALICE M. RIVLIN, *Director.*

### C. INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(1)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that this bill will not have an inflationary impact on prices and costs in the operation of the national economy.

### D. OVERSIGHT STATEMENT

The Subcommittee on Monopolies and Commercial Law of this Committee exercises oversight responsibilities with respect to the Federal bankruptcy laws.

No findings or recommendations of the Committee on Government Operations were received as referred to in rule XI, clause 2(1)(3)(D).

\*          \*          \*          \*          \*

A - 00006

# National Forge Company Holdings, Inc.
# &
# National Forge Company®
# Board of Directors

# January 27, 1999

# Harry D. Rosequist

EXHIBIT
B

A - 00007

## TABLE OF CONTENTS

**AGENDA**

**MINUTES** ................................................................................................................ **EXHIBIT 1**

**IRVINE REVIEW** ................................................................................................ **EXHIBIT 2**

**NF COMPONENTS, INC.** .................................................................................. **EXHIBIT 3**

**MITCHELL, SHACKLETON** .............................................................................. **EXHIBIT 4**

**N W FORGEMASTERS** ...................................................................................... **EXHIBIT 5**

**CONSOLIDATED** ............................................................................................... **EXHIBIT 6**

**BOARD MATTERS** ............................................................................................. **EXHIBIT 7**

**FINANCIAL MATTERS** ..................................................................................... **EXHIBIT 8**

**ADDITIONAL MATTERS** .................................................................................. **EXHIBIT 9**

# National Forge Company Holdings, Inc.
# National Forge Company®

## Board of Directors
## January 27, 1999

## A G E N D A

I.  Minutes Approved – October 28, 1998, National
    Forge Company Holdings, Inc.
    Minutes Approved – October 28, 1998, National Forge
    Company
    Minutes Approved – December 22, 1998, National Forge
    Company Holdings, Inc.
    Minutes Approved – Executive Committee Meetings

II. Irvine Review
    - Financial
    - Operations
    - Marketing
    - Melt Shop Review

III. National Forge Components, Inc. Review

IV. Mitchell, Shackleton & Co. Ltd. Review
    - Financial
    - Operations
    - Trading
    - Global Crankshaft Services Ltd.
    - Capital Investment Plan

V.  North West Forgemasters Ltd.
    - Financial
    - Operations
    - Trading

VI. Consolidated Financial Statements
    - Review

VII. Board Matters
    - Meeting Dates

VIII.   Financial Matters
- Loan Status Update
- Availability Under Revolver
- Loan Covenant Review
- Capital Expenditure Update
- S Corporation Update

IX.   Additional Matters
- Excess Cash Flow Bonus Plan – Second Quarter
- Early Retirement – ESOP Stock
- Y2K Update
- Environmental Update
- National Forge Community Fund
- Department of Defense Resolution
- Old Business
- New Business
- Adjournment

**EXHIBIT
1**

A - 00011

National Forge Company Holdings, Inc.
National Forge Company®

Minutes of a Regular
Meeting of the Board of Directors
Held October 28, 1998

A meeting of the Board of Directors of National Forge Company Holdings, Inc. and National Forge Company was held concurrently and convened at the Clinton E. Wilder Museum, Irvine, Pennsylvania, on October 28, 1998 at 8:00 A.M.

Directors attending were: Randy M. Abplanalp, E. Roger Clark, Patrick A. Flanagan, Charles C. Judd, Ashok K. Khare, John G. Koedel Jr., Stan Lundine, Dennis L. Peterson and Harry D. Rosequist. Others present by invitation were Dana A. Beyeler, Maurice J. Cashman, Thomas H. Jackson, Robert A. Kaemmerer and Charles R. Olson.

Mr. Clark acted as Chairman of the meeting with Mr. Cashman acting as Secretary.

**Chairman's Remarks**
Mr. Clark welcomed the Board members and reviewed the agenda for the meeting.

Mr. Clark informed the Board that he had received a letter of resignation from Board Member Harry Walters due to health problems. He had also received a letter of resignation effective November 1, 1998 from Randy Abplanalp, as he will no longer be serving as Union President.

Mr. Clark advised the Board that the Nominating Committee had met to consider replacements proposed to them by the Independent Union of National Forge Employees. They considered the matter and placed the following resolution before the Board, which was unanimously approved.

RESOLVED, that the Board of Directors of National Forge Company Holdings, Inc., hereby elect Harry D. Rosequist to fill the unexpired term of Harry D. Walters, and elect Robert W. Richards to fill the unexpired term of Randy M. Abplanalp as of November 1, 1998.

In addition the Board unanimously approved the following resolutions.

RESOLVED, that the proper officers of National Forge Company Holdings, Inc. are hereby authorized and directed to execute the necessary written consents of the sole shareholders of the following companies in order to appoint Robert W. Richards, President of The Independent Union of National Forge Employee, as a director of National Forge Company effective November 1, 1998:

1

RESOLVED, that the proper officers of National Forge Company are hereby authorized and directed to execute the necessary written consents of the sole shareholders of the following companies in order to appoint Robert W. Richards as a director effective November 1, 1998:

- a) National Forge Components, Inc.
- b) NFIP, Inc.
- c) National Forge Export, Ltd.
- d) National Forge Europe, Ltd.

It is also directed that the proper officers of National Forge Europe, Ltd. are hereby authorized to execute the necessary written consents of the sole shareholder of the following companies in order to appoint Robert W. Richards and Gregory Bacon to the Board of directors of Mitchell, Shackleton & Co. Ltd. as of November 1, 1998, and appoint Robert W. Richards to the Board of Directors of North West Forgemasters Ltd. as of November 1, 1998.

RESOLVED, the Board of Directors of National Forge Company Holdings, Inc. wishes to thank Harry D. Walters for his three plus years of service as a Board Member. His dedication, attention to Board matters and advice has always been appreciated. We wish Harry continued success and improved health.

RESOLVED, the Board of Directors of National Forge Company Holdings, Inc. wishes to thank Randy M. Abplanalp'for his three plus years of service as a Board Member, and his efforts as an original board member of The NFC Acquisition Company in the formation of National Forge Company Holdings, Inc. as a majority owned ESOP company. Randy's dedication, many hours of work, and his key involvement in leading the ESOP effort are deeply appreciated. We wish Randy the very best in his future.

RESOLVED, that the Board of Directors of National Forge Company Holdings, Inc., pursuant to the Certificate of Incorporation and Bylaws of the Corporation, hereby designate:

- a) Robert W. Richards to serve on the Executive Committee effective November 1, 1998
- b) Harry D. Rosequist to serve on the Nomination Committee.

RESOLVED, that the Board of Directors of National Forge Company Holdings, Inc. pursuant to the Certificate of Incorporation and Bylaws of the Corporation, hereby designate the following alternate members for the following committees:

- a) Robert W. Richards to serve as an alternate member for Harry D. Rosequist on the Nominating Committee effective November 1, 1998.
- b) Robert W. Richards to serve as an alternate member for Dennis Peterson on the Audit Committee effective November 1, 1998.

RESOLVED, that the Board of Directors of National Forge Company, pursuant to the Certificate of Incorporation and Bylaws of the Corporation, hereby designate Robert W. Richards to serve on the Executive Committee effective November 1, 1998.

2

RESOLVED, that the Board of Directors of National Forge Company, pursuant to the Certificate of Incorporation and Bylaws of the Corporation, hereby designate Robert W. Richards to serve as an alternate member for Dennis L. Peterson on the Audit Committee effective November 1, 1998.

RESOLVED, that the Board of Directors of National Forge Company appoint Robert W. Richards to the following committees effective on November 1, 1998:
a)     Retirement Plan
b)     National Forge Company Employee Savings Plan
c)     Community Fund Trustees

**Approval of Minutes**
Minutes of the September 17, 1998, Board meeting were approved.

The Minutes of a special Executive Committee meeting held October 14, 1998 were approved.

The Minutes of a special Executive Committee meeting held October 20, 1998 were approved.

**Financial Matters**
Mr. Jackson reviewed the financial results of the Irvine operation for first quarter of fiscal year 1999. He noted that a decline in the sales of crankshafts and pipe molds and a US government-delay in the shipment of penetrators negatively affected results. A settlement on a price-fixing action against producers of electrodes had a positive impact on the pre-tax profit for the period.

Mr. Clark reviewed a series of graphs depicting various measurements of sales and profitability of the Irvine operation.

**Irvine Operations**
Mr. Olson presented a report on the Irvine operation for the quarter. He reported that manpower for the quarter was reduced by 35 employees, of which 22 were placed on layoff. Four salary positions were eliminated. Consideration is being given to further reductions over the next several months. He reported that the Company received its ISO 9002 certificate at the end of August. The apprentice training program is progressing with good attendance. The new shop control software should be in use by February, 1999.

**Capital Projects**
Capital P-531 for the remanufacture of 251 GFM machine with the addition of CNC controls in the amount of $1,004,530 was presented to the Board by Mr. Olson. The Board unanimously approved the request after extensive discussion.

3

A - 00014

Capital P-533 in the amount of $114,765 to replace the electric controls on #475 overhead crane in the Department 608 was approved.

## Irvine Marketing

Mr. Beyeler updated the Board on the marketing activities for each of the Company's product lines during the quarter. Bookings for the quarter lagged the forecasted levels. Discussions are taking place with Powers Parts, a division of Motive Power, for after-market sales of EMD-type crankshafts He also reported that although the marketing agreement with Wildauer has not been approved, the Company has moved forward in presenting opportunities to Wildauer.

Domestic pipe mold sales were positive for the quarter, however U.S. Pipe has had personnel changes that may increase pressure to reduce our pricing to them. Foreign pipe mold sales continue to be adversely affected by the lower priced foreign competition as well as the strong US dollar.

All other product lines, with the exception of penetrators, have experienced severe economic declines. Mr. Beyeler advised the Board that pricing negotiations were taking place on the BLU113 but that we will receive the order for 72 units with a follow-up order of 173 additional units anticipated. Mr. Beyeler indicated that the US government had not yet paid us the $340,000 from the primer settlement. They have promised payment during the second quarter of FY 1999 with interest.

Mr. Clark presented a number of graphical representations of booking trends for review by the Board. Also included were historical graphs of the backlog and sales mix.

## National Forge Components

Mr. Jackson reviewed the financial results of National Forge Components for the quarter to date. Sales and pre-tax profit were significantly below plan. This reflected fewer crankshafts being supplied by GE for reconditioning.

Mr. Beyeler reviewed the marketing outlook. Reconditioning activity continues to be adversely affected by demand for locomotives and GE's improved inspection skill. Other opportunities for reconditioning are being investigated. Currently discussions are underway with Motive Power.

## Mitchell Shackleton

Mr. Clark reviewed the financial performance of Mitchell Shackleton for the quarter. Performance was below the forecasted levels.

Mr. Clark advised the Board that an independent flange business that was a potential acquisition has been acquired through a management buyout. The flange business moved into Mitchell from North West Forgemasters was in place and operating. He also reported that success was being achieved with the Global Crankshaft Services, joint venture.

4

A - 00015

A future capital for the repair and renovation of the GFM machine at Mitchell was discussed with further investigation to be done before a capital request is proposed. No action was taken.

Mr. Clark then reviewed a number of graphs depicting historical sales and profits.

**North West Forgemasters**
Mr. Clark reported on the financial results for the first quarter of fiscal year 1999. Sales and profits were slightly below plan. Mr. Clark also reported that he had reached an agreement with Greg Bacon to do business development work for both North West Forgemasters Ltd. and Mitchell, Shackleton & Co. Ltd. Mr. Bacon will gradually reduce his day-to-day role at North West Forgemasters Ltd. and he will join the Mitchell, Shackleton Board of Directors.

**Consolidated Financial Results**
Mr. Jackson reported on the consolidated financial results. Net profit for the quarter was $379,000 on consolidated sales of $18,513,000.

The Board unanimously approved an additional $250,000 to repurchase shares of stock from former employees. Total amount approved in fiscal year 1999 is $1,250,000.

**Board Matters**
Dates for future Board meetings were reviewed. The next Board meeting will be held Thursday, January 21, 1999. **(This date was later changed to January 27, 1999.)**

**Financial Matters**
Mr. Cashman reviewed the outstanding loans of National Forge Company Holdings, Inc., Mitchell Shackleton, Global Crankshaft Services, North West Forgemasters and National Forge Europe. He also reviewed the borrowing base certificate and the status of the bank covenants. The financial targets for the Fiscal Year 1999 Stock Appreciation Rights Program was also presented.

Mr. Olson reviewed the status of the capital expenditure program for the Irvine operation and the status of the environmental remediation efforts. He reported that an agreement had been reached with the Pennsylvania Department of Environmental Protection relating to the closure of AOC6. Additionally, Smith Alexander, the firm mining the slag site in Irvine, had informed the company that it would be ending operations and selling its assets. The recent drop in scrap metal prices does not allow them to continue in operation. Alternate solutions to the closure of the slag site are being investigated.

Mr. Olson also reported that bids for electric power supply are under consideration. Deregulation will occur January 1, 1999. It is expected the Company could save up to 8% on its annual electric bill in Irvine.

A - 00016

**Other Matters**

Mr. Cashman reviewed the results of the first quarter 1999 cash flow bonus program. Employees in Irvine will receive a 3.11% bonus.

Charitable contributions made by the Company were reviewed. The Company made charitable contribution of $103,000 in Fiscal Year 1998, of which $102,000 was made to local organizations.

Upon proper motion and second, the Board unanimously approve a contribution of $38,500 to the United Fund of Warren County Campaign for 1999.

Mr. Clark informed the Board that he had been contacted by the Public Broadcasting Corporation regarding a film piece dealing with employee ownership. The piece would be broadcasted on national public broadcast television stations.

Mr. Jackson reviewed two letters sent to the Company by PricewaterhouseCoopers that made recommendations dealing with certain areas of internal control. He advised the Board that the matter would be addressed in the future.

Mr. Jackson also presented a schedule of fees proposed by PricewaterhouseCoopers for the fiscal year 1999 audit. Upon proper motion and second the Board approved the fee schedule and authorized management to engage PricewaterhouseCoopers as the audit firm.

Mr. Jackson presented a report on each Company's efforts to address the Year 2000 systems problem. A task team was formed to deal with this issue and significant progress has been made. He will continue to report to the Board on the progress of this effort.

Mr. Cashman made a presentation regarding the early retirement repurchase liability. He advised the Board that the Credit Agreement prohibited making an amendment to the ESOP that would increase the repurchase liability. After discussion, the Board requested that Mr. Cashman and Mr. Kaemmerer contact Kirkpatrick and Lockhart to determine if changes could be made to the plan which would allow only a limited number of Early Retirements in any fiscal year and to report back to the Board in January 1999.

Mr. Kaemmerer presented to the Board a series of graphs depicting the cash expense for retirees and active employees since fiscal year 1996. The total cash expense for actives and retirees was $4,394,403 in fiscal year 1998. It was noted that the healthcare expense is excepted to rise beyond $4.5 million in fiscal year 1999. Mr. Clark pointed out to the Board that this cost must be addressed if the Company is to remain competitive in the future.

Upon proper motion and second, the Board elected not to pay a Christmas Remembrance in December of 1998.

A - 00017

There being no further business, the meeting was adjourned.

An executive session followed the meeting to discuss topics of strategic interest.

Filed with the minutes of the Board of Directors of National Forge Company Holdings, Inc. and National Forge Company this 27th day of January, 1999.

_____

Maurice J. Cashman, Secretary

A - 00018

# National Forge Company®

Minutes of a Special Meeting
of the Executive Committee
held December 10, 1998

A special meeting of the Executive Committee of the National Forge Company Board of Directors was held on December 10, 1998. Mr. Clark served as Chairman and Secretary of the meeting. Roger Clark and Robert Richards participated in person and John G. Koedel, Jr. participated via a telephone call.

## Capital Expenditure

The Executive Committee authorized the Chief Financial Officer of the Company to initiate negotiations with SCM Corrugator Rolls Limited (SCM), located in Manchester, England, UK, for the acquisition of the material, equipment and inventory of SCM. The maximum bid approved for this acquisition was £272,000 or $450,000.

There being no other business to conduct, the meeting was adjourned.

Filed with the minutes of the Executive Committee of National Forge Company this 27th day of

January, 1999.

_____
E. Roger Clark, Secretary

# National Forge Company®

Minutes of a Special Meeting
of the Executive Committee
held December 7, 1998

A special meeting of the Executive Committee of the National Forge Company Board of Directors was held on December 7, 1998. Mr. Clark served as Chairman and Secretary of the meeting. Roger Clark and Robert Richards participated in person and John G. Koedel, Jr. participated via a telephone call.

## Capital Expenditure

Mr. Clark presented the following Capital Expenditures for approval:

| P-538 | Purchase self centering rest and brackets for #310 lathe. | | $28,000 |
|-------|----------------------------------------------------------|------------------|---------|
| | | | |
| P-485 Rev.1 | Replace duct expansion joints on baghouse. | Original Rev. 1 Total | $25,000 10,390 $35,390 |

The above Capital Expenditures were approved.

There being no other business to conduct, the meeting was adjourned.

Filed with the minutes of the Executive Committee of National Forge Company this 27th day of

January, 1999.

_____

E. Roger Clark, Secretary

NATIONAL FORGE COMPANY
IRVINE PLANT

A   ICATION FOR:    ADDITION TO PROPERTY, PLANT AND EQUIPMENT    NUMBER: P-538

PROGRAM: FY 1999                         ORIGINAL DATE: 12/04/98
REV. NO.                                 REV. DATE:

DESCRIPTION OF PROJECT: PURCHASE SELF CENTERING REST AND BRACKETS FOR #310 LATHE.


PURPOSE: TO GIVE #310 LATHE THE ABILITY TO HOLD 50MM TO 300MM WORKPIECES.


START DATE: ON APPROVAL                  EST. COMPLETION DATE: 3 QTR 99

ANTICIPATED COST:

| MATERIAL OR SUB. CONTR. | INTERNAL LABOR | OVERHEAD | CONTINGENCY | TOTAL |
|---|---|---|---|---|
| ---------- | ---------- | ---------- | ---------- | ---------- |
| $28,000 | | | | $28,000 |

TIMING OF EXPENDITURE:
CURRENT YEAR:     1ST QTR.   %  2ND. QTR.   %  3RD. QTR. 100 %  4TH. QTR.     %
NEXT YEAR:        1ST QTR.   %  2ND. QTR.   %  3RD. QTR.     %  4TH. QTR.     %

JUSTIFICATION: ADD CAPABILITY AND REDUCE MANUFACTURING COST OF CHARLOTTE PIPE MOLDS
               PROCESSED THROUGH #310 LATHE - (CONTINUED SEE ATTACHED)


NET PRESENT VALUE CALCULATION: _____ ATTACHED _____ WAIVED _____ NOT REQUIRED

SPONSOR: PETTIT S                         NOTIFICATION OF APPROVAL:
                                          DEPT. NO. 606

MGR. PLANT & FAC. ENGR.:                  WORK TO BE DONE BY DEPT/S NO.

V.P. OPER-IRVINE:                         EQUIP. NO.: 310

CONTROLLER:                               REQ. NO.: H105324

PRESIDENT:                                MATERIAL CHARGE: _____

BOARD OF DIRECTORS:                       LABOR CHARGE: _____

CHIEF FINANCIAL OFFICER: _____    DATE: _____


DISTRIBUTION:  SPONSOR/S, M.CASHMAN, G.ENGLISH, T.JACKSON, H.MURPHY, B.NICHOLS,
               C.OLSON, P.VAVALA, PURCHASING

December 1, 1998

Justification – P-538

By purchasing and installing one self-centering steadyrest and related hardware, #310 lathe will be capable of machining products with outside diameters of 50mm through 300mm. This will specifically address the Charlotte Pipe Company molds. Presently machine #240 is the only machine capable. When #310 is equipped, both #240 and #310 can be operated with only one operator per shift much the same as we do when producing BLU/109's.

The present average processing time of a Charlotte mold is 5.45 hours. The labor savings should be 31.49 per hour times 300 units per year. The latest sales forecast is 600 units per year (in 1998, 638 units were actually sold).

$$5.45 \times 31.49 = 171.61/\text{unit savings} \times 300 = \$51,486.15/ \text{ year savings}$$

CRO:pv

NATIONAL FORGE COMPANY
IRVINE PLANT

A   ICATION FOR:    ADDITION TO PROPERTY, PLANT AND EQUIPMENT    NUMBER: P-485

PROGRAM: FY 1999                      ORIGINAL DATE: 2/19/98
REV. NO. 01                          REV. DATE: 11/23/98

DESCRIPTION OF PROJECT: REPLACE DUCT EXPANSION JOINTS ON BAGHOUSE


PURPOSE: MAINTAIN EQUIPMENT AND ENVIRONMENTAL COMPLIANCE


START DATE: 070198                   EST. COMPLETION DATE: 1 QTR 99

ANTICIPATED COST:

| MATERIAL OR SUB. CONTR. | INTERNAL LABOR | OVERHEAD | CONTINGENCY | TOTAL |
|---|---|---|---|---|
| $21,000 | $1,000 | $2,000 | $1,000 | $25,000 |
| REV. 01 AMOUNT | $10,390 | | TOTAL | $35,390 |

TIMING OF EXPENDITURE:
CURRENT YEAR:    1ST QTR.    %  2ND. QTR. 100 %  3RD. QTR.    %  4TH. QTR.    %
NEXT YEAR:       1ST QTR.    %  2ND. QTR.    %  3RD. QTR.    %  4TH. QTR.    %

    'IFICATION: ADDITIONAL COSTS DUE TO UNFORESEEN STRUCTURAL PROBLEMS.



NET PRESENT VALUE CALCULATION:    ____ ATTACHED ____ WAIVED ____ NOT REQUIRED

SPONSOR: WINTER R

MGR. PLANT & FAC. ENGR.: _X/DM 11-24-98_

V.P. OPER-IRVINE: _____ 11/24/98_

CONTROLLER: _____ 12/1/98_

PRESIDENT: _____ 12/7/98_

BOARD OF DIRECTORS: _____ 12/7/98_

CHIEF FINANCIAL OFFICER: _____    DATE: _____

NOTIFICATION OF APPROVAL:
DEPT. NO. 601

WORK TO BE DONE BY DEPT/S NO. 643
EQUIP. NO.: 245

REQ. NO.:

MATERIAL CHARGE: _____

LABOR CHARGE: _____


DISTRIBUTION:  SPONSOR/S, M.CASHMAN, G.ENGLISH, T.JACKSON, H.MURPHY, B.NICHOLS,
               C.OLSON, P.VAVALA, PURCHASING

# National Forge Company®

Minutes of a Special Meeting
of the Executive Committee
held December 2, 1998

A special meeting of the Executive Committee of the National Forge Company Board of Directors was held on December 2, 1998. Mr. Clark served as Chairman and Secretary of the meeting. Robert Richards and John G. Koedel, Jr. participated via a telephone call.

## Capital Expenditure

Mr. Clark presented the following Capital Expenditure for approval:

| P-536 | Repair, restore and stabilize North bridge abutment and adjacent bank that leads to the waste water treatment facility. | $80,000 |
|---|---|---|

The above Capital Expenditure was approved.

There being no other business to conduct, the meeting was adjourned.

Filed with the minutes of the Executive Committee of National Forge Company this 27th day of

January, 1999.


_____
E. Roger Clark, Secretary

NATIONAL FORGE COMPANY
IRVINE PLANT

Aϊ  CATION FOR:      ADDITION TO PROPERTY,PLANT AND EQUIPMENT       NUMBER: P-536

PROGRAM: FY 1999                        ORIGINAL DATE: 12/01/98
REV. NO.                                REV. DATE:

DESCRIPTION OF PROJECT: REPAIR, RESTORE AND STABILIZE NORTH BRIDGE ABUTMENT AND ADJACENT
                        BANK THAT LEADS TO THE WASTE WATER TREATMENT FACILITY.


PURPOSE: THE BRIDGE IS SEVERLY UNDERMINED AND ERODED AND IS IN IMMEDIATE NEED
         OF REPAIR.

START DATE: ON APPROVAL              EST. COMPLETION DATE: 3 QTR 99

ANTICIPATED COST:
MATERIAL OR        INTERNAL
SUB. CONTR.        LABOR          OVERHEAD          CONTINGENCY         TOTAL
-----------        ----------     ----------        -----------         ----------
  $80,000                                                               $80,000

TIMING OF EXPENDITURE:
CURRENT YEAR:      1ST QTR.   % 2ND. QTR.    % 3RD. QTR. 100 % 4TH. QTR.      %
NEXT YEAR:         1ST QTR.   % 2ND. QTR.    % 3RD. QTR.     % 4TH. QTR.      %

JU  IFICATION: THE BRIDGE IS THE ONLY ACCESS TO NFC'S PROCESSED WATER TREATMENT
               FACILITY AND IF NOT REPAIRED NOW DURING THE CURRENT PERIOD OF LOW
               WATER, COULD BE LOST DUE TO HIGH WATER IN LATE WINTER OR EARLY
               SPRING OF 1999.

NET PRESENT VALUE CALCULATION: _____ ATTACHED _____ WAIVED _____ NOT REQUIRED

                                                 NOTIFICATION OF APPROVAL:
SPONSOR: DILUZIO C                               DEPT. NO. 750

MGR. PLANT & FAC. ENGR. HDM                      WORK TO BE DONE BY DEPT/S NO.

V.P. OPER-IRVINE: CMW 12/1/98                    EQUIP. NO.:

CONTROLLER:                                      REQ. NO.:

PRESIDENT: E.R. Clark 12/2/98                    MATERIAL CHARGE: _____

BOARD OF DIRECTORS: S.R. Clark 12/2/98              LABOR CHARGE: _____

CHIEF FINANCIAL OFFICER: _____    DATE: _____


DISTRIBUTION:  SPONSOR/S,M.CASHMAN,G.ENGLISH,T.JACKSON,H.MURPHY,B.NICHOLS,
               C.OLSON,P.VAVALA,PURCHASING

**National Forge Company Holdings, Inc.**
**National Forge Company**

Minutes of a Regular Meeting
of the Board of Directors
held December 22, 1998

A meeting of the Board of Directors of National Forge Company Holdings, Inc. and National Forge Company was held concurrently and convened at the Corporate Boardroom at National Forge Company, Irvine, Pennsylvania, on December 22, 1998 at 11:00 a.m.

Directors attending in person were E. Roger Clark, Ash K. Khare, Dennis L. Peterson, Robert W. Richards and Harry D. Rosequist. The directors participating by telephone were Patrick A. Flanagan, Charles C. Judd, John G. Koedel, Jr. and Stan Lundine. Maurice J. Cashman was present by invitation.

Mr. Clark acted as Chairman of the meeting with Mr. Cashman acting as secretary.

After a presentation and discussion on a proposal for National Forge Company Holdings, Inc. and its domestic subsidiaries to be an S Corporation, the following resolution was unanimously approved.

WHEREAS, pursuant to the Small Business Job Protection Act of 1996 and the Taxpayer Relief Act of 1997, employee stock ownership plans are permitted to be shareholders in corporations taxed under Subchapter S of the Internal Revenue Code of 1986, as amended ("Subchapter S Corporations"); and

WHEREAS, senior management, in consultation with PricewaterhouseCoopers LLC, the Company's professional accounting firm; Kirkpatrick & Lockhart LLP, the Company's legal counsel; and Valumetrics, Inc., the Company's professional valuation advisor (collectively, the Company's "Professional Advisors"), has studied the financial, tax and other implications of causing the Company to elect to be taxed as a Subchapter S Corporation, including the requirements that a Subchapter S Corporation have no more than one class of outstanding stock and no more than 75 shareholders; and

WHEREAS, the Board of Directors of the Company has considered the results of that study and the advice of the Company's Professional Advisors and considers it to be prudent and in the best interests of the Company, its shareholders, and its employees to:

(i)     redeem or cash out through a merger the shares of Class B Common Stock of the Company held by certain management shareholders (individually or through their individual retirement accounts) (the "Management Shareholders") so that, following such redemption or merger, the National Forge Company Holdings, Inc. Employee Stock Ownership Plan (the "ESOP") would be the sole shareholder of the Company;

A - 00026

(ii)    borrow funds sufficient to enable the Company to complete the redemption or merger;

(iii)   amend the ESOP to provide that distributions from the ESOP to participants therein may be made only in the form of cash and not in the form of Company stock; and

(iv)   cause the Company to elect to be taxed as a Subchapter S Corporation.

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the President and Chief Executive Officer of the Company and the Vice President, Chief Financial Officer and Secretary of the Company (the "Designated Officers") are each authorized, on behalf of the Company, to offer to redeem at $49.42 per share from the Management Shareholders, the shares of Class B Common Stock of the Company held by such Management Shareholders and/or their individual retirement accounts, on such terms and conditions as the Designated Officers may deem appropriate (the "Redemption Offer") (such Redemption Offer to be conclusively evidenced by the execution and delivery of the offering materials); provided, however, that such Redemption Offer shall be conditioned upon (i) (a) acceptance of the Redemption Offer by all Management Shareholders and in respect of all outstanding shares of Class B Common Stock of the Company ("Unanimous Acceptance"), or (b) in the absence of Unanimous Acceptance, approval by the Company's shareholders of a merger of the Company as hereinafter described (the "Merger"), and (ii) obtaining all necessary consents to the foregoing redemption and/or the Merger.

FURTHER RESOLVED, that in the event of a Unanimous Acceptance of the Redemption Offer, the Designated Officers are hereby authorized and directed, on behalf of the Company, to redeem the shares of Class B Common Stock held by the Management Shareholders and/or their individual retirement accounts pursuant to the terms and conditions of the Redemption Offer.

FURTHER RESOLVED, that in the event of less than Unanimous Acceptance of the Redemption Offer, each Designated Officer is hereby authorized and directed, on behalf of the Company, to take any and all actions necessary or appropriate to effectuate a merger of the Company with another corporation (organized and established by one or both of the Designated Officers), with the Company designated as the surviving corporation (the "Merger"), for the sole purpose of (i) causing each outstanding share of Class B Common Stock of the Company to be exchanged for an amount of cash equal to the fair value of such Class B Common Stock, and (ii) causing all of the outstanding shares of Class A Common Stock of the Company to be exchanged for shares of the surviving corporation.

FURTHER RESOLVED, that each Designated Officer is hereby authorized and directed to borrow, on behalf of the Company, from Chase Manhattan Bank or another reputable lender, on terms and conditions deemed advisable by either or both of such Designated Officers, funds sufficient to enable the Company to complete the Redemption Offer and/or Merger (such borrowing to be conclusively evidenced by the execution and delivery of a promissory note) and

G:\FILES\BRD\DEC98\MINUTES.DOC

to obtain from Chase Manhattan Bank such approvals of or consents to the Redemption Offer and/or Merger and Subchapter S Corporation election, and any such other approvals or consents, as the Designated Officers may determine to be necessary or advisable.

FURTHER RESOLVED, that, conditioned upon the consummation of the Redemption Offer and/or the Merger, each of the Designated Officers is hereby authorized and directed, on behalf of the Company, to (i) file Form 2553 with the Internal Revenue Service, designating thereon a July 1 to June 30 tax year, effective for the tax year beginning July 1, 1999, and to obtain necessary shareholder consents in connection therewith, on or before the due date for such filing, and (ii) complete such other filings, make such other elections and take such other actions in connection with the federal income tax status of the Company's direct and indirect subsidiaries as such Designated Officer may deem to be necessary or appropriate.

FURTHER RESOLVED, that each of the Designated Officers is hereby authorized and directed, on behalf of the Company, to amend the ESOP to provide that distributions from the ESOP to ESOP participants shall be made only in the form of cash and may not be made in the form of Company stock (such amendment to be conclusively evidenced by the execution and delivery of an amendment to the ESOP).

FURTHER RESOLVED, that each of the Designated Officers is hereby authorized and directed, on behalf of the Company, to execute and deliver all such documents and instruments and to take or cause to be taken all such further action, as he shall deem necessary or advisable in order to carry into effect the purposes and intent of any and all of the foregoing resolutions.

It was also agreed that the Compensation Committee should meet to design a top management incentive plan and present it to the Board of Directors for consideration prior to July 1, 1999.

By unanimous consent the following resolution was approved.

WHEREAS, National City Bank of Pennsylvania ("National City') is acting under individual Agreements of Trust as Trustee of each of National Forge Company Savings Plan ("Savings Plan"), the National Forge Company Retirement Plan ("Retirement Plan") and the National Forge Company Voluntary Employees Beneficiary Association Plan ("VEBA"); and

WHEREAS, the Company desires to appoint The Chase Manhattan Bank ("Chase") as the successor Trustee of the Retirement Plan and VEBA; and

WHEREAS, the Company desires to appoint Fidelity Management Trust Company ("Fidelity") as successor Trustee of the Savings Plan.

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that The Chase Manhattan Bank is hereby appointed the successor to the National City Bank of Pennsylvania as Trustee of the National Forge Company Retirement Plan and the National Forge Company Voluntary Employees Beneficiary Association Plan effective as of such dates as may be mutually satisfactory to the Company, National City and Chase.

RESOLVED, that Fidelity Management Trust Company is hereby appointed the successor to National City Bank of Pennsylvania as Trustee of the National Forge Company Savings Plan effective as of such date as may be mutually satisfactory to the Company, National City and Fidelity.

RESOLVED, that the proper officers of the Company be and they hereby are authorized and directed, with the advice of counsel, to negotiate, execute and deliver appropriate Agreements of Trust with Chase with respect to the Retirement Plan and VEBA.

RESOLVED, that the proper officers of the Company be and they hereby are authorized and directed, with the advice of counsel, to negotiate, execute and deliver an appropriate Agreement of Trust with Fidelity with respect to the Savings Plan.

RESOLVED, that the proper officers of the Company are hereby authorized and directed to cause National City to transfer and delivery all the assets of the Retirement Plan and VEBA to Chase as successor Trustee as soon as administratively practical following the execution and delivery of the appropriate Agreements of Trust between the Company and Chase.

RESOLVED, that the proper officers of the Company be and they hereby are authorized and directed to cause National City to transfer and deliver all the assets of the Savings Plan to Fidelity as successor Trustee as soon as administratively practical following the execution and delivery of the appropriate Agreement of Trust between the Company and Fidelity.

RESOLVED, that the proper officers of the Company be and they hereby are authorized and directed, with the advice of counsel, to execute and deliver such additional documents, instruments and agreements as may be necessary or appropriate to carry out the intent and purpose of the foregoing Resolutions.

There being no further business, the meeting was adjourned at 12:00 p.m.

Filed with the minutes of the Board of Directors of National Forge Company Holdings, Inc. this 27th day of January 1999.

_____
Maurice J. Cashman, Secretary

EXHIBIT
2

A - 00030

**National Forge Company**
Irvine Plant
Results of Operations
**For the second quarter ended December 31, 1998 and December 31, 1997**
*(dollars in thousands)*

| | Second Quarter FY 1999 | Second Quarter FY 99 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | Second Quarter FY 1998 | Better or (Worse) Than FY 98 | % Better or (Worse) Than FY 98 | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| Sales-customers | $17,518 | $19,940 | ($2,422) | (12.1) % | $20,036 | ($2,518) | (12.6) % | $75,631 |
| Sales-intercompany | 0 | 0 | 0 | 0.0 | 64 | (64) | (100.0) | 0 |
| **Net Sales** | 17,518 | 19,940 | (2,422) | (12.1) | 20,100 | (2,582) | (12.8) | 75,631 |
| Cost of sales: | | | | | | | | |
| Material | 3,533 | 4,313 | 780 | 18.1 | 3,960 | 427 | 10.8 | 15,402 |
| Labor | 1,700 | 1,656 | (44) | (2.7) | 1,788 | 88 | 4.9 | 6,548 |
| Variable Overhead | 4,891 | 5,179 | 288 | 5.6 | 5,552 | 661 | 11.9 | 19,780 |
| Fixed Overhead | 4,006 | 4,454 | 448 | 10.1 | 4,419 | 413 | 9.3 | 17,129 |
| Lifo adjustment | 75 | 75 | 0 | 0.0 | 75 | 0 | 0.0 | 300 |
| Errors and defects | 309 | 482 | 173 | 35.9 | 477 | 168 | 35.2 | 1,813 |
| Period costs | 421 | 437 | 16 | 3.7 | 372 | (49) | (13.2) | 1,724 |
| Research and development | 1 | 69 | 68 | 98.6 | 18 | 17 | 94.4 | 276 |
| Cost of sales | 14,936 | 16,665 | 1,729 | 10.4 | 16,661 | 1,725 | 10.4 | 62,972 |
| **Gross profit** | 2,582 | 3,275 | (693) | (21.2) | 3,439 | (857) | (24.9) | 12,659 |
| Selling | 807 | 901 | 94 | 10.4 | 844 | 37 | 4.4 | 3,637 |
| Administrative | 990 | 1,120 | 130 | 11.6 | 985 | (5) | (0.5) | 4,517 |
| **Operating profit (loss)** | 785 | 1,254 | (469) | (37.4) | 1,610 | (825) | (51.2) | 4,505 |
| Other expense (income) | (176) | 231 | 407 | 176.2 | 230 | 406 | 176.5 | 855 |
| Interest expense | 393 | 575 | 182 | 31.7 | 618 | 225 | 36.4 | 2,057 |
| **Pre-tax profit (loss)** | $568 | $448 | $120 | 26.8 % | $762 | ($194) | 25.5 % | $1,593 |

As a percent of net sales

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Net Sales** | 100.0% | 100.0% | 0.0% | | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | | | | |
| Material | 20.2 | 21.6 | 1.5 | | 19.7 | (0.5) | | 20.4 |
| Labor | 9.7 | 8.3 | (1.4) | | 8.9 | (0.8) | | 8.7 |
| Variable Overhead | 27.9 | 26.0 | (1.9) | | 27.6 | (0.3) | | 26.2 |
| Fixed Overhead | 22.9 | 22.3 | (0.5) | | 22.0 | (0.9) | | 22.6 |
| Errors and defects | 1.8 | 2.4 | 0.7 | | 2.4 | 0.6 | | 2.4 |
| Other costs | 2.8 | 2.9 | 0.1 | | 2.3 | (0.5) | | 3.0 |
| Cost of sales | 85.3 | 83.6 | (1.7) | | 82.9 | (2.4) | | 83.3 |
| **Gross profit** | 14.7 | 16.4 | (1.7) | | 17.1 | (2.4) | | 16.7 |
| Selling and administrative | 10.3 | 10.1 | (0.1) | | 9.1 | (1.2) | | 10.8 |
| **Operating profit (loss)** | 4.5 | 6.3 | (1.8) | | 8.0 | (3.5) | | 6.0 |
| Other expense (income) | (1.0) | 1.2 | 2.2 | | 1.1 | 2.1 | | 1.1 |
| Interest expense | 2.2 | 2.9 | 0.6 | | 3.1 | 0.8 | | 2.7 |
| **Pre-tax profit (loss)** | 3.2 | 2.2 | 1.0 | | 3.8 | (0.5) | | 2.1 |

This statement also includes the results of National Forge Export, LTD. and NFIP, Inc.

**National Forge Company**
**Plant**
**Results of Operations**
**For the six months ended December 31, 1998 and December 31, 1997**
*(dollars in thousands)*

| | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FYTD 1998 Actual | Better or (Worse) Than FY 98 | % Better or (Worse) Than FY 98 | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| Sales-customers | $32,325 | $38,454 | ($6,129) | (15.9) % | $36,328 | ($4,003) | (11.0) % | $75,631 |
| Sales-intercompany | 0 | 0 | 0 | 0.0 | 64 | (64) | (100.0) | 0 |
| Net Sales | 32,325 | 38,454 | (6,129) | (15.9) | 36,392 | (4,067) | (11.2) | 75,631 |
| Cost of sales: | | | | | | | | |
| Material | 6,053 | 8,373 | 2,320 | 27.7 | 7,045 | 992 | 14.1 | 15,402 |
| Labor | 3,041 | 3,197 | 156 | 4.9 | 3,180 | 139 | 4.4 | 6,548 |
| Variable Overhead | 9,040 | 9,940 | 900 | 9.1 | 10,331 | 1,291 | 12.5 | 19,780 |
| Fixed Overhead | 7,541 | 8,331 | 790 | 9.5 | 7,996 | 455 | 5.7 | 17,129 |
| Lifo adjustment | 150 | 150 | 0 | 0.0 | 150 | 0 | 0.0 | 300 |
| Errors and defects | 492 | 905 | 413 | 45.6 | 945 | 453 | 47.9 | 1,813 |
| Period costs | 723 | 850 | 127 | 14.9 | 733 | 10 | 1.4 | 1,724 |
| Research and development | 30 | 138 | 108 | 78.3 | 58 | 28 | 48.3 | 276 |
| Cost of sales | 27,070 | 31,884 | 4,814 | 15.1 | 30,438 | 3,368 | 11.1 | 62,972 |
| Gross profit | 5,255 | 6,570 | (1,315) | (20.0) | 5,954 | (699) | (11.7) | 12,659 |
| Selling | 1,443 | 1,902 | 459 | 24.1 | 1,558 | 115 | 7.4 | 3,637 |
| Administrative | 1,989 | 2,259 | 270 | 12.0 | 2,109 | 120 | 5.7 | 4,517 |
| Operating profit (loss) | 1,823 | 2,409 | (586) | (24.3) | 2,287 | (464) | (20.3) | 4,505 |
| Other expense (income) | (178) | 437 | 615 | 140.7 | 450 | 628 | 139.6 | 855 |
| Interest expense | 897 | 1,107 | 210 | 19.0 | 1,103 | 206 | 18.7 | 2,057 |
| Pre-tax profit (loss) | $1,104 | $865 | $239 | 27.6 % | $734 | $370 | 50.4 % | $1,593 |

As a percent of net sales

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Net Sales | 100.0% | 100.0% | 0.0% | | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | | | | |
| Material | 18.7 | 21.8 | 3.0 | | 19.4 | 0.6 | | 20.4 |
| Labor | 9.4 | 8.3 | (1.1) | | 8.7 | (0.7) | | 8.7 |
| Variable Overhead | 28.0 | 25.8 | (2.1) | | 28.4 | 0.4 | | 26.2 |
| Fixed Overhead | 23.3 | 21.7 | (1.7) | | 22.0 | (1.4) | | 22.6 |
| Errors and defects | 1.5 | 2.4 | 0.8 | | 2.6 | 1.1 | | 2.4 |
| Other costs | 2.8 | 3.0 | 0.2 | | 2.6 | (0.2) | | 3.0 |
| Cost of sales | 83.7 | 82.9 | (0.8) | | 83.6 | (0.1) | | 83.3 |
| Gross profit | 16.3 | 17.1 | (0.8) | | 16.4 | (0.1) | | 16.7 |
| Selling and administrative | 10.6 | 10.8 | 0.2 | | 10.1 | (0.5) | | 10.8 |
| Operating profit (loss) | 5.6 | 6.3 | (0.6) | | 6.3 | (0.6) | | 6.0 |
| Other expense (income) | (0.6) | 1.1 | 1.7 | | 1.2 | 1.8 | | 1.1 |
| Interest expense | 2.8 | 2.9 | 0.1 | | 3.0 | 0.3 | | 2.7 |
| Pre-tax profit (loss) | 3.4 | 2.2 | 1.2 | | 2.0 | 1.4 | | 2.1 |

This statement also includes the results of National Forge Export, LTD. and NFIP, Inc.

LLC 1/15/99

**National Forge Company**
**Irvine Plant**
Balance Sheet
*(dollars in thousands)*

| | December 31, 1998 Actual | December 31, 1997 Actual |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $1,697 | $94 |
| Accounts receivable | 11,429 | 11,464 |
| Intercompany receivables | 96 | 55 |
| Inventories: | | |
| Work in process | 12,452 | 13,080 |
| Raw materials | 935 | 1,147 |
| Supplies | 2,165 | 2,179 |
| Total Inventories | 15,552 | 16,406 |
| Prepaid expenses | 1,078 | 914 |
| Deferred income taxes | 306 | 259 |
| **Total Current Assets** | 30,158 | 29,192 |
| Property, Plant and Equipment - net | 24,132 | 22,236 |
| Investment in Subsidiaries | 6,780 | 5,129 |
| Deferred Income Taxes | 6,236 | 6,734 |
| Other Assets | 8,947 | 9,560 |
| Goodwill | 4,317 | 4,518 |
| **TOTAL ASSETS** | $80,570 | $77,369 |
| **LIABILITIES** | | |
| **Current Liabilities:** | | |
| Notes payable | $0 | $0 |
| Current portion of long term debt | 3,073 | 3,657 |
| Accounts payable | 2,374 | 3,707 |
| Salaries, wages and commissions | 3,253 | 3,241 |
| Accrued taxes on income | 65 | 34 |
| Accrued pension | 45 | 494 |
| Customer deposits | 241 | 226 |
| Deferred Income Taxes | 0 | 0 |
| Other accrued liabilities | 5,820 | 5,463 |
| **Total Current Liabilities** | 14,871 | 16,822 |
| Long Term Debt | 15,499 | 6,770 |
| Pension and Other Noncurrent Liabilities | 268 | 1,379 |
| Postretirement and Postemployment Benefits Other Than Pensions | 32,930 | 32,546 |
| Intercompany Payables | 9,051 | 12,979 |
| **TOTAL LIABILITIES** | 72,619 | 70,496 |
| **SHAREHOLDERS' EQUITY** | | |
| Common Stock | 0 | 0 |
| Additional Paid in Capital | 1,601 | 1,601 |
| Retained Earnings | 6,882 | 5,238 |
| Minimum Pension Liability Adjustment | (571) | 0 |
| Foreign Currency Translation Adjustment | 39 | 34 |
| **TOTAL COMMON SHAREHOLDERS' EQUITY** | 7,951 | 6,873 |
| **TOTAL LIABILITIES AND EQUITY** | $80,570 | $77,369 |
| **WORKING CAPITAL** | $15,287 | $12,370 |

NFC Irvine Plant also includes the results of National Forge Export, LTD. and NFIP, Inc.

LLC: 1/18/99

**National Forge Company**
**Irvine Plant**
**Statement of Cash Flows**
**Period Ended December 31, 1998 and December 31, 1997**
*(dollars in thousands)*

| | Second quarter | | Six months | |
|---|---|---|---|---|
| | FY 1999 | FY 1998 | FY 1999 | FY 1998 |
| **Cash Flows From Operating Activities:** | | | | |
| Net income (loss) | $390 | $521 | $748 | $547 |
| Adjustment to reconcile net income to net cash | | | | |
| provided by operating activities: | | | | |
| Provision for Common Stock to be issued to the ESOP Trust | 1,301 | 1,310 | 2,536 | 2,607 |
| Depreciation | 599 | 546 | 1,197 | 1,092 |
| Amortization | 181 | 411 | 365 | 681 |
| Deferred taxes | 0 | 0 | 0 | 0 |
| Change in assets and liabilities: | | | | |
| (Increase) decrease in accounts receivable | (1,283) | (289) | 1,082 | (148) |
| (Increase) decrease in inventories | 538 | 457 | 2 | 319 |
| (Increase) decrease in prepaid expenses | 201 | 521 | (520) | (404) |
| Increase (decrease) in accounts payable | (1,131) | 387 | (1,082) | 307 |
| Increase (decrease) in income taxes | 159 | (6) | 65 | 34 |
| Increase (decrease) in customer deposits | (2) | (54) | 14 | 39 |
| Increase (decrease) in all other current liabilities | | | | |
| (excluding borrowings) | 759 | (16) | (2,284) | (1,406) |
| Other net | 121 | 37 | 123 | 302 |
| **Net Cash Provided By (Used For) Operating Activities** | 1,833 | 3,825 | 2,246 | 3,970 |
| **Cash Flows From Investing Activities:** | | | | |
| (Additions) reductions of property, plant and equipment | (1,043) | (1,240) | (2,432) | (1,882) |
| **Net Cash Used In Investing Activities** | (1,043) | (1,240) | (2,432) | (1,882) |
| **Cash Flows From Financing Activities:** | | | | |
| Additional (repayment of) borrowings | (2,654) | (895) | (3,299) | (3,240) |
| Increase (decrease) in intercompany account | (464) | (1,681) | (887) | (1,669) |
| **Net Cash Provided By Financing Activities** | (3,118) | (2,576) | (4,186) | (4,909) |
| Change in cumulative foreign currency | | | | |
| translation adjustment | (26) | 21 | (5) | (9) |
| **Increase (Decrease) In Cash And Cash** | | | | |
| **Equivalents** | ($2,354) | $30 | ($4,377) | ($2,830) |

NFC Irvine Plant also includes the results of National Forge Export, LTD. and NFIP, Inc.

# National Forge Company
## Irvine Plant

**Sales**



A - 00035

## National Forge Company
## Irvine Plant

## Operating Profit in Dollars



A - 00036

## National Forge Company
## Irvine Plant

## Operating Profit Percentages



A - 00037

**National Forge Company**
**Irvine Plant**

## Annual Operating Profit/Employee



A - 00038

# National Forge Company
# Irvine Plant

## Rolling Twelve-Month Period-Sales and Operating Profit



A - 00039

**National Forge Company**
**Irvine Plant**



### Annual Sales/Employee

A - 00040

## National Forge Company
### Irvine Plant

### Annual Sales/Hours Worked Hourly



Pre-ESOP

ESOP

$90
$80
$70
$60
$50
$40
$30
$20
$10
$0

4th Qtr 93    4th Qtr 94    2nd Qtr FY96    2nd Qtr FY97    2nd Qtr FY98    2nd Qtr FY99

A - 00041

Operations Overview
Board of Directors Meeting – January 27, 1999

Production labor activities increased by approximately 3% in the second quarter and sales increased approximately 18% above the first quarter. Crankshafts and pipemolds were about 80% of sales with all other products including penetrators (14%) making up the balance of 20%. Clearly we have just three products making up our production and sales activities.

Operating schedules in Melting and Forging were typically four days per week with an occasional five-day schedule and a one-week shutdown the last week of November.

Hourly manpower reductions year to date -

|  | |
|---|---|
| | 1 deceased |
| | 4 quit |
| | 14 retired |
| | 23 layed off |
| | 42 |

Salary manpower reduction year to date –

6 job eliminations

The cost of unplanned operations was $114,000 for the second quarter down from $139,000 in the first.

Error and defect cost for the second quarter were $309,000 or 1.8% of sales. Year to date, error and defect costs are $492,000 or 1.5% of sales, down from 2.8% for last year.

On time shipping performance improved in the second quarter from 87.7% on time to 89.8%.

Process improvements implemented and/or continued include:
- Elimination of turn plus 3/16 on pipemolds 6" through 8" result in savings of $180 per unit.
- SPC to eliminate approximately 90% of dimensional inspection on Charlotte Pipe Company molds at a saving of $125 per unit.
- Pipemolds previously treated solid will be rough bored before heat treat to reduce furnace cycle times (experimental phase).
- Bottom pouring of cylindrical round ingots for crankshafts and pipe molds - efforts to improve yield and quality plus open market opportunities for additional sales
- Over 60 heats have been bottom-poured to date. Four have been teemed into cylindrical rough ingots; the balance has been fluted.

Board of Directors Meeting
January 27, 1999

Page 2

◆ Solid forging of a 28" pipemold (previously mandrel forged) was accomplished with a cost reduction of approximately $11,000.

◆ Engineered time studies are being completed where new equipment has been installed. When completed, the new standards will be implemented reflecting more competitive processing times.

In early December we signed a one-year contract for the supply of electricity with Exelon Energy, a part of the Philadelphia Electric Company (PECO). This was the conclusion of a significant amount of work over the past twelve months. On the subject of deregulation, the resulting benefit to National Forge is an 18% cost reduction on kWh used. Based on the past twelve months of actual usage, this would generate savings of $384,000.

The in-plant apprentice-training program completed the lathe training section (60 hours) and the grinding training is now underway.

The Vision 4000 shop floor control system is on schedule for late February implementation.

Capital Projects addressed in the second quarter were:

• #352 lathe run off (in process) – production ready early March.
• #731 grinder is approximately 50% complete and on schedule for April delivery.
• #251 GFM has been removed and shipped to Spain for rebuilding.
• #710 and #200 rebuilding capital requests have been completed and will be submitted January 27 for Board approval.

Other capitals being developed include:
• Dynamic Balancer
• Induction Hardening machine

Looking ahead to the third quarter –
- Sales are projected at approximately $18,000,000.
- Product mix will be heavy on crankshafts and pipemolds with penetrators and GOI ordnance making up the balance.
- Melt and Forge Operations will likely be reduced to one shift each.
  The affect of this on employment will be a reduction of 20 hourly and 3 salaried personnel.

CRO:pv

A - 00043

NATIONAL FORGE COMPANY
IRVINE PLANT

A??ICATION FOR:       ADDITION TO PROPERTY,PLANT AND EQUIPMENT       NUMBER: P-540

PROGRAM: FY 1999                          ORIGINAL DATE: 12/14/98
REV. NO.                                  REV. DATE:

DESCRIPTION OF PROJECT: PURCHASE LOAD SUPPORT ASSEMBLY CONSISTING OF BASE AND MAST, MAST
                        SPIDER AND BASE GUIDE COLLAR FOR #634 NITRIDE FURNACE.


PURPOSE: MAINTAIN PRODUCTION


START DATE: ON APPROVAL              EST. COMPLETION DATE: 3 QTR 99

ANTICIPATED COST:

| MATERIAL OR SUB. CONTR. | INTERNAL LABOR | OVERHEAD | CONTINGENCY | TOTAL |
| --- | --- | --- | --- | --- |
| $27,800 | $2,000 | $4,000 | $1,200 | $35,000 |

TIMING OF EXPENDITURE:
CURRENT YEAR:      1ST QTR.    % 2ND. QTR.    % 3RD. QTR. 100 % 4TH. QTR.      %
NEXT YEAR:         1ST QTR.    % 2ND. QTR.    % 3RD. QTR.     % 4TH. QTR.      %

JUSTIFICATION: THE BASE, MAST AND SPIDER ASSEMBLY MATERIAL HAS DETERIORATED MAKING
               REPAIR BY STRAIGHTENING OR WELDING NO LONGER FEASIBLE.  THIS IS AN
               ORIGINAL PART WHICH WAS INSTALLED IN 1954.


NET PRESENT VALUE CALCULATION:    _____ ATTACHED  _____ WAIVED  _____ NOT REQUIRED


SPONSOR: BAILEY T

MGR. PLANT & FAC. ENGR.: _~NDM__ 12-15-98_____

V.P. OPER-IRVINE: _CMD 12/15_____

CONTROLLER: _EV 12/16/98_____

PRESIDENT: _SM 1/22/99_____

BOARD OF DIRECTORS: _____

CHIEF FINANCIAL OFFICER: _____    DATE: _____

NOTIFICATION OF APPROVAL:
DEPT. NO. 610

WORK TO BE DONE BY DEPT/S NO.

EQUIP. NO.: 634

REQ. NO.:

MATERIAL CHARGE: _____

LABOR CHARGE: _____


DISTRIBUTION:  SPONSOR/S,M.CASHMAN,G.ENGLISH,T.JACKSON,H.MURPHY,B.NICHOLS,
               C.OLSON,P.VAVALA,PURCHASING


A - 00044

IRVINE PLANT

```
APPLICATION FOR:       ADDITION TO PROPERTY, PLANT AND EQUIPMENT       NUMBER: P-544

PROGRAM: FY 1999                        ORIGINAL DATE:  1/12/99
REV. NO.                                REV. DATE:

DESCRIPTION OF PROJECT: REBUILD #200 TURNING LATHE.



PURPOSE: TO CONTINUE FINISH TURNING OPERATIONS.


START DATE: ON APPROVAL              EST. COMPLETION DATE: 4 QTR 99

ANTICIPATED COST:
MATERIAL OR          INTERNAL
SUB. CONTR.          LABOR            OVERHEAD           CONTINGENCY          TOTAL
-----------          ----------       ----------         -----------          ----------
 $398,200             $10,000          $23,000            $20,000              $451,200

TIMING OF EXPENDITURE:
CURRENT YEAR:         1ST QTR.   % 2ND. QTR.    % 3RD. QTR.    % 4TH. QTR.  60 %
NEXT YEAR:            1ST QTR. 40 % 2ND. QTR.    % 3RD. QTR.    % 4TH. QTR.     %

JUSTIFICATION: SEE ATTACHED



NET PRESENT VALUE CALCULATION:  ____ ATTACHED  _X_ WAIVED  ____ NOT REQUIRED
```

```
                                                NOTIFICATION OF APPROVAL:
SPONSOR: HARRIS J                               DEPT. NO. 608

MGR. PLANT & FAC. ENGR.: X/DM  1-12-99          WORK TO BE DONE BY DEPT/S NO.
                                                643 646 649
V.P. OPER-IRVINE:  1/12/99                      EQUIP. NO.: 200

CONTROLLER:  1/19/99                            REQ. NO.:

PRESIDENT:  1/22/99                             MATERIAL CHARGE: _____

BOARD OF DIRECTORS: _____                       _____
                                                LABOR CHARGE: _____
CHIEF FINANCIAL OFFICER: _____  DATE: _____    _____
```

```
DISTRIBUTION:  SPONSOR/S, M.CASHMAN, G.ENGLISH, T.JACKSON, H.MURPHY, B.NICHOLS,
               C.OLSON, P.VAVALA, PURCHASING
```

**A - 00045**

January 11, 1999

Justification for Rebuild of #200 Lathe

*Specifications*:                75 H.P. 51' x 54", 35" over the carriage
                                 5 to 750 RPM, 0 to 150/min feed
                                 Purchased new in 1983, GE 1050 control

### *Type of work done in machine:*

♦  Precision turning, threading and contouring complex configurations such as
   crankshafts, gear rolls, pressure vessels, pipe molds cylinders and penetrators.

200 lathe is the only CNC lathe in Department 608 and is fitted with a 10" boring bar
capable of reaching 7' into work pieces to form radii, angles, undercuts and bottoms.  The
machine has 4 station and 6 station turrets.

### *Reconditioning/Replace/Rebuild Required:*

♦  Headstock – replace bearings and clutches
♦  Tailstock – replace bearing pack and center, fit to bed
♦  Headstock motor -  okay
♦  Bed and ways – hardened ways are worn badly regrind or replace
♦  Bed dove tail for screw hangers – worn very badly .015" to .020", needs re-cut if "Z"
   axis screw is kept.  "Z" axis drive and screw (55 ft. long).  This is a very poor way to
   run the carriage "Z" movement.
♦  "Z" axis screw – completely worn out, has too much backlash and slop to maintain
   good contouring or positioning. (it is recommended not to use ballscrew over 20' long
   on "Z" axis for lathes)
♦  Carriage  - needs fit to and lined up with the bed ways due to years of wear.  New "Z"
   axis dual pinion and rack drive will be installed
♦  "X" axis ways – need reground and "X" axis drive and ball screw replaced with new
   units.
♦  Power track and cables – need replaced
♦  Self centering steady rest – bent and needs repaired
♦  Both turrets – need checked and aligned to machine, too many wrecks over the years.
♦  Control – is obsolete, parts have to be made since they are not longer available.  The
   existing 1050 will be replaced with a new Fanuc/GE, same as others we use.

*Notes:*

This machine has been one of the best producers for finish turning crankshafts. Unfortunately not all types of crankshafts can be done in this lathe as the condition of the bed ways and "Z" axis screw in certain areas are so badly worn the machine will not hold size necessary to do complete machining of the work piece. This is also the case for final machining close tolerance work pieces such as pipe molds, pressure vessels, cylinders, mandrel bars, threaded work pieces etc.

*Lost Opportunities*

As an example, we are now quoting two very complex 6300-ton press cylinders for SMS Sutton. These type parts are needed to help fill our capacity in the Finishing Department but we are reluctant to take on this job as the condition of the lathe is such that it can not be trusted to perform the close work required to manufacture these cylinders.

The rebuilding of #200 lathe will provide us with a machine capable of performing all finish turning operations on products we currently produce plus others we have the opportunity to quote. The cost of the rebuild is approximately 45% of a brand new machine which when complete, #200 will be capable of everything a new one would be capable of and take approximately one-half the time required to build and install a new one. The rebuild of #200 is necessary for us to machine precision products. We will reduce maintenance cost by $17,000 per year and realize a 10% increase in up time (approximately 300 hours) but most important is to re-establish high quality machining capability.

JBH:pv

NATIONAL FORGE COMPANY
IRVINE PLANT

A  ICATION FOR:      ADDITION TO PROPERTY,PLANT AND EQUIPMENT        NUMBER: P-545

PROGRAM: FY 1999                              ORIGINAL DATE:  1/15/99
REV. NO.                                      REV. DATE:

DESCRIPTION OF PROJECT: PURCHASE SURFACE ANALYZING EQUIPMENT AND REBUILD EXISTING EQUIPMENT
                        AND MODIFY TO INTERFACE WITH NEW EQUIPMENT.


PURPOSE: EQUIPMENT USED TO MEASURE AND DOCUMENT THE SURFACE FINISH,WAVINESS
         AND STRAIGHTNESS OF CRANKSHAFT JOURNALS, FILLETS AND OTHER PRODUCTS.

START DATE: 3 QTR 99              EST. COMPLETION DATE: 4 QTR 99

ANTICIPATED COST:
MATERIAL OR        INTERNAL
SUB. CONTR.        LABOR          OVERHEAD          CONTINGENCY          TOTAL
----------         ----------     ----------        -----------          ----------
  $31,225            $1,000          $2,300            $3,000              $37,525

TIMING OF EXPENDITURE:
CURRENT YEAR:       1ST QTR.    % 2ND. QTR.    % 3RD. QTR.    % 4TH. QTR. 100 %
NEXT YEAR:          1ST QTR.    % 2ND. QTR.    % 3RD. QTR.    % 4TH. QTR.     %

JUSTIFICATION: CUSTOMER REQUIREMENTS ARE BECOMING INCREASINGLY RESTRICTIVE AND MORE
               COMPLEX THEREFORE, EQUIPMENT IS NECESSARY TO VERIFY CONFORMANCE
               TO THEIR SPECIFICATIONS.


NET PRESENT VALUE CALCULATION: _____ ATTACHED _____ WAIVED _√_ NOT REQUIRED

                                              NOTIFICATION OF APPROVAL:
SPONSOR: ANTOS D                              DEPT. NO. 627

MGR. PLANT & FAC. ENGR.: _XDM 1-15-99_        WORK TO BE DONE BY DEPT/S NO.

V.P. OPER-IRVINE: _OND 1/15/99_               EQUIP. NO.:

CONTROLLER: _1/19/99_                         REQ. NO.:

PRESIDENT: _Gu 1/22/99_                       MATERIAL CHARGE: _____
                                                               _____
BOARD OF DIRECTORS: _____ LABOR CHARGE: _____
                                                            _____
CHIEF FINANCIAL OFFICER: _____ DATE: _____


DISTRIBUTION:  SPONSOR/S,M.CASHMAN,G.ENGLISH,T.JACKSON,H.MURPHY,B.NICHOLS,
               C.OLSON,P.VAVALA,PURCHASING


A - 00048

NATIONAL FORGE COMPANY
IRVINE PLANT

A  ICATION FOR:     ADDITION TO PROPERTY,PLANT AND EQUIPMENT      NUMBER: P-546

PROGRAM: FY 1999                      ORIGINAL DATE:  1/20/99
REV. NO.                              REV. DATE:

DESCRIPTION OF PROJECT: PURCHASE LECO DH-103 HYDROGEN DETERMINATOR

PURPOSE: EQUIPMENT IS USED FOR DETERMINATION OF HYDROGEN IN STEEL.

START DATE: 3 QTR 99              EST. COMPLETION DATE: 3 QTR 99

ANTICIPATED COST:

| MATERIAL OR SUB. CONTR. | INTERNAL LABOR | OVERHEAD | CONTINGENCY | TOTAL |
|---|---|---|---|---|
| $25,000 | | | | $25,000 |

TIMING OF EXPENDITURE:
CURRENT YEAR:     1ST QTR.     % 2ND. QTR.     % 3RD. QTR. 100 % 4TH. QTR.     %
NEXT YEAR:        1ST QTR.     % 2ND. QTR.     % 3RD. QTR.     % 4TH. QTR.     %

JUSTIFICATION: SEE ATTACHED

NET PRESENT VALUE CALCULATION:  _____ ATTACHED _____ WAIVED _____ NOT REQUIRED

SPONSOR: NISBETT E

MGR. PLANT & FAC. ENGR.: _~√DM_ 1-22.99

V.P. OPER-IRVINE: _____ 1/22/99

CONTROLLER: _____ 1/22/99

PRESIDENT: _____ 1/22/99

BOARD OF DIRECTORS: _____

CHIEF FINANCIAL OFFICER: _____   DATE: _____

NOTIFICATION OF APPROVAL:
DEPT. NO. 612

WORK TO BE DONE BY DEPT/S NO.

EQUIP. NO.:

REQ. NO.:

MATERIAL CHARGE: _____
_____
LABOR CHARGE: _____
_____

DISTRIBUTION:  SPONSOR/S,M.CASHMAN,G.ENGLISH,T.JACKSON,H.MURPHY,B.NICHOLS,
               C.OLSON,P.VAVALA,PURCHASING

**A - 00049**

**NATIONAL FORGE COMPANY®**

Employee Owned

## REPLACEMENT OF HYDROGEN DETERMINATOR
## FOR THE CHEMICAL LABORATORY

The existing Leco RH1E equipment for the determination of hydrogen in steel is over 25 year old. We have been depending on aftermarket spare parts for several years and the supply of these is beginning to dry up. There is agreement that a more modern piece of equipment would be desirable, since we are depending on the hydrogen results to guide us in determining the best post forge handling practice to use. When the equipment is down ash annealing is used on all products, and this results in considerable scheduling delays.

The latest Leco equipment is the RH402 costing about $56,000. This unit measures residual hydrogen in the pin sample after collection, similar to the method we currently use. There is a German apparatus called Eltra OH900 on the market and it also measures the residual hydrogen and is cheaper than the RH402 at about $40,000, but there are very few examples in this country at the present time and the timely supply of spares is questionable.

Leco had a second analysis system on the market, but this was withdrawn about a year ago from their catalog. It is thought that competition with the Hydris equipment (used here on a trial just over a year ago) may have been instrumental in Leco reducing the range of hydrogen determinators available. This second system is the DH103. Using a special sampling device this instrument measures the hydrogen given off as the sample solidifies known by Leco as the diffusible hydrogen, and then measures the residual hydrogen in the pin sample. The instrument reports the diffusible; residual and total ( sum of the first two) hydrogen values. This equipment is used by First Miss, and Ellwood. Besides the special samplers that enable the total hydrogen to be determined the glass tube sampler, or the vacuum glass sample tubes can be used with this equipment. Because the sample is not melted no crucibles are required, constituting an operating consumables savings.

The company in Pittsburgh that services our RH1E and the oxygen nitrogen equipment, Electrical Engineered Products has offered us a reconditioned DH103 machine for $25,000. The quotation is attached. We feel that this piece of equipment will be the most suitable type for our purposes. Jeff Cademan of EED will provide warranty and future service for the apparatus. On receipt of the new equipment we would propose to run it alongside the current RH1E to gain operating data for our steel making and degassing.

18 January 1999

A - 00050

NATIONAL FORGE COMPANY
IRVINE PLANT

A˝ ICATION FOR:      ADDITION TO PROPERTY,PLANT AND EQUIPMENT      NUMBER: P-548

PROGRAM: FY 1999                          ORIGINAL DATE:  1/22/99
REV. NO.                                  REV. DATE:

DESCRIPTION OF PROJECT: REBUILD #710 BORING LATHE COMPLETE WITH NEW 100 HP HEADSTOCK AND
                        DRIVE.

PURPOSE: IMPROVE EFFICIENCY FOR HOGNOSE AND FINISH BORE OPERATIONS ON 6" THRU
         12" PIPEMOLDS AND OTHER PRODUCTS OF SIMILAR SIZE BORES.

START DATE: 4 QTR 99                 EST. COMPLETION DATE: 2 QTR 00

ANTICIPATED COST:

| MATERIAL OR SUB. CONTR. | INTERNAL LABOR | OVERHEAD | CONTINGENCY | TOTAL |
| --- | --- | --- | --- | --- |
| $232,000 | $9,000 | $22,000 | $22,000 | $285,000 |

TIMING OF EXPENDITURE:
CURRENT YEAR:       1ST QTR.    %  2ND. QTR.     %  3RD. QTR.     %  4TH. QTR.  30 %
NEXT YEAR:          1ST QTR. 40 %  2ND. QTR.  30 %  3RD. QTR.     %  4TH. QTR.     %

JUSTIFICATION: SEE ATTACHED

NET PRESENT VALUE CALCULATION:  ATTACHED

SPONSOR: HARRIS J

MGR. PLANT & FAC. ENGR.: _____ 1-22-99

V.P. OPER-IRVINE: _____ 1/22/99

CONTROLLER: _____ 1/22/99

PRESIDENT: _____ 1/22/99

BOARD OF DIRECTORS: _____

CHIEF FINANCIAL OFFICER: _____      DATE: _____

NOTIFICATION OF APPROVAL:
DEPT. NO. 606

WORK TO BE DONE BY DEPT/S NO.
643 646 649
EQUIP. NO.: 710

REQ. NO.:

MATERIAL CHARGE: _____

LABOR CHARGE: _____

DISTRIBUTION:  SPONSOR/S,M.CASHMAN,G.ENGLISH,T.JACKSON,H.MURPHY,B.NICHOLS,
               C.OLSON,P.VAVALA,PURCHASING

A - 00051

Justification – P-548
1-22-99

In preparing for this capital expenditure, a thorough equipment study was made to determine exactly what was required to produce pipemold products sizes 6" through 12" most efficiently. Presently, three machines are used on an average of one shift each. These machines are National Forge #710, #967 and #988. Each of these machines have differing capabilities effecting size ranges, feeds, work piece rotation and tooling, all of which are incapable of benefiting from certain cutting tools that have been developed in recent years.

♦ #710 is a 1956 model lathe with a 90' bedway
♦ #967 is a 1961 model lathe with a 55' bedway and originally a turning lathe that was converted to a boring lathe about 1978.
♦ #988 was constructed, in house, in 1969 from a variety of discarded lathe parts, the oldest of which is the headstock (1951) and the bedway 61' date of origin unknown.

Of the three machines #710 is the best suited for rebuild due to its length (90') and feed capability (up to 7" per minute). Additionally, tooling and boring bars expensed each year for #967 and 988 will be eliminated for a savings of $25,000 per year. While #967 and #988 will be eliminated from service, the capability, capacity and production output of #710 after rebuild, will exceed that of the combined capacity of all three in their present condition.

The consolidation of products to one machine (#710) will result in quicker processing times, reduced queue and reduced WIP inventories and improved utilization of manpower. Based on forecasted requirements, two operators will be required instead of three.

Refer to the savings and payback calculations, which is attached.

CRO/JBH:pv

A - 00052

**Irvine Plant**
**Proposed project: Rebuild #710 boring lathe included new headstock**
**Request date: January 20, 1999**

Cost Assumptions:

| Savings directly related to proposed project: | hours saved | $rate/hour | savings |
|---|---|---|---|
| 1. Labor | | | $54,000 |
| 2. Maintenance material | | | 10,000 |
| 3. Tooling | | | 25,000 |
| Subtotal savings | | | 89,000 |
| 4. Cashflow bonus (25%) | | | 22,250 |
| Total projected annual cost savings | | | $66,750 |

Other assumptions:

1. The original cost of the project is $285,000.00
2. Tax depreciation is double declining with switch to straight line and half year convention
   over tax life of 7 years on asset basis of $285,000.00.
3. Income tax rate used is 40%.

| | Internal Rate of Return - | | 16.7% | | | |
|---|---|---|---|---|---|---|
| | Discount rate which equates the present value of a project's | | | | | |
| | expected cash inflows to the present value of its expected costs | | | | | |

| Year | annual cost reduction | tax depreciation | taxable income (loss) | tax cost (savings) | Cash Flow | Internal Rate of Return |
|---|---|---|---|---|---|---|
| | (285,000) | | | | | |
| | - | | | | | |
| 0 | (285,000) | | | | (285,000) | |
| 1 | 66,750 | (40,727) | 26,023 | 10,409 | 56,341 | -80.2% |
| 2 | 66,750 | (69,797) | (3,047) | (1,219) | 67,969 | -40.3% |
| 3 | 66,750 | (49,847) | 16,903 | 6,761 | 59,989 | -18.9% |
| 4 | 66,750 | (35,597) | 31,153 | 12,461 | 54,289 | -6.8% |
| 5 | 66,750 | (25,451) | 41,299 | 16,520 | 50,230 | 0.5% |
| 6 | 66,750 | (25,422) | 41,328 | 16,531 | 50,219 | 5.4% |
| 7 | 66,750 | (25,451) | 41,299 | 16,520 | 50,230 | 8.9% |
| 8 | 66,750 | (12,708) | 54,042 | 21,617 | 45,133 | 11.1% |
| 9 | 66,750 | 0 | 66,750 | 26,700 | 40,050 | 12.6% |
| 10 | 66,750 | 0 | 66,750 | 26,700 | 40,050 | 13.7% |
| 11 | 66,750 | 0 | 66,750 | 26,700 | 40,050 | 14.6% |
| 12 | 66,750 | 0 | 66,750 | 26,700 | 40,050 | 15.3% |
| 13 | 66,750 | 0 | 66,750 | 26,700 | 40,050 | 15.9% |
| 14 | 66,750 | 0 | 66,750 | 26,700 | 40,050 | 16.3% |
| 15 | 66,750 | 0 | 66,750 | 26,700 | 40,050 | 16.7% |

| Net Present Value | | npv & irr relationship: | 0 |
|---|---|---|---|
| Required rate of return | 15.0% | | |
| Net Present value | 17,967 | | |

A - 00053

IRVINE
MARKET OVERVIEW

Bookings for the first half of FY 99 were $ 30.6 million against the Business Plan of $33 million. Booking results of our major products are: Crankshafts totaled $14.4 million or $400,000 over the plan of $14 million. Pipe Molds totaled $13.2 million, which placed us $1.7 million over the plan of $11.5 million. Paper Rolls totaled $900,000 which was $650,000 under the plan of $1.55 million. Three additional product areas contributed to our shortfall against plan: Steel Sales totaled $231,000 or $2.4 million under plan, Special Projects totaled $126,000 or $774,000 under plan and Oilfield totaled $253,000 or $400,000 under plan.

## Crankshafts

General Electric forecasts remain strong through the first half of National Forge's FY00 with the engine build schedule for the new HDL 6000HP model strengthening in third quarter FY99. GE driven schedule fluctuations and to a lesser degree National Forge metallurgical issues have caused difficulty in meeting the customer's short-term schedule demands in the early part of the third quarter. Rapid processing intervention by Operations has enabled us to meet the customer's requirements. The final contracted price discount of 2% on the older FDL model was made in January 1999. Our contract with GE expires January 1, 2001.

We reached agreement with Power Parts Company (Division of Motive Power) to act as our exclusive distributors for EMD type crankshafts in the USA and Mexico. Deliveries to Power Parts for the balance of FY99 are approximately $750,000 with expectations of doubling the business during the next fiscal year. Sales in FY98 of EMD type crankshafts were $899,000. With the addition of Power Parts, we expect to grow the EMD type product line to $1.2 million in FY99. Keys to success include on time deliveries, to fully develop the market, and cost reductions to attain our profit objectives.

MWM in Germany has presented us with a challenge to produce the new HDL 6000HP crankshaft with fully induction hardened fillets. MWM, in agreements with GE, has the right to modify and sell the HDL product in Europe. With very short notice we have offered pricing for the new product to MWM and now face the technical challenges to develop an operational capability and produce the new product. Our German competitor Alfing is favored by MWM. They have already produced a slab crankshaft prototype with the required induction hardened fillets.

The Indian Railways have begun to utilize fewer types of locomotives which means a more narrow crankshaft product offering to Diesel Locomotive Works (DLW) and fewer locomotives. In addition, Heavy Engineering Corporation (HEC) has recently experienced greater success in delivering crankshafts to the Railways. Therefore, the Railway Ministry is likely to order more crankshafts from HEC. The impact on Irvine is a potential shift of a larger portion of Railway demand to the rough machined product which we supply to HEC.

## Pipe Molds

Domestic second quarter demand remained strong with customers continuing to set record pipe production levels. Demand is expected to remain at its current level for the second half of FY99. At the same time we are encountering increased activity from competitors from Italy, France and Japan as they are aggressively driving mold prices down at all major customers. To maintain market share we have met these prices in certain size ranges.

We are increasing our presence in the North American soil pipe market by growing existing accounts and opening new accounts in Canada at Bibby-St. Croix and California at AB&I with trial orders.

In the export market Pont-a-Mousson (PAM) continues to expand as the major global pipe producer. In addition to their recent acquisitions in China and Columbia they have acquired Thyssen Guss in Germany and are actively evaluating acquisition candidates in the U.S., Egypt and Southeast Asia. To maintain market share our annual pipe mold negotiations with PAM continue to result in lower prices against further encroachment by competitors from Italy, France, Germany and Japan.

A reorganized and redirected representative network in China coupled with key customer contacts by Irvine Marketing have led us to win an order at a large customer and given us hope for further success.

## Paper Rolls

Bookings improved slightly in the second quarter due to aggressive pricing and success of the domestic machine builders fighting their foreign competitors. United Container continues to afford us the opportunity to compete with their Hungarian subsidiary at a 5% to 7% price premium. We have lost about 90% of the Corrugating Roll Corp. business to their German sister company at prices 30% to 50 % below our pricing levels. Langston continues to struggle and has 40% of their workforce on layoff.

In December we participated in the analysis of acquiring the assets of SCM Ltd. in Manchester U.K. SCM was a manufacturer and repairer of corrugating rolls now in receivership. During the due diligence process we learned that key management personnel would not join any new owner and that several key machines could not meet future product size requirements. We chose to terminate our bid.

## Oilfield

With oil prices in the $10 per barrel range major oil and exploration companies have announced workforce reductions and severe reductions in capital spending. These moves have resulted in forecast reductions impacting the supplier base. We do not see an improving trend in the near term. Our successes are in isolated areas where companies have ongoing projects that require completion.

## Penetrators

The U.S. Government formally modified its contract to enable our recovery of the $364,914 in primer claims which was received in January. Payment consisted of $340,025 in principal and $24,889 in interest charges.

Pricing negotiations for the 72 units of BLU-113s currently in production were recently finalized after completing government financial and technical audits due to our proposed price increase. A price increase of $5,603 or 13.7% per unit was established due to a team effort from Accounting, Engineering and Program Management in Marketing. This increased price is significant because it will also be applied to an option quantity of 173 units expected to be exercised in the third quarter. More than $1.3 million in added revenues will be generated by the price increase applied to the 245 units.

The BLU-109 project for the Greek government remains active and we anticipate their budget decision in the first quarter of FY00. This project is susceptible to changes in U.S. Government international policy and Greek government approvals; therefore, a more prolonged decision timetable is likely. We continue to maintain an active role in discussions at multiple decision making levels in the Greek government.

## Ordnance

We have received the formal request for proposal documents from the Government of Israel's New York City office for 120mm components. It is anticipated that the Israeli process of documentation review and order placement will be completed in the third quarter.

## Steel Rolls

Rather than abandon the business due to continued negative profitability, a teaming agreement was established with Ellwood City Forge whereby we serve as their subcontractor for machining of Xtek rolls. The strategy has proven successful with the booking of machining orders valued at $40,000. We estimate that positive profitability will be achieved.

## Steel Sales

In October 1996 Marketing outlined opportunities that bottom pouring offered in the form of cost savings for internal applications and external sales growing over a period of time to nearly $5 million annually from ingots, billets and rough turned bars (RTB).

August 1997 saw the investment of $250,000 in basic equipment with sales of cylindrical rounds and taper fluted products projected to begin about March of 1998. It is noteworthy that the majority of externally driven product demand is for cylindrical round ingots and key to successfully pouring this product is strict control of the liquid metal flow rates. To manage the technical and mechanical requirements, it was determined at several points in the development process that additional equipment was necessary. During this time a small amount of sales were made for products produced from fluted ingots which is in far less demand. Also, manufacturing, rather than simply wait for the new equipment, began experiments to try and produce products in greatest demand. Unfortunately those experiments did not produce saleable products despite significant efforts.

In the fall of 1998 the entire steel industry received a severe blow as global demand dropped and foreign competitors began shipping major quantities of their products to the U.S. These circumstances created a major industry downturn resulting in price erosion by major producers such as Ellwood Quality Steels, FirstMiss and Erie Forge & Steel. Erie has since placed their capital investment for melt house expansion and modernization on hold. Each time we enter the market the majors simply lower their prices to keep business.

We have produced several heats of cylindrical rounds and are now very close to having the capability to produce cylindrical rounds routinely. With actual production data we will soon be able to go to the market with a credible presentation on why we should be considered as a supplier of bottom poured products. As noted earlier the market has changed dramatically. It has a much smaller demand and competitors whose primary business is steel sales are fiercely protecting their market share. Even with those realities we believe we can compete for selected customers in certain grades but with only breakeven results. Our projection is that we could generate about $1.5 to $2 million of external sales over 18 months after we have a proven production capability.

A - 00056

## Business Development/Special Projects

The U.S. Navy has shown interest in the Advanced Unitary Penetrator 1 (AUP 1). We are teamed with Lockheed Martin on this system and are hopeful that a contract could be placed in the fourth quarter FY99 or first quarter FY00 for 400 units. Our efforts also continue with British Aerospace and Lockheed Martin on their respective solutions for the Conventional Air Launched Cruise Missile (CALCM). Due to the need to replace inventory of existing munitions used in the recent operation in Iraq the application of penetrators in CALCM could be delayed an entire year.

We are pursuing a follow up production order for Bell Helicopter rotor shafts. It is anticipated that order placement could be in the fourth quarter FY99.

## Industry Conditions Overview

The open die forging industry is showing lower incoming orders compared to last year with the top six industry segments (based on shipments) all reporting downturns in their business. Those top six segments are: 1) Steel Industry 2) Construction, mining & material handling, oilfield 3) Aircraft and parts 4) General & special industrial equipment 5) Service centers 6) Forgers of billet stock and die stock.

In a more general view of the condition of U.S. manufacturing, the Purchasing Managers' Index of Manufacturing is a good indicator as it is based on surveys of over 350 industrial companies. In December it declined to 45.1, its lowest level since the recession of eight years ago. It is the seventh consecutive month the index has been below 50. A reading under 50 indicates that industrial output is falling while a reading above 50 indicates expansion. Irvine's business, excluding penetrators, historically has lagged this index by 3 to 9 months.



**PURCHASING MANAGEMENT Index,** which monitors business activity within the manufacturing sector, fell to 45.1 in December from November's level of 46.8. (Article on page A2)

A third indicator which helps predict the health of the manufacturing sector is the Manufacturers Alliance (MAPI) Business Outlook survey which is updated quarterly by member CFOs. MAPI's index of future business activity has fallen 22 percentage points in the last nine months. At 48 percent in December 1998, the index is at its lowest level since the previous recession in 1990 – 1991 and " is signaling a business recession – at least in the manufacturing sector " according to a MAPI economist. The business outlook index indicates that manufacturing activity will decline in the first quarter of calendar 1999 and " the outlook for the year as a whole is precarious ".



This data indicates that we should expect continued difficulty in securing orders beyond crankshafts and pipe molds and could experience weakening in those areas.

# National Forge Company
## Irvine Plant

**Bookings**



# National Forge Company
# Irvine Plant

## Crankshaft Bookings



A - 00060

# National Forge Company
# Irvine Plant

## Pipe Mold Bookings



A - 00061

# National Forge Company
# Irvine Plant

## Penetrator Bookings



# National Forge Company
## Irvine Plant

### All Other Product Bookings





# National Forge Company
## Irvine Plant

## Quarter Ending Backlog



A - 000064

# National Forge Company
## Irvine Plant

### Period Ending Backlog



# National Forge Company
## Irvine Plant

### Relationship of Backlog to Next Twelve Months' Sales



A - 00090





A - 00067

## Melt Shop

For the past 18 months the status of the National Forge Melt Shop and its future has been under careful review. This presentation is a summary of these efforts.

The last major expansion of the shop occurred in 1962 with the major equipment additions being the 45-ton electric arc furnace and the Dortmund Horten Vacuum Degasser. In 1965 the 75/15 ton ladle crane was installed with an upgrade to 90 tons being accomplished in 1983. In 1972 the chemical laboratory which monitors steel chemistry was upgraded. In 1978 the dust collection system for the 45-ton and 20-ton furnaces was constructed. In 1995 the first bottom pouring pit was installed and in 1996 the purchase of the Westinghouse EAF transformer and the re-build of the GE EAF transformer occurred. In 1997 a second bottom pouring pit was installed. In 1998 Rotary teeming gates and associated ladle heaters were put on line. In summary, the majority of this equipment has been well maintained and continues to perform in a satisfactory manner but the key pieces of equipment such as the electric arc furnace and the vacuum degasser are based on technology that is more than 40 years old. A prime reason that National Forge continues to melt steel at a reasonable cost and quality is that we have a highly skilled and dedicated Melt Shop work force and the equipment is almost completely depreciated from a tax standpoint. The focus of that operation has been to do our own internal requirements.

The Melt Shop review has included five distinct courses of action. They are:

1.  Modernize the Melt Shop which will require significant monetary investments.
2.  Close down and purchase all of the National Forge steel requirements from a third party.
3.  Run the Melt Shop without capital investments simply meeting maintenance needs.
4.  Continue current product mix and make modest investments while maintaining the equipment in good order.
5.  Concentrate steel production on what National Forge can produce in a cost efficient manner and purchase the remainder from a third party. Continue to make modest investments while maintaining the equipment.

G:\FILES\BRD\JAN99\MELTSHOP.DOC

Further comment on each of these options follows.

1. **Modernize Melt Shop**

National Forge has completed a detailed plan for an expansion and modernization of the Melt Shop which includes the definition of procedures and equipment, the layout of this equipment and the building requirements. The $21 million investment requires a three-year period to become fully operational. It would include a ladle refiner, a modern ladle degasser with alloying conveyor system and the expansion of the pouring pits. We have carefully estimated the revenue and profit stream that would be possible to achieve with a modernized Melt Shop and have used this information for a projected pay back calculation. We have also lined up a potential joint venture partner that would share in the capital outlay and use a certain amount of the capacity. Based upon our analysis, the investment would not generate enough cashflow to achieve a minimum positive internal rate of return of 15%, nor would it come close to a payback within the fifteen-year period that we have projected forward. This course of action is not a viable option for National Forge Company now and in the foreseeable future.

2. **Close the Melt Shop**

Today we cannot recommend this course of action for our analysis is not complete. We intend to complete our review by obtaining quotes from an outside source to ascertain whether we could purchase our steel at a lower cost than we can produce it. We must continue to examine this option in the best interests of National Forge Company

3. **Run the Melt Shop without Capital Investments**

This "let it rust" option with only maintenance needs being met is very short term. We believe this course would be viable for about 1-1/2 to 2 years and we do not recommend that this course of action can be followed. A planned shut down would also have to be established in order to have a continued source of supply.

G:\FILES\BRD\JAN99\MELTSHOP.DOC

4.  **Continue current product mix, making modest investments and maintaining
    equipment.**

This is our current operating status for the Melt Shop. This course of action has both plusses
and minuses and can be followed only in the rather short term. Over the past 3 years our
maintenance costs for the Melt Shop have been $1.5 million and our capital outlays $1.0
million. Our needs for both are likely to increase in the next 3-year period at the same time
we have urgent capital needs in the machine shop. We believe that we currently can produce
steel for such products as pipe molds at a lower cost than we can purchase it; however, this
could change as the US steel industry continues to lower prices. A key question is what is the
long-term outlook for material pricing. Also, not all products are in this situation as discussed
in option #5.

5.  **Concentrate steel production on what National Forge can produce in a cost efficient
    manner and purchase the remainder.**

Today we buy steel for special needs such as the BLU 113, and occasionally for products too
large for our facility. We estimate that we will melt 32,000 tons of steel in FY 99 compared
to 41,051 tons in FY 98 and our high point of 46,769 tons in FY 97. This volume of 32,000
tons does not support a two-shift melt operation and our projections indicate that this low
volume will continue throughout FY 2000. One product line that would benefit today from
buying steel from an outside supplier is crankshafts. We have firm quotes from Timken Steel
to supply 10,000 tons of annual crankshaft bar needs that would save National Forge $1
million per year. Timken produces 1.25 million tons of steel per year that generates sales of
$2.6 billion and we would take advantage of this economy of scale with higher ball bearing
steel quality. If we had a full one shift of Melt Shop demand excluding crankshafts, we
would strongly recommend buying bars from Timken. But since this is not the case today and
in the immediate future, we do not recommend this action. However, we are working to
obtain profitable orders for our Melt Shop that would enable us to take advantage of the
Timken opportunity.

A - 00070

**Conclusion**

With limited capital for investments, the Company will need to make some very difficult decisions in the near future. Do we continue to invest in the Melt Shop at the expense of not using this capital to be put in the Machine Shop? Can the additional cost of closing the Melt Shop be absorbed by the additional return of capital in machine tools? Are we trying to maintain a fully integrated facility at the expense of growing the business on a profitable basis?

These questions and others will be answered in the near term as we continue to refine data and develop our viable options. At the same time our competitors are choosing their strategic directions and investing capital to achieve their goals. This is making it very difficult, if not impossible, for National Forge to grow or maintain its business on a profitable basis.

As we continue to refine our strategic direction options regarding the Melt Shop, we will strive to maintain our current operation as is. When the opportunity arises for purchasing a portion or all of our steel needs from a third party on a long-term profitable basis, then this proposition will be presented to the Board of Directors for review.

*[handwritten note]*

A - 00071

**EXHIBIT
3**

A - 00072

NATIONAL FORGE COMPONENTS

OVERVIEW

Sales for the first half of the year were $148,000, which was short of plan by $116,000, and pre-tax profit was $39,000 or $110,000 below plan. Although behind the mid-year plan, the second quarter showed significant improvement over the first quarter. Sales in the second quarter were $100,000 and pre-tax profit was $42,000. The shortfall from Plan continues to be due to railroads holding locomotives due to demand requirements and GE doing a better job at pre-sorting crankshafts prior to release for repair.

GE's most recent projections indicate that growth in order volume should continue to show slow improvement.

Business Growth Opportunities

Our discussions with GE regarding opportunities to perform sub-contractor work for their Grove City facility have slowed significantly. We are continuing to look for possibilities at GE and link those ideas with their priorities.

We are also calling on other potential clients soliciting their outsourcing requirements.

A - 00073

**National Forge Components, Inc.**
**A Subsidiary of National Forge Company**
**Results of Operations**
**For the second quarter ended December 31, 1998 and December 31, 1997**
*(dollars in thousands)*

|  | Second Quarter FY 1999 | Second Quarter FY 99 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | Second Quarter FY 1998 | Better or (Worse) Than FY 98 | % Better or (Worse) Than FY 98 | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| Sales-customers | $99 | $132 | ($33) | (25.0) % | $101 | ($2) | (2.0) % | $504 |
| Sales-intercompany | 1 | 0 | 1 | 0.0 | 0 | 1 | 0.0 | 0 |
| Net Sales | 100 | 132 | (32) | (24.2) | 101 | (1) | (1.0) | 504 |
| Cost of sales: |  |  |  |  |  |  |  |  |
| Labor | 16 | 18 | 2 | 11.1 | 19 | 3 | 15.8 | 72 |
| Overhead | 28 | 29 | 1 | 3.4 | 13 | (15) | (115.4) | 112 |
| Cost of sales | 44 | 47 | 3 | 6.4 | 32 | (12) | (37.5) | 184 |
| Gross profit | 56 | 85 | (29) | (34.1) | 69 | (13) | (18.8) | 320 |
| Administrative | 15 | 14 | (1) | (7.1) | 14 | (1) | (7.1) | 56 |
| Operating profit | 41 | 71 | (30) | (42.3) | 55 | (14) | (25.5) | 264 |
| Interest expense | (1) | (2) | (1) | (50.0) | 0 | 1 | 0.0 | (10) |
| Pre-tax profit | $42 | $73 | ($31) | (42.5) % | $55 | ($13) | (23.6) % | $274 |

As a percent of net sales

|  | Second Quarter FY 1999 | Second Quarter FY 99 Plan | Better or (Worse) Than Plan | Second Quarter FY 1998 | % Better or (Worse) Than FY 98 | FY 99 Business Plan |
|---|---|---|---|---|---|---|
| Net Sales | 100.0% | 100.0% | 0.0% | 100.0% | 0.0% | 100.0% |
| Cost of sales: |  |  |  |  |  |  |
| Labor | 16.0 | 13.6 | (2.4) | 18.8 | 2.8 | 14.3 |
| Overhead | 28.0 | 22.0 | (6.0) | 12.9 | (15.1) | 22.2 |
| Cost of sales | 44.0 | 35.6 | (8.4) | 31.7 | (12.3) | 36.5 |
| Gross profit | 56.0 | 64.4 | (8.4) | 68.3 | (12.3) | 63.5 |
| Selling and administrative | 15.0 | 10.6 | (4.4) | 13.9 | (1.1) | 11.1 |
| Operating profit | 41.0 | 53.8 | (12.8) | 54.5 | (13.5) | 52.4 |
| Interest expense | (1.0) | (1.5) | (0.5) | 0.0 | 1.0 | (2.0) |
| Pre-tax profit | 42.0 | 55.3 | (13.3) | 54.5 | (12.5) | 54.4 |

A - 00074

LLC 1/19/99

**National Forge Components, Inc.**
**A Subsidiary of National Forge Company**
**Results of Operations**
**For the six months ended December 31, 1998 and December 31, 1997**
*(dollars in thousands)*

| | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FYTD 1998 Actual | Better or (Worse) Than FY 98 | % Better or (Worse) Than FY 98 | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| Sales-customers | $147 | $264 | ($117) | (44.3) % | $214 | ($67) | (31.3) % | $504 |
| Sales-intercompany | 1 | 0 | 1 | 0.0 | 4 | (3) | (75.0) | 0 |
| Net Sales | 148 | 264 | (116) | (43.9) | 218 | (70) | (32.1) | 504 |
| Cost of sales: | | | | | | | | |
| Labor | 32 | 36 | 4 | 11.1 | 35 | 3 | 8.6 | 72 |
| Overhead | 47 | 53 | 6 | 11.3 | 32 | (15) | (46.9) | 112 |
| Cost of sales | 79 | 89 | 10 | 11.2 | 67 | (12) | (17.9) | 184 |
| Gross profit (loss) | 69 | 175 | (106) | (60.6) | 151 | (82) | (54.3) | 320 |
| Administrative | 32 | 28 | (4) | (14.3) | 29 | (3) | (10.3) | 56 |
| Operating profit (loss) | 37 | 147 | (110) | (74.8) | 122 | (85) | (69.7) | 264 |
| Interest expense (income) | (2) | (2) | 0 | 0.0 | 2 | 4 | 200.0 | (10) |
| Pre-tax profit (loss) | $39 | $149 | ($110) | (73.8) % | $120 | ($81) | (67.5) % | $274 |

As a percent of net sales

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Net Sales | 100.0% | 100.0% | 0.0% | | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | | | | |
| Labor | 21.6 | 13.6 | (8.0) | | 16.1 | (5.6) | | 14.3 |
| Overhead | 31.8 | 20.1 | (11.7) | | 14.7 | (17.1) | | 22.2 |
| Cost of sales | 53.4 | 33.7 | (19.7) | | 30.7 | (22.6) | | 36.5 |
| Gross profit (loss) | 46.6 | 66.3 | (19.7) | | 69.3 | (22.6) | | 63.5 |
| Administrative | 21.6 | 10.6 | (11.0) | | 13.3 | (8.3) | | 11.1 |
| Operating profit (loss) | 25.0 | 55.7 | (30.7) | | 56.0 | (31.0) | | 52.4 |
| Interest expense (income) | (1.4) | (0.8) | 0.6 | | 0.9 | 2.3 | | (2.0) |
| Pre-tax profit (loss) | 26.4 | 56.4 | (30.1) | | 55.0 | (28.7) | | 54.4 |

LLC 1/15.99

**National Forge Components, Inc.**

**A Subsidiary of National Forge Company**

**Balance Sheet**

*(dollars in thousands)*

| | December 31, 1998 Actual | December 31, 1997 Actual |
|---|---|---|
| **ASSETS** | | |
| | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $1 | $1 |
| Accounts receivable | 52 | 45 |
| Intercompany receivables | 0 | 0 |
| Inventories: | | |
| Work in process | 0 | 0 |
| Supplies | 0 | 0 |
| Total Inventories | 0 | 0 |
| Prepaid expenses | 6 | 0 |
| **Total Current Assets** | 59 | 46 |
| | | |
| Property, Plant and Equipment - net | 59 | 65 |
| Deferred Income Taxes | (1) | 0 |
| Other Assets | 0 | 0 |
| **TOTAL ASSETS** | $117 | $111 |
| | | |
| **LIABILITIES** | | |
| | | |
| Current Liabilities: | | |
| Notes payable | $0 | $0 |
| Current portion of long term debt | 0 | 0 |
| Accounts payable | 0 | 1 |
| Salaries, wages and commissions | 0 | 4 |
| Accrued taxes on income | 63 | 41 |
| Other accrued liabilities | 3 | 0 |
| **Total Current Liabilities** | 66 | 46 |
| | | |
| Long Term Debt | 0 | 0 |
| Pension and Other Noncurrent Liabilities | 0 | 0 |
| Intercompany Payables | (70) | (8) |
| **TOTAL LIABILITIES** | (4) | 38 |
| | | |
| **SHAREHOLDERS' EQUITY** | | |
| Common Stock | 1 | 1 |
| Additional Paid in Capital | 0 | 0 |
| Retained Earnings (Deficit) | 120 | 72 |
| Foreign Currency Translation Adjustment | 0 | 0 |
| **TOTAL COMMON SHAREHOLDERS' EQUITY** | 121 | 73 |
| | | |
| **TOTAL LIABILITIES AND EQUITY** | $117 | $111 |
| | | |
| **WORKING CAPITAL** | ($7) | $0 |

LLC: 1/18/99

A - 00076

National Forge Components, Inc.
A Subsidiary of National Forge Company
Statement of Cash Flows
Period Ended December 31, 1998 and December 31, 1997
*(dollars in thousands)*

| | Second quarter | | Six months | |
|---|---|---|---|---|
| | **FY 1999** | FY 1998 | **FY 1999** | FY 1998 |
| **Cash Flows From Operating Activities:** | | | | |
| Net income (loss) | **$25** | $32 | **$23** | $71 |
| Adjustment to reconcile net income to net cash | | | | |
| provided by operating activities: | | | | |
| Depreciation | **1** | 1 | **3** | 3 |
| Deferred taxes | | | **0** | |
| Change in assets and liabilities: | | | | |
| (Increase) decrease in accounts receivable | **6** | 17 | **(13)** | (8) |
| (Increase) decrease in inventories | **0** | 0 | **0** | 0 |
| (Increase) decrease in prepaid expenses | **0** | 0 | **(6)** | 0 |
| Increase (decrease) in accounts payable | **0** | 0 | **0** | 1 |
| Increase (decrease) in income taxes | **17** | 23 | **16** | 41 |
| Increase (decrease) in all other current liabilities | | | | |
| (excluding borrowings) | **1** | (4) | **0** | (27) |
| Other net | **0** | 0 | **0** | 0 |
| **Net Cash Provided By (Used For) Operating Activities** | **50** | 69 | **23** | 81 |
| **Cash Flows From Investing Activities:** | | | | |
| (Additions) reductions of property, plant and equipment | **1** | (4) | **(1)** | (5) |
| Net Cash Used In Investing Activities | **1** | (4) | **(1)** | (5) |
| **Cash Flows From Financing Activities:** | | | | |
| Additional (repayment of) borrowings | **0** | 0 | **0** | 0 |
| Issuance of stock | **0** | 0 | **0** | 0 |
| Increase (decrease) in intercompany account | **(51)** | (65) | **(22)** | (76) |
| **Net Cash Provided By Financing Activities** | **(51)** | (65) | **(22)** | (76) |
| Change in cumulative foreign currency | | | | |
| translation adjustment | **0** | 0 | **0** | 0 |
| **Increase (Decrease) In Cash And Cash** | | | | |
| **Equivalents** | **$0** | $0 | **$0** | $0 |

A - 00077

LLC: 1/19/99

**EXHIBIT
4**

**Note to the Financial Statements of Mitchell, Shackleton & Co. Ltd.**

The actual results, in dollars, on the financial statements of Mitchell, Shackleton & Co. Ltd.
(MSL) include the flange business which was transferred from North West Forgemasters Ltd. in
early FY 1999. If the FY 1999 Plan, in dollars, had been revised to include the flange business,
actual sales for the first six months of FY 1999 would have fallen short of Plan by $77,000 or 2%
and the pre tax profit would have fallen short of Plan by $38,000 or 35%. The Plan, in dollars,
was not revised because it was submitted to the banks by May 31, 1998. The decision to transfer
the flange business came after the FY 1999 Plan was finalized. In order to better judge MSL
including the flange business, we instructed them to revise their FY 1999Plan in pounds for
internal purposes.

**Mitchell Sha...eton & Co. LTD.**
**A Subsidiary of National Forge Company**
**Results of Operations**
**For the second quarter ended December 31, 1998 and December 31, 1997**
*(dollars in thousands)*

| | Second Quarter FY 1999 | Second Quarter FY 99 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | Second Quarter FY 1998 | Better or (Worse) Than FY 98 | % Better or (Worse) Than FY 98 | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| Sales-customers | **$2,263** | $2,027 | $236 | 11.6 % | $2,179 | $84 | 3.9 % | $8,496 |
| Sales-intercompany | **17** | 0 | 17 | 0.0 | 0 | 17 | 0.0 | 0 |
| **Net Sales** | **2,280** | 2,027 | 253 | 12.5 | 2,179 | 101 | 4.6 | 8,496 |
| Cost of sales: | | | | | | | | |
| Material | **819** | 656 | (163) | (24.8) | 743 | (76) | (10.2) | 2,668 |
| Labor | **288** | 285 | (3) | (1.1) | 258 | (30) | (11.6) | 1,190 |
| Overhead | **737** | 656 | (81) | (12.3) | 713 | (24) | (3.4) | 2,731 |
| Errors and defects | **0** | 52 | 52 | 100.0 | 24 | 24 | 100.0 | 217 |
| Cost of sales | **1,844** | 1,649 | (195) | (11.8) | 1,738 | (106) | (6.1) | 6,806 |
| **Gross profit** | **436** | 378 | 58 | 15.3 | 441 | (5) | (1.1) | 1,690 |
| Selling | **86** | 37 | (49) | (132.4) | 72 | (14) | (19.4) | 191 |
| Administrative | **265** | 262 | (3) | (1.1) | 235 | (30) | (12.8) | 1,048 |
| **Operating profit** | **85** | 79 | 6 | 7.6 | 134 | (49) | (36.6) | 451 |
| Other expense (income) | **0** | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0 |
| Interest expense | **43** | 37 | (6) | (16.2) | 32 | (11) | (34.4) | 148 |
| **Pre-tax profit** | **$42** | $42 | $0 | 0.0 % | $102 | ($60) | (58.8) % | $303 |

As a percent of net sales

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Net Sales** | **100.0%** | 100.0% | 0.0% | | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | | | | |
| Material | **35.9** | 32.4 | (3.6) | | 34.1 | (1.8) | | 31.4 |
| Labor | **12.6** | 14.1 | 1.4 | | 11.8 | (0.8) | | 14.0 |
| Overhead | **32.3** | 32.4 | 0.0 | | 32.7 | 0.4 | | 32.1 |
| Errors and defects | **0.0** | 2.6 | 2.6 | | 1.1 | 1.1 | | 2.6 |
| Cost of sales | **80.9** | 81.4 | 0.5 | | 79.8 | (1.1) | | 80.1 |
| **Gross profit** | **19.1** | 18.6 | 0.5 | | 20.2 | (1.1) | | 19.9 |
| Selling and administrative | **15.4** | 14.8 | (0.6) | | 14.1 | (1.3) | | 14.6 |
| **Operating profit** | **3.7** | 3.9 | (0.2) | | 6.1 | (2.4) | | 5.3 |
| Other expense (income) | **0.0** | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 |
| Interest expense | **1.9** | 1.8 | (0.1) | | 1.5 | (0.4) | | 1.7 |
| **Pre-tax profit** | **1.8** | 2.1 | (0.2) | | 4.7 | (2.8) | | 3.6 |

LLC 1/15/99

Mitchell Shackleton & Co. LTD
A Subsidiary of National Forge Europe Ltd.
Results of Operations
For the six months ended December 31, 1998 and December 31, 1997
*(dollars in thousands)*

| | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FYTD 1998 Actual | Better or (Worse) Than FY 98 | % Better or (Worse) Than FY 98 | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| Sales-customers | $4,281 | $4,031 | $250 | 6.2 % | $4,423 | ($142) | (3.2) % | $8,496 |
| Sales-intercompany | 28 | 0 | 28 | 0.0 | 0 | 28 | 0.0 | 0 |
| Net Sales | 4,309 | 4,031 | 278 | 6.9 | 4,423 | (114) | (2.6) | 8,496 |
| Cost of sales: | | | | | | | | |
| Material | 1,413 | 1,198 | (215) | (17.9) | 1,437 | 24 | 1.7 | 2,668 |
| Labor | 595 | 595 | 0 | 0.0 | 561 | (34) | (6.1) | 1,190 |
| Overhead | 1,444 | 1,344 | (100) | (7.4) | 1,470 | 26 | 1.8 | 2,731 |
| Errors and defects | 0 | 103 | 103 | 100.0 | 104 | 104 | 100.0 | 217 |
| Cost of sales | 3,452 | 3,240 | (212) | (6.5) | 3,572 | 120 | 3.4 | 6,806 |
| Gross profit | 857 | 791 | 66 | 8.3 | 851 | 6 | 0.7 | 1,690 |
| Selling | 157 | 82 | (75) | (91.5) | 115 | (42) | (36.5) | 191 |
| Administrative | 541 | 526 | (15) | (2.9) | 493 | (48) | (9.7) | 1,048 |
| Operating profit | 159 | 183 | (24) | (13.1) | 243 | (84) | (34.6) | 451 |
| Other expense (income) | 0 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0 |
| Interest expense | 88 | 84 | (4) | (4.8) | 64 | (24) | (37.5) | 148 |
| Pre-tax profit | $71 | $99 | ($28) | (28.3) % | $179 | ($108) | (60.3) % | $303 |

As a percent of net sales

| | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | | FYTD 1998 Actual | Better or (Worse) Than FY 98 | | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| Net Sales | 100.0% | 100.0% | 0.0% | | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | | | | |
| Material | 32.8 | 29.7 | (3.1) | | 32.5 | (0.3) | | 31.4 |
| Labor | 13.8 | 14.8 | 1.0 | | 12.7 | (1.1) | | 14.0 |
| Overhead | 33.5 | 33.3 | (0.2) | | 33.2 | (0.3) | | 32.1 |
| Errors and defects | 0.0 | 2.6 | 2.6 | | 2.4 | 2.4 | | 2.6 |
| Cost of sales | 80.1 | 80.4 | 0.3 | | 80.8 | 0.6 | | 80.1 |
| Gross profit | 19.9 | 19.6 | 0.3 | | 19.2 | 0.6 | | 19.9 |
| Selling and administrative | 16.2 | 15.1 | (1.1) | | 13.7 | (2.5) | | 14.6 |
| Operating profit | 3.7 | 4.5 | (0.8) | | 5.5 | (1.8) | | 5.3 |
| Other expense (income) | 0.0 | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 |
| Interest expense | 2.0 | 2.1 | 0.0 | | 1.4 | (0.6) | | 1.7 |
| Pre-tax profit | 1.6 | 2.5 | (0.8) | | 4.0 | (2.4) | | 3.6 |

LLC 1/15/99

# Mitchell, Shackleton & Co. Ltd.
## A Subsidiary of National Forge Europe Ltd.
### Balance Sheet
*(dollars in thousands)*

|  | December 31, 1998 Actual | December 31, 1997 Actual |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | **$7** | $165 |
| Accounts receivable | **2,446** | 2,229 |
| Intercompany receivables | **(20)** | (63) |
| Inventories: | | |
|     Work in process | **1,819** | 1,351 |
|     Supplies | **61** | 71 |
|     Total Inventories | **1,880** | 1,422 |
| Prepaid expenses | **0** | 69 |
| **Total Current Assets** | **4,313** | 3,822 |
| Property, Plant and Equipment - net | **4,080** | 3,984 |
| Investment in subsidiaries | **125** | 0 |
| Other Assets | **616** | 553 |
| **TOTAL ASSETS** | **$9,134** | $8,359 |
| **LIABILITIES** | | |
| Current Liabilities: | | |
|     Notes payable | **$536** | $234 |
|     Current portion of long term debt | **586** | 545 |
|     Accounts payable | **1,054** | 530 |
|     Customer deposits | **28** | 0 |
|     Deferred Income Taxes | **367** | 0 |
|     Other accrued liabilities | **25** | 0 |
| **Total Current Liabilities** | **2,596** | 1,309 |
| Long Term Debt | **375** | 652 |
| Pension and Other Noncurrent Liabilities | **0** | 0 |
| Deferred Income Taxes | **0** | 289 |
| Intercompany Payables | **1,070** | 1,065 |
| **TOTAL LIABILITIES** | **4,041** | 3,315 |
| **SHAREHOLDERS' EQUITY** | | |
| Common Stock | **2,708** | 2,708 |
| Additional Paid in Capital | **1,847** | 1,847 |
| Retained Earnings (Deficit) | **(651)** | (679) |
| Foreign Currency Translation Adjustment | **1,189** | 1,168 |
| **TOTAL COMMON SHAREHOLDERS' EQUITY** | **5,093** | 5,044 |
| **TOTAL LIABILITIES AND EQUITY** | **$9,134** | $8,359 |
| **WORKING CAPITAL** | **$1,717** | $2,513 |

LLC: 1/18/99

**Mitchell Shackleton & Co. Ltd.**
**A Subsidiary of National Forge Europe Ltd.**
**Statement of Cash Flows**
**Period Ended December 31, 1998 and December 31, 1997**
*(dollars in thousands)*

| | Second quarter | | Six months | |
|---|---|---|---|---|
| | **FY 1999** | FY 1998 | **FY 1999** | FY 1998 |
| **Cash Flows From Operating Activities:** | | | | |
| Net income (loss) | **$42** | $102 | **$71** | $179 |
| Adjustment to reconcile net income to net cash | | | | |
| provided by operating activities: | | | | |
| Depreciation | **92** | 85 | **181** | 171 |
| Deferred taxes | **(9)** | 6 | **(2)** | (2) |
| Change in assets and liabilities: | | | | |
| (Increase) decrease in accounts receivable | **645** | (219) | **316** | (393) |
| (Increase) decrease in inventories | **240** | 178 | **423** | 832 |
| (Increase) decrease in prepaid expenses | **0** | (69) | **12** | (67) |
| Increase (decrease) in accounts payable | **(323)** | (74) | **(662)** | (659) |
| Increase (decrease) in customer deposits | **28** | (115) | **28** | (118) |
| Increase (decrease) in all other current liabilities | | | | |
| (excluding borrowings) | **(19)** | 0 | **25** | 0 |
| Other net | **15** | (11) | **3** | 5 |
| **Net Cash Provided By (Used For) Operating Activities** | **711** | (117) | **395** | (52) |
| **Cash Flows From Investing Activities:** | | | | |
| (Additions) reductions of property, plant and equipment | **48** | (160) | **(104)** | (105) |
| **Net Cash Used In Investing Activities** | **48** | (160) | **(104)** | (105) |
| **Cash Flows From Financing Activities:** | | | | |
| Additional (repayment of) borrowings | **(632)** | 84 | **(491)** | (109) |
| Increase (decrease) in intercompany account | **(10)** | 85 | **(13)** | 56 |
| **Net Cash Provided By Financing Activities** | **(642)** | 169 | **(504)** | (53) |
| Change in cumulative foreign currency | | | | |
| translation adjustment | **(120)** | 98 | **(25)** | (41) |
| **Increase (Decrease) In Cash And Cash** | | | | |
| **Equivalents** | **($3)** | ($10) | **($238)** | ($251) |

A - 00083

# Global Crankshaft Services Ltd.
## A Subsidiary of Mitchell, Sha...ton & Co. Ltd.
### Results of Operations
### For the second quarter ended December 31, 1998
*(dollars in thousands)*

| | Second Quarter FY 1999 | Second Quarter FY 99 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FY 99 Business Plan |
|---|---|---|---|---|---|
| Sales-customers | $86 | $57 | $29 | 50.9 % | $248 |
| Sales-intercompany | 0 | 0 | 0 | 0.0 | 0 |
| **Net Sales** | 86 | 57 | 29 | 50.9 | 248 |
| Cost of sales: | | | | | |
| Material | 7 | 3 | (4) | (133.3) | 12 |
| Labor | 29 | 18 | (11) | (61.1) | 78 |
| Overhead | 17 | 10 | (7) | (70.0) | 46 |
| Errors and defects | 0 | 0 | 0 | 0.0 | 0 |
| Cost of sales | 53 | 31 | (22) | (71.0) | 136 |
| **Gross profit** | 33 | 26 | 7 | 26.9 | 112 |
| Selling | 13 | 6 | (7) | (116.7) | 26 |
| Administrative | 19 | 14 | (5) | (35.7) | 56 |
| **Operating profit** | 1 | 6 | (5) | (83.3) | 30 |
| Interest expense | 2 | 0 | (2) | 0.0 | 0 |
| Minority interest | 0 | 0 | 0 | 0.0 | 0 |
| **Pre-tax profit** | ($1) | $6 | ($7) | (116.7) % | $30 |

As a percent of net sales

| | | | | | |
|---|---|---|---|---|---|
| **Net Sales** | 100.0% | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | |
| Material | 8.1 | 5.3 | (2.9) | | 4.8 |
| Labor | 33.7 | 31.6 | (2.1) | | 31.5 |
| Overhead | 19.8 | 17.5 | (2.2) | | 18.5 |
| Errors and defects | 0.0 | 0.0 | 0.0 | | 0.0 |
| Cost of sales | 61.6 | 54.4 | (7.2) | | 54.8 |
| **Gross profit** | 38.4 | 45.6 | (7.2) | | 45.2 |
| Selling and administrative | 37.2 | 35.1 | (2.1) | | 33.1 |
| **Operating profit** | 1.2 | 10.5 | (9.4) | | 12.1 |
| Interest expense | 2.3 | 0.0 | (2.3) | | 0.0 |
| Minority interest | 0.0 | 0.0 | 0.0 | | 0.0 |
| **Pre-tax profit** | (1.2) | 10.5 | (11.7) | | 12.1 |

A - 00084

LLC 1/19/99

**Global Crankshaft Services Ltd.**
**A Subsidiary of Mitchell, Shalton & Co. Ltd.**
**Results of Operations**
**For the six months ended December 31, 1998**

*(dollars in thousands)*

| | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FY 99 Business Plan |
|---|---|---|---|---|---|
| Sales-customers | $228 | $114 | $114 | 100.0 % | $248 |
| Sales-intercompany | 0 | 0 | 0 | 0.0 | 0 |
| **Net Sales** | 228 | 114 | 114 | 100.0 | 248 |
| Cost of sales: | | | | | |
|   Material | 7 | 6 | (1) | (16.7) | 12 |
|   Labor | 81 | 36 | (45) | (125.0) | 78 |
|   Overhead | 36 | 22 | (14) | (63.6) | 46 |
|   Errors and defects | 0 | 0 | 0 | 0.0 | 0 |
| Cost of sales | 124 | 64 | (60) | (93.8) | 136 |
| **Gross profit** | 104 | 50 | 54 | 108.0 | 112 |
| Selling | 37 | 12 | (25) | (208.3) | 26 |
| Administrative | 51 | 26 | (25) | (96.2) | 56 |
| **Operating profit** | 16 | 12 | 4 | 33.3 | 30 |
| Interest expense | 2 | 0 | (2) | 0.0 | 0 |
| Minority interest | 3 | 0 | (3) | 0.0 | 0 |
| **Pre-tax profit** | $11 | $12 | ($1) | (8.3) % | $30 |

As a percent of net sales

| | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | | FY 99 Business Plan |
|---|---|---|---|---|---|
| **Net Sales** | 100.0% | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | |
|   Material | 3.1 | 5.3 | 2.2 | | 4.8 |
|   Labor | 35.5 | 31.6 | (3.9) | | 31.5 |
|   Overhead | 15.8 | 19.3 | 3.5 | | 18.5 |
|   Errors and defects | 0.0 | 0.0 | 0.0 | | 0.0 |
| Cost of sales | 54.4 | 56.1 | 1.8 | | 54.8 |
| **Gross profit** | 45.6 | 43.9 | 1.8 | | 45.2 |
| Selling and administrative | 38.6 | 33.3 | (5.3) | | 33.1 |
| **Operating profit** | 7.0 | 10.5 | (3.5) | | 12.1 |
| Interest expense | 0.9 | 0.0 | (0.9) | | 0.0 |
| Minority interest | 1.3 | 0.0 | (1.3) | | 0.0 |
| **Pre-tax profit** | 4.8 | 10.5 | (5.7) | | 12.1 |

A - 00085

LLC 1/15/99

**Global Crankshaft Services Ltd.**

A Subsidiary of Mitchell, Shackleton & Co. Ltd.

Balance Sheet

*(dollars in thousands)*

|  | December 31, 1998 Actual |
|---|---|
| **ASSETS** | |
| **Current Assets:** | |
| Cash and cash equivalents | $0 |
| Accounts receivable | 121 |
| Intercompany receivables | (48) |
| Inventories: | |
| Work in process | 0 |
| Supplies | 0 |
| Total Inventories | 0 |
| Prepaid expenses | 7 |
| **Total Current Assets** | **80** |
| Property, Plant and Equipment - net | 108 |
| Investment in subsidiaries | 0 |
| Deferred Income Taxes | 0 |
| Goodwill | 71 |
| **TOTAL ASSETS** | **$259** |
| **LIABILITIES** | |
| **Current Liabilities:** | |
| Notes payable | $37 |
| Current portion of long term debt | 0 |
| Accounts payable | 63 |
| Accrued taxes on income | 3 |
| Customer deposits | 0 |
| Other accrued liabilities | 0 |
| **Total Current Liabilities** | **103** |
| Long Term Debt | 0 |
| Pension and Other Noncurrent Liabilities | 0 |
| Deferred Income Taxes | 0 |
| Intercompany Payables | 0 |
| **TOTAL LIABILITIES** | **103** |
| Minority Interest | 37 |
| **SHAREHOLDERS' EQUITY** | |
| Common Stock | 125 |
| Additional Paid in Capital | 0 |
| Retained Earnings (Deficit) | (7) |
| Foreign Currency Translation Adjustment | 1 |
| **TOTAL COMMON SHAREHOLDERS' EQUITY** | **119** |
| **TOTAL LIABILITIES AND EQUITY** | **$259** |
| **WORKING CAPITAL** | **($23)** |

A - 00086

LLC: 1/18/99

**Global Crankshaft Services Ltd.**
**A Subsidiary of Mitchell, Shackleton & Co. Ltd.**
**Statement of Cash Flows**
**Period Ended December 31, 1998**
*(dollars in thousands)*

| | Second quarter FY 1999 | Six months FY 1999 |
|---|---|---|
| **Cash Flows From Operating Activities:** | | |
| Net income (loss) | ($1) | $8 |
| Adjustment to reconcile net income to net cash | | |
| provided by operating activities: | | |
| Depreciation | 6 | 12 |
| Amortization | 2 | 4 |
| Deferred taxes | 0 | 0 |
| Change in assets and liabilities: | | |
| (Increase) decrease in accounts receivable | 0 | (97) |
| (Increase) decrease in inventories | 0 | 0 |
| (Increase) decrease in prepaid expenses | (4) | 2 |
| Increase (decrease) in accounts payable | (27) | 13 |
| Increase (decrease) in income taxes | 0 | 3 |
| Increase (decrease) in customer deposits | 0 | 0 |
| Increase (decrease) in all other current liabilities | | |
| (excluding borrowings) | 0 | 0 |
| Other net | 2 | 7 |
| **Net Cash Provided By (Used For) Operating Activities** | (22) | (48) |
| **Cash Flows From Investing Activities:** | | |
| (Additions) reductions of property, plant and equipment | 3 | 0 |
| **Net Cash Used In Investing Activities** | 3 | 0 |
| **Cash Flows From Financing Activities:** | | |
| Additional (repayment of) borrowings | 20 | 25 |
| Issuance of stock | 0 | 0 |
| Increase (decrease) in intercompany account | 2 | 28 |
| **Net Cash Provided By Financing Activities** | 22 | 53 |
| Change in cumulative foreign currency | | |
| translation adjustment | (3) | (5) |
| **Increase (Decrease) In Cash And Cash** | | |
| **Equivalents** | $0 | $0 |

A - 00087

LLC: 1/18/99

## MITCHELL, SHACKLETON & CO. LTD.

### Quarterly Report to National Forge Company Board of Directors

### January 1999

1.    **Financial Update**

Half Year Ended December 1998

£000s

| 1st Six Months FY 1998 Actual | | 1st Six Months FY 1999 Actual | FY 1999 Business Plan |
|---|---|---|---|
| £2,692 | Sales | £2,586 | £2,813 |
| £518 | Manufacturing Profit | £515 | £557 |
| 19% | % of Sales | 20% | 20% |
| £149 | Trading Profit | £96 | £133 |
| £110 | Net Profit | £43 | £84 |
| 4% | Return on Sales | 2% | 3% |
| 8% | Return on Net Assets | 3% | 6% |
| £767 | Net External Borrowings | £898 | £1,116 |
| £3,776 | Capital Employed | £3,987 | £4,386 |

The trading performance for the half-year ended 31 December 1998 compares unfavourably with both Business Plan and previous year actuals.

Sales represented ninety-two percent of Business Plan and, when adjusted for flange sales of £229,000, only eighty seven percent of the figure achieved in the previous year which in turn reflects the low intake of orders in the current year.

Whilst the manufacturing profit has held up at twenty percent, it is envisaged that the effect of recent price reductions will be felt in the second half of the year inevitably resulting in lower margins.

A - 00088

The Resident Directors in an attempt to take corrective action have declared a redundancy involving seven people. This action has taken place in January, though it is acknowledged that this will have greater benefit in FY 2000 with anticipated annual savings of £130,000. Despite taking such action, we have found it necessary to revise our year-end profit projections as follows:

| Mitchell, Shackleton & Co. Ltd. FY 1999 FORECAST £000S | | |
|---|---|---|
| | Original | Revised |
| Sales | £5,740 | £5,400 |
| Manufacturing Profit | £1,151 | £1,020 |
| Trading Profit | £286 | £200 |
| Net Profit | £192 | £100 |

With a highly valued pound continuing to prevail, this revision mirrors the state of so many UK manufacturing organisations. However, we remain committed to effecting all feasible improvements in order to maximise the FY99 result, and furthermore, there is a recognition of a need to change operational practices and accelerate the process of diversification.

Borrowing requirements which were stretched close to their limits in the first quarter have eased considerably and are now lower than Business Plan.

The above figures exclude the results of Global Crankshaft Services Ltd. which although somewhat disappointing, do not give cause for concern. Sales amounted to a satisfactory £137,000 which produced a net profit of £8,000, this being a Business Plan profit shortfall of £6,000 which could be attributable wholly to brochure development and printing expenses.

2. **Operational Review**

2.2.1  General Activities

During the past quarter, the essential need to reduce operating costs has become increasingly apparent. Although the strict control of all purchases together with overtime and shift-working costs has continued to be applied rigidly, it became necessary to plan more drastic action, which already has been put into effect during the past week. As mentioned in Section 1 above, such action has included the redundancies of seven employees with a resultant annual cost savings of £130,000, together with a re-organisation of the management structure and responsibilities, with a view to strengthening the Company's ability to become

involved in the sub contract heat treating and machining of components other than crankshafts.

## 2.2.2 Flange Division (North West Flanges)

North West Flanges has continued to trade in an acceptable manner whilst proceeding smoothly to establish itself as an integrated part of the Mitchell, Shackleton plant.

This division maintains a keen eye to possible expansion by the planned introduction of a small raw material stocking programme and the acquisition of some form of flange merchanting business should it be successful in unearthing a suitable opportunity.

## 2.2.3 Proposed Capital Expenditure

Accompanying this report is a separately published proposal relative to essential major capital expenditure on a total retro fit of a large GFM Profile Milling Machine. This upgrade is considered to be essential to enable us to achieve necessary cost reductions to face the future challenges. Assistance in the compilation of this proposal has been received from Mr. C. T. Jenkins.

In addition a proposal to upgrade both the Company's computer facilities together with those of North West Forgemasters Ltd. to ensure Year 2000 compliance and essential systems development also will be submitted.

## 3. Marketing Update

### 3.1 Customer Requirements

Owing to continued strong competition and currencies, product pricing remains the major criteria for order placement. Virtually every order received from Original Equipment Manufacturers has to be negotiated as a reduced price and reductions of ten percent are normal. Our sole supplier status with Rolls Royce Package System Supply (W. H. Allen) recently became under threat due to a newly appointed Purchasing Director requiring significant price reductions on all factored items. This opened the door to competition to quote for specific types within their portfolio. By reducing prices we were able to stave off such competition but sadly at a cost of drastically reduced margins.

### 3.2 Competition

It has to be restated that competition is extremely fierce in the current depressed market. Competitors who have invested heavily are endeavouring to utilise the increased capacity available probably in an attempt to justify the investments made.

3.3    Current Developments

    3.3.1    New Customers and Products
Recent actions relative to the procurement of new customers and products can be summarised as follows:

       a.   Dresser Rand Shanghai has been visited by Messrs. McGuinness and Thomas, who believe thst this organisation could develop into a worthwhile crankshaft customer during the next five years.

       b.   A small number of visits have been made to UK companies with a view to us becoming involved with the sub contract machining of a small number of components including electrical generators and marine shafting.

       c.   Plans have been made to utilise the services of Greg Bacon to assist our efforts to develop into the business of selective sub contract heat treatment and machining.

    3.3.2    Crankshaft Repairs

The profitable business of crankshaft repairs has remained too static and therefore during the next two months an amount of exploratory research work will be undertaken, principally in Continental Europe, in an effort to locate new business links which could fuel our current level of activity to more rewarding heights.

    3.3.3    Crankshaft In-Situ Repairs

Global Crankshaft Services Ltd. has suffered a profit standstill during the past quarter, which has been a period of a learning curve education, accelerated technician training and relatively high brochure development and printing costs. The venture remains capable of achieving its year end profit prediction and thereafter a satisfactory growth. Perhaps of greater importance to future strategic planning, it may prove to be an available and convenient vehicle capable of assisting the development of further business expansion.


J. B. McGuinness                         JBM/BE/pdc
Managing Director                   19 January, 1999

# NATIONAL FORGE COMPANY

## MITCHELL, SHACKLETON & CO. LTD.

APPLICATION FOR:    ADDITION TO PROPERTY, PLANT AND EQUIPMENT        NUMBER: P-

PROGRAM:                                      ORIGINAL DATE:        19 January, 1999
REV. NO.                                      REV. DATE:

DESCRIPTION OF PROJECT:

Remanufacture GFM Profile Milling Machine complete, including conversion to CNC

*(handwritten: in that conflict with result of dups)*

PURPOSE:

Cost reduction and quality improvement by upgrading the machine to "State of the Art" condition.

START DATE:  Upon approval          EST. COMPLETION DATE:    11 months

ANTICIPATED COST:

| MATERIAL OR SUB. CONTR. | INTERNAL LABOR | OVERHEAD | CONTINGENCY | TOTAL |
|---|---|---|---|---|
| £730,910 | £10,000 | £10,000 | £100,637 | £871,547 |

TIMING OF EXPENDITURE:

| | 1ST QTR. | % | 2ND QTR. | % | 3RD QTR | % | 4TH. QTR | % |
|---|---|---|---|---|---|---|---|---|
| CURRENT YEAR: | | | | | 25 | | | |
| NEXT YEAR: | | | 50 | | 25 | | | |

JUSTIFICATION:

See attachment

NET PRESENT VALUE CALCULATION: _____ ATTACHED _____ WAIVED _____ NOT REQUIRED

SPONSOR:          *(signature)*  Mitchell, Shackleton & Co. Ltd.          NOTIFICATION OF APPROVAL: DEPT. NO.

MGR. PLANT & FAC. ENGR:                                WORK TO BE DONE BY DEPT/S NO.

V.P. OPER-IRVINE:                                       EQUIP. NO.:

MANAGING DIRECTOR:          *(signature)*  2/5/99

CONTROLLER:                                             REQ. NO.:

PRESIDENT:                                              MATERIAL CHARGE: _____

BOARD OF DIRECTORS:                                     LABOR CHARGE _____

CHIEF FINANCIAL OFFICER: _____            DATE: _____

DISTRIBUTION:

A - 00092

MITCHELL, SHACKLETON & CO. LTD.

PROPOSAL

TO

REMANUFACTURE GFM PROFILE MILLING MACHINE NO. 470

(Complete with Conversion to CNC)

**PURPOSE:**

The purpose of this project is to evaluate the possible upgrade of an existing GFM crankshaft milling machine to "State of the Art Computer Numerical Control" and to estimate the resultant affect on Mitchell, Shackleton's competitive position in the crankshaft market place, and thereafter serve as a proposal to the National Forge Company Board of Directors to authorise capital expenditure of £871,000.

**BACKGROUND:**

The Company owns three GFM Profile Milling Machines, one of which being **Machine Number 468**, has not been used for many years. The other two machines are numbered 470 and 471.

**Machine Number 470** is presently inoperable because of mechanical and electrical problems. The machine has been out of service for several months and its hydraulic copying capability has not been usable for about six years.

This machine has had its work holding table extended to 28 feet but its throw limitation is 7 inches which restricts it to small crankshafts. In this survey the throw limitation would allow only 27 percent of the crankshafts to be machined by a GFM machine even if the equipment were functional. It is worn to the point that even if repaired the tolerances achievable would allow only very rough work to be done and efficiency would be very poor.

**Machine Number 471** presently is operating but owing to its inefficient condition it is used only for very rough operations. This machine would continue to be used as support for Machine No. 470 when upgraded; the planned completion date of such an upgrade being the final quarter of FY2000. Although recognition has been given to the fact that there are other machines and methods used for large crankshaft machining, it is well accepted that for "brute strength" and "efficient metal removal" there is no better equipment than a GFM Profile Milling Machine.

**THE UPGRADE FACILITY:**

The upgrade of **Machine Number 470** GFM will affect one minor and four major machining operations; namely -

**Minor:**

    1. Rough machining of main bearings for twisting or for heat treatment.

**Major:**

    1. Rough machining of pins before stress relieving to about + ½" per surface.

    2. Rough machining of web contours before stress relieving to about + ½" per surface.

A - 00093

2

3.  a)  Machining of pin diameters to about +.080" on diameter prior to the C.P.M. operation to "finish recesses and turn +.020" for grinding".

Pin spacing above collars (or above recesses if there are no collars) milled to final size and collar spacing to -.015" grinding.

b)  Machining of pin diameters to about +.050" on diameter prior to grinding when there are no recesses.

Pin spacing above collars milled to final size and collar spacing about -.015" for grinding.

4.  Machining of web contours to final size except where close tolerance or counterweight fits are required. In this case about 1/8" stock will remain for CNC mills to finish.

## QUOTATION:

BOST S.A. of Spain has quoted the proposed remanufacture. This Company has upgraded two machines for Sidenor, one for Wildauer, one for Alfing and are working on one for National Forge Company.

An outline of the quotation reads as follows:-

| | | |
|---|---|---|
| - | Base price to repair completely, construct five new steady rests and convert to CNC, including erection and start-up. | £552,075 * |
| - | Option for 1680 mm Ø cutter clearance | 1,190 |
| - | Option for 1800 mm Ø cutter clearance | 1,300 * |
| - | Option for a 3 metre way extension | 58,675 * |
| - | Option for a power rotating tailstock | 58,860 * |
| - | Option for a 900 mm I.D. chucking steady rest | 143,845 |
| - | Option for power rotation of the chucking steady rest | 66,890 |

Suggested options are as noted with an asterisk(*) and result in the following:-

| | |
|---|---|
| Base machine | £552,075 |
| 1800 mm Ø cutter | 1,300 |
| 3 metre extension | £58,675 |
| Powered Tailstock | £58,860 |
| | 670,910 |
| Contingency - fifteen percent | 100,637 |
| New cutter wheel | 60,000 |
| M/S internal labour, transportation and sundries | 40,000 |
| **TOTAL COST OF PROJECT** | **£871,547** |

A - 00094

3

## MACHINE LOADING:

A recently published five year plan confirms that this new remanufactured machine would be loaded fully at all times, and therefore built into all future working arrangements will be the operation of a weekend swing shift which would enable the machine to be subjected to daily three shift working for seven days each week. After making allowances for vacations and normal stoppages the machine is estimated to have a capacity of 5,750 hours per annum.

## JUSTIFICATION:

This proposed project can be justified by an identification of the positive advantages, cost savings and resultant increased business, or alternatively by an assessment of the probable affects of doing nothing, which in brief can be commented upon as follows:-

1.  The crankshaft market has become increasingly more competitive as huge sums of State aided finances have been invested by international competitors. Worldwide supply is greater than demand and virtually all significant customers make purchases based upon service defined by price, quality and delivery rather than traditional loyalties and historical allegiances.

    In order to remain in business cost reduction measures and performance enhancing activities now are essential ingredients of a crankshaft manufacturer's life and therefore capital expenditure proposals must give due consideration to the sustenance of existing business and not focus solely upon monetary pay back improvements to existing profits and cash flows.

2.  A failure to proceed with this proposed remanufacture of **Machine Number 470** automatically will prohibit a timely upgrade of **Machine Number 471** which in a due matter of time most certainly will suffer a catastrophic breakdown. The effect of losing any form of GFM facility for a prolonged period of time would result in an immediate crippling loss to the Company followed by probable consequential losses of unmeasurable proportion.

However, following an in depth review of the efficiences achievable by the remanufactured machine together with their evaluation and affect upon probable business opportunities during the next five years, it is appropriate to record a positive justification summarised as follows:-

1.  It has been established that -

    a)  The machine will be fully loaded throughout four of the five years from FY 2000 to FY 2004.

    b)  Metal removal rates will be increased after the rebuild. It is anticipated that the time savings from the current level of production will be 5,348 hours or 48% from the present 11,098 hours.

4

2. The time savings of 5,348 hours would equate to a cost reduction of £180,000 at the manufacturing profit level as a result of less direct wages and works overhead (calculated at a rate of £33.66/hour). Along with these direct savings and an increase in capacity, any additional sales would produce more profits. The forecasted profit and loss account over the five years shows an average increase in sales of £352,000 and £53,000 in net profit.

The additional book depreciation of this capital, based on a straight line of 20 years, would be £43,000. The added interest cost on average would be £42,000 based on a 5 year term loan with an interest rate of 8.75%.

In summary therefore, the total average annual increased profit during the first five years of the refurbished GFM being in operation would be:

| | |
|---|---|
| Time savings | £180,000 |
| Estimated Profit from additional sales | 53,000 |
| | 233,000 |
| Less: | |
| Average Finance Charges | (42,000) |
| Depreciation | (43,000) |
| **Average Annual increased Profit** | £148,000 |

It is worthy of note that in ensuing years beyond FY 2004 profit would increase with the elimination of finance charges.

3. The recent publication of a five year trading forecast supports the above figures and therefore serves as supporting information as recorded in APPENDIX A.

**CONCLUDING COMMENT:**

1. The Management of Mitchell, Shackleton & Co. Ltd. recognise that it would be both unwise and unreasonable to consider the merits of this proposal without paying due regard to the Company's other anticipated capital requirements during the next five years. Therefore such requirements which have been identified and assessed in house and subsequently reviewed by Mr. C. T. Jenkins, are as recorded in the attached APPENDIX B.

A - 00096

5

2.    Simultaneously it is prudent to be mindful of capital investment which has been made or is likely to be made by competitors, particularly as it already is known that large sums of money have been invested worldwide in "State of the Art" crankshaft finishing machines, such as the "Turn Mill" variety possibly costing between two and four million pounds.

At this time an investment in a Turn Mill Center is not deemed necessary for Mitchell, Shackleton. However it also is believed that during the next five year period the subjects of competition, changing markets and capital expenditure will be subjected to a continual assessment.

**J.B. McGuinness**
**Managing Director**

**Patricroft**
**England**
**21 January, 1999**

Appendix  A

**Mitchell, Shackleton & Co. Ltd.**
**Business Plan FY 2000  -  FY 2004**
**Profit and Loss Account**
**(£ 000's omitted)**

|  | FY 2000 | FY 2001 | FY 2002 | FY 2003 | FY 2004 |
|---|---|---|---|---|---|
| **Sales** | £  5,623 | £  6,195 | £  6,794 | £  7,394 | £  7,963 |
| Materials | 2,033 | 2,294 | 2,581 | 2,784 | 3,050 |
| Direct Wages | 775 | 840 | 920 | 1,015 | 1,100 |
| Works Overhead | 1,725 | 1,790 | 1,875 | 2,050 | 2,200 |
| W.I.P. Adjustment | (50) | (150) | (140) | (142) | (149) |
| **Manufacturing Profit** | **1,140** | **1,421** | **1,558** | **1,687** | **1,762** |
| Selling & Admin Overheads | 869 | 922 | 945 | 980 | 1,005 |
| **Trading Profits** | **271** | **499** | **613** | **707** | **757** |
| Interest | 121 | 137 | 114 | 83 | 50 |
| **Net Profit** | **150** | **362** | **499** | **624** | **707** |
| Corporate Tax | - | - | 150 | 187 | 212 |
| **Net Profit After Tax** | £    150 | £    362 | £    349 | £    437 | £    495 |

As a percentage of sales

|  | FY 2000 | FY 2001 | FY 2002 | FY 2003 | FY 2004 |
|---|---|---|---|---|---|
| **Sales** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Materials | 36.2% | 37.0% | 38.0% | 37.7% | 38.3% |
| Direct Wages | 13.8% | 13.6% | 13.5% | 13.7% | 13.8% |
| Works Overhead | 30.7% | 28.9% | 27.6% | 27.7% | 27.6% |
| W.I.P. Adjustment | -0.9% | -2.4% | -2.1% | -1.9% | -1.9% |
| **Manufacturing Profit** | **20.3%** | **22.9%** | **22.9%** | **22.8%** | **22.1%** |
| Selling & Admin Overheads | 15.5% | 14.9% | 13.9% | 13.3% | 12.6% |
| **Trading Profits** | **4.8%** | **8.1%** | **9.0%** | **9.6%** | **9.5%** |
| Interest | 2.2% | 2.2% | 1.7% | 1.1% | 0.6% |
| **Net Profit** | **2.7%** | **5.8%** | **7.3%** | **8.4%** | **8.9%** |
| Corporate Tax | 0.0% | 0.0% | 2.2% | 2.5% | 2.7% |
| **Net Profit After Tax** | **2.7%** | **5.8%** | **5.1%** | **5.9%** | **6.2%** |

GFM Remanufacture Proposal                                    APPENDIX B

## MITCHELL, SHACKLETON & CO. LTD.

### SUMMARY

### OF

### ANTICIPATED CAPITAL EXPENDITURE

| Period | Amount | Major Items Included | |
|---|---|---|---|
| FY 1999 | £920,000 | GFM Remanufacture | £871,000 |
| | | Computer Upgrade | |
| | | (Part Cost) | 40,000 |
| FY 2000 | 250,000 | Rough Turning | |
| | | Machine Upgrade | 80,000 |
| | | Roller Steadies | 96,000 |
| FY 2001 | 425,000 | GFM Refurbishment | 150,000 |
| | | Retrofit Semi Finishing Lathe | 200,000 |
| FY 2002 | 290,000 | H.T. Furnace | 200,000 |
| | | Twisting Machine Upgrade | 15,000 |
| FY 2003 | 200,000 | Drilling Machine | 200,000 |
| FY 2004 | 300,000 | - | |

A - 00099

MITCHELL SHACKLETON & CO. LTD

**Proposed project:  Remanufacture #470 GFM profile milling machine**
**Request date:  January 22, 1999**

Cost Assumptions:

| Improvement directly related to proposed project: | hours saved | rate/hour | improvement |
|---|---|---|---|
| 1.  Efficiency Improvement: metal removal rate improved 48% | 5,348 | £   33.66 | £   180,000 |
| 2.  Profit on additional crankshaft volume | | | 53,000 |
| Total projected annual improvement | | | £   233,000 |

Other assumptions:
1. The original cost of the project is:    £   871,547
2. Tax depreciation is at a 25% rate on the remaining balance with a tax life of
   10 years on an asset basis of :      £   871,547
3. Tax rate used is 31%.

---

**Internal Rate of Return -**                          **20.9%**

Discount rate which equates the present value of a project's
expected cash inflows to the present value of its expected costs

| Year | annual cost reduction | tax depreciation | taxable income (loss) | tax cost (savings) | Cash Flow | Internal Rate of Return |
|---|---|---|---|---|---|---|
| | (871,547) | | | | | |
| | - | | | | | |
| 0 | (871,547) | | | | (871,547) | |
| 1 | 233,000 | (217,887) | 15,113 | 4,685 | 228,315 | **-73.8%** |
| 2 | 233,000 | (163,415) | 69,585 | 21,571 | 211,429 | **-35.9%** |
| 3 | 233,000 | (122,561) | 110,439 | 34,236 | 198,764 | **-14.4%** |
| 4 | 233,000 | (91,921) | 141,079 | 43,734 | 189,266 | **-2.1%** |
| 5 | 233,000 | (68,941) | 164,059 | 50,858 | 182,142 | **5.3%** |
| 6 | 233,000 | (51,706) | 181,294 | 56,201 | 176,799 | **10.1%** |
| 7 | 233,000 | (38,779) | 194,221 | 60,209 | 172,791 | **13.3%** |
| 8 | 233,000 | (29,084) | 203,916 | 63,214 | 169,786 | **15.5%** |
| 9 | 233,000 | (21,813) | 211,187 | 65,468 | 167,532 | **17.1%** |
| 10 | 233,000 | (65,440) | 167,560 | 51,944 | 181,056 | **18.3%** |
| 11 | 233,000 | 0 | 233,000 | 72,230 | 160,770 | **19.1%** |
| 12 | 233,000 | 0 | 233,000 | 72,230 | 160,770 | **19.8%** |
| 13 | 233,000 | 0 | 233,000 | 72,230 | 160,770 | **20.3%** |
| 14 | 233,000 | 0 | 233,000 | 72,230 | 160,770 | **20.6%** |
| 15 | 233,000 | 0 | 233,000 | 72,230 | 160,770 | **20.9%** |

| **Net Present Value** | | npv & irr relationship: | (0) |
|---|---|---|---|
| Required rate of return | 15.0% | | |
| | | | |
| Net Present value | 207,659 | | |

A - 00100

# NATIONAL FORGE COMPANY

## MITCHELL, SHACKLETON & CO. LTD./NORTH WEST FORGEMASTERS LTD.

APPLICATION FOR:    ADDITION TO PROPERTY, PLANT AND EQUIPMENT        NUMBER: P-

PROGRAM:                                ORIGINAL DATE:    19 January, 1999
REV. NO.                                REV. DATE:

DESCRIPTION OF PROJECT:

Upgrade the computer systems at both Mitchell, Shackleton & Co. Ltd. and North West Forgemasters Ltd.

PURPOSE:

To satisfy the present and future needs of the business and to ensure both companies are Year 2000 compliant.

START DATE:  February, 1999        EST. COMPLETION DATE:  June, 1999

ANTICIPATED COST:

| MATERIAL OR SUB. CONTR. | INTERNAL LABOR | OVERHEAD | CONTINGENCY | TOTAL |
|---|---|---|---|---|
| £55,000 | nil | nil | £5,500 | £60,500 |

TIMING OF EXPENDITURE:

| | 1ST QTR. | % | 2ND QTR. | % | 3RD QTR. | % | 4TH QTR | % |
|---|---|---|---|---|---|---|---|---|
| CURRENT YEAR: | | | | | 80 | | 20 | |
| NEXT YEAR: | | | | | | | | |

JUSTIFICATION:

This project is essential to satisfy Year 2000 compliance and support the changing needs of the businesses

NET PRESENT VALUE CALCULATION: _____ ATTACHED _____ WAIVED ____✓____ NOT REQUIRED

SPONSOR:        J. Thomas   *J Thomas*        NOTIFICATION OF APPROVAL:
                                              DEPT. NO.

MGR. PLANT & FAC. ENGR.:                      WORK TO BE DONE BY DEPT/S NO.

V.P. OPER-IRVINE:                             EQUIP. NO.:

MANAGING DIRECTOR:        20/1/99
                J.B. McGuinness

CONTROLLER:                                   REQ. NO.:

PRESIDENT:                                    MATERIAL CHARGE: _____

BOARD OF DIRECTORS:                           LABOR CHARGE _____

CHIEF FINANCIAL OFFICER: _____ DATE: _____

DISTRIBUTION:

A - 00101

# MITCHELL, SHACKLETON & CO. LTD.

# NORTH WEST FORGEMASTERS LTD.

# COMPUTER UPGRADE PROJECT

### Purpose

The purpose of this project is to upgrade the computer system at Mitchell, Shackleton & Co. Ltd. and North West Forgemasters Ltd.

### Background

Mitchell, Shackleton & Co. Ltd. originally installed its computer network in 1989/90 with a Unisys File Server, using Novell netware for a 5 user system wired with thin Ethernet cable. This system is now totally inadequate for the current number of users with desktop computers and the total length of the cabling has reached its maximum operating capacity. In addition to this the File Server and network operating system together with a number of older pre windows 95 workstations are not Year 2000 compliant. The cabling is also unsatisfactory and needs to be replaced with category 5 to enable greater distances to be covered and to improve network stability. The accounting software is also DOS based and is not 2000 compliant.

A similar position exists at North West Forgemasters Ltd. in Hyde where they currently operate a small network running a Sales Order Entry and partially installed accounting system both of which are unsatisfactory to meet present day needs.

### Quotation

Brilaw International Ltd. a Company based in the Manchester area who have recently been awarded the title of "The Network Re-seller of the Year 1998" were requested to quote for the complete replacement of the networks both at Eccles and Hyde. This quotation has been split into a number of sections.

| | | | |
|---|---|---|---|
| A) | Cabling | - Patricroft | £4,500 |
| | | - Hyde | £1,000 |

The quotation for cabling at Patricroft excludes extending the network into the Works/Works Office environment which would cost a further £8000 and whilst this would improve the control of the issue of programs to CNC machines this aspect has been deferred.

| | | | |
|---|---|---|---|
| B) | File Server | - Patricroft | £3,636 |
| | | - Hyde | £3,640 |

The File Server selected is a Compaq Proliant 1600 PII 450 Mhz Processor with 64Mb Ram and 3 x 4.3 Gb SCSI-3 hard disk at Eccles, with a slightly lower specification at Hyde. Both Servers having a DAT tape backup unit.

A - 00102

2

C)        Network Software    - Patricroft    £3,500
                              - Hyde         £1,304

The network software quoted for is Windows NT Server v4 with a 15 user licence at Patricroft and a five year licence at Hyde. Also included is Microsoft Exchange v5.5 to provide e-mail and calendering capabilities to all users; Cheyenne backup and anti-virus software.

D)        Workstations        - Patricroft    £5,469
                              - Hyde         £3,300

The Patricroft site currently has 11 desk based workstations and 1 notebook computer. Five of these machines are pre Windows 95 and will need to be replaced. In respect of Hyde 4 machines will be required.

E)        Workstation Software - Patricroft   £4,397
                              - Hyde         £1,678

The plan is to standardise the software used by the UK companies to that used by the parent company in the USA. It is therefore proposed that a mixture of Microsoft Office 97 Professional Edition and the Standard Edition is installed on the workstations. Currently there is a mixture of both different spreadsheet and word processing packages as well as different versions of the same package.

F)        Firewall Router      - Patricroft   £1,675
                              - Hyde         £495

To provide controlled, secure internet activity and to route global e mail it is proposed to use a dedicated router with Firewall containing filter software to control internet access from undesirable sites.

G)        Installation         - Patricroft   £3,250
                              - Hyde         £2,600

H)        Remote Connectivity - Patricroft   £1,488
                              - Hyde         £1,488

It is important to link both sites for accounting purposes.

I)        Accounting Software  - Patricroft   £6,310
                              - Hyde         £4,770

The accounting software selected is Pegasus Opera and this will include order processing and invoicing modules.

A - 00103

3

J)    Annual maintenance
      cover for File Server          - Patricroft    £625
                                     - Hyde          £685

The File Server annual maintenance cover is for a guaranteed 8 hour line during normal office hours.

K)    Network Support Agreement - Patricroft £2,450
                                 - Hyde       £1,250

The network support agreement covers the network operating system, Exchange Server and M.S. Office 97 software. The agreement is for 25 units at Patricroft, 10 at Hyde, covering unlimited calls for each separate incident of which upon completion uses 1 unit. The contract period is open ended and does not end after a year.

L)    Firewall Filter annual
      subscription                   - Patricroft    £650
                                     - Hyde          £175

M)    Accounting Software

Annual licence agreement and telephone support    - Patricroft    £650
                                                  - Hyde          £650

4

| SUMMARY | | PATRICROFT | HYDE | |
|---|---|---|---|---|
| Capital | | | | |
| A | Cabling | £4,500 | £1,000 | |
| B | File Server | 3,636 | 3,640 | |
| C | Network Software | 3,500 | 1,304 | |
| D | Work Stations | 5,469 | 3,300 | |
| E | Work Station Software | 4,397 | 1,678 | |
| F | Firewall Router | 1,675 | 495 | |
| G | Installation | 3,250 | 2,600 | |
| H | Remote Link | 1,488 | 1,488 | |
| | Sundries | 300 | 200 | |
| TOTAL NETWORK COST | | 28,215 | 15,705 | |
| I | Accounting Software and production software | 6,310 | 4,770 | |
| | | 34,525 | 20,475 | £55,000 |
| **Annual Maintenance** | | | | |
| J | File Server Maintenance | 625 | 685 | |
| K | Network Support | 2,450 | 1,250 | |
| L | Firewall Filter subs. | 650 | 175 | |
| M | Accounting software support | 450 | 650 | |
| TOTAL ANNUAL MAINTENANCE | | 4,375 | 2,760 | £7,135 |

## CONCLUSION

This project concentrates upon upgrading both the computer infrastructure and software currently in existence at both UK locations, and in addition to being Year 2000 compliant the system will provide secure internet activity and will be compatible in all respects with National Forge Co. requirements.

The project does not address some of the operational requirements at North West Forgemasters which will be the subject of a more in depth review over the next three months. However as the Hardware would be in place it is unlikely that any further investment in software which would occur in FY2000 would exceed £15,000.

I. Thomas                                           20 January, 1999

A - 00105

# Mitchell, Shackleton & Co. Ltd.





## Mitchell, Shackleton & Co. Ltd.



### Operating Profits in Pounds Sterling

# Mitchell, Shackleton & Co. Ltd.



## Operating Profit Percentages

Twelve Month Rolling Average

Quarterly Operating Profit

A - 00108

## Mitchell, Shackleton & Co. Ltd.



**Annual Operating Profit/Employee**

A - 00109

# Mitchell, Shackleton & Co. Ltd.



A - 00110

## Mitchell, Shackleton & Co. Ltd.



**Annual Sales/Employee**

A - 00111

## Mitchell, Shackleton & Co. Ltd.



Sales/Hours Worked Hourly

A - 00112

# Mitchell, Shackleton & Co. Ltd.



A - 00113

**Mitchell, Shackleton & Co. Ltd.**



A - 00114

**EXHIBIT
5**

A - 00115

**Note to the Financial Statements of North West Forgemasters Ltd.**

The actual results, in dollars, on the Financial Statements of North West Forgemasters Ltd.
(NWFM) do not include the flange business that was transferred to Mitchell, Shackleton & Co.
Ltd. in early FY 1999. If the FY 1999 Plan, in dollars, had been revised to remove the flange
business, actual sales for the first six months of FY 1999 would have exceeded Plan by $434,000
or 18% and the pre tax profit would have exceeded Plan by $115,000 or 32%. The Plan, in
dollars, was not revised because it was submitted to the banks by May 31, 1998. The decision to
transfer the flange business came after the FY 1999 Plan was finalized. In order to better judge
NWFM without the flange business, we instructed them to revise their FY 1999Plan in pounds
for internal purposes.

**North West Forgemasters Ltd.**
**A Subsidiary of N____nal Forge Europe Ltd.**
**Results of Operations**
**For the second quarter ended December 31, 1998**
*(dollars in thousands)*

| | Second Quarter FY 1999 | Second Quarter FY 99 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FY 99 Business Plan |
|---|---|---|---|---|---|
| Sales-customers | **$1,284** | $1,542 | ($258) | (16.7) % | $6,435 |
| Sales-intercompany | **0** | 0 | 0 | 0.0 | 0 |
| **Net Sales** | **1,284** | 1,542 | (258) | (16.7) | 6,435 |
| Cost of sales: | | | | | |
|   Material | **601** | 770 | 169 | 21.9 | 3,224 |
|   Labor | **77** | 109 | 32 | 29.4 | 454 |
|   Overhead | **128** | 159 | 31 | 19.5 | 650 |
|   Errors and defects | **0** | 0 | 0 | 0.0 | 0 |
| Cost of sales | **806** | 1,038 | 232 | 22.4 | 4,328 |
| **Gross profit** | **478** | 504 | (26) | (5.2) | 2,107 |
| Selling | **74** | 93 | 19 | 20.4 | 373 |
| Administrative | **151** | 141 | (10) | (7.1) | 566 |
| **Operating profit** | **253** | 270 | (17) | (6.3) | 1,168 |
| Other expense (income) | **0** | 0 | 0 | 0.0 | 0 |
| Interest expense | **4** | 10 | 6 | 60.0 | 44 |
| **Pre-tax profit** | **$249** | $260 | ($11) | (4.2) % | $1,124 |

As a percent of net sales

| | | | | | |
|---|---|---|---|---|---|
| **Net Sales** | **100.0%** | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | |
|   Material | **46.8** | 49.9 | 3.1 | | 50.1 |
|   Labor | **6.0** | 7.1 | 1.1 | | 7.1 |
|   Overhead | **10.0** | 10.3 | 0.3 | | 10.1 |
|   Errors and defects | **0.0** | 0.0 | 0.0 | | 0.0 |
| Cost of sales | **62.8** | 67.3 | 4.5 | | 67.3 |
| **Gross profit** | **37.2** | 32.7 | 4.5 | | 32.7 |
| Selling and administrative | **17.5** | 15.2 | (2.3) | | 14.6 |
| **Operating profit** | **19.7** | 17.5 | 2.2 | | 18.2 |
| Other expense (income) | **0.0** | 0.0 | 0.0 | | 0.0 |
| Interest expense | **0.3** | 0.6 | 0.3 | | 0.7 |
| **Pre-tax profit** | **19.4** | 16.9 | 2.5 | | 17.5 |

LLC 1/15/99

**North West Forgemasters Ltd.**
**A Subsidiary of National Forge Europe Ltd.**
**Results of Operations**
**For the six months ended December 31, 1998**
*(dollars in thousands)*

| | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FY 99 Business Plan |
|---|---|---|---|---|---|
| Sales-customers | $2,782 | $3,096 | ($314) | (10.1) % | $6,435 |
| Sales-intercompany | 5 | 0 | 5 | 0.0 | 0 |
| **Net Sales** | 2,787 | 3,096 | (309) | (10.0) | 6,435 |
| Cost of sales: | | | | | |
|    Material | 1,484 | 1,535 | 51 | 3.3 | 3,224 |
|    Labor | 146 | 227 | 81 | 35.7 | 454 |
|    Overhead | 252 | 322 | 70 | 21.7 | 650 |
|    Errors and defects | 0 | 0 | 0 | 0.0 | 0 |
| Cost of sales | 1,882 | 2,084 | 202 | 9.7 | 4,328 |
| **Gross profit** | 905 | 1,012 | (107) | (10.6) | 2,107 |
| Selling | 139 | 186 | 47 | 25.3 | 373 |
| Administrative | 288 | 282 | (6) | (2.1) | 566 |
| **Operating profit** | 478 | 544 | (66) | (12.1) | 1,168 |
| Other expense (income) | 0 | 0 | 0 | 0.0 | 0 |
| Interest expense | 6 | 15 | 9 | 60.0 | 44 |
| **Pre-tax profit** | $472 | $529 | ($57) | (10.8) % | $1,124 |

As a percent of net sales

| | | | | | |
|---|---|---|---|---|---|
| **Net Sales** | **100.0%** | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | |
|    Material | 53.2 | 49.6 | (3.7) | | 50.1 |
|    Labor | 5.2 | 7.3 | 2.1 | | 7.1 |
|    Overhead | 9.0 | 10.4 | 1.4 | | 10.1 |
|    Errors and defects | 0.0 | 0.0 | 0.0 | | 0.0 |
| Cost of sales | 67.5 | 67.3 | (0.2) | | 67.3 |
| **Gross profit** | 32.5 | 32.7 | (0.2) | | 32.7 |
| Selling and administrative | 15.3 | 15.1 | (0.2) | | 14.6 |
| **Operating profit** | 17.2 | 17.6 | (0.4) | | 18.2 |
| Other expense (income) | 0.0 | 0.0 | 0.0 | | 0.0 |
| Interest expense | 0.2 | 0.5 | 0.3 | | 0.7 |
| **Pre-tax profit** | 16.9 | 17.1 | (0.2) | | 17.5 |

A - 00118

LLC 1/15/99

**North West Forgemasters Ltd.**
**Subsidiary of National Forge Europe Ltd.**
**Balance Sheet**
*(dollars in thousands)*

|  | December 31, 1998 Actual |
|---|---|
| **ASSETS** | |
| **Current Assets:** | |
| Cash and cash equivalents | $106 |
| Accounts receivable | 1,140 |
| Intercompany receivables | 916 |
| Inventories: | |
| Work in process | 197 |
| Supplies | 156 |
| Total Inventories | 353 |
| Prepaid expenses | 0 |
| **Total Current Assets** | **2,515** |
| Property, Plant and Equipment - net | 518 |
| Other Assets | 0 |
| **TOTAL ASSETS** | **$3,033** |
| **LIABILITIES** | |
| Current Liabilities: | |
| Notes payable | $0 |
| Current portion of long term debt | 0 |
| Accounts payable | 976 |
| Salaries, wages and commissions | 0 |
| Accrued taxes on income | 332 |
| Accrued pension | 0 |
| Customer deposits | 0 |
| Other accrued liabilities | 86 |
| **Total Current Liabilities** | **1,394** |
| Long Term Debt | 0 |
| Pension and Other Noncurrent Liabilities | 0 |
| Deferred Income Taxes | 0 |
| Intercompany Payables | 0 |
| **TOTAL LIABILITIES** | **1,394** |
| **SHAREHOLDERS' EQUITY** | |
| Common Stock | 2 |
| Additional Paid in Capital | 1,004 |
| Retained Earnings (Deficit) | 624 |
| Foreign Currency Translation Adjustment | 9 |
| **TOTAL COMMON SHAREHOLDERS' EQUITY** | **1,639** |
| **TOTAL LIABILITIES AND EQUITY** | **$3,033** |
| **WORKING CAPITAL** | **$1,121** |

A - 00119

LLC: 1/18/99

**North West Forgemasters Ltd.**
**A Subsidiary of National Forge Europe Ltd.**
**Statement of Cash Flows**
**Period Ended December 31, 1998**
*(dollars in thousands)*

|  | Second quarter<br>FY 1999 | Six months<br>FY 1999 |
|---|---|---|
| **Cash Flows From Operating Activities:** |  |  |
| Net income (loss) | $172 | $325 |
| Adjustment to reconcile net income to net cash |  |  |
| provided by operating activities: |  |  |
| Depreciation | 13 | 24 |
| Deferred taxes | 0 | 0 |
| Change in assets and liabilities: |  |  |
| (Increase) decrease in accounts receivable | 378 | 411 |
| (Increase) decrease in inventories | (1) | 166 |
| (Increase) decrease in prepaid expenses | 0 | 0 |
| Increase (decrease) in accounts payable | (27) | (70) |
| Increase (decrease) in income taxes | 67 | 87 |
| Increase (decrease) in customer deposits | 0 | 0 |
| Increase (decrease) in all other current liabilities |  |  |
| (excluding borrowings) | (31) | (4) |
| Other net | 0 | 0 |
| **Net Cash Provided By (Used For) Operating Activities** | 571 | 939 |
| **Cash Flows From Investing Activities:** |  |  |
| (Additions) reductions of property, plant and equipment | 16 | (20) |
| **Net Cash Used In Investing Activities** | 16 | (20) |
| **Cash Flows From Financing Activities:** |  |  |
| Additional (repayment of) borrowings | (129) | (228) |
| Increase (decrease) in intercompany account | (316) | (579) |
| **Net Cash Provided By Financing Activities** | (445) | (807) |
| Change in cumulative foreign currency |  |  |
| translation adjustment | (36) | (6) |
| **Increase (Decrease) In Cash And Cash** |  |  |
| **Equivalents** | $106 | $106 |

A - 00120

LLC: 1/19/99

Including Only No. West Forgemasters Ltd.
## Results of Operations
### For the second quarter ended December 31, 1998
*(dollars in thousands)*

| | Second Quarter FY 1999 | Second Quarter FY 99 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FY 99 Business Plan |
|---|---|---|---|---|---|
| Sales-customers | $1,284 | $1,542 | ($258) | (16.7) % | $6,435 |
| Sales-intercompany | 0 | 0 | 0 | 0.0 | 0 |
| **Net Sales** | 1,284 | 1,542 | (258) | (16.7) | 6,435 |
| Cost of sales: | | | | | |
| Material | 601 | 770 | 169 | 21.9 | 3,224 |
| Labor | 77 | ·109 | 32 | 29.4 | 454 |
| Overhead | 128 | 159 | 31 | 19.5 | 650 |
| Errors and defects | 0 | 0 | 0 | 0.0 | 0 |
| Cost of sales | 806 | 1,038 | 232 | 22.4 | 4,328 |
| **Gross profit** | 478 | 504 | (26) | (5.2) | 2,107 |
| Selling | 74 | 93 | 19 | 20.4 | 373 |
| Administrative | 153 | 141 | (12) | (8.5) | 566 |
| **Operating profit** | 251 | 270 | (19) | (7.0) | 1,168 |
| Other expense (income) | 77 | 85 | 8 | 9.4 | 327 |
| Interest expense | 122 | 136 | 14 | 10.3 | 539 |
| **Pre-tax profit** | $52 | $49 | $3 | 6.1 % | $302 |

As a percent of net sales

| | | | | | |
|---|---|---|---|---|---|
| **Net Sales** | 100.0% | 100.0% | 0.0% | | 100.0% |
| Cost of sales: | | | | | |
| Material | 46.8 | 49.9 | 3.1 | | 50.1 |
| Labor | 6.0 | 7.1 | 1.1 | | 7.1 |
| Overhead | 10.0 | 10.3 | 0.3 | | 10.1 |
| Errors and defects | 0.0 | 0.0 | 0.0 | | 0.0 |
| Cost of sales | 62.8 | 67.3 | 4.5 | | 67.3 |
| **Gross profit** | 37.2 | 32.7 | 4.5 | | 32.7 |
| Selling and administrative | 17.7 | 15.2 | (2.5) | | 14.6 |
| **Operating profit** | 19.5 | 17.5 | 2.0 | | 18.2 |
| Other expense (income) | 6.0 | 5.5 | (0.5) | | 5.1 |
| Interest expense | 9.5 | 8.8 | (0.7) | | 8.4 |
| **Pre-tax profit** | 4.0 | 3.2 | 0.9 | | 4.7 |

LLC 1/15/99

National Forge Europe, Ltd.
Including Only No. West Forgemasters Ltd.
**Results of Operations**
**For the six months ended December 31, 1998**
*(dollars in thousands)*

|  | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FY 99 Business Plan |
|---|---|---|---|---|---|
| Sales-customers | $2,782 | $3,096 | ($314) | (10.1) % | $6,435 |
| Sales-intercompany | 5 | 0 | 5 | 0.0 | 0 |
| **Net Sales** | 2,787 | 3,096 | (309) | (10.0) | 6,435 |
| Cost of sales: |  |  |  |  |  |
| Material | 1,484 | 1,535 | 51 | 3.3 | 3,224 |
| Labor | 146 | 227 | 81 | 35.7 | 454 |
| Overhead | 252 | 322 | 70 | 21.7 | 650 |
| Errors and defects | 0 | 0 | 0 | 0.0 | 0 |
| Cost of sales | 1,882 | 2,084 | 202 | 9.7 | 4,328 |
| **Gross profit** | 905 | 1,012 | (107) | (10.6) | 2,107 |
| Selling | 139 | 186 | 47 | 25.3 | 373 |
| Administrative | 292 | 282 | (10) | (3.5) | 566 |
| **Operating profit** | 474 | 544 | (70) | (12.9) | 1,168 |
| Other expense (income) | 154 | 170 | 16 | 9.4 | 327 |
| Interest expense | 251 | 267 | 16 | 6.0 | 539 |
| **Pre-tax profit** | $69 | $107 | ($38) | (35.5) % | $302 |

As a percent of net sales

|  | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | | FY 99 Business Plan |
|---|---|---|---|---|---|
| **Net Sales** | 100.0% | 100.0% | 0.0% | | 100.0% |
| Cost of sales: |  |  |  |  |  |
| Material | 53.2 | 49.6 | (3.7) | | 50.1 |
| Labor | 5.2 | 7.3 | 2.1 | | 7.1 |
| Overhead | 9.0 | 10.4 | 1.4 | | 10.1 |
| Errors and defects | 0.0 | 0.0 | 0.0 | | 0.0 |
| Cost of sales | 67.5 | 67.3 | (0.2) | | 67.3 |
| **Gross profit** | 32.5 | 32.7 | (0.2) | | 32.7 |
| Selling and administrative | 15.5 | 15.1 | (0.3) | | 14.6 |
| **Operating profit** | 17.0 | 17.6 | (0.6) | | 18.2 |
| Other expense (income) | 5.5 | 5.5 | (0.0) | | 5.1 |
| Interest expense | 9.0 | 8.6 | (0.4) | | 8.4 |
| **Pre-tax profit** | 2.5 | 3.5 | (1.0) | | 4.7 |

LLC 1/15/99

A - 00122

National Forge Europe Ltd.
A Subsidiary of National Forge Company
Balance Sheet
*(dollars in thousands)*

|  | December 31, 1998 Actual |
|---|---|
| **ASSETS** | |
| **Current Assets:** | |
| Cash and cash equivalents | $566 |
| Accounts receivable | 0 |
| Intercompany receivables | (1,014) |
| Inventories: | |
| Work in process | 0 |
| Supplies | 0 |
| Total Inventories | 0 |
| Prepaid expenses | 0 |
| **Total Current Assets** | **(448)** |
| Property, Plant and Equipment - net | 0 |
| Investment in subsidiaries | 5,108 |
| Other Assets | 0 |
| Goodwill | 5,773 |
| **TOTAL ASSETS** | **$10,433** |
| **LIABILITIES** | |
| **Current Liabilities:** | |
| Notes payable | $0 |
| Current portion of long term debt | 1,266 |
| Accounts payable | 8 |
| Salaries, wages and commissions | 0 |
| Accrued taxes on income | (77) |
| Accrued pension | 0 |
| Customer deposits | 0 |
| Other accrued liabilities | 0 |
| **Total Current Liabilities** | **1,197** |
| Long Term Debt | 4,127 |
| Pension and Other Noncurrent Liabilities | 0 |
| Deferred Income Taxes | 0 |
| Intercompany Payables | 0 |
| **TOTAL LIABILITIES** | **5,324** |
| **SHAREHOLDERS' EQUITY** | |
| Common Stock | 5,709 |
| Additional Paid in Capital | 0 |
| Retained Earnings (Deficit) | (607) |
| Foreign Currency Translation Adjustment | 7 |
| **TOTAL COMMON SHAREHOLDERS' EQUITY** | **5,109** |
| **TOTAL LIABILITIES AND EQUITY** | **$10,433** |
| **WORKING CAPITAL** | **($1,645)** |

LLC: 1/18/99

**National Forge Europe Ltd.**
**A Subsidiary of National Forge Company**
**Statement of Cash Flows**
**Period Ended December 31, 1998**

*(dollars in thousands)*

| | Second quarter<br>**FY 1999** | Six months<br>**FY 1999** |
|---|---|---|
| **Cash Flows From Operating Activities:** | | |
| Net income (loss) | ($160) | ($328) |
| Adjustment to reconcile net income to net cash | | |
| provided by operating activities: | | |
|     Depreciation | 0 | 0 |
|     Deferred taxes | 0 | 0 |
|     Amortization | 77 | 154 |
| Change in assets and liabilities: | | |
|     (Increase) decrease in accounts receivable | 0 | 0 |
|     (Increase) decrease in inventories | 0 | 0 |
|     (Increase) decrease in prepaid expenses | 0 | 3 |
|     Increase (decrease) in accounts payable | (2) | (87) |
|     Increase (decrease) in income taxes | (35) | (1) |
|     Increase (decrease) in customer deposits | 0 | 0 |
|     Increase (decrease) in all other current liabilities | | |
|     (excluding borrowings) | 0 | 0 |
|     Other net | 143 | 28 |
| **Net Cash Provided By (Used For) Operating Activities** | 23 | (231) |
| **Cash Flows From Investing Activities:** | | |
| (Additions) reductions of property, plant and equipment | 0 | 0 |
| **Net Cash Used In Investing Activities** | 0 | 0 |
| **Cash Flows From Financing Activities:** | | |
| Additional (repayment of) borrowings | (132) | (27) |
| Increase (decrease) in intercompany account | 283 | 629 |
| **Net Cash Provided By Financing Activities** | 151 | 602 |
| Change in cumulative foreign currency | | |
| translation adjustment | (3) | 3 |
| **Increase (Decrease) In Cash And Cash** | | |
| **Equivalents** | $171 | $374 |

LLC: 1/19/99

# NORTH WEST FORGEMASTERS LTD.

## QUARTERLY REPORT TO NATIONAL FORGE COMPANY
## BOARD OF DIRECTORS
## JANUARY 1999

1.   Financial

|  | **First Six Months of FY 1999** | |
|---|---|---|
|  | **(£000's omitted)** | |
|  | **Actual** | **Business Plan** |
| Sales | £1,677 | £1,505 |
| Materials | 790 | 616 |
| Direct Wages | 88 | 113 |
| Works Overhead | 151 | 180 |
| WIP Dec. | 104 | 94 |
| Mfg. Cost | 1,133 | 1,003 |
| Mfg. Profit | 544 | 502 |
| Mfg. Profit % | 32% | 33% |
| Selling/Adm. Exp. | 256 | 254 |
| Trading Profit | 288 | 248 |
| External Interest | 3 | 7 |
| Net Profit | £285 | £241 |

**North West Forgemasters Ltd.**
**Report to the National Forge Company Holdings, Inc.**
**Board of Directors**
**January 1999**

1. **FINANCIAL**

The half-year ending December 1998 recorded sales of £1,677,000 and a net profit of £285,000 which exceeded the Business Plan by £44,000.  This result is excellent in the current economic climate and whilst we still anticipate achieving FY 99 profit projection of £473,000, the second half year will be much more difficult.

It is significant that the second quarter profits exceeded first quarter despite the removal of the flange business to Mitchell, Shackleton & Co. Ltd. The Company has continued to demonstrate the ability to generate cash and has repaid £352,000 off its inter company loan with National Forge Europe Ltd. in this period and is still able to show a favourable variance of £345,000 in external borrowing when compared to Business Plan.

2. **OPERATIONAL REVIEW**

From a low order book at the start of the second quarter to achieve the profits we did is a testament to the people at North West Forgemasters. The shopfloor worked overtime, including weekends, nighttime and over the Christmas holidays in some cases. This willingness to be flexible is a major factor in our success.

We did not have any major breakdowns in the quarter and cooperation with Mitchell, Shackleton continues to progress.

Our outstanding order book is now only £210,000, although this is typical of a jobbing shop. It again indicates future difficulty.

3. **MARKETING**

The general outlook worsens month by month. Many of our customers and competitors have announced redundancies and short time working.  Our main accounts have, however, held up very well. The second line customers seem to be the ones that are suffering most.

The first period of statistical analysis of our sales has not raised any significant points, but we are refining this for the future.

4. **STRATEGIC PLANNING**

We are looking for a centre lathe and a deep hold boring lathe in the near future. This would double our capacity in an area that could cause problems if we had a breakdown.

We have concluded that we must advertise for a new marketing person in the South of England, as we do not have much success in this area.

**EXHIBIT
6**

A - 00127

**National Forge Company Holdings, Inc.**
**Consolidating Results of Operations**
**Second Quarter Ended December 31, 1998**
*(dollars in thousands)*

| | NFC Irvine Plant * | National Forge Components, Inc. | Mitchell Shackleton & Co., Ltd. | Global Crankshaft Services Ltd. | North West Forgemasters, Ltd. | National Forge Europe, Ltd. | NFC Holdings, Inc. Consolidated |
|---|---|---|---|---|---|---|---|
| Sales-Customers | $17,518 | $99 | $2,263 | $86 | $1,284 | $0 | $21,250 |
| Sales-Intercompany | 0 | 1 | 17 | 0 | 0 | 0 | 0 |
| Net sales | 17,518 | 100 | 2,280 | 86 | 1,284 | 0 | 21,250 |
| Cost of sales | 14,936 | 44 | 1,844 | 53 | 806 | 0 | 17,666 |
| Gross profit | 2,582 | 56 | 436 | 33 | 478 | 0 | 3,584 |
| Selling | 807 | 0 | 86 | 13 | 74 | 0 | 980 |
| Administrative | 990 | 15 | 265 | 19 | 151 | 2 | 1,442 |
| Operating profit (loss) | 785 | 41 | 85 | 1 | 253 | (2) | 1,162 |
| Other deductions (income) | (176) | 0 | 0 | 0 | 0 | 77 | (100) |
| Interest | 393 | (1) | 43 | 2 | 4 | 118 | 559 |
| Minority interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pre-tax profit (loss) | 568 | 42 | 42 | (1) | 249 | (197) | 703 |
| Taxes | 178 | 17 | 0 | 0 | 77 | (37) | 235 |
| Net profit (loss) | $390 | $25 | $42 | ($1) | $172 | ($160) | $468 |
| Income before: | | | | | | | |
| Interest and Taxes | $961 | $41 | $85 | $1 | $253 | ($79) | $1,262 |
| Interest, Taxes and Depreciation | $1,560 | $42 | $177 | $7 | $266 | ($79) | $1,973 |
| Total Depreciation | $599 | $1 | $92 | $6 | $13 | $0 | $711 |

* NFC Irvine Plant also includes the results of National Forge Export, LTD. and NFIP, Inc.

A - 00128

LLC 1/19/99

National Forge Company Holdings, Inc.
Results of Operations
**For the second quarter ended December 31, 1998 and December 31, 1997**
*(dollars in thousands)*

| | Second Quarter FY 1999 | Second Quarter FY 99 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | Second Quarter FY 1998 | Better or (Worse) Than FY 98 | % Better or (Worse) Than FY 98 | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| **Net Sales** | **$21,250** | $23,698 | ($2,448) | (10.3) % | $22,316 | ($1,066) | (4.8) % | $91,314 |
| Cost of sales: | | | | | | | | |
| Material | **4,943** | 5,742 | 799 | 13.9 | 4,639 | (304) | (6.6) | 21,306 |
| Labor | **2,110** | 2,086 | (24) | (1.2) | 2,065 | (45) | (2.2) | 8,342 |
| Overhead | **9,807** | 10,487 | 680 | 6.5 | 10,697 | 890 | 8.3 | 40,448 |
| Lifo adjustment | **75** | 75 | 0 | 0.0 | 75 | 0 | 0.0 | 300 |
| Errors and defects | **309** | 534 | 225 | 42.1 | 501 | 192 | 38.3 | 2,030 |
| Period costs | **421** | 437 | 16 | 3.7 | 372 | (49) | (13.2) | 1,724 |
| Research and development | **1** | 69 | 68 | 98.6 | 18 | 17 | 94.4 | 276 |
| Cost of sales | **17,666** | 19,430 | 1,764 | 9.1 | 18,367 | 701 | 3.8 | 74,426 |
| **Gross profit** | **3,584** | 4,268 | (684) | (16.0) | 3,949 | (365) | (9.2) | 16,888 |
| Selling | **980** | 1,037 | 57 | 5.5 | 916 | (64) | (7.0) | 4,227 |
| Administrative | **1,442** | 1,551 | 109 | 7.0 | 1,234 | (208) | (16.9) | 6,243 |
| **Operating profit** | **1,162** | 1,680 | (518) | (30.8) | 1,799 | (637) | (35.4) | 6,418 |
| Other expense (income) | **(100)** | 316 | 416 | 131.6 | 230 | 330 | 143.5 | 1,182 |
| Interest expense | **559** | 746 | 187 | 25.1 | 562 | 3 | 0.5 | 2,734 |
| Minority interest | **0** | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0 |
| **Pre-tax profit (loss)** | **703** | 618 | 85 | 13.8 | 1,007 | (304) | (30.2) | 2,502 |
| Taxes | **235** | 204 | (31) | (15.2) | 300 | 65 | 21.7 | 778 |
| **Net income (loss)** | **$468** | $414 | $54 | 13.0 % | $707 | ($239) | (33.8) % | $1,724 |

As a percent of net sales

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Net Sales** | **100%** | 100% | 0.0% | | 100% | 0.0% | | 100% |
| Cost of sales: | | | | | | | | |
| Material | **23.3** | 24.2 | 1.0 | | 20.8 | (2.5) | | 23.3 |
| Labor | **9.9** | 8.8 | (1.1) | | 9.3 | (0.7) | | 9.1 |
| Overhead | **46.2** | 44.3 | (1.9) | | 47.9 | 1.8 | | 44.3 |
| Errors and defects | **1.5** | 2.3 | 0.8 | | 2.2 | 0.8 | | 2.2 |
| Other costs | **2.3** | 2.5 | 0.1 | | 2.1 | (0.3) | | 2.5 |
| Cost of sales | **83.1** | 82.0 | (1.1) | | 82.3 | (0.8) | | 81.5 |
| **Gross profit** | **16.9** | 18.0 | (1.1) | | 17.7 | (0.8) | | 18.5 |
| Selling and administrative | **11.4** | 10.9 | (0.5) | | 9.6 | (1.8) | | 11.5 |
| **Operating profit** | **5.5** | 7.1 | (1.6) | | 8.1 | (2.6) | | 7.0 |
| Other expense (income) | **(0.5)** | 1.3 | 1.8 | | 1.0 | 1.5 | | 1.3 |
| Interest expense | **2.6** | 3.1 | 0.5 | | 2.5 | (0.1) | | 3.0 |
| Minority interest | **0.0** | 0.0 | 0.0 | | 0.0 | 0.0 | | 0.0 |
| **Pre-tax profit (loss)** | **3.3** | 2.6 | 0.7 | | 4.5 | (1.2) | | 2.7 |
| Taxes | **1.1** | 0.9 | (0.2) | | 1.3 | 0.2 | | 0.9 |
| **Net income (loss)** | **2.2** | 1.7 | 0.5 | | 3.2 | (1.0) | | 1.9 |

LLC 1/15/99

**National Forge Company Holdings, Inc.**
**Consolidating Results of Operations**
**Six Months Ended December 31, 1998**

*(dollars in thousands)*

| | NFC Irvine Plant * | National Forge Components, Inc. | Mitchell Shackleton & Co., Ltd. | Global Crankshaft Services Ltd. | North West Forgemasters, Ltd. | National Forge Europe, Ltd. | NFC Holdings, Inc. Consolidated |
|---|---|---|---|---|---|---|---|
| Sales-Customers | $32,325 | $147 | $4,281 | $228 | $2,782 | $0 | $39,763 |
| Sales-Intercompany | 0 | 1 | 28 | 0 | 5 | 0 | 0 |
| Net sales | 32,325 | 148 | 4,309 | 228 | 2,787 | 0 | 39,763 |
| Cost of sales | 27,070 | 79 | 3,452 | 124 | 1,882 | 0 | 32,574 |
| Gross profit | 5,255 | 69 | 857 | 104 | 905 | 0 | 7,189 |
| Selling | 1,443 | 0 | 157 | 37 | 139 | 0 | 1,776 |
| Administrative | 1,989 | 32 | 541 | 51 | 288 | 4 | 2,905 |
| Operating profit (loss) | 1,823 | 37 | 159 | 16 | 478 | (4) | 2,508 |
| Other deductions (income) | (178) | 0 | 0 | 0 | 0 | 154 | (25) |
| Interest | 897 | (2) | 88 | 2 | 6 | 245 | 1,236 |
| Minority interest | 0 | 0 | 0 | 3 | 0 | 0 | 3 |
| Pre-tax profit (loss) | 1,104 | 39 | 71 | 11 | 472 | (403) | 1,294 |
| Taxes | 356 | 16 | 0 | 3 | 147 | (75) | 447 |
| Net profit (loss) | $748 | $23 | $71 | $8 | $325 | ($328) | $847 |
| Income before: | | | | | | | |
| Interest and Taxes | $2,001 | $37 | $159 | $13 | $478 | ($158) | $2,530 |
| Interest, Taxes and Depreciation | $3,198 | $40 | $340 | $25 | $502 | ($158) | $3,947 |
| Total Depreciation | $1,197 | $3 | $181 | $12 | $24 | $0 | $1,417 |

* NFC Irvine Plant also includes the results of National Forge Export, LTD. and NFIP, Inc.

A - 00130

LLC 1/18/99

Consolidated
Results of Operations
For the six months ended December 31, 1998 and December 31, 1997
*(dollars in thousands)*

| | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | % Better or (Worse) Than Plan | FYTD 1998 Actual | Better or (Worse) Than FY 98 | % Better or (Worse) Than FY 98 | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| **Net Sales** | **$39,763** | $45,959 | ($6,196) | (13.5) % | $40,965 | ($1,202) | (2.9) % | $91,314 |
| Cost of sales: | | | | | | | | |
| Material | **8,924** | 11,112 | 2,188 | 19.7 | 8,414 | (510) | (6.1) | 21,306 |
| Labor | **3,895** | 4,091 | 196 | 4.8 | 3,776 | (119) | (3.2) | 8,342 |
| Overhead | **18,360** | 20,012 | 1,652 | 8.3 | 19,829 | 1,469 | 7.4 | 40,448 |
| Lifo adjustment | **150** | 150 | 0 | 0.0 | 150 | 0 | 0.0 | 300 |
| Errors and defects | **492** | 1,008 | 516 | 51.2 | 1,049 | 557 | 53.1 | 2,030 |
| Period costs | **723** | 850 | 127 | 14.9 | 733 | 10 | 1.4 | 1,724 |
| Research and development | **30** | 138 | 108 | 78.3 | 58 | 28 | 48.3 | 276 |
| Cost of sales | **32,574** | 37,361 | 4,787 | 12.8 | 34,009 | 1,435 | 4.2 | 74,426 |
| **Gross profit** | **7,189** | 8,598 | (1,409) | (16.4) | 6,956 | 233 | 3.3 | 16,888 |
| Selling | **1,776** | 2,182 | 406 | 18.6 | 1,673 | (103) | (6.2) | 4,227 |
| Administrative | **2,905** | 3,121 | 216 | 6.9 | 2,631 | (274) | (10.4) | 6,243 |
| **Operating profit** | **2,508** | 3,295 | (787) | (23.9) | 2,652 | (144) | (5.4) | 6,418 |
| Other expense (income) | **(25)** | 607 | 632 | 104.1 | 450 | 475 | 105.6 | 1,182 |
| Interest expense | **1,236** | 1,456 | 220 | 15.1 | 993 | (243) | (24.5) | 2,734 |
| Minority interest | **3** | 0 | (3) | 0.0 | 0 | (3) | 0.0 | 0 |
| **Pre-tax profit (loss)** | **1,294** | 1,232 | 62 | 5.0 | 1,209 | 85 | 7.0 | 2,502 |
| Taxes | **447** | 402 | (45) | (11.2) | 308 | (139) | (45.1) | 778 |
| **Net income (loss)** | **$847** | $830 | $17 | 2.0 % | $901 | ($54) | (6.0) % | $1,724 |

As a percent of net sales

| | FYTD 1999 Actual | FYTD 1999 Plan | Better or (Worse) Than Plan | | FYTD 1998 Actual | Better or (Worse) Than FY 98 | | FY 99 Business Plan |
|---|---|---|---|---|---|---|---|---|
| **Net Sales** | **100%** | 100% | 0.0% | | 100% | 0.0% | | 100% |
| Cost of sales: | | | | | | | | |
| Material | **22.4** | 24.2 | 1.7 | | 20.5 | (1.9) | | 23.3 |
| Labor | **9.8** | 8.9 | (0.9) | | 9.2 | (0.6) | | 9.1 |
| Overhead | **46.2** | 43.5 | (2.6) | | 48.4 | 2.2 | | 44.3 |
| Errors and defects | **1.2** | 2.2 | 1.0 | | 2.6 | 1.3 | | 2.2 |
| Other costs | **2.3** | 2.5 | 0.2 | | 2.3 | 0.0 | | 2.5 |
| Cost of sales | **81.9** | 81.3 | (0.6) | | 83.0 | 1.1 | | 81.5 |
| **Gross profit** | **18.1** | 18.7 | (0.6) | | 17.0 | 1.1 | | 18.5 |
| Selling and administrative | **11.8** | 11.5 | (0.2) | | 10.5 | (1.3) | | 11.5 |
| **Operating profit** | **6.3** | 7.2 | (0.9) | | 6.5 | (0.2) | | 7.0 |
| Other expense (income) | **(0.1)** | 1.3 | 1.4 | | 1.1 | 1.2 | | 1.3 |
| Interest expense | **3.1** | 3.2 | 0.1 | | 2.4 | (0.7) | | 3.0 |
| Minority interest | **0.0** | 0.0 | (0.0) | | 0.0 | (0.0) | | 0.0 |
| **Pre-tax profit (loss)** | **3.3** | 2.7 | 0.6 | | 3.0 | 0.3 | | 2.7 |
| Taxes | **1.1** | 0.9 | (0.2) | | 0.8 | (0.4) | | 0.9 |
| **Net income (loss)** | **2.1** | 1.8 | 0.3 | | 2.2 | (0.1) | | 1.9 |

A - 00131

LLC 1/15/99

National Forge Company Holdings, Inc.
Consolidated Balance Sheet
As of December 31, 1998
*(dollars in thousands)*

| | NFC Irvine Plant * | National Forge Components, Inc. | Mitchell Shackleton & Co., Ltd. | Global Crankshaft Services Ltd. | North West Forgemasters, Ltd. | National Forge Europe, Ltd. | NFC Holdings, Inc. | NFC Holdings, Inc. Consolidated |
|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | |
| **Current Assets:** | | | | | | | | |
| Cash and cash equivalents | $1,697 | $1 | $7 | $0 | $106 | $566 | $0 | $2,377 |
| Accounts receivable | 11,429 | 52 | 2,446 | 121 | 1,140 | 0 | 0 | 15,188 |
| Intercompany receivables | 96 | 0 | (20) | (48) | 916 | (1,014) | 9,051 | 0 |
| Inventories | 15,552 | 0 | 1,880 | 0 | 353 | 0 | 0 | 17,785 |
| Prepaid expenses | 1,078 | 6 | 0 | 7 | 0 | 0 | 0 | 980 |
| Deferred income taxes | 306 | 0 | 0 | 0 | 0 | 0 | 0 | 306 |
| **Total Current Assets** | 30,158 | 59 | 4,313 | 80 | 2,515 | (448) | 9,051 | 36,636 |
| Property, Plant and Equipment - net | 24,132 | 59 | 4,080 | 108 | 518 | 0 | 0 | 28,897 |
| Investment in subsidiaries | 6,780 | 0 | 125 | 0 | 0 | 5,108 | 1,601 | 0 |
| Deferred Income Taxes | 6,236 | (1) | 0 | 0 | 0 | 0 | 0 | 6,235 |
| Other Assets | 8,947 | 0 | 616 | 0 | 0 | 0 | 0 | 9,563 |
| Goodwill | 4,317 | 0 | 0 | 71 | 0 | 5,773 | 0 | 10,161 |
| **TOTAL ASSETS** | $80,570 | $117 | $9,134 | $259 | $3,033 | $10,433 | $10,652 | $91,492 |
| **LIABILITIES** | | | | | | | | |
| **Current Liabilities:** | | | | | | | | |
| Notes payable | $0 | $0 | $536 | $37 | $0 | $0 | $0 | $573 |
| Current portion of long term debt | 3,073 | 0 | 586 | 0 | 0 | 1,266 | 0 | 4,925 |
| Accounts payable | 2,374 | 0 | 1,054 | 63 | 976 | 8 | 0 | 4,475 |
| Other accrued liabilities | 9,424 | 66 | 420 | 3 | 418 | (77) | 64 | 10,207 |
| **Total Current Liabilities** | 14,871 | 66 | 2,596 | 103 | 1,394 | 1,197 | 64 | 20,180 |
| Long Term Debt | 15,499 | 0 | 375 | 0 | 0 | 4,127 | 0 | 20,001 |
| Pension and Other Noncurrent Liabilities | 268 | 0 | 0 | 0 | 0 | 0 | 0 | 268 |
| Postretirement and Postemployment Benefits Other Than Pensions | 32,930 | 0 | 0 | 0 | 0 | 0 | 0 | 32,930 |
| Deferred Income Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Intercompany payables | 9,051 | (70) | 1,070 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL LIABILITIES** | 72,619 | (4) | 4,041 | 103 | 1,394 | 5,324 | 64 | 73,379 |
| Minority Interest | 0 | 0 | 0 | 37 | 0 | 0 | 0 | 37 |
| **SHAREHOLDERS' EQUITY** | | | | | | | | |
| Common Stock, Class A | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| Common Stock, Class B | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| Class A Common Stock to be issued to the ESOP Trust | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Common Stock | 0 | 1 | 2,708 | 125 | 2 | 5,709 | 0 | 0 |
| Additional Paid in Capital | 1,601 | 0 | 1,847 | 0 | 1,004 | 0 | 17,400 | 17,400 |
| Retained Earnings (Deficit) | 6,882 | 120 | (651) | (7) | 624 | (607) | (5,346) | 2,471 |
| Minimum Pension Liability Adjustment | (571) | 0 | 0 | 0 | 0 | 0 | 0 | (571) |
| Foreign Currency Translation Adjustment | 39 | 0 | 1,189 | 1 | 9 | 7 | 0 | 242 |
| Less Treasury | 0 | 0 | 0 | 0 | 0 | 0 | (1,472) | (1,472) |
| **TOTAL COMMON SHAREHOLDERS' EQUITY** | 7,951 | 121 | 5,093 | 119 | 1,639 | 5,109 | 10,588 | 18,076 |
| **TOTAL LIABILITIES, PREFERRED STOCK AND EQUITY** | $80,570 | $117 | $9,134 | $259 | $3,033 | $10,433 | $10,652 | $91,492 |
| **WORKING CAPITAL** | $15,287 | ($7) | $1,717 | ($23) | $1,121 | ($1,645) | $8,987 | $16,456 |

* NFC Irvine Plant also includes the results of National Forge Export, LTD. and NFIP, Inc.

**National Forge Company Holdings, Inc.**
Consolidated Balance Sheet
*(dollars in thousands)*

| | December 31, 1998 Actual | December 31, 1997 Actual |
|---|---|---|
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | **$2,377** | $260 |
| Accounts receivable | **15,188** | 13,738 |
| Inventories: | | |
| Work in process | **14,468** | 14,431 |
| Raw materials | **935** | 1,147 |
| Supplies | **2,382** | 2,250 |
| Total Inventories | **17,785** | 17,828 |
| Prepaid expenses | **980** | 872 |
| Deferred income taxes | **306** | 259 |
| **Total Current Assets** | **36,636** | 32,957 |
| Property, Plant and Equipment - net | **28,897** | 26,285 |
| Deferred Income Taxes | **6,235** | 6,445 |
| Other Assets | **9,563** | 10,113 |
| Goodwill | **10,161** | 4,518 |
| **TOTAL ASSETS** | **$91,492** | $80,318 |
| **LIABILITIES** | | |
| **Current Liabilities:** | | |
| Notes payable | **$573** | $234 |
| Current portion of long term debt | **4,925** | 4,202 |
| Accounts payable | **4,475** | 4,238 |
| Salaries, wages and commissions | **3,253** | 3,245 |
| Accrued taxes on income | **339** | 105 |
| Accrued pension | **45** | 494 |
| Customer deposits | **269** | 226 |
| Deferred Income Taxes | **367** | 0 |
| Other accrued liabilities | **5,934** | 5,463 |
| **Total Current Liabilities** | **20,180** | 18,207 |
| Long Term Debt | **20,001** | 7,422 |
| Pension and Other Noncurrent Liabilities | **268** | 1,379 |
| Postretirement and Postemployment Benefits Other Than Pensions | **32,930** | 32,546 |
| **TOTAL LIABILITIES** | **73,379** | 59,554 |
| Minority Interest | **37** | 0 |
| **SHAREHOLDERS' EQUITY** | | |
| Redeemable Convertible Preferred Stock-Authorized 35,000 Shares; 0 Shares Outstanding as of December 31, 1998 and 35,000 Shares Outstanding as of December 31, 1997 | **0** | 3,500 |
| Common Stock, Class A, $.01 Par Value-Authorized 635,000 Shares; 382,991 Shares Outstanding as of December 31, 1998 and 287,358 Shares Outstanding as of December 31, 1997 | **4** | 3 |
| Common Stock, Class B, $.01 Par Value-Authorized 1,000,000 Shares; 126,863 Shares Outstanding as of December 31, 1998 and 136,279 Shares Outstanding as of December 31, 1997 | **2** | 1 |
| Class A Common Stock to be issued to the ESOP Trust | **0** | 0 |
| Additional Paid in Capital | **17,400** | 13,184 |
| Retained Earnings | **2,471** | 4,510 |
| Minimum Pension Liability Adjustment | **(571)** | 0 |
| Foreign Currency Translation Adjustment | **242** | 199 |
| Less Common Stock held in Treasury, 33,481 shares as of December 31, 1998 and 16,501 shares as of December 31, 1997 | **(1,472)** | (633) |
| **TOTAL SHAREHOLDERS' EQUITY** | **18,076** | 20,764 |
| **TOTAL LIABILITIES, PREFERRED STOCK AND EQUITY** | **$91,492** | $80,318 |
| **WORKING CAPITAL** | **$16,456** | $14,750 |

LLC: 1/18/99

**National Forge Company Holdings, Inc.**
Consolidated
Statement of Cash Flows
Period Ended December 31, 1998 and December 31, 1997
*(dollars in thousands)*

| | Second quarter | | Six months | |
|---|---|---|---|---|
| | **FY 1999** | FY 1998 | **FY 1999** | FY 1998 |
| **Cash Flows From Operating Activities:** | | | | |
| Net income (loss) | **$468** | $707 | **$847** | $901 |
| Adjustment to reconcile net income to net cash | | | | |
| provided by operating activities: | | | | |
| Provision for Common Stock to be issued to the ESOP Trust | **1,301** | 1,310 | **2,536** | 2,607 |
| Depreciation | **711** | 632 | **1,417** | 1,266 |
| Amortization | **261** | 411 | **524** | 681 |
| Deferred taxes | **(9)** | 6 | **(2)** | (2) |
| Change in assets and liabilities: | | | | |
| (Increase) decrease in accounts receivable | **(254)** | (491) | **1,699** | (549) |
| (Increase) decrease in inventories | **777** | 635 | **591** | 1,151 |
| (Increase) decrease in prepaid expenses | **197** | 452 | **(509)** | (428) |
| Increase (decrease) in accounts payable | **(1,510)** | 313 | **(1,888)** | (351) |
| Increase (decrease) in income taxes | **208** | 53 | **170** | 105 |
| Increase (decrease) in customer deposits | **26** | (169) | **42** | (79) |
| Increase (decrease) in all other current liabilities | | | | |
| (excluding borrowings) | **710** | (20) | **(2,263)** | (1,433) |
| Other net | **253** | 47 | **155** | 298 |
| **Net Cash Provided By (Used For) Operating Activities** | **3,139** | 3,886 | **3,319** | 4,167 |
| **Cash Flows From Investing Activities:** | | | | |
| (Additions) reductions of property, plant and equipment | **(975)** | (1,404) | **(2,557)** | (1,992) |
| **Net Cash Used In Investing Activities** | **(975)** | (1,404) | **(2,557)** | (1,992) |
| **Cash Flows From Financing Activities:** | | | | |
| Additional (repayment of) borrowings | **(3,527)** | (811) | **(4,020)** | (3,349) |
| Repurchase of stock | **(722)** | (1,682) | **(839)** | (1,682) |
| Preferred stock dividends | **0** | (88) | **0** | (175) |
| **Net Cash Provided By Financing Activities** | **(4,249)** | (2,581) | **(4,859)** | (5,206) |
| Change in cumulative foreign currency | | | | |
| translation adjustment | **(188)** | 119 | **(38)** | (50) |
| **Increase (Decrease) In Cash And Cash** | | | | |
| **Equivalents** | **($2,273)** | $20 | **($4,135)** | ($3,081) |

**EXHIBIT
7**

A - 00135

# National Forge Company®
# Board of Directors

The following dates were selected for the National Forge Board of Directors' meetings for 1999.

1. Wednesday, April 28, 1999
2. Thursday, August 19, 1999
3. ~~Wednesday, October 27, 1999~~

These meetings normally will be held in Irvine and will start at 8:00 a.m.

**Revised January 22, 1998**

National Forge Company Board of Directors

| First Name | M.I. | Last Name | Home Address | Home Phone Numbers | Business Address | Office Phone Numbers |
|---|---|---|---|---|---|---|
| E. | Roger | Clark | 4 Songbird Lane Warren, PA 16365 | 814-726-5793 home fax 814-726-5794 | National Forge Company One Front Street Irvine, PA 16329 | 814-563-8739 fax 814-563-9209 |
| Patrick | A. | Flanagan | 164 Highland Street Milton, MA   02186 | 617-698-5408 fax: 617-698-7631 | Alouette Capital 21 School Street Boston, MA 02108 | 617-523-8666 fax: 617-523-8699 |
| Charles | C. | Judd | 80 Big Oak Road Stamford, CT 06903 | 203-322-4882 - home fax same number - call ahead | Southern New England Telephone Company 555 Main Street Stamford, CT   06901 | 203-964-2020 fax 203-359-4335 |
| Ashok | K. | Khare | 5 Leslie Boulevard Warren, PA 16365 | 814-726-2909 | National Forge Company One Front Street Irvine, PA 16329 | 814-563-8734 fax 814-563-4525 |
| John | G. | Koedel | P. O. Box 877 Deltaville, VA 23043 | 804-776-6168 | P. O. Box 877 Deltaville, VA 23043 | 804-776-6056 fax - same number |
| Stan | | Lundine | 2718 West Lake Road Route 394 Ashville, NY  14710 (PO Box 3050 Jamestown, NY 14702-3050) | 716-763-7070 | Sotir & Goldman, Attorneys at Law 8 East Fourth Street P. O. Box 3050 Jamestown, NY 14702-3050 | 716-487-0106 fax 716-487-0694 |
| Dennis | L. | Peterson | 478 East Main Street Youngsville, PA 16371 | 814-563-7408 | National Forge Company One Front Street Irvine, PA 16329 | 814-563-7522 ext. 5001 |
| Robert | W. | Richards | 600 Follett Run Road Warren, PA 16365 | 814-723-5478 | National Forge Company One Front Street Irvine, PA 16329 | 814-563-7522 ext. 5001 |
| Harry | D. | Rosequist | 2594 Pennsylvania Avenue West Ext. Warren, PA 16365 | 814-723-5919 | National Forge Company One Front Street Irvine, PA 16329 | 814-563-7522 ext. 5001 |

**EXHIBIT
8**

A - 00138

## Summary of Loans Outstanding -Irvine
### (000's Omitted)

| | 12/31/98 | 9/30/98 | 6/30/98 | 3/31/98 | 12/31/97 |
|---|---|---|---|---|---|
| **Notes payable and current portion of long-term debt** | | | | | |
| Revolver | - | - | - | - | - |
| Term Loan | 2,946 | $ 4,762 | $ 4,566 | $ 4,413 | $ 3,475 |
| Capitalized Leases | - | 3 | 14 | 22 | 30 |
| Gas Pipeline | 44 | 74 | 98 | 131 | 170 |
| MELF-Pa loan | 83 | 81 | 81 | 80 | 79 |
| Warrant Amortization | - | - | - | (92) | (97) |
| Total | $ 3,073 | $ 4,920 | $ 4,759 | $ 4,554 | $ 3,657 |
| | | | | | |
| **Long-Term Debt** | | | | | |
| Term Loan | $15,274 | $16,059 | $16,845 | $ 5,651 | $ 6,589 |
| Capitalized Leases | - | - | - | - | - |
| Gas Pipeline | - | - | - | - | - |
| MELF-Pa loan | 225 | 247 | 267 | 288 | 308 |
| Warrant Amortization | - | - | - | (106) | (127) |
| Total | $15,499 | $16,306 | $17,112 | $ 5,833 | $ 6,770 |
| | | | | | |
| **Total Debt** | | | | | |
| Revolver | - | - | - | - | - |
| Term Loan | $18,220 | $20,821 | $21,411 | $10,064 | $10,064 |
| Capitalized Leases | - | 3 | 14 | 22 | 30 |
| Gas Pipeline | 44 | 74 | 98 | 131 | 170 |
| MELF-Pa loan | 308 | 328 | 348 | 368 | 387 |
| Warrant Amortization | - | - | - | (198) | (224) |
| Total | $18,572 | $21,226 | $21,871 | $10,387 | $10,427 |

LLC 1/18/99 loans299

A - 00139

### Summary of Loans Outstanding -Mitchell, Shackleton & Co. Ltd.
### (000's Omitted)

| | 12/31/98 | 9/30/98 | 6/30/98 | 3/31/98 | 12/31/97 |
|---|---|---|---|---|---|
| **Notes payable and current portion of long-term debt** | | | | | |
| Bank Overdraft | $ 536 | $ 976 | $ 685 | $ 440 | $ 234 |
| Business Development Loan | 40 | 40 | 38 | - | - |
| Capital Equipment Loan | 317 | 401 | 396 | 348 | 337 |
| Capital Equipment Lease | 229 | 229 | 220 | 216 | 208 |
| | $ 1,122 | $ 1,646 | $ 1,339 | $ 1,004 | $ 779 |
| | | | | | |
| **Long-Term Debt** | | | | | |
| Business Development Loan | $ 60 | $ 72 | $ 81 | | |
| Capital Equipment Loan | 182 | 215 | 319 | $ 210 | $ 298 |
| Capital Equipment Lease | 133 | 196 | 249 | 304 | 354 |
| | $ 375 | $ 483 | $ 649 | $ 514 | $ 652 |
| | | | | | |
| **Total Debt** | | | | | |
| Bank Overdraft | $ 536 | $ 976 | $ 685 | $ 440 | $ 234 |
| Business Development Loan | 100 | 112 | 119 | - | - |
| Capital Equipment Loan | 499 | 616 | 715 | 558 | 635 |
| Capital Equipment Lease | 362 | 425 | 469 | 520 | 562 |
| | $ 1,497 | $ 2,129 | $ 1,988 | $ 1,518 | $ 1,431 |
| | | | | | |
| Exchange Rate | 1.6595 | 1.7000 | 1.6677 | 1.6713 | 1.6508 |

LLC 1/18/99 loans299

A - 00140

**Summary of Loans Outstanding - Global Crankshaft Services Ltd.**
**(000's Omitted)**

|  | 12/31/98 | 9/30/98 | 6/30/98 |
|---|---|---|---|
| **Notes payable and current portion of long-term debt** | | | |
| Bank Overdraft | $37 | $17 | $12 |
| Total | $37 | $17 | $12 |
| | | | |
| **Long-Term Debt** | | | |
| Total | $0 | $0 | $0 |
| | | | |
| **Total Debt** | | | |
| Bank Overdraft | $37 | $17 | $12 |
| Total | $37 | $17 | $12 |
| | | | |
| Exchange Rate | 1.6595 | 1.7000 | 1.6677 |

LLC 1/18/99 loans299

A - 00141

**Summary of Loans Outstanding -National Forge Europe**
**(000's Omitted)**

|  | 12/31/98 | 9/30/98 | 6/30/98 | 3/31/98 |
|---|---|---|---|---|
| **Notes payable and current portion of long-term debt** | | | | |
| Loan Notes | $  1,266 | $  1,112 | $    911 | $  5,097 |
| | | | | |
| **Long-Term Debt** | | | | |
| Loan Notes | $  4,127 | $  4,413 | $  4,509 | $    334 |
| | | | | |
| **Total Debt** | | | | |
| Loan Notes | $  5,393 | $  5,525 | $  5,420 | $  5,431 |
| | | | | |
| Exchange Rate | 1.6595 | 1.7000 | 1.6677 | 1.6713 |

**Summary of Loans Outstanding -North West Forgemasters Ltd.**
**(000's Omitted)**

|  | 12/31/98 | 9/30/98 | 6/30/98 |
|---|---|---|---|
| **Notes payable and current portion of long-term debt** | | | |
| Bank Overdraft | $0 | $129 | $228 |
| Total | $0 | $129 | $228 |
| | | | |
| **Long-Term Debt** | | | |
| Total | $0 | $0 | $0 |
| | | | |
| **Total Debt** | | | |
| Bank Overdraft | $0 | $129 | $228 |
| Total | $0 | $129 | $228 |
| | | | |
| Exchange Rate | 1.6595 | 1.7000 | 1.6677 |

A - 00143

BORROWING BASE CERTIFICATE

TO: | The Chase Manhattan Bank | DATE: | 01/19/99

The Chase Manhattan Bank
200 Jericho Quadrangle
Jericho, New York 11753
Attn:  Carol A. Edkins, Vice President

SUBJECT:    National Forge Company

| | | | |
|---|---|---|---|
| A. | Total Accounts Receivable as of   12/31/98 | | |
| | National Forge Company | $ | 11,544 |
| | National Forge Components | $ | 51 |
| | Ineligibles: | | |
| | Accounts Receivable over 60 days | $ | 635 |
| | Contras | $ | 3 |
| | Receivables from affiliate companies | $ | 8 |
| | Foreign Receivables not supported by FCIA insurance or letters of credit | $ | 0 |
| | Cross-aged Receivables | $ | 49 |
| | Disputes | $ | 0 |
| | Customer Deposits | $ | 112 |
| | Credits | $ | 0 |
| | Concentrations (portion of Receivable over 10% of Total Accounts Receivable, excluding Receivables from General Electric) | $ | 574 |
| | Government Receivables with no Assignment of Claims Act notice acknowledgement | $ | 2,852 |
| | Progress Billings | $ | 0 |
| | Other | $ | 0 |
| | Total ineligibles | $ | 4,233 |
| | Net Eligible Accounts Receivable | $ | 7,362 |
| | Availability (85% Advance Rate;75% for Foreign currency denominated Receivables not hedged by a Currency Hedge Arrangement)    6,513    @85%<br>849    @75% | $ | 6,173 |

Borrowing Base Certificate:   12/31/98
National Forge Company
Page 2

B.        Total Inventory as of        12/31/98                    20,237

|  | Waiting to ship | Work In Process | Manufactured Parts | Purchased Parts | Stores | Total |
|---|---|---|---|---|---|---|
|  | 5,160 | 8,897 | 3,333 | 1,579 | 1,268 | 20,237 |
| Ineligibles |  |  |  |  |  |  |
| Book Reserves |  |  |  |  |  | 0 |
| Heats of steel |  |  |  |  |  | 0 |
| adjustment |  | 44 |  |  |  | 44 |
| Bill and Hold | 4,607 |  |  |  |  | 4,607 |
| Recost | (3) | 129 | 43 | 45 | 16 | 230 |
| Scrap Value adjustment |  |  |  | 264 |  | 264 |
| Mold reclassified as |  |  |  |  |  | 0 |
| fixed assets |  |  |  |  |  | 0 |
| Weights adjustment |  |  |  |  |  | 0 |
| Other |  |  |  |  |  | 0 |
| Total Ineligibles | 4,604 $ | 173 $ | 43 $ | 309 $ | 16 $ | 5,145 |
| Net Eligible Inventory | 556 $ | 8,724 $ | 3,290 $ | 1,270 $ | 1,252 $ | 15,092 |
| Advance Rates | 80% | 43.5% | 50% | 50% | 20% |  |
| Availability | 445 | 3,795 | 1,645 | 635 | 250 $ | 6,770 |

C.        Total Availability on Accounts Receivables and Inventory              $      12,000
              ($12,000  or the actual availability, whichever is lower)
D.        Loans CurrentLy Outstanding                                          $           0

          Amounts Requested/Paid                                              $           0

          Letters of Credit Currently Outstanding                            $       4,152

          Mitchell Shackleton Loan Guarantee                                 $       1,162

          Northwest Forgemasters                                             $         830

          Guaranty Reserve                                                   $          55

          Currency Hedge Exposure Reserve                                    $         TBD

          Total                                                              $       6,199

Net Available (C-D)                                                          $       5,801

A - 00145

Borrowing Base Certificate
National Forge Company
Page 3

The undersigned hereby represents and warrants that this is a correct statement regarding the status of accounts receivable and inventory assigned to Chase Bank and that the figures set forth are completely accurate.  The undersigned further warrants and represents that the Company is in complete compliance with all of the terms and conditions in the agreements between us.  The undersigned further understands that your loans to the Company will be based upon your reliance on the information contained herein.

National Forge Company
(Company Name)                                Authorized Signature

January 19, 1999                              Vice President & Chief Financial Officer
(Dated)                                       (Title)

A - 00146

National Forge Company
FY96 Actual LIFO Basis - Chase Bank Covenants
*(dollars in thousands)*

| | Qtr ended Dec-98 |
|---|---|
| **Section 7.07 Capital Expenditures** | |
| Required Covenant-capital expenditures not to exceed | |
| Domestic subsidiaries | 4,481 |
| Total Spent qtr    (Irvine & Components) | 2,438 |
| Carry over | 2,043 |
| | |
| NFE Consolidated | 823 |
| Total Spent qtr | 147 |
| Carry over | 676 |
| | |
| Compliance (Yes/No) | Yes |
| | |
| **Section 7.08 Debt Service Coverage Ratio** | |
| Net cash flow | 6,884 |
| Debt Service Expense | 3,873 |
| Required Covenant Ratio - Minimum Allowed | 1.20 |
| Calculated ratio | 1.78 |
| Compliance (Yes/No) | Yes |
| | |
| **Section 7.09 Interest Coverage Ratio** | |
| EBITDA less capital expenditures | 11,868 |
| Cash Interest Expense | 2,144 |
| Required Covenant Ratio - Minimum Allowed | 3.00 |
| Calculated ratio | 5.54 |
| Compliance (Yes/No) | Yes |
| **Section 7.10 Total Funded Debt to Net Cash Flow** | |
| Total Funded Debt | 29,051 |
| Net Cash Flow | 6,354 |
| Required Covenant Ratio - Maximum Allowed | 6.35 |
| Calculated ratio | 4.57 |
| Compliance (Yes/No) | Yes |

A - 00147

sum                                1/20/99 RAK\Covenant

SUMMARY
1999 CAPITAL EXPENDITURES AUTHORIZED
THROUGH   12/31/98

|  |  | AMOUNT APPROVED |
| --- | --- | --- |
| **IRVINE PLANT** |  |  |
| AMOUNT APPROVED THROUGH 12/31/98 |  | 2,002,541 |
| 1999 BOARD PROGRAM | 4,000,000 |  |
| BALANCE 1999 PROGRAM | 1,997,459 |  |
| **MITCHELL SHACKLETON** |  |  |
| AMOUNT APPROVED THROUGH 12/31/98 |  | 100,234 |
| **NORTHWEST FORGEMASTERS LTD.** |  |  |
| AMOUNT APPROVED THROUGH 12/31/98 |  | 0 |
| 1999 BOARD PROGRAM | 720,000 |  |
| BALANCE 1999 PROGRAM | 619,766 |  |

GLE

1/21/99

A - 00148

IRVINE PLANT
IRVINE, PA
FYE 1999 CAPITAL EXPENDITURES AUTHORIZED
THROUGH      12/31/98

| DEPARTMENT | P# | PROJECT DESCRIPTION | DATE APPROVED | AMOUNT APPROVED |
|---|---|---|---|---|
| MKT-GENERAL | P-519 | 8 THINKPAD NOTEBOOK COMPUTERS | 07/16/98 | 22,800 |
| MELT | P-472-R | ROTARY NOZZLE LADLE GATE SYSTEM | 08/03/98 | 152,176 |
| IND RELATIONS | P-520 | 3 PC'S FOR HR/BENEFITS | 08/05/98 | 6,025 |
| IS | P-521 | TELEPHONE SWITCH & COMM SERVER | 08/13/98 | 269,346 |
| PF-HT | P-522 | 3 SAFETY SHUTOFF VALVES PF GAS LINES | 08/19/98 | 10,500 |
| QA | P-523 | AIR CONDITION UNIT VIRTUAL PRINT ROOM | 08/19/98 | 6,900 |
| MELT | P-524 | BOTTOM POUR PLATE | 09/14/98 | 45,000 |
| PL & FAC ENG | P-526 | CADD SOFTWARE | 09/10/98 | 23,499 |
| IS | P-527 | PC'S FOR MARKETING & ACCOUNTING | 09/10/98 | 9,700 |
| SURF HARD | P-528 | MONITOR INSTRUMENTATION NITRADE FURN | 09/25/98 | 14,100 |
| CAD/CAM | P-529 | CAD HARDWARE & CONV SOFTWARE | 10/13/98 | 22,053 |
| CHEM LAB | P-530 | LECO OXYGEN, NITROGEN ANALIZER | 10/15/98 | 35,000 |
| IS | P-532 | PURCH P/C FOR IS | 10/27/98 | 2,000 |
| MKT/BUS DEV | P-525 | AFTERMARKET MOLD RECONDITIONING | 11/03/98 | 100,000 |
| PF/MACH | P-531 | REMFG #251 GFM MACHINE | 11/03/98 | 1,004,530 |
| MACH/FIN | P-533 | REPLACE ELEC CONTROLS #475 OH CRANE | 11/03/98 | 114,765 |
| MKT/GEN | P-534 | NF LOGO ON DISK & CD ROM | 11/09/98 | 5,625 |
| QA | P-523-R | AIR CONDITION UNIT VIRTUAL PRINT ROOM | 11/16/98 | 3,567 |
| IS | P-535 | NT SERVER & CISCO ROUTER | 12/09/98 | 6,100 |
| GEN PL MAINT | P-536 | REPAIR BRIDGE ABUTMENT | 12/08/98 | 80,000 |
| IS | P-537 | PC'S FOR PURCHASING DEPARTMENT | 12/08/98 | 9,500 |
| MACH/BORING | P-538 | REST & BRACKETS FOR #310 LATHE | 12/09/98 | 28,000 |
| IS | P-539 | PC'S & SOFTWARE FOR QA DEPT | 12/21/98 | 18,200 |
| GEN PL MAINT | P-541 | STORAGE/OFFICE FOR VEHICLE STORAGE | 12/29/98 | 13,155 |

TOTALS FOR IRVINE                                      2,002,541

GLE

M.S.L.
MANCHESTER, U.K.
**1999 CAPITAL EXPENDITURES AUTHORIZED**
THROUGH        12/31/98

| P# | PROJECT DESCRIPTION | DATE APPROVED | POUNDS STERLING/ DOLLARS APPROVED | |
|---|---|---|---|---|
| P-237P | REPLACE HEAT TREATMENT BOGEY | 08/17/98 | £ | 5,400 |
| | | | $ | 8,961 |
| P-233P | BLDG ALTERATIONS & TFR FLANGES | 08/17/98 | £ | 55,000 |
| | | | $ | 91,273 |
| | | | £ | 60,400 |
| | TOTALS FOR MITCHELL SHACKLETON | | $ | 100,234 |

**NORTHWEST FORGEMASTERS LTD.**
MANCHESTER, U.K.
**1999 CAPITAL EXPENDITURES AUTHORIZED**
THROUGH        12/31/98

| P# | PROJECT DESCRIPTION | DATE APPROVED | POUNDS STERLING/ DOLLARS APPROVED |
|---|---|---|---|
| | TOTALS FOR NORTHWEST FORGEMASTERS | | |

GLE

A - 00150

**NATIONAL FORGE COMPANY**
**CAPITAL PROJECT STATUS**
**AS OF DECEMBER 31, 1998**

| DEPARTMENT | P# | 1999 OPEN CAPITAL PROJECTS | DATE APPR | AMOUNT APPROVED | SPENT TO DATE | BALANCE | % OF ALLOC SPENT |
|---|---|---|---|---|---|---|---|
| MELT | P-472-R | ROTARY NOZZLE LADLE GATE SYSTEM | 08/03/98 | 152,176 | 49,643 | 102,533 | 32.62% |
| IS | P-521 | TELEPHONE SWITCH & COMM SERVER | 08/13/98 | 269,346 | 68,367 | 200,979 | 25.38% |
| PF-HT | P-522 | 3 SAFETY SHUTOFF VALVES PF GAS LINE | 08/19/98 | 10,500 | 4,759 | 5,741 | 45.32% |
| MELT | P-524 | BOTTOM POUR PLATE | 09/14/98 | 45,000 | 3,598 | 41,402 | 8.00% |
| MKT/BUS DEV | P-525 | AFTERMARKET MOLD RECONDITIONING | 11/03/98 | 100,000 | 91,980 | 8,020 | 91.98% |
| SURF HARD | P-528 | MONITOR INSTRUMENT NITRADE FURN | 09/25/98 | 14,100 | 0 | 14,100 | 0.00% |
| PF/MACH | P-531 | REMANUFACTURE #251 GFM | 11/03/98 | 1,004,530 | 254,649 | 749,881 | 25.35% |
| MACH/FIN | P-533 | REPLACE ELEC CONTROLS #475 CRANE | 11/03/98 | 114,765 | 0 | 114,765 | 0.00% |
| IS | P-535 | PURCHASE ROUTER AND SERVER | 12/09/98 | 6,100 | 2,831 | 3,269 | 46.41% |
| GEN PL MAINT | P-536 | REPAIR BRIDGE TO WWT FACILITY | 12/08/98 | 80,000 | 0 | 80,000 | 0.00% |
| IS | P-537 | PC'S FOR PURCHASING DEPT | 12/08/98 | 9,500 | 0 | 9,500 | 0.00% |
| MACH/BORING | P-538 | PURCHASE PARTS #310 LATHE | 12/09/98 | 28,000 | 0 | 28,000 | 0.00% |
| IS | P-539 | PC'S FOR QA DEPT | 12/21/98 | 18,200 | 0 | 18,200 | 0.00% |
| | | **TOTAL OPEN 1999 PROJECTS** | | **1,852,217** | **475,827** | **1,376,390** | **25.69%** |

| DEPARTMENT | P# | PR YR OPEN CAPITAL PROJECTS | DATE APPR | AMOUNT APPROVED | SPENT TO DATE | BALANCE | % OF ALLOC SPENT |
|---|---|---|---|---|---|---|---|
| PF/MACHINE | P-335-R | DC DRIVES - MACHINE 528 | 04/01/97 | 35,000 | 28,730 | 6,270 | 82.09% |
| FP/FORGE | P-346 | REBUILD 949 FORGING MANIPULATOR | 04/25/96 | 600,000 | 523,264 | 76,736 | 87.21% |
| C/S FINISHING | P-404 | TRANSFORM 731 PIN GRINDER TO MAIN | 08/19/97 | 870,500 | 51,176 | 819,324 | 5.88% |
| PF/MACHINE | P-407 | MODIFY #408 DRILL | 02/13/97 | 8,600 | 249 | 8,351 | 2.90% |
| GEN PL MAINT | P-433 | REPAIR BLDG NO. 2 | 07/16/97 | 80,000 | 0 | 80,000 | 0.00% |
| MACH/ROUGH | P-441 | MODIFY #807 CENTERING MACHINE | 08/19/97 | 78,556 | 62,572 | 15,984 | 79.65% |
| PF/MACHINE | P-444 | PUR/RBLD LATHE - CRANKSHAFTS | 10/29/97 | 450,000 | 375,973 | 74,027 | 83.55% |
| HT/WELDING | P-447 | 1550 TON STRAIGHTENING PRESS | 10/29/97 | 500,000 | 446,795 | 53,205 | 89.36% |
| HT/WELDING | P-465 | 15 TON PENDANT OPERATED CRANE | 12/15/97 | 45,000 | 42,837 | 2,163 | 95.19% |
| MACH/BORING | P-466 | INSTALL BED SECTION #112 LATHE | 12/05/97 | 24,700 | 13,452 | 11,248 | 54.46% |
| SHIPPING | P-470 | LUMBER STORAGE BUILDING | 01/14/98 | 40,000 | 38,666 | 1,334 | 96.67% |
| MELT | P-472 | ROTARY NOZZLE LADLE GATE SYSTEM | 01/23/98 | 166,086 | 166,086 | 0 | 100.00% |
| FORGE PRESS | P-475 | MICROMAX FURNACE CONTROL INSTRUM | 01/23/98 | 65,500 | 49,326 | 16,174 | 75.31% |
| SHIPPING | P-476 | UPGRADE SHOT PEEN FACILITY | 01/23/98 | 45,000 | 12,078 | 32,922 | 26.84% |
| MACH/ROUGH | P-486 | TOOL POST MODIFICATION | 02/26/98 | 22,000 | 3,099 | 18,901 | 14.09% |
| MELT | P-488 | P&I WATER COOLING BEZEL RING - #169 | 04/09/98 | 52,000 | 0 | 52,000 | 0.00% |
| MELT | P-496 | UPGRADE #169 ARC FURNACE CONTROLS | 04/27/98 | 428,030 | 254 | 427,776 | 0.06% |
| PROD PLANNING | P-498 | CAPACITY MANAGEMENT SOFTWARE | 04/27/98 | 144,000 | 145,634 | 0 | 101.13% |
| GEN PL MAINT | P-499 | HAZMAT RESPONSE VEHICLE | 04/28/98 | 8,500 | 7,506 | 994 | 88.31% |
| STOREHOUSE | P-500 | GAS BOTTLE STORAGE BLDG | 04/27/98 | 7,400 | 6,111 | 1,289 | 82.58% |
| GEN PL MAINT | P-502 | CLOSE SLAG LANDFILL | 05/07/98 | 125,000 | 95,733 | 29,267 | 76.59% |
| TREASURER | P-510 | UPDATE CORPORATE A/C | 06/10/98 | 60,708 | 60,199 | 509 | 99.16% |
| GEN PL MAINT | P-515 | INSTALL ROOF - BLDG #7 | 07/03/98 | 30,000 | 0 | 30,000 | 0.00% |
| GEN PL MAINT | P-516 | RESURFACE MAIN PLANT ROAD | 07/03/98 | 35,000 | 4,187 | 30,813 | 11.96% |
| GEN PL MAINT | P-517 | FLOORING/PAINT QA BLDG | 07/03/98 | 20,000 | 2,380 | 17,620 | 11.90% |
| | | **TOTAL OPEN PR YEAR PROJECTS** | | **3,941,580** | **2,136,307** | **1,806,907** | **54.20%** |
| | | **TOTAL OPEN PROJECTS** | | **5,793,797** | **2,612,134** | **3,183,297** | **45.09%** |

A - 00151

**NATIONAL FORGE COMPANY**
**CAPITAL PROJECT STATUS**
**AS OF DECEMBER 31, 1998**

| DEPARTMENT | P# | 1999 CLOSED CAPITAL PROJECTS | DATE APPR | AMOUNT APPROVED | SPENT TO DATE | BALANCE | % OF ALLOC SPENT |
|---|---|---|---|---|---|---|---|
| MKT-GENERAL | P-519 | 8 THINKPAD NOTEBOOK COMPUTERS | 07/16/98 | 22,800 | 26,271 | 0 | 115.22% |
| IND RELATIONS | P-520 | 3 PC'S FOR HR/BENEFITS | 08/05/98 | 6,025 | 5,562 | 463 | 92.32% |
| QA | P-523-R | AIR CONDITION UNIT VIRTUAL PRINT ROO | 08/19/98 | 10,467 | 10,467 | 0 | 100.00% |
| PL & FAC ENG | P-526 | CADD SOFTWARE | 09/10/98 | 23,499 | 26499 | 0 | 112.77% |
| IS | P-527 | PC'S FOR MARKETING & ACCOUNTING | 09/10/98 | 9,700 | 8228 | 1,472 | 84.82% |
| CAD/CAM | P-529 | CADD SOFTWARE/HARDWARE | 10/13/98 | 22,053 | 22,765 | 0 | 103.23% |
| CHEM LAB | P-530 | LECO OXY HYD ANALIZER - CHEM LAB | 10/15/98 | 35,000 | 32,670 | 2,330 | 93.34% |
| IS | P-532 | PC FOR IS DEPT | 10/27/98 | 2,000 | 0 | 2,000 | 0.00% |
| MKT/GEN | P-534 | NF LOGO SOFTWARE | 11/09/98 | 5,625 | 0 | 5,625 | 0.00% |
| GEN PL MAINT | P-541 | CONSTRUCT ROOM VEHICLE STORAGE | 12/29/98 | 13,155 | 13,152 | 3 | 99.98% |
| | | **TOTAL CLOSED 1999 PROJECTS** | | 150,324 | 145,614 | 11,893 | 96.87% |

| DEPARTMENT | P# | PR YR CLOSED CAPITAL PROJECTS | DATE APPR | AMOUNT APPROVED | SPENT TO DATE | BALANCE | ALLOC SPENT |
|---|---|---|---|---|---|---|---|
| MAINT | P-391-R | UTILITIES FOR MAINT STORAGE BUILDING | 12/03/96 | 31,222 | 30,974 | 248 | 99.21% |
| GEN PL MAINT | P-422 | PASSIVE WASTE WATER IMPOUNDMENT | 06/04/97 | 30,000 | 24,318 | 0 | 81.06% |
| C/S FINISH | P-462 | MAGNETIC SWITCH RADIO CONTR #210 | 12/15/97 | 59,500 | 40,143 | 19,357 | 67.47% |
| STEAM | P-464 | COMBUSTION/FEEDWATER COMP #909 | 12/15/97 | 37,800 | 25,204 | 12,596 | 66.68% |
| MACH/BORING | P-473 | SERVO MOTOR & DRIVE CONTROL | 01/23/98 | 23,600 | 20,838 | 2,762 | 88.30% |
| FORGE PRESS | P-477 | REBUILD #103 HEAT TO FORGE FURNACE | 01/23/98 | 537,000 | 493,146 | 43,854 | 91.83% |
| PF/PRESS | P-484 | CORRECT CRANE RUNWAY BLDG #64 | 02/26/98 | 24,000 | 17,388 | 6,612 | 72.45% |
| MELT | P-485 | REPLACE DUCT EXP JOINTS BAGHOUSE | 03/06/98 | 25,000 | 35,390 | 0 | 141.56% |
| SHIPPING | P-489 | REBUILT 20 TON CRANE IN SHIPPING | 03/09/98 | 263,000 | 193,944 | 69,056 | 73.74% |
| C/S FINISH | P-491 | PUR GRANITE SURFACE PLATES | 04/09/98 | 40,000 | 29,533 | 10,467 | 73.83% |
| MACH/FIN/TOOL | P-493 | HEIDENHAIN PT TOOL SYTEM #356 MILL | 04/15/98 | 9,255 | 8,868 | 387 | 95.82% |
| MACH/FIN/TOOL | P-494 | HEIDENHAIN PT READOUT SYS #430 MILL | 04/15/98 | 11,055 | 9,874 | 1,181 | 89.32% |
| C/S FINISH | P-495 | UPGRADE #234 FLANGE DRILL | 04/27/98 | 183,000 | 177,355 | 5,645 | 96.92% |
| MECH MAINT | P-497 | HAMAR LASER ALIGNMENT SYSTEM | 04/27/98 | 81,230 | 80,547 | 683 | 99.16% |
| QA | P-501 | AIR COND/HEAT UNIT - QA BUILDING | 04/27/98 | 8,527 | 8,123 | 404 | 95.26% |
| IND RELATIONS | P-507 | HR SOFTWARE | 06/15/98 | 24,000 | 19,340 | 4,660 | 80.58% |
| CAD/CAM | P-508 | EXPANSION OF DNC SYSTEM | 06/01/98 | 7,440 | 7,423 | 17 | 99.77% |
| CHEM LAB | P-509 | INSTALL AC/ MELT CHEM LAB | 06/01/98 | 14,400 | 7,332 | 7,068 | 50.92% |
| IND RELATIONS | P-514 | AIR MONITORING SYSTEM | 06/23/98 | 17,500 | 18,800 | 0 | 107.43% |
| | | **TOTAL PR YR CLOSED PROJECTS** | | 1,274,907 | 1,126,973 | 158,324 | 88.40% |
| | | **TOTAL CLOSED PROJECTS** | | 1,425,231 | 1,272,587 | 170,217 | 89.29% |

A - 00152

**MITCHELL, SHACKLETON & CO. LTD.**
**CAPITAL PROJECT STATUS**
**AS OF DECEMBER 31, 1998**

| P# | 1999 OPEN CAPITAL PROJECTS | DATE APPR | AMOUNT APPROVED | SPENT TO DATE | BALANCE | % OF ALLOC SPENT |
|----|---------------------------|-----------|-----------------|---------------|---------|------------------|
| P233 | Building Alterations & Plant Tfrs re: NW Flange | 08/98 | 91,273 | 88,384 | 2,889 | 96.83% |
| P237 | Replacement Heat Treatment Bogey | 08/98 | 8,961 | 16,884 | 0 | 188.42% |
| | TOTAL OPEN 1998 PROJECTS | | 100,234 | 105,268 | 2,889 | 105.02% |

| P# | PR YR OPEN CAPITAL PROJECTS | DATE APPR | AMOUNT APPROVED | SPENT TO DATE | BALANCE | % OF ALLOC SPENT |
|----|----------------------------|-----------|-----------------|---------------|---------|------------------|
| P226 | Main Office Restoration | 08/97 | 116,165 | 146,375 | 0 | 126.01% |
| P230 | Enclosure for Fitting Lathe | 01/98 | 23,565 | 21,574 | 1,991 | 91.55% |
| P234 | Grinding M/C - Roller Steadies | 05/98 | 23,233 | 21,814 | 1,419 | 93.89% |
| | TOTAL OPEN PR YEAR PROJECTS | | 162,963 | 189,763 | 3,410 | 116.45% |
| | TOTAL OPEN PROJECTS | | 263,197 | 295,031 | 6,299 | 112.10% |

**NORTH WEST FORGEMASTERS, LTD.**
**CAPITAL PROJECT STATUS**
**AS OF DECEMBER 31, 1998**

| P# | 1999 OPEN CAPITAL PROJECTS | DATE APPR | AMOUNT APPROVED | SPENT TO DATE | BALANCE | % OF ALLOC SPENT |
|----|---------------------------|-----------|-----------------|---------------|---------|------------------|
| | None | | | | | |
| | TOTAL OPEN PROJECTS | | - | - | - | |

A - 00153

**EXHIBIT
9**

A - 00154

| | NATIONAL FORGE COMPANY | | |
| | IRVINE PLANT | | |
| | QUARTERLY CASH FLOW BONUS PLAN | | |
| | FISCAL YEAR 1999 ACTUAL | | |
| | (DOLLARS IN THOUSANDS) | | |
| | | | |
| | FIRST QUARTER ACTUAL | SECOND QUARTER ACTUAL | |
| PRE-TAX PROFIT (LOSS) | $536 | $568 | |
| ADD BONUS ACCRUED IN PROFITS | 174 | 326 | |
| ADD ESOP CONTRIBUTION | 1,235 | 1,301 | |
| ADD DEPRECIATION & MOLD AMORT. | 598 | 598 | |
| ADD ORGANIZATIONAL COST AMORT. | 2 | 2 | |
| ADD GOODWILL AMORTIZATION | 146 | 146 | |
| ADD REFINANCING COSTS | 36 | 33 | |
| ADD AMORTIZATION OF WARRANTS | 0 | 0 | |
| LESS CAPITAL EXPENDITURES | (1,393) | (1,043) | |
| LESS DEBT PAYMENTS-TERM | (609) | (609) | |
| LESS DEBT PAYMENTS-PIPE LINE | (24) | (30) | |
| ADJUSTED CASH FLOW | 701 | 1,293 | |
| QUARTERLY ADJUSTED CASH FLOW | 701 | 1,293 | |
| QUARTERLY CASH FLOW BONUS POOL (25%) | $175 | $323 | |
| | | | |
| BONUS AS % OF QUARTERLY W-2 EARNINGS | 3.11 % | 5.35 % | |

FILE:CFBONUS99
1/15/99
LLC

# NATIONAL FORGE COMPANY

Employee Owned

# Memorandum

January 20, 1999

TO: E. Roger Clark

FROM: Maurice J. Cashman

RE: **Early Retirement**

At the National Forge Company Holdings, Inc.'s Board meeting on October 28, 1998, Dennis Peterson requested Robert Kaemmerer and I to research the possibility of buying back an employee's ESOP stock when they would take early retirement[1], but on a restrictive basis. That is to say for example: Limit it to 3 people or $150,000 a year maximum. Kirkpatrick & Lockhart LLP have advised us that the ESOP Plan document could be changed in a limited manner such as proposed.

Robert Kaemmerer and I do not recommend a change at this time primarily because we could not devise a plan that would deal with this problem in a fair and equitable way. Charlie Smith, of Kirkpatrick & Lockhart LLP, also has recommended that the Plan should not be changed as it would become an inducement for people to leave the company earlier than would be the case if the Plan did not change.

If the Board of Directors would approve any change, it would also need to be approved by a vote of the majority of the participants. Chase Bank also will need to approve the change as there is a prohibition to any change of the ESOP Plan document in the Loan Agreement. At the current time there is no business reason for the bank to approve this change.

---

[1] A person qualifies for Early Retirement when he/she is at least 55 years old with 15 years of service or has 25 years of service.

G:\FILES\BRD\JAN99\EARLYRET.DOC

A - 00156

ATTORNEY-CLIENT PRIVILEGED
ATTORNEY WORK PRODUCT
CONFIDENTIAL

# MEMORANDUM

| | |
|---|---|
| **TO:** | Our Clients |
| **FROM:** | Kirkpatrick & Lockhart LLP |
| **DATE:** | November 6, 1998 |
| **SUBJECT:** | Year 2000 Information and Readiness Disclosure Act: A Legislative Analysis |

### Overview

On October 19, 1998, the Year 2000 Information and Readiness Disclosure Act (the "Y2K Act" or "Act"), P.L. 105-271, was signed into law. The Y2K Act is intended to facilitate and promote the voluntary sharing of Year 2000-related information among and between private entities and governmental units by attempting to remove the fear of litigation exposure which some feel has posed a barrier to more open and frank communication.

To that end, the Y2K Act sets forth a number of protections and limitations of liability for the disclosure and sharing of Year 2000-related information. The Act covers various issues, including, among other things, (1) limitations on the admissibility into evidence of certain Year 2000 Readiness Disclosures; (2) certain liability exclusions for allegedly false, inaccurate or misleading Year 2000 Statements; (3) a temporary antitrust exemption for agreements for the purpose of facilitating responses intended to correct or avoid Y2K problems and (4) provisions for the retroactive application of the Act to Year 2000 Readiness Disclosures made after January 1, 1996 and before enactment of the Act, provided that there is compliance with the retroactivity provisions of the Act. The Act also details certain circumstances under which a Y2K statement will and will not be interpreted or construed as an amendment to or alteration of a contract or warranty.

Although the Y2K Act may facilitate the disclosure of Year 2000-related information and help remove the chill on prospective Y2K communications, we caution that it is far from a blanket "litigation killer" or a panacea of liability limitation. While the Act excludes liability based upon certain statements and imposes barriers to admission into evidence of Year 2000 Readiness Disclosures, the Act expressly provides that it shall not be construed to preclude any claims that are not based <u>exclusively</u> on Year 2000 Statements. If a problem or failure occurs with respect to a product or service, the Act does nothing to limit or exclude liability under theories that are not based on the prior Y2K statement or disclosure. Therefore, while it may be appropriate to take advantage of the protections the Act may afford after considered analysis, one should not be lulled into a false sense of security regarding the breadth and depth of protection afforded – or, more accurately, not afforded – by the Y2K Act.

PI-281271.02

A - 00157

# NATIONAL FORGE COMPANY ®

Employee Owned

Thomas H. Jackson
Controller

One Front Street
Irvine, Pennsylvania 16329   USA
Telephone: (814) 563-7522
Fax:  (814) 563-9209

**THIS LETTER IS A YEAR 2000 READINESS DISCLOSURE PURSUANT TO THE YEAR 2000 INFORMATION AND READINESS DISCLOSURE ACT, P.L. 105-271. PLEASE NOTE THAT SOME OF THE YEAR 2000 STATEMENTS SET FORTH HEREIN MAY BE REPUBLISHED STATEMENTS BASED ON INFORMATION SUPPLIED BY ANOTHER PERSON OR ENTITY THE CONTENTS OF WHICH HAVE NOT BEEN VERIFIED.**

January 20, 1999

«Company_Name»
«Company_Contact»
«Address_1»
«Address_2»
«City» «State» «Zip»

Dear Y2K Coordinator:

This is in response to your inquiry regarding the efforts we are making in preparation for the Year 2000. As you may recognize, the Year 2000 computer bug presents the business world with an unprecedented and unique problem that potentially touches every facet of business operations.  At National Forge Company ("National Forge"), we are working hard to attempt to address these challenges within our company.

Accordingly, we have instituted a Year 2000 plan, the goal of which is to make the company Year 2000 compliant.  We are proceeding to analyze all systems and equipment which we currently believe may present a Year 2000 problem, including, but not limited to, all software, hardware, equipment we believe to contain embedded date-sensitive micro-chip processors or software, manufacturing equipment, building systems, and other at-risk systems. As appropriate, we are attempting to remediate existing equipment or migrate to new equipment that has been represented to be Year 2000 compliant.

As a user of commercial equipment, software and hardware products, and other systems, in many instances National Forge is dependent on others in evaluating Year 2000 compliance or bringing systems into compliance.  As you may know, the United States Securities and Exchange Commission has noted that "it is not, and will not, be possible for any single entity or collective enterprise to represent that it has achieved complete Year 2000 compliance and thus to guarantee its remediation efforts."

Regardless of these inevitable limitations of any efforts in this regard, National Forge believes that its Year 2000 program is taking appropriate steps and making good progress in addressing any Year 2000 concerns. We look forward to working with you in regard to addressing the difficult and complex challenges relating to the Year 2000 issue.

Very truly yours,

Thomas H. Jackson
Controller and Year 2000 Compliance Coordinator

THJ/pdc

A - 00158

# National Forge Company
# Irvine Plant

## Customers
## Y2K Compliance Status Request



A - 00159

# National Forge Company
# Irvine Plant

## Key Suppliers
## Y2K Compliance Status



A - 00160

# National Forge Company
# Irvine Plant

## Manufacturing Equipment/Systems
## Y2K Compliance Status



# National Forge Company
# Irvine Plant

## Information Systems
## Y2K Compliance Status



**RONALD L. KUIS, ESQUIRE**
ATTORNEY - AT - LAW
12 SCENERY ROAD
PITTSBURGH, PENNSYLVANIA 15221
TELEPHONE 412/731-7246
TELECOPIER 412/731-3970

CONFIDENTIAL
ATTORNEY/CLIENT PRIVILEGE

January 19, 1999

E. Roger Clark, President
National Forge Company
One Front Street
Irvine, PA  16329

Re:    Status Report - Environmental Investigation and Remediation

Dear Mr. Clark:

        This letter summarizes the status of the environmental investigation and remediation at the National Forge Company facility in Irvine, Pennsylvania.

Irvine Investigation and Remediation

        The status of the investigation and remediation activities for each of the nine (9) Areas of Concern ("AOC") identified in the June 1995 Sear-Brown Phase II Environmental Assessment is as follows:

AOCs 1, 2, 3, 4, 5, 8 and 9 are complete.

AOC 6.        Underground Storage Tanks/Cutting Oil Contamination.

        Meetings were held with the technical staff of the PADEP on December 22 and August 27, 1998.  There were two primary purposes for these meetings: (i) to reach agreement with the PADEP on the scope of additional groundwater sampling and analysis needed to supplement the RETEC final site characterization report and (ii) to agree upon a strategy and schedule for completing the AOC 6 cleanup.  With respect to the groundwater sampling program, Sheila Anderson prepared a work scope that was transmitted to the PADEP on September 15.  Although this work scope was initially agreed to by the PADEP technical staff, we have recently been informed that the PADEP is conducting an internal audit of all cleanup projects conducted under the Pennsylvania Land Recycling Act.  As a result of this audit, the PADEP is likely to revise the September 15 sampling program.  Sheila Anderson will continue to work with the PADEP technical staff to finalize an agreement on any additional groundwater sampling and characterization required by the PADEP.  With respect to the second goal of finalizing the closure strategy, a cleanup standard for cutting oil will be established using a risk-based, site-specific analysis.  RETEC will prepare the required

A - 00163

Page 2

documentation to support the risk-based, site-specific submittal.

Moody has completed its report on the computer model, including results describing the oil plume emanating from the lower boring department. The computer model has provided preliminary conclusions to estimate oil migration and volumes in the subsurface. Moody will continue to measure oil thickness at locations around the lower boring department for the next few months. During that time, the computer model will undergo continuous refinement and recalibration. By no later than April 1999, Moody will submit a final model assessment report to the PADEP; this report will be reviewed by National Forge and RCR prior to submittal of recommendations to PADEP on possible future oil recovery operations.

Based on the computer model results and groundwater monitoring data obtained to date, Moody estimates that the total amount of oil contaminating groundwater released beneath the lower boring department was approximately 153,000 gallons. As of today, it is estimated that approximately 26,005 gallons of oil have been recovered from the oil recovery wells. Moody estimates that a total of approximately 125,000 gallons of oil is trapped in subsurface and is not recoverable.

National Forge is continuing with the oil recovery operations at groundwater wells designated by Moody and Associates. The general trend of declining oil thicknesses in monitoring wells is continuing and Moody has provided direction to National Forge on the operation and maintenance of the recovery wells. In addition, significant quantities of cutting oil are being recovered at the wastewater treatment plant. At this time it is not clear whether the oil recovered at the treatment plant is the result of either: (1) oil recovery tank overfills; (2) operational discharges; (3) internal leaks in the cutting oil recycling system; or (4) migration of oil from the soil into the sewer lines. Moody will investigate this problem and report back to National Forge.

In December, all aboveground cleanup activities were completed with the shipment to County Environmental of the last rollbox of oil contaminated sludge obtained from the July plant shutdown.

The PADEP has agreed that the AOC 5 groundwater issues will be addressed as a component of the AOC 6 closure report.

AOC 7.    Surficial Staining.

The technical staff at the PADEP has reviewed the preliminary data submittal for AOC 7. From this review, the PADEP has determined that the vanadium concentrations in groundwater reported by Moody and Freecol Laboratories do not meet the standards in Pennsylvania for minimum detection limits. The analytical method used by Freecol Laboratories apparently does not measure vanadium to the minimum detection limits established by Pennsylvania regulations under the Land Recycling Act. In order to satisfy the PADEP requirements, vanadium will be reanalyzed at a different laboratory using analytical methods that meet the PADEP requirements for minimum detection limits.

Page 3

The PADEP has now indicated that two (2) additional calendar quarters of sampling data for metals will be required. Accordingly, the final closure report will be submitted to the State by no later than mid-May 1999. The AOC 7 closure report will seek to obtain a waiver of environmental liability for both soil and groundwater. Groundwater cleanup issues associated with cutting oil contamination underlying AOC 7 will be addressed in the AOC 6 closure report.

<u>General Matters</u>

The litigation with Liberty Mutual to recover costs of environmental cleanup is proceeding. Liberty Mutual has made an offer of $330,000 to settle this case. This settlement offer was rejected by RCR and discovery is continuing. It is likely that sometime over the next few months attorneys from Liberty Mutual will visit National Forge and review documents associated with the AOC 5, AOC 6 and AOC 7 remediation activities.

Enclosed is a copy of the latest escrow disbursement summary for costs incurred under the Remediation Agreement between National Forge and RCR.

If you have any questions about the matters discussed herein, please do not hesitate to call.

Very truly yours,

Ronald L. Kuis

RLK/sbg
Enclosure

cc:     Maurice J. Cashman
        John G. Koedel, Jr.
        Charles Olson
        Sheila Anderson
        Robert D. Wilder
        Robert D. Winter
        Paul Wojciak
        Carl J. Diluzio

All with enclosure

A - 00165

ENVIRONMENTAL REMEDIATION
DISBURSEMENT CERTIFICATE STATUS REPORT
AS OF DECEMBER 31, 1998

| Ctf # | Vendor | Certificate Amount | DISBURSEMENT CERTIFICATES APPROVED FOR PAYMENT | | | | | | | | | | WAITING APPROVAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | AOC 1 | AOC 2 | AOC 3 | AOC 4 | AOC 5 | AOC 6 | AOC 7 | AOC 8 | AOC 9 | GENERAL | |
| 01 | County Environmental | 3,125.84 | | | | | | | | 3,125.84 | | | |
| 01 | DDG Indust | 943.50 | | | | | | | | 943.50 | | | |
| 01 | IAT Labs | 1,080.00 | | | | | | | | 1,080.00 | | | |
| 01 | Nat'l Forge | 3,881.00 | | | | | | | | 3,881.00 | | | |
| 01 | Moody | 7,246.12 | | | | | | | | 7,246.12 | | | |
| 02 | County Environmental | 13,128.87 | | | | | | | | 13,128.87 | | | |
| 03 | Moody & Associates | 13,773.93 | | | | | | | | | | | |
| | Refunded 12/22/95 | (13,773.93) | | | | | | | | | | | |
| 04 | Patterson Eng | 3,375.00 | | | | | | 3,375.00 | | | | | |
| 05 | SMS Tank | 10,400.00 | | | | | 10,400.00 | | | | | | |
| 06 | Kuis ( Warren Times Observer) | 472.74 | | | | | | | | | | 472.74 | |
| 07 | E.E. Austin | 18,500.00 | | | | | | 18,500.00 | | | | | |
| 08 | Moody | 600.00 | | | | | | | | 600.00 | | | |
| 09 | Moody | 325.00 | | | | | | | | 325.00 | | | |
| 10 | National Forge Company | 200.20 | | | | | | | | | | | 200.20 |
| 11 | SMS Tank | 10,770.00 | | | | | 10,770.00 | | | | | | |
| 12 | E.E. Austin | 34,980.00 | | | | | | 34,980.00 | | | | | |
| 13 | Remediation Technologies, Inc. | 12,186.60 | | | | | | 12,186.60 | | | | | |
| 14 | E.E. Austin | 11,040.00 | | | | | | 11,040.00 | | | | | |
| 15 | Remediation Technologies, Inc. | 11,681.60 | | | | | | 11,681.60 | | | | | |
| 16 | SMS Tank | 9,580.32 | | | | | 9,580.32 | | | | | | |
| 17 | SMS Tank | 20,262.98 | | | | | 20,262.98 | | | | | | |
| 18 | CE Remediation | 15,675.00 | | | 15,675.00 | | | | | | | | |
| 19 | CE Remediation | 9,500.00 | | | | 9,500.00 | | | | | | | |
| 20 | Warren Times | 70.08 | | | | | | | | | | 70.08 | |
| 21 | EE Austin | 13,270.00 | | | | | | 13,270.00 | | | | | |
| 22 | County Environmental | 3,850.00 | | | | | | 3,850.00 | | | | | |
| 23 | James Hunter Assoc | 600.00 | | | | | | | | | | 600.00 | |
| 24 | Sear-Brown Group | 71.23 | | | | | | | | | | 71.23 | |
| 25 | EE Austin | 5,330.00 | | | | | | 5,330.00 | | | | | |
| 26 | Remediation Technologies, Inc. | 2,762.71 | | | | | | 2,762.71 | | | | | |
| 27 | Remediation Technologies, Inc. | 5,897.52 | | | | | | 5,897.52 | | | | | |
| 28 | Moody and Associates | 6,482.94 | | | 6,482.94 | | | | | | | | |
| 29 | CE Remediation, Inc. | 51,652.11 | | | | | | 51,652.11 | | | | | |
| 30 | SMS Tank & Co. Env. | 13,720.00 | | | | | 13,720.00 | | | | | | |
| 31 | Scientific Testing | 115.00 | | | | | 115.00 | | | | | | |
| 32 | SMS Tank & Co. Env. | 13,114.71 | | | | | 13,114.71 | | | | | | |
| 33 | Remediation Technologies, Inc. | 12,476.85 | | | | | | 12,476.85 | | | | | |
| 34 | James P. Hunter | 750.00 | | | | | | | | | | 750.00 | |
| 35 | CE Remediation , Inc. | 20,517.20 | | | | | | 20,517.20 | | | | | |
| 36 | American Contracting | 23,690.00 | | | | | | | | 23,690.00 | | | |
| 37 | Moody & Associates | 230.00 | 230.00 | | | | | | | | | | |
| 38 | Remediation Technologies, Inc. | 47,135.65 | | | | | | 47,135.65 | | | | | |
| 39 | Moody & Associates, Inc. | 8,780.00 | 8,780.00 | | | | | | | | | | |
| 40 | Remediation Technologies, Inc. | 14,919.56 | | | | | | 14,919.56 | | | | | |
| 41 | CE Remediation, Inc. | 30,038.40 | | | | | | 30,038.40 | | | | | |
| 42 | American Contracting Enterprise | 17,346.00 | | | | | | | | 17,346.00 | | | |

ENVIRONMENTAL REMEDIATION
DISBURSEMENT CERTIFICATE STATUS REPORT
AS OF DECEMBER 31, 1998

| Ctf # | Vendor | Certificate Amount | AOC 1 | AOC 2 | AOC 3 | AOC 4 | AOC 5 | AOC 6 | AOC 7 | AOC 8 | AOC 9 | GENERAL | WAITING APPROVAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43 | Moody | 28,765.04 | 28,765.04 | | | | | | | | | | |
| 44 | American Contracting Enterprise | 6,502.00 | | | | | | | | | 6,502.00 | | |
| 45 | RBR Consulting, Inc. | 300.00 | | | | | | 300.00 | | | | | |
| 46 | Remediation Technologies, Inc. | 30,090.30 | | | | | | 30,090.30 | | | | | |
| 47 | Moody and Associates, Inc. | 575.00 | 575.00 | | | | | | | | | | |
| 48 | Moody and Associates, Inc. | 120.00 | 120.00 | | | | | | | | | | |
| 49 | Remediation Technologies, Inc | 21,358.05 | | | | | | 21,358.05 | | | | | |
| 50 | Moody & Associates, Inc. | 3,677.93 | | | | | | 1,312.50 | | 2,365.43 | | | |
| 51 | National Forge Company | 23,323.66 | | | | 2,389.84 | 1,253.50 | 18,494.68 | | 125.00 | | 1,060.64 | |
| 52 | Remediation Technologies | 4,785.80 | | | | | | 4,785.80 | | | | | |
| 53 | Environmental Management | 653.46 | | | | | 653.46 | | | | | | |
| 54 | National Forge Company | 22,252.01 | | | | 359.23 | 1,119.17 | 20,773.61 | | | | | |
| 55 | Voegele Co., Inc. | 49,989.00 | | | | | | | | | 49,989.00 | | |
| 56 | Remediation Technologies, Inc. | 7,970.30 | | | | | | 7,970.30 | | | | | |
| 57 | Moody and Associates, Inc. | 2,215.00 | | 2,215.00 | | | | | | | | | |
| 58 | CE Remediation, Inc. | 20,572.29 | | | | | | 9,732.50 | 10,839.79 | | | | |
| 59 | ADM Welding & Fabrication | 2,150.00 | | | | | | 2,150.00 | | | | | |
| 60 | E. E. Austin & Son, Inc. | 47,455.30 | | | | | | 47,455.30 | | | | | |
| 61 | Remediation Technologies | 17,999.20 | | | | | | 17,999.20 | | | | | |
| 62 | Innerscope Technical Services | 17,083.50 | | | | | | | | | 17,083.50 | | |
| 63 | Moody and Associates, Inc. | 5,026.65 | 5,026.65 | | | | | | | | | | |
| 64 | Innerscope Technical Services | 450.00 | | | | | | | | | 450.00 | | |
| 65 | Remediation Technologies, Inc. | 1,396.63 | | | | | | 1,396.63 | | | | | |
| 66 | ADM Welding & Fabrication | 2,300.00 | | | | | | 2,300.00 | | | | | |
| 67 | Moody and Associates, Inc. | 1,354.20 | | 1,354.20 | | | | | | | | | |
| 68 | Environmental Management | 1,265.00 | | | | | 1,265.00 | | | | | | |
| 69 | CE Remediation, Inc. | 18,104.91 | | | | | | | 18,104.91 | | | | |
| 70 | Moody and Associates, Inc. | 4,401.25 | 4,401.25 | | | | | | | | | | |
| 71 | RBR Consulting, Inc. | 800.00 | | | | | | 800.00 | | | | | |
| 72 | Environmental Management | 4,079.35 | 4,079.35 | | | | | | | | | | |
| 73 | Moody and Associates, Inc. | 287.50 | 287.50 | | | | | | | | | | |
| 74 | Moody and Associates, Inc. | 367.50 | | 367.50 | | | | | | | | | |
| 75 | Voegele Co., Inc. | 20,937.00 | | | | | | | | | 20,937.00 | | |
| 76 | Moody and Associates, Inc. | 400.00 | 400.00 | | | | | | | | | | |
| 77 | Environmental Management | 1,693.16 | | | | | 1,693.16 | | | | | | |
| 78 | Environmental Management | 1,883.17 | | 1,220.67 | | | 662.50 | | | | | | |
| 79 | Moody and Associates, Inc. | 240.00 | 240.00 | | | | | | | | | | |
| 80 | Warren Times Observer | 146.68 | | 146.68 | | | | | | | | | |
| 81 | Moody and Associates, Inc. | 1,735.00 | | 1,735.00 | | | | | | | | | |
| 82 | Environmental Management | 1,330.71 | | 1,330.71 | | | | | | | | | |
| 83 | Moody and Associates, Inc. | 4,594.50 | | 4,594.50 | | | | | | | | | |
| 84 | Hutch's Enterprises, Inc. | 49,898.74 | | | | | | | | | 49,898.74 | | |
| 85 | Moody & Associates, Inc. | 3,155.05 | | | | | | 3,155.05 | | | | | |
| 86 | ADM Welding & Fabrication | 1,350.00 | | | | | | 1,350.00 | | | | | |
| 87 | McManus Engineering Company | 4,160.00 | 4,160.00 | | | | | | | | | | |
| 88 | National Forge Company | 8,221.21 | 141.50 | | | | | 8,174.52 | | | | 330.19 | (425.00) |
| 89 | Hutch's Enterprises, Inc. | 31,527.26 | | | | | | | | | 31,527.26 | | |
| 90 | Moody & Associates, Inc. | 4,217.70 | | | | | | 4,217.70 | | | | | |

A - 00167

ENVIRO...TAL REMEDIATION
DISBURSEMENT CERTIFICATE STATUS REPORT
AS OF DECEMBER 31, 1998

| Ctf # | Vendor | Certificate Amount | DISBURSEMENT CERTIFICATES APPROVED FOR PAYMENT | | | | | | | | | | WAITING |
| | | | AOC 1 | AOC 2 | AOC 3 | AOC 4 | AOC 5 | AOC 6 | AOC 7 | AOC 8 | AOC 9 | GENERAL | APPROVAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 91 | Hutch's Enterprises, Inc. | 39,891.00 | | | | | | | | | 39,891.00 | | |
| 92 | CE Remediation, Inc. | 15,278.73 | | | | | | 15,278.73 | | | | | |
| 93 | Hutch's Enterprises, Inc. | 225.00 | | | | | | | | | 225.00 | | |
| 94 | Remediation Technologies, Inc. | 3,432.77 | | | | | | 3,432.77 | | | | | |
| 95 | Remediation Technologies, Inc. | 14,581.36 | | | | | | 14,581.36 | | | | | |
| 96 | Turner Enterprises | 800.00 | 800.00 | | | | | | | | | | |
| 97 | County Environmental | 455.84 | 455.84 | | | | | | | | | | |
| 98 | Remediation Technologies, Inc. | 1,375.00 | | | | | | 1,375.00 | | | | | |
| 99 | Remediation Technologies, Inc. | 1,184.90 | | | | | | 1,184.90 | | | | | |
| 100 | County Environmental | 4,096.87 | | | | | | | 4,096.87 | | | | |
| 101 | Remediation Technologies, Inc. | 2,178.00 | | | | | | 2,178.00 | | | | | |
| 102 | Environmental Management | 2,916.97 | | | | | 2,916.97 | | | | | | |
| 103 | Moody and Associates, Inc. | 652.50 | | | | | | 652.50 | | | | | |
| 104 | James P. Hunter | 600.00 | | | | | | 600.00 | | | | | |
| 105 | Hutch's Enterprises, Inc. | 1,460.35 | | | | | | | | | 1,460.35 | | |
| 106 | Environmental Management | 4,082.00 | | | | | 2,041.00 | 2,041.00 | | | | | |
| 107 | Moody and Associates, Inc. | 400.00 | | | | | | 400.00 | | | | | |
| 108 | Remediation Technologies, Inc. | 228.20 | | | | | | 228.20 | | | | | |
| 109 | Moody and Associates, Inc. | 12,661.50 | | | | | 5,761.50 | 6,900.00 | | | | | |
| 110 | ADM Welding & Fabrication | 4,900.00 | | | | | | 4,900.00 | | | | | |
| 111 | Environmental Management | 5,884.32 | | | | | 5,884.32 | | | | | | |
| 112 | Innerscope Technical Services | 2,916.50 | | | | | | | | | 2,916.50 | | |
| 113 | Remediation Technologies, Inc. | 2,173.98 | | | | | | 2,173.98 | | | | | |
| 114 | Environmental Management | 7,217.36 | | | | | | 3,608.68 | 3,608.68 | | | | |
| 115 | Moody and Associates, Inc. | 11,694.25 | | | | | | 11,694.25 | | | | | |
| 116 | Remediation Technologies, Inc | 265.72 | | | | | | 265.72 | | | | | |
| 117 | Pedersen & Pedersen, Inc. | 3,065.00 | | | | | | | | | 3,065.00 | | |
| 118 | Environmental Management | 4,970.12 | | | | | | 2,485.06 | 2,485.06 | | | | |
| 119 | Pedersen & Pedersen, Inc. | 153.00 | | | | | | | | | 153.00 | | |
| 120 | Moody and Associates, Inc. | 4,545.00 | | | | | | 4,545.00 | | | | | |
| 121 | Environmental Management | 6,684.65 | | | | | | 3,342.33 | 3342.32 | | | | |
| 122 | Moody and Associates, Inc. | 28,371.13 | | | | | | 28,371.13 | | | | | |
| 123 | Moody and Associates, Inc. | 9,590.00 | | | | | | 9,590.00 | | | | | |
| 124 | James P. Hunter | 525.00 | | | | | | 525.00 | | | | | |
| 125 | Environmental Management | 4,508.36 | | | | | | 2,254.18 | 2254.18 | | | | |
| 126 | Moody and Associates, Inc. | 12,930.00 | | | | | | 12,930.00 | | | | | |
| 127 | Remediation Technologies | 6,336.10 | | | | | | 6,336.10 | | | | | |
| 128 | Environmental Management | 3,688.82 | | | | | | | 3688.82 | | | | |
| 129 | Moody and Associates, Inc. | 6,885.00 | | | | | | 6,885.00 | | | | | |
| 130 | Remediation Technologies, Inc. | 5,901.00 | | | | | | 5,901.00 | | | | | |
| 131 | Enviommental Management | 2,781.55 | | | | | | 1,390.78 | 1390.77 | | | | |
| 132 | Moody and Associates, Inc. | 5,510.30 | | | | | | 5,510.30 | | | | | |
| 133 | Remediation Technologies, Inc | 3,172.00 | | | | | | 3,172.00 | | | | | |
| 134 | Pedersen & Pedersen, Inc. | 160.00 | | | | | | 80.00 | 80.00 | | | | |
| 135 | Weavertown Transport Leasing | 9,750.00 | | | | | | 9,750.00 | | | | | |
| 136 | Environmental Management | 1,661.92 | | | | | | 830.96 | 830.96 | | | | |

A - 00168

ENVIRONMENTAL REMEDIATION
DISBURSEMENT CERTIFICATE STATUS REPORT
AS OF DECEMBER 31, 1998

| Ctf # | Vendor | Certificate Amount | DISBURSEMENT CERTIFICATES APPROVED FOR PAYMENT | | | | | | | | | | WAITING APPROVAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | AOC 1 | AOC 2 | AOC 3 | AOC 4 | AOC 5 | AOC 6 | AOC 7 | AOC 8 | AOC 9 | GENERAL | |
| 137 | Remediation Technologies Inc | 14,267.44 | | | | | | 14,267.44 | | | | | |
| 138 | Pedersen & Pedersen, Inc. | 1,375.91 | | | | | | 1,375.91 | | | | | |
| 139 | Moody & Associates, Inc. | 8,695.00 | | | | | | 8,695.00 | | | | | |
| 140 | Environmental Management | 1,769.24 | | | | | | 884.62 | 884.62 | | | | |
| 141 | Remediation Technologies, Inc. | 5,101.00 | | | | | | 5,101.00 | | | | | |
| 142 | National Forge Company | 12,137.91 | 148.67 | | | | | 11,989.24 | | | | | |
| 143 | Moody and Associates, Inc. | 7,665.00 | | | | | | 7,665.00 | | | | | |
| 144 | Remediation Technologies | 3,096.50 | | | | | | 3,096.50 | | | | | |
| 145 | Crossett Inc. | 696.00 | | | | | | 696.00 | | | | | |
| 146 | County Environmental | 328.27 | | | | | | 328.27 | | | | | |
| 147 | Environmental Management | 1,495.48 | | | | | | 1,495.48 | | | | | |
| 148 | Moody and Associates, Inc. | 7,455.80 | | | | | | 7,455.80 | | | | | |
| 149 | Remediation Technologies, Inc. | 1,570.00 | | | | | | 1,570.00 | | | | | |
| 150 | Weavertown Transport Leasing | 722.50 | | | | | | 722.50 | | | | | |
| 151 | Moody and Associates, Inc. | 6,120.65 | | | | | | 6,120.65 | | | | | |
| 152 | Environmental Management | 4,136.76 | | | | | | | 4136.76 | | | | |
| 153 | Moody and Associates, Inc. | 4,436.20 | | | | | | 4,436.20 | | | | | |
| 154 | Weavertown Transport Leasing | 2,188.75 | | | | | | 2,188.75 | | | | | |
| | Total Spent to Date | 1,320,936.22 | 58,610.80 | 12,964.26 | 22,157.94 | 12,249.07 | 101,213.59 | 756,911.63 | 55,743.74 | 32,820.76 | 265,464.54 | 2,599.69 | 200.20 |

Total Disbursement Certificates Approved    1,320,736.02
Total Disbursement Certificates Open            200.20
Total Disbursement Certificates Issued      1,320,936.22    SPENT TO DATE

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sear-Brown Estimate | 370,000.00 | 110,000.00 | 50,000.00 | 36,000.00 | | AOC 5, 6, 7 --- 825,000.00 | | 250,000.00 | 100,000.00 |
| NFC Estimate | 275,000.00 | 45,000.00 | 15,000.00 | 15,000.00 | 12,000.00 | AOC 6, 7 -- 1,239,000.00 | | 50,000.00 | 150,000.00 |

Prepared by:  Gayle English

Distribution:
R. Clark       R. Kuis
C. Olson       R. Winter

## National Forge Employees Community Fund

**RESOLVED**, that the Board of Directors of National Forge Company appoint the following trustees for National Forge Employees Community Fund to fill the vacancies as a result of the resignations of William F. Battko, Jr. and Rodney E. Wolfe:

New Trustees:
Patrick R. Littlefield
Thomas J. Lord

A - 00170

## RESOLUTION FOR EXEMPTION OF CERTAIN DIRECTORS OR OFFICERS

WHEREAS, current Department of Defense Regulations contain a provision making it mandatory that the Chairman of the Board and all principal officers meet the personnel clearance requirements established for a contractor's facility clearance; and

WHEREAS, said Department of Defense Regulations permit the exclusion from the personnel clearance requirements of certain members of the Board of Directors and other officers, provided that this action is recorded in the Corporate Minutes.

NOW THEREFORE BE IT DECLARED that the Chairman of the Board, at least an official quorum of the Board of Directors and all principal officers at the present time do possess, or will be processed for, the required security clearance; and

BE IT RESOLVED that in the future, when any individual enters upon any duties as Chairman of the Board, as a replacement for one of the cleared quorum of the Board, or as one of the principal officers of this Corporation, such as President, Executive Vice President, Secretary, Treasurer, such individual shall immediately make application for the required security clearance; and

BE IT RESOLVED FURTHER that the following members of the Board of Directors shall not require, shall not have, and can be effectively excluded from access to all classified information in the possession of the Corporation and do not occupy positions that would enable them to affect adversely corporate policies or practices in the performance of classified contracts for the Department of Defense or the User Agencies of its Industrial Security Program:

Patrick A. Flanagan, Director
Charles C. Judd, Director
Ashok K. Khare, Director
John G. Koedel, Jr., Director
Stan Lundine, Director
Dennis L. Peterson, Director
Robert W. Richards, Director
Harry D. Rosequist, Director
E. Roger Clark, Director, Chairman

_____        _____
Maurice J. Cashman                                    Title

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of National Forge Company with 27th day of January 1999.



G:\FILES\BRD\GENERAL\RESOLEXP.DOC

A - 00171

**National Forge Company Holdings, Inc.**
**National Forge Company**

Minutes of a Regular Meeting
of the Board of Directors
held December 22, 1998

A meeting of the Board of Directors of National Forge Company Holdings, Inc. and National Forge Company was held concurrently and convened at the Corporate Boardroom at National Forge Company, Irvine, Pennsylvania, on December 22, 1998 at 11:00 a.m.

Directors attending in person were E. Roger Clark, Ash K. Khare, Dennis L. Peterson, Robert W. Richards and Harry D. Rosequist. The directors participating by telephone were Patrick A. Flanagan, Charles C. Judd, John G. Koedel, Jr. and Stan Lundine. Maurice J. Cashman was present by invitation.

Mr. Clark acted as Chairman of the meeting with Mr. Cashman acting as secretary.

After a presentation and discussion on a proposal for National Forge Company Holdings, Inc. and its domestic subsidiaries to be an S Corporation, the following resolution was unanimously approved.

WHEREAS, pursuant to the Small Business Job Protection Act of 1996 and the Taxpayer Relief Act of 1997, employee stock ownership plans are permitted to be shareholders in corporations taxed under Subchapter S of the Internal Revenue Code of 1986, as amended ("Subchapter S Corporations"); and

WHEREAS, senior management, in consultation with PricewaterhouseCoopers LLC, the Company's professional accounting firm; Kirkpatrick & Lockhart LLP, the Company's legal counsel; and Valumetrics, Inc., the Company's professional valuation advisor (collectively, the Company's "Professional Advisors"), has studied the financial, tax and other implications of causing the Company to elect to be taxed as a Subchapter S Corporation, including the requirements that a Subchapter S Corporation have no more than one class of outstanding stock and no more than 75 shareholders; and

WHEREAS, the Board of Directors of the Company has considered the results of that study and the advice of the Company's Professional Advisors and considers it to be prudent and in the best interests of the Company, its shareholders, and its employees to:

(i)    redeem or cash out through a merger the shares of Class B Common Stock of the Company held by certain management shareholders (individually or through their individual retirement accounts) (the "Management Shareholders") so that, following such redemption or merger, the National Forge Company Holdings, Inc. Employee Stock Ownership Plan (the "ESOP") would be the sole shareholder of the Company;

**EXHIBIT C**

(ii)    borrow funds sufficient to enable the Company to complete the redemption or merger;

(iii)    amend the ESOP to provide that distributions from the ESOP to participants therein may be made only in the form of cash and not in the form of Company stock; and

(iv)    cause the Company to elect to be taxed as a Subchapter S Corporation.

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that the President and Chief Executive Officer of the Company and the Vice President, Chief Financial Officer and Secretary of the Company (the "Designated Officers") are each authorized, on behalf of the Company, to offer to redeem at $49.42 per share from the Management Shareholders, the shares of Class B Common Stock of the Company held by such Management Shareholders and/or their individual retirement accounts, on such terms and conditions as the Designated Officers may deem appropriate (the "Redemption Offer") (such Redemption Offer to be conclusively evidenced by the execution and delivery of the offering materials); provided, however, that such Redemption Offer shall be conditioned upon (i) (a) acceptance of the Redemption Offer by all Management Shareholders and in respect of all outstanding shares of Class B Common Stock of the Company ("Unanimous Acceptance"), or (b) in the absence of Unanimous Acceptance, approval by the Company's shareholders of a merger of the Company as hereinafter described (the "Merger"), and (ii) obtaining all necessary consents to the foregoing redemption and/or the Merger.

FURTHER RESOLVED, that in the event of a Unanimous Acceptance of the Redemption Offer, the Designated Officers are hereby authorized and directed, on behalf of the Company, to redeem the shares of Class B Common Stock held by the Management Shareholders and/or their individual retirement accounts pursuant to the terms and conditions of the Redemption Offer.

FURTHER RESOLVED, that in the event of less than Unanimous Acceptance of the Redemption Offer, each Designated Officer is hereby authorized and directed, on behalf of the Company, to take any and all actions necessary or appropriate to effectuate a merger of the Company with another corporation (organized and established by one or both of the Designated Officers), with the Company designated as the surviving corporation (the "Merger"), for the sole purpose of (i) causing each outstanding share of Class B Common Stock of the Company to be exchanged for an amount of cash equal to the fair value of such Class B Common Stock, and (ii) causing all of the outstanding shares of Class A Common Stock of the Company to be exchanged for shares of the surviving corporation.

FURTHER RESOLVED, that each Designated Officer is hereby authorized and directed to borrow, on behalf of the Company, from Chase Manhattan Bank or another reputable lender, on terms and conditions deemed advisable by either or both of such Designated Officers, funds sufficient to enable the Company to complete the Redemption Offer and/or Merger (such borrowing to be conclusively evidenced by the execution and delivery of a promissory note) and

to obtain from Chase Manhattan Bank such approvals of or consents to the Redemption Offer and/or Merger and Subchapter S Corporation election, and any such other approvals or consents, as the Designated Officers may determine to be necessary or advisable.

FURTHER RESOLVED, that, conditioned upon the consummation of the Redemption Offer and/or the Merger, each of the Designated Officers is hereby authorized and directed, on behalf of the Company, to (i) file Form 2553 with the Internal Revenue Service, designating thereon a July 1 to June 30 tax year, effective for the tax year beginning July 1, 1999, and to obtain necessary shareholder consents in connection therewith, on or before the due date for such filing, and (ii) complete such other filings, make such other elections and take such other actions in connection with the federal income tax status of the Company's direct and indirect subsidiaries as such Designated Officer may deem to be necessary or appropriate.

FURTHER RESOLVED, that each of the Designated Officers is hereby authorized and directed, on behalf of the Company, to amend the ESOP to provide that distributions from the ESOP to ESOP participants shall be made only in the form of cash and may not be made in the form of Company stock (such amendment to be conclusively evidenced by the execution and delivery of an amendment to the ESOP).

FURTHER RESOLVED, that each of the Designated Officers is hereby authorized and directed, on behalf of the Company, to execute and deliver all such documents and instruments and to take or cause to be taken all such further action, as he shall deem necessary or advisable in order to carry into effect the purposes and intent of any and all of the foregoing resolutions.

It was also agreed that the Compensation Committee should meet to design a top management incentive plan and present it to the Board of Directors for consideration prior to July 1, 1999.

By unanimous consent the following resolution was approved.

WHEREAS, National City Bank of Pennsylvania ("National City') is acting under individual Agreements of Trust as Trustee of each of National Forge Company Savings Plan ("Savings Plan"), the National Forge Company Retirement Plan ("Retirement Plan") and the National Forge Company Voluntary Employees Beneficiary Association Plan ("VEBA"); and

WHEREAS, the Company desires to appoint The Chase Manhattan Bank ("Chase") as the successor Trustee of the Retirement Plan and VEBA; and

WHEREAS, the Company desires to appoint Fidelity Management Trust Company ("Fidelity") as successor Trustee of the Savings Plan.

NOW, THEREFORE, IT IS HEREBY

RESOLVED, that The Chase Manhattan Bank is hereby appointed the successor to the National City Bank of Pennsylvania as Trustee of the National Forge Company Retirement Plan and the National Forge Company Voluntary Employees Beneficiary Association Plan effective as of such dates as may be mutually satisfactory to the Company, National City and Chase.

RESOLVED, that Fidelity Management Trust Company is hereby appointed the successor to National City Bank of Pennsylvania as Trustee of the National Forge Company Savings Plan effective as of such date as may be mutually satisfactory to the Company, National City and Fidelity.

RESOLVED, that the proper officers of the Company be and they hereby are authorized and directed, with the advice of counsel, to negotiate, execute and deliver appropriate Agreements of Trust with Chase with respect to the Retirement Plan and VEBA.

RESOLVED, that the proper officers of the Company be and they hereby are authorized and directed, with the advice of counsel, to negotiate, execute and deliver an appropriate Agreement of Trust with Fidelity with respect to the Savings Plan.

RESOLVED, that the proper officers of the Company are hereby authorized and directed to cause National City to transfer and delivery all the assets of the Retirement Plan and VEBA to Chase as successor Trustee as soon as administratively practical following the execution and delivery of the appropriate Agreements of Trust between the Company and Chase.

RESOLVED, that the proper officers of the Company be and they hereby are authorized and directed to cause National City to transfer and deliver all the assets of the Savings Plan to Fidelity as successor Trustee as soon as administratively practical following the execution and delivery of the appropriate Agreement of Trust between the Company and Fidelity.

RESOLVED, that the proper officers of the Company be and they hereby are authorized and directed, with the advice of counsel, to execute and deliver such additional documents, instruments and agreements as may be necessary or appropriate to carry out the intent and purpose of the foregoing Resolutions.

There being no further business, the meeting was adjourned at 12:00 p.m.

Filed with the minutes of the Board of Directors of National Forge Company Holdings, Inc. this 27th day of January 1999.

_____
Maurice J. Cashman, Secretary

G:\FILES\BRD\DEC98\MINUTES.DOC

A - 00175