IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

In re:

NATIONAL FORGE COMPANY, et al.,

                    Debtor.

-----------------------------------------------------------

OFFICIAL COMMITTEE OF UNSECURED          Civil No. 04-21 Erie
CREDITORS OF NATIONAL FORGE
COMPANY,

                    Plaintiff,

and

OFFICIAL COMMITTEE OF RETIREES
OF NATIONAL FORGE COMPANY,

                    Intervenors,

v.

E. ROGER CLARK, both Individually and as
an Officer and Director of National Forge
Company, et al.,

                    Defendants.

_____

*Opening Brief of Defendants E. Roger Clark, Maurice J. Cashman,
Dana Beyeler and Robert A. Kaemmerer in Support of Their Motion for
Summary Judgment as to Counts I through VII of the Amended Complaint*

Douglas A. Campbell
PA I.D. No. 23143
Erik Sobkiewicz
PA I.D. No. 56836
CAMPBELL & LEVINE, LLC
1700 Grant Building
Pittsburgh, PA  15219
Telephone:  (412) 261-0310

Counsel for Defendants E. Roger
Clark, Maurice J. Cashman, Dana
Beyeler and Robert A. Kaemmerer

TABLE OF CONTENTS

PAGE

Table of Authorities ........................................................................................................ii

Introductory Statement................................................................................................. 1

Statement of Facts ......................................................................................................... 1

Standard for Summary Judgment............................................................................... 6

Argument ........................................................................................................................7

As a Matter of Law, Bankruptcy Code § 546(e) Bars the Plaintiff's
Fraudulent Transfer Claims .........................................................................................7

  A. The Events that Culminated in the Redemption of the Class B Shares
    Constitute an Integrated Transaction ...........................................................7

  B. The Payments Made to the Moving Defendants Are Protected
    "Settlement Payments" under Bankruptcy Code § 741(8) .........................11

  C. The Settlement Payments Were Made by or to a Financial Institution ........13

Counts IV, V and VI Are Untimely As a Matter
of Law and, Therefore, Must Be Dismissed ...........................................................16

  A. Dismissal of Counts IV and V .....................................................................16

  B. Dismissal of Count VI .................................................................................19

As Is the Case with the Plaintiff's Fraudulent
Transfer Claims, § 546(e) Bars Count VII................................................................21

Count VIII Must be Limited to the
Actual Officer and Directors of Holdings................................................................23

Conclusion ....................................................................................................................24

TABLE OF AUTHORITIES

PAGE

Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ............................................................ 6

In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,
878 F.2d 742 (3d Cir. 1989)..................................................................................................... 12

Big Apple BMW, Inc. v. BMW of North America, Inc.,
974 F.2d 1358 (3d Cir. 1992) ..................................................................................................... 6

CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69 (1987) ............................................... 17

First National City Bank v. Banco Para El Comercio, 462 U.S. 611 (1983)............................ 17

In re Hechinger Inv. Co. of Del., 274 B.R. 71 (Bankr. D. Del. 2002).................................. 8, 15

In re Integra Realty Resources, Inc., 198 B.R. 352 (Bankr. D. Colo. 1996) ............................ 23

Kaiser Steel Corp. v. Charles Schwab & Co.,
913 F.2d 846 (10th Cir. 1990) ........................................................................................... 12, 13

Kaiser Steel Corp. v. Pearl Brewing Co.,
952 F.2d 1230 (10th Cir. 1991) ......................................................................................... 12, 13

Klang v. Smith's Food & Drug Centers, Inc., 702 A.2d 150 (Del. 1997) ................................ 22

Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941)................................ 17

In re Loranger Mfg. Corp., 324 B.R. 575 (Bankr. W.D. Pa. 2005) .......................................... 14

In re Mediators, Inc., 105 F.3d 822 (2d Cir. 1997).................................................................... 9

Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380 (3d Cir. 1994)....................... 17-18

In re PHP Healthcare Corp., 291 B.R. 592 (D. Del. 2003), aff'd per curiam,
 128 Fed. App. 839 (3d Cir. 2005)...................................................................................... 21, 22

Resolution Trust Company v. Farmer, 865 F.Supp. 1143 (E.D. Pa. 1985) .............................. 18

In re Resorts Int'l, Inc.,
181 F.3d 505 (3d Cir.), cert. denied, 528 U.S. 1021 (1999) .............................................. 12, 14

Saldana v. Kmart Corp., 260 F.3d 228 (3d Cir. 2001)................................................................ 6

Sameric Corp. of Delaware, Inc. v. City of Philadelphia,
142 F.3d 582 (3d Cir. 1998) ........................................................... 6

United States v. Tabor Realty Corp., 803 F.2d 1288 (3d Cir. 1990) ....................................... 7, 8

In re VF Brands, Inc., 282 B.R. 134 (Bankr. D. Del. 2002) ................................................ 11, 15

Voerst-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206 (3d Cir. 1990) .......... 7

Zimmer v. Gruntal & Co., Inc., 732 F.Supp. 1330 (W.D. Pa. 1989) ......................................... 17

Statutes

11 U.S.C. § 101(22) ...................................................................................................... 13

11 U.S.C. § 101(49)(A) .................................................................................................. 12

11 U.S.C. § 541(a) ........................................................................................................ 19

11 U.S.C. § 544 ....................................................................................................... passim

11 U.S.C. § 544(a) .................................................................................................... passim

11 U.S.C. § 544(b) .................................................................................................... passim

11 U.S.C. § 546(e) .................................................................................................... *passim*

11 U.S.C. § 550(a) ........................................................................................................ 11

12 Pa. C.S.A. § 5104(a)(1) .............................................................................................. 9

12 Pa. C.S.A. § 5104(a)(2) .............................................................................................. 9

12 Pa. C.S.A. § 5105 ...................................................................................................... 9

12 Pa. C.S.A. § 5109 ...................................................................................................... 9

13 Pa.C.S.A. § 4215(a) .................................................................................................. 15

15 Pa.C.S.A. § 1551 .............................................................................................. 16, 17, 20

15 Pa. C.S.A. § 1553 ............................................................................................. 16, 17, 20

15 Pa. C.S.A. § 1712 .................................................................................................. 19, 20

15 Pa. C.S.A. § 1713 .................................................................................................. 19, 20

15 Pa. C.S.A. § 4145(a) ................................................................................................17

42 Pa. C.S.A. § 5524(7) ...............................................................................................17

8 Del. C. § 160 ..............................................................................................21, 22, 23

8 Del. C. § 160(a)(1) .....................................................................................................21

8 Del. C. § 173 ..............................................................................................................21

8 Del. C. § 174 ..............................................................................................................22

8 Del. C. § 174(a) .................................................................................................22, 23

8 Del. C. § 174(c) ..........................................................................................................23

### Other Authorities

5 Lawrence P. King, et al., eds., COLLIER ON BANKRUPTCY
¶ 546.06[2][b], at 546-49 (15th ed. 2003)........................................................... 12, 15

http:www.federalreserve.gov/releases/lbr/ ...............................................................14

INTRODUCTORY STATEMENT

The hurdles that the Plaintiff faces here are insurmountable, and no number of amendments to the Plaintiff's complaint can change that fact.  First, Bankruptcy Code § 546(e) is an absolute bar to Counts I, II, III and VII of the Amended Complaint.  Second, Counts IV, V and VI are flat out untimely.  Accordingly, Defendants E. Roger Clark, Maurice J. Cashman, Dana Beyeler and Robert A. Kaemmerer (collectively, the "Moving Defendants") are entitled to summary judgment on these counts.  Finally, as to Count VIII, it must be limited to those Defendants who were actually officers or directors of National Forge Company Holdings, Inc. ("Holdings").

STATEMENT OF FACTS

As of April 12, 1999 (that is, the date immediately preceding the date on which the transactions the Plaintiff challenges closed), Holdings, a corporation organized under the laws of Delaware, owned all of the stock of National Forge Company ("NFC"), itself a corporation organized under the laws of Pennsylvania.  [Ex. A, Cashman Decl. ¶ 2, A3.][1]  Holdings as of that date had two classes of common stock:  Class A, the issued shares of which were held exclusively by the National Forge Company Holdings, Inc. Employee Stock Ownership Plan (the "ESOP"), and Class B, the issued shares of which were held almost exclusively by the individuals named as defendants in this action.  [Id.]

Some discussion is in order as to how the individual defendants came to hold the Class B shares.  In 1995 the ESOP and certain NFC employees formed Holdings as the vehicle to acquire the stock of NFC's then owners.  [Id.]  To partly fund Holdings' acquisition of NFC, these employees bought 116,347 Class B shares for $11.04 per share, thus generating $1,284,470.88

---

[1] "A" followed by a number refers to the page number in the Appendix filed by the Moving Defendants with this Opening Brief.

for Holdings. [Id.] The bank defendants then loaned Holdings, NFC and NFC's European subsidiary collectively the remaining cash necessary to fund both the balance of the NFC purchase price and the borrowers' working capital needs. [Id.] Holdings' acquisition of NFC's stock closed in June 1995.

Until 1997, qualified retirement plan trusts like the ESOP were not permitted to be shareholders in corporations that elected to be taxed under Subchapter S of the Internal Revenue Code of 1986 (the "IRC").[2] However, the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1310, and the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1601, amended the IRC by repealing that restriction. As a result of this change and because qualified retirement plan trusts were generally exempt from federal and state income taxes, a corporation that was wholly owned by an employee stock ownership plan could avoid federal and state income taxes by electing to be taxed under Subchapter S, thereby having all of the corporation's income pass through to a tax-exempt shareholder.

Given that the ESOP was Holdings' largest shareholder, these changes to the IRC understandably gained the attention of Holdings' board of directors.[3] On December 22, 1998, after being advised by Holdings' outside counsel, its accounting firm and its valuation expert as to the definite benefits of electing Subchapter S status, Holdings' full board unanimously approved Holdings making that election. [Ex. B, Presentation to Holdings' Board of Directors,

---

[2] Subchapter S generally provides that, for federal income tax purposes, a corporation that has elected Subchapter S tax treatment does not pay federal or state income tax; rather, a Subchapter S's income "passes through" to its shareholders on a pro rata basis, and each shareholder pays federal and state income taxes with respect to his or her pro-rated share of the corporation's income.

[3] The Holdings board of directors consisted of nine members: three members from Holdings' management, the President of the Union of National Forge Employees along with two additional union members and three independents. [Ex. A, Cashman Decl. ¶ 4, A3; Ex. 1, Holdings' Certificate of Incorporation, A25-29.]

A68-112; Ex. C, December 22, 1998 Resolution of Holdings' Board of Directors, A114-17.][4]

However, because a corporation that elects Subchapter S status could have only one class of

stock, 26 U.S.C. § 1361(b)(1) (West 1998), Holdings could not eliminate its federal income tax

liability until it eliminated the Class B shares (that is, the non-ESOP held shares).[5]  Thus, the

resolution that authorized Holdings to elect Subchapter S status also authorized it to eliminate the

outstanding Class B shares by redeeming those shares at a price per share of $49.42.  [Ex. C,

December 22, 1998 Resolution of Holdings' Board of Directors, A115.]  Holdings' board further

directed that, in the event a Class B shareholder did not agree to the terms of the redemption,

management was to take the steps necessary to merge Holdings into a new entity so that the

outstanding Class B shares could be replaced with shares in the successor entity.  [Id.,]  (Through

such a merger, Holdings would come to have one class of stock and thus qualify for Subchapter

S status.)  The resolution further authorized Holdings to borrow the funds necessary to fund the

redemption (and should it be necessary, the merger).  [Id., at 115-16.][6]  Holdings subsequently

sought and obtained the approval of the bank defendants to fund the redemption of the Class B

shares.  [Ex. A, Cashman Decl. ¶ 5, A5.]

---

[4] The board's decision made eminent sense.  According to internally prepared calculations, Holdings' federal income tax liability for fiscal years 1998 through 2003 was projected to be  $5,517,000.  By making the Subchapter S election, Holdings would, *in just six years*, recover through tax savings all but $233,000 of the $5,749,868.74 it paid to redeem the Class B shares.  [See Ex. A, Cashman Decl. ¶ 3, A4.]

[5] Given that Holdings' board made the decision to elect Subchapter S status in order to eliminate Holdings' federal income tax liability, it would have made no sense to eliminate the Class A shares because those were held by the ESOP.  To derive the tax benefits that Holdings sought, the ESOP had to be the shareholder.

[6] Although it is not a point which is critical to the arguments that the Moving Defendants advance here, neither Holdings nor NFC granted any additional liens to the bank defendants in connection with the redemption, nor did Holdings or NFC ask the bank defendants to increase their existing credit facility.  Rather, they asked only for authority to use up to $4 million that was *already* available under a 1998 facility to fund the redemption if the redemption could not be funded from cash flow.  [Ex. A, Cashman Decl. ¶ 5, A5.]  Thus, the allegation in paragraph 48 of the Amended Complaint that "[i]n order to fund the Stock Cancellation [actually the redemption of Class B shares], on or about March 29, 1999, NFC, NFC Holdings, and National Forge Europe Limited, and the Lenders entered into Amendment No. 1 to the Amended and Restated Credit Agreement dated April 6, 1998 which allowed NFC to borrow and [sic] amount not to exceed [$4 million]" is wrong to the extent it suggests that Holdings and NFC granted new liens to the bank defendants in connection with the redemption.

As for the $49.42 price per share that Holdings offered its Class B shareholders, that price did not come about as a result of a wink from Holdings' board and a collective nod from the Class B shareholders. Rather, when Holdings' board decided that it made financial sense to eliminate the Class B shares through a redemption, it engaged Valuemetrics, Inc. to value those shares.[7] In a report dated December 14, 1998, Valuemetrics, Inc. fixed the value per share of the Class A and Class B shares as of June 30, 1998 (that is, the end of fiscal year 1998) at $49.42. [Ex. E, December 14, 1998 Letter from Valuemetrics, Inc. to Messrs. Clark and Cashman, A119-65.][8]

All of the Class B shareholders accepted Holdings' $49.42 per share redemption offer. [Ex. A, Cashman Decl. ¶ 6, A5.] To pay the shareholders, NFC on April 13, 1999, directed The Chase Manhattan Bank ("Chase")[9] to transfer $5,749,868.74 (that is, the aggregate redemption value of the outstanding Class B shares) from an NFC operating account to a Holdings' account at Chase. [Id.] On that same day, Holdings repurchased the outstanding Class B shares in one of two ways. For those 94,538 shares held in individual retirement accounts at National City Bank, Holdings directed Chase to wire transfer to National City Bank a single payment of $4,672,067.96 representing the aggregate value of the shares held in those accounts. [Id. ¶ 7, at A5-6.] National City Bank then distributed that $4,672,067.96 as follows:

---

[7] Federal law required that the ESOP's shares in Holdings be valued on an annual basis. In light of this requirement, Holdings, beginning with its June 30, 1996 fiscal year end valuation and continuing each year through June 30, 2001, used Valuemetrics, Inc. as its valuation expert. [Ex. A, Cashman Decl. ¶ 4, A4-5.] Holdings and NFC filed for bankruptcy protection in 2002.

[8] As of June 30, 1999 (that is, *pos*t-redemption), Valuemetrics, Inc. calculated the value of each Class A share in Holdings (the Class B shares having been redeemed) at $58.03, or $8.61 per share more than Holdings paid Class B shareholders pursuant to the redemption offer. See Ex. E, Holdings Business Valuation as of June 30, 1999, A167-68. Clearly, this increase in shareholder value does not bode well for the Plaintiff's contention that either NFC or Holdings was rendered insolvent as a result of the redemption.

[9] Defendant JP Morgan Chase is the successor to Chase.

| Class B Shareholder | Number of Shares Held | Amount Received |
|---|---|---|
| Antos, Daniel | 3,582 | $ 177,022.44 |
| Bailey, William D. | 4,474 | 221,105.08 |
| Beyeler, Dana A. | 4,474 | 221,105.08 |
| Brewster, Richard A. | 1,790 | 88,461.80 |
| Caldwell, James E. | 4,029 | 199,113.18 |
| Campbell, Larry | 4,474 | 221,105.08 |
| Cashman, Maurice J. | 8,277 | 409,049.34 |
| Clark, E. Roger | 14,125 | 698,057.50 |
| Confer, James C. | 2,687 | 132,791.54 |
| D'Alessandro, Richard | 4,474 | 221,105.08 |
| Harris, James B. | 1,690 | 83,519.80 |
| Jackson, Thomas H. | 1,330 | 65,728.60 |
| Kaemmerer, Robert A. | 4,034 | 199,360.28 |
| Khare, Ashok K. | 4,300 | 212,506.00 |
| Luppino, Carl J. | 1,531 | 75,662.02 |
| Mason, Clarence E. | 4,474 | 221,105.08 |
| Murphy, Harold | 2,629 | 129,925.18 |
| Novosel, Phillip R. | 2,687 | 132,791.54 |
| Olson, Charles R. | 3,613 | 178,554.46 |
| Ruhlman, James D. | 4,029 | 199,113.18 |
| Simons, Phillip R. | 2,239 | 110,651.38 |
| Turk Glenn E. | 5,567 | 275,121.14 |
| Young, Ronald L. | 2,239 | 110,651.38 |
| Zischkau, Barry | 1,790 | 88,461.80 |

[Id. ¶ 7, at A5-6.]

    For a shareholder that held his or her shares outside of an individual retirement account,

Holdings issued each such shareholder a check drawn on a Holdings' account at Chase.  [Id. ¶ 8,

at A5-6.] Those individuals and what they received are listed below:

| Class B Shareholder | Number of Shares Held | Amount Received |
|---|---|---|
| Cashman, Maurice J. | 672 | $ 33,210.24 |
| Clark, Deborah E. | 8,240 | 407,220.80 |
| Kaemmerer, Robert A. | 4,915 | 242,899.30 |
| Turk, Glenn E. | 1,591 | 78,627.22 |
| Jackson, Thomas H. | 3,144 | 155,376.48 |
| Khare, Ashok K. | 174 | 8,599.08 |
| Olson, Charles R. | 861 | 42,550.62 |
| Murphy, Harold | 58 | 2,866.36 |
| Harris, James B. | 549 | 27,131.58 |
| Luppino, Carl J. | 708 | 34,989.36 |
| Fissel, Donald | 897 | 44,329.74 |

[Id. ¶ 8, at A5-6.]

Thus, as a result of Holdings' redemption of the Class B shares, Holdings had a single shareholder:  the ESOP.  The story could, of course, continue.  However, it does not need to because, based on these undisputed facts and those developed in the pages that follow, the Moving Defendants are entitled to summary judgment as to Counts I through VII.

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Sameric Corp. of Delaware, Inc. v. City of Philadelphia, 142 F.3d 582, 590 (3d Cir. 1998). When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  While a court may not consider the weight or credibility of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent, Id., a party opposing summary judgment must do more than just rest upon mere allegations, general denials or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  Moreover, a genuine dispute as to a factual issue exists only if the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

ARGUMENT

AS A MATTER OF LAW, BANKRUPTCY CODE § 546(e)
BARS THE PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS

Counts I, II and III seek to avoid both the payments that the holders of Class B shares received in connection with Holdings' redemption of those shares and any liens granted to the bank defendants in connection with the redemption. However, Bankruptcy Code § 546(e) provides that a trustee (or debtor in possession) may not avoid a transfer under § 544 that is a settlement payment, made by or to a financial institution before the commencement of the case.[10] Here, the Plaintiff characterizes the transactions between NFC and Holdings and Holdings and the Moving Defendants as an integrated transaction. Thus, the inquiry here is limited to two straightforward questions: (i) were the payments that the Moving Defendants received settlement payments, and (ii) if so, were those payments made either by or to a financial institution. Because the answer to both questions is unequivocally yes, the Moving Defendants are entitled to summary judgment on Counts I, II and III.

**A.      The Events that Culminated in the Redemption Of the Class B Shares Constitute an Integrated Transaction.**

The Third Circuit has recognized that multi-step transactions like the one at issue here can be collapsed when the steps of that transaction are "part of one integrated transaction." United States v. Tabor Realty Corp., 803 F.2d 1288, 1302 (3d Cir. 1990); see also Voerst-Alpine

---

[10] Section 546(e) provides:

> Notwithstanding section 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741 or 761 of this title, or a *settlement payment*, as defined in section 101 or 741 of this title, *made by or to a* commodity broker, forward contract merchant, stockbroker, *financial institution*, or security clearing agency, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) (West 2005) (emphasis supplied).

7

Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206, 212-13 (3d Cir. 1990).  When

considering whether a series of transactions should be collapsed, the focus should be "not on the

structure of the transaction but the knowledge and intent of the parties involved in the

transaction."  Official Committee of Unsecured Creditors v. Fleet Retail Fin. Group (In re

Hechinger Inv. Co. of Del.), 274 B.R. 71, 91 (D. Del. 2002); see also Tabor Realty, 803 F.2d at

1303.

      Here, the events that culminated in the redemption of the Class B shares must

unquestionably be viewed as an integrated one.  First, the Plaintiff views the two pieces that

resulted in the redemption of the Class B shares – the distribution from NFC to Holdings and

Holdings' redemption of the Class B shares – as a single transaction.  Indeed, after describing

how NFC transferred money to Holdings and how Holdings used that cash to redeem the Class B

shares, the Plaintiff (at least most of the time) stops distinguishing between Holdings and NFC,

and instead lumps them together in the catch-all "NFC and/or NFC Holdings."  See, e.g., ¶¶ 52,

54, 56, 58-62, 67-72 and 77-83.  By the Plaintiff's own pleading, then, the redemption was an

integrated transaction.  Moreover, all of the individual defendants must have understood how the

transaction would work (after all, they were some combination of officers, directors or

shareholders), and JP Morgan Chase certainly knew the means by which Holdings would

effectuate the redemption.  [Ex. A, Cashman Decl. ¶ 5, A5.][11]  In fact, the Plaintiff alleges as

much in the Amended Complaint, see ¶¶ 47-50 and 52.  Clearly, each step that led to Holdings'

redemption of the Class B shares would not have occurred on its own, as each relied on

additional steps to fulfill the parties' intentions to redeem the Class B shares.  In light of these

---

[11] The Plaintiff identifies Defendants Thomas A. Jackson and Charles R. Olson as officers of NFC and "NFC and/ NFC Holdings," respectively, for the first time in the Amended Complaint.  [See Amended Complaint ¶¶ 14 and 15.]

realities, the steps that led to Holdings' redemption of the Class B shares are only properly understood as an integrated transaction.

Admittedly, even though the Plaintiff concedes through its own pleading that the redemption should be understood as an integrated transaction, there are times when it views at least NFC's transfer of $5,749,868.74 to Holdings (that is, the amount Holdings needed to redeem the Class B shares) as a distinct transaction that is itself subject to avoidance as a fraudulent transfer.  However, the Plaintiff's peculiar (or, said differently, inconsistent) stance on whether this is an integrated transaction is not something that need take up much of the Court's time.  This is so for three very straightforward reasons.  *First*, the Plaintiff cannot challenge the transfer from NFC to Holdings for the most fundamental of reasons:  Holdings is not a defendant in this action.  Moreover, the Plaintiff, by its own request, represents Holdings in this action. Clearly, the Plaintiff cannot bring suit against one of the very parties it represents.  *Second*, even if the Plaintiff could somehow now pursue an action against Holdings, that cause of action is time-barred:  under § 546(a), an action under § 544(a) had to be brought within two years of the date that NFC filed its bankruptcy case.  In re Mediators, Inc., 105 F.3d 822 (2d Cir. 1997) (if state law fraudulent transfer action claim is not brought within period specified by § 546(a), then it will be time-barred, even if the claim would be timely under state law limitations period). NFC sought bankruptcy protection on March 6, 2002, and the Plaintiff first suggested that the transfer from NFC to Holdings was avoidable on August 15, 2005, that is, the date on which it sought leave to file the Amended Complaint.  Because the Plaintiff's suggestions that the transfer from NFC to Holdings is avoidable are outside of the two-year window fixed by § 546(a), those claims are untimely.  *Third*, the Pennsylvania Uniform Fraudulent Transfer Act (the "UFTA") itself bars any challenge of that transfer.  Under Section 5109 of the UFTA, 12 Pa.C.S.A. §5109

(West 1999), a cause of action under § 5104(a)(1), 5104(a)(2) or 5105 (and Counts II, III and I,

respectively, are based on those provisions) "is extinguished" unless that cause of action is

brought within four years of the transfer.[12]  According to the Committee Comment to § 5109, the

purpose of the provision "is to make clear that a lapse of the statutory periods prescribed by this

section bars the right and not merely the remedy."  1993 Committee Comment (1) to 12

Pa.C.S.A. § 5109.  Section 5109, then, is a statute of repose, not of limitation, and thus the time it

fixes to bring an action under § 5104 or 5105 is not subject to tolling.  According to the

Plaintiff's own allegations, the transfer from NFC to Holdings occurred on April 13, 1999.  See

Amended Complaint ¶50.  Thus, an action to challenge that transfer had to be commenced prior

to April 12, 2003, and clearly that did not happen here.  Rather, the first time the Plaintiff even

*suggested* that the transfer from NFC to Holdings was avoidable was (at the earliest) August 15,

2005, that is, the date on which it sought leave to file the Amended Complaint.  Put simply, the

UFTA's statute of repose bars any claim against Holdings.  Thus, based on any one of these

three reasons – that Holdings is not a defendant, that the action is barred by § 546 and that UFTA

itself bars the action – the conclusion is undeniable:  any challenge of the transfer from NFC to

Holdings is dead on arrival.

---

[12] Section 5109 reads in full as follows:

> A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:
>
> (1) under section 5104(a)(1) (relating to transfers fraudulent as to present and future creditors), within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant; or
>
> (2) under section 5104(a)(2) or 5105 (relating to transfers fraudulent as to present creditors), within four years after the transfer was made or the obligation was incurred.

12 Pa.C.S.A. § 5109 (West 1999).

In sum, while the Plaintiff seeks to have it both ways – it wants to be able to argue that the transactions culminating in the redemption should be viewed both as an integrated transaction and at the same time as a series of transactions – it has to choose.  Either path is, however, fraught with peril for the Plaintiff.  If the Plaintiff now abandons the notion of an integrated transaction, it fails to state a cause of action against the Moving Defendants in Counts I, II and III because they are transferees of Holdings, not of NFC, and the Plaintiff has never challenged (and cannot now challenge) the transfer from NFC to Holdings.  Until the NFC-to-Holdings transfer is avoided, the Moving Defendants are not liable under Counts I, II or III as subsequent transferees of Holdings.  See 11 U.S.C. § 550(a) ("Except as otherwise provided in this section, to the extent that a transfer *is avoided* under section 544. . . , the trustee may recover. . . ." (emphasis supplied); see also In re VF Brands, Inc., 282 B.R. 134, 138 (Bankr. D. Del. 2002) ("Under section 550 of the Bankruptcy Code, in order to recover against a mediate or intermediate transferee, the claimant must establish that the transfer is a voidable fraudulent conveyance vis-à-vis the initial transferee.")  Thus, if the Plaintiff elects to proceed on that path, those counts must be dismissed.  On the other hand, if the Plaintiff elects to challenge the redemption as an integrated transaction, Counts I, II and III are barred by § 546(e).  The Moving Defendants thus turn to an analysis of that section.

**B.     The Payments Made to the Moving Defendants Are Protected "Settlement Payments" under Bankruptcy Code § 741(8).**

Bankruptcy Code § 741(8) defines a "settlement payment" to include "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in

the securities trade." 11 U.S.C. § 741(8) (West 2005).[13]  Although the definition is admittedly

circular – defining a "settlement payment" as a "settlement payment" – it is nevertheless

"extremely broad."  Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 848-49 (10th

Cir. 1990) ("Kaiser I").  See In re Resorts Int'l, Inc., 181 F.3d 505, 515 (3d Cir.), cert. denied,

528 U.S. 1021 (1999) "([i]n the securities industry, a settlement payment is generally the transfer

of cash or securities made to complete a transaction"); Kaiser Steel Corp. v. Pearl Brewing Co.,

952 F.2d 1230, 1239 (10th Cir. 1991) ("Kaiser II") ("[T]here is no reason to narrow the plain

concept of 'settlement' to a single type of securities transaction."); In re Bevill, Bresler &

Schulman Asset Mgmt. Corp., 878 F.2d 742, 751-52 (3d Cir. 1989) (broad definition of

settlement payment includes trades that are "normally regarded as part of the settlement

process"); 5 Lawrence P. King, et al., eds., COLLIER ON BANKRUPTCY ¶ 546.06[2][b], at 546-49

("[T]he term 'settlement payment' should be interpreted very broadly.").  This "extremely

broad" definition furthers Congressional intent that § 546(e)'s safe harbor promotes and ensures

stability in the financial and securities markets.  See Kaiser I, 913 F.2d at 848-49 ("[T]he

legislative intent behind § 546 [is] to protect the nation's financial markets from the instability

caused by the reversal of settled securities transactions.") (citations omitted).  See also Bevill,

878 F.2d at 751-52 (emphasizing legislative intent to ensure liquidity in government securities

repo market in construing settlement payments broadly).

     Consistent with this purpose, courts have rejected debtors' attempts to attack securities

settlement payments, even where those payments were not cleared through a centralized system.

See Resorts Int'l, Inc., 181 F.3d at 515 (payment for securities made in conjunction with

leveraged buyout is settlement payment, regardless of whether clearing agency was involved)

---

[13] There is no question that the Class B shares constitute "securities."  Bankruptcy Code § 101(49)(A), which
defines "security," includes "stock" in the definition without limitation.  See 11 U.S.C. § 101(49)(A) (West 2005).

(citations omitted); <u>Kaiser II</u>, 952 F.2d at 1239-40 ("While the leveraged buy out may not be a 'routine' securities trade. . .we cannot deny what in substance took place here. . . . In settlement of that transaction, the Kaiser Steel shareholders tendered their shares and received payment. These payments were 'settlement payments'.").

Thus, whether Holdings' redemption of the Class B shares was a "routine" securities transaction or not is irrelevant. Here, Holdings offered to redeem its Class B shares, the offer was accepted by all of the holders of those shares, Holdings paid each shareholder for his or her shares by either wire transfer or by check and each shareholder surrendered his or her shares. Thus, "[w]hat occurred in this case was 'delivery and receipt of funds and securities,'" and that transaction constitutes a settlement payment. <u>Kaiser I</u>, 913 F.2d at 850 (citation omitted).

## C.     The Settlement Payments Were Made by or to a Financial Institution.

The protections afforded by § 546(e) extend to settlement payments made to or from a financial institution. <u>See</u> <u>Kaiser II</u>, 952 F.2d at 1240 ("[t]he statute [§ 546(e)] exempts payments made 'by or to' a stockbroker, financial institution, or clearing house"). The term "financial institution" is defined in § 101(22) to include "a commercial or savings bank."[14] JP Morgan

---

[14] Bankruptcy Code § 101(22) defines "financial institution" as:

> (A). . . (i) a Federal reserve bank or an entity (domestic or foreign) that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, or receiver or conservator for such entity and, when any such Federal reserve bank, receiver, conservator, or entity is acting as agent or custodian for a customer in connection with a securities contract, as defined in section 741 of this title, the customer; or (ii) in connection with a securities contract, as defined in section 741 of this title, an investment company registered under the Investment Company Act of 1940; and

> (B) includes any person described in subparagraph (A) which operates, or operates as, a multilateral clearing organization pursuant to section 409 of the Federal Deposit Insurance Corporation Improvement Act of 1991.

11 U.S.C. § 101(22) (West 2005).

Chase, the successor to Chase, is a commercial bank.[15]  See March 31, 2005 Federal Reserve
Statistical Release (listing JP Morgan Chase as the largest domestically chartered insured
commercial bank as March 31, 2005).[16]  We know that Chase, at the direction of Holdings, on
April 13, 1999, wired $4,672,067.96 to National City Bank in order to redeem the 94,538 Class
B shares held by certain of the individual defendants in individual retirement accounts.  [Ex. A,
Cashman Decl. ¶ 7, A6.]  That wire transfer constituted a settlement payment made *by* Chase.  In
re Loranger Mfg. Corp., 324 B.R. 575, 585 (Bankr. W.D. Pa. 2005) (finding that a settlement
payment made by wire transfer to a shareholder constitutes a payment by a financial institution
for purposes of § 546(e) so that plaintiff's fraudulent transfer claim under § 544 is barred).
Moreover, not only was that settlement payment on account of those 94,538 shares made by
Chase, it was made to National City Bank, and National City Bank is itself a "financial
institution" under Bankruptcy Code § 101(22).  See September 30, 2001 Federal Reserve
Statistical Release, supra, (listing National City Bank as the 16th largest domestically chartered
insured commercial bank as of March 31, 2005).

Simply put, the $4,672,067.96 settlement payment made to National City Bank was both
"made by [and] to. . . a financial institution."  Resorts Int'l, 181 F.3d at 515 (transaction where
debtor wired LBO payments to Chase Manhattan which then forwarded payments to Merrill
Lynch which then paid individual defendant was settlement payment protected by § 546(e)).
Accordingly, the payment that Chase made to National City Bank is, as a matter of law, immune
from avoidance by the Plaintiff.  Moreover, because that payment is protected, so are the
subsequent transfers that National City Bank made to the Moving Defendants' individual

---

[15] The Plaintiff in its Complaint draws no distinction between Chase, the entity actually involved in the transfers it
seeks to avoid, and JP Morgan Chase, the successor entity.  See Complaint ¶¶37 and 40.

[16] Available at http:www.federalreserve.gov/releases/lbr/ (website last visited on September 19, 2005).

retirement accounts. In re VF Brands, Inc., supra; King, supra ¶ 550.01[1], at 550-53 (15th ed. 2003) ("Section 550 of the Bankruptcy Code permits a trustee (or debtor in possession), *after* avoidance of a transfer under the trustee's avoiding powers, to recover the property transferred or the value of the property transferred.") (emphasis supplied).

As for the settlement payments made to the Moving Defendants by check, those, too, are protected by § 546(e)'s safe harbor. When the redeeming shareholders' checks were presented to Chase, Chase, as the payor bank, "finally paid" the items. 13 Pa.C.S.A. § 4215(a) (West 1999) ("An item *is finally paid* by a payor bank. . . .") (emphasis supplied).[17] Thus, payment on those checks was "made by" Chase. Because § 546(e) protects settlement payments "made by . . . a financial institution" and because JP Morgan Chase is unquestionably a "financial institution," supra, at page 13, the settlement payments paid by check are also immune from the Plaintiff's challenge. "So long as a financial institution is involved, the payment is an unavoidable 'settlement payment.'" In re Hechinger Inv. Co. of Del., 274 B.R. at 87. Accordingly, the settlement payments made on account of the 21,809 shares held directly by individual shareholders are likewise unavoidable.

Accordingly, because all of the settlement payments the Plaintiff challenges were made by or to a financial institution (or, in the case of the wire transfers, made both by *and* to a

---

[17] Section 4215(a) provides that:

> (a) When item is finally paid by payor bank.--An item is finally paid by a payor bank when the bank has first done any of the following:
>
> (1) Paid the item in cash.
>
> (2) Settled for the item without having a right to revoke the settlement under statute, clearinghouse rule or agreement.
>
> (3) Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearinghouse rule or agreement.

13 Pa.C.S.A. § 4215(a) (West 1999).

financial institution), the transactions are fully protected by Bankruptcy Code § 546(e), and the

transfers that the Plaintiff attacks cannot, as a matter of law, be avoided.  Thus, as to Counts I, II

and III, the Moving Defendants are entitled to summary judgment.

COUNTS IV, V AND VI ARE UNTIMELY AS A
MATTER OF LAW AND, THEREFORE, MUST BE DISMISSED

**A.     Dismissal of Counts IV and V.**

In Counts IV and V of the Amended Complaint, the Plaintiff seeks to recover against the

Moving Defendants on the theory that, by causing "NFC and/or Holdings" to proceed with the

redemption of the Class B shares, they as  "officers and directors" violated §§ 1551 and 1553 of

the Pennsylvania Business Corporation Law (the "BCL"), 15 Pa.C.S.A. §§ 1551 and 1553 (West

1995).[18]  Unfortunately for the Plaintiff, neither Count can go forward.

---

[18] The portions of § 1551 relevant here read as follows:

> (a) General rule.--Unless otherwise restricted in the bylaws, the board of directors may authorize and a business corporation may make distributions. A provision in the articles setting forth a par value for any authorized shares or class or series of shares shall not restrict the ability of a corporation to make distributions.

> (b) Limitation.--A distribution may not be made if, after giving effect thereto:

>   (1) the corporation would be unable to pay its debts as they become due in the usual course of its business; or

>   (2) the total assets of the corporation would be less than the sum of its total liabilities plus (unless otherwise provided in the articles) the amount that would be needed, if the corporation were to be dissolved at the time as of which the distribution is measured, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

15 Pa.C.S.A. § 1551(a) and (b) (West 1995).  Section 1553 provides in pertinent part:

> (a) Directors.--Except as otherwise provided pursuant to section 1713 (relating to personal liability of directors), a director who votes for or assents to any dividend or other distribution contrary to the provisions of this subpart or contrary to any restrictions contained in the bylaws shall, if he has not complied with the standard provided in or pursuant to section 1712 (relating to standard of care and justifiable reliance), be liable to the corporation, jointly and severally with all other directors so voting or assenting, for the amount of the dividend that is paid or the value of the other distribution in excess of the amount of the

First, both §§ 1551 and 1553 apply only to directors, not to directors *and* officers.  Out of the 25 individual defendants here, only E. Roger Clark was a director of NFC.[19]  Thus, Mr. Clark is the only possible defendant under either Count IV or V.  However, not even Mr. Clark has liability here.  The causes of action created by BCL §§ 1551 and 1553 are breach of fiduciary duty claims, and under Pennsylvania law, the statute of limitations for a breach of fiduciary duty claim is two years.  42 Pa.C.S.A. § 5524(7) (West 2002) ("[a]ny action or proceeding to recover damages for injury to person or property which if founded on negligent . . . or otherwise tortuous conduct" must be commenced within two years); see also Zimmer v. Gruntal & Co., Inc., 732 F.Supp. 1330 (W.D. Pa. 1989) (plaintiff's claim for breach of fiduciary duty was untimely because it was not commenced within two years of action accruing).  Here, the challenged redemption occurred on April 13, 1999, Amended Complaint ¶52, and thus any claim under either BCL § 1551 or 1553 had to be brought by April 12, 2001.  For its part, the Plaintiff did not file its action against the Moving Defendants (and, again, Mr. Clark is the only defendant that matters here) until January 30, 2003 – that is, more than 21 months too late.

Nor do the principles of equitable tolling grant the Plaintiff a reprieve.  Equitable tolling functions to stop the statute of limitations from running where the claim's accrual date has already passed.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir.

---

dividend or other distribution that could have been made without a violation of the provisions of this subpart or the restrictions in the bylaws.

15 Pa.C.S.A. § 1553(a) (West 1995).

[19] Only NFC, because it was organized under the laws of Pennsylvania, is subject to the provisions of the BCL.  [Ex. A, Cashman Declaration ¶ 2; A3.]  Holdings is organized under the laws of Delaware.  [Id.]  As such, it is the Delaware General Corporation Law, not the BCL, which governs whether Holdings' redemption of the Class B shares was proper.  Under the "internal affairs doctrine," a court must look to the law of the state of formation to resolve issues involving the internal affairs of a corporation.  CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 89-93 (1987); First National City Bank v. Banco Para El Comercio, 462 U.S. 611, 621 (1983).  Because this Court sits in Pennsylvania, it applies that state's conflict of law principles, Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487 (1941), and Pennsylvania has adopted the "internal affairs doctrine" by statute. See 15 Pa.C.S.A.§ 4145(a).

1994).  The Third Circuit has instructed that equitable tolling may be appropriate in three principal instances:  (i) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (ii) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (iii) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.  Id.  The Plaintiff does not (nor can it in good faith) allege that Mr. Clark misled it with respect to its cause of action.  Nor is there any "wrong forum" issue here.  Thus, the Plaintiff's *only* basis for asserting a claim of equitable tolling is that NFC could not have brought the action that the Plaintiff brings now on its behalf because Mr. Clark dominated NFC (and apparently the other eight directors and, for that matter, the trustees of the ESOP) and certainly would not have permitted NFC to bring an action against him; Mr. Clark, after all (so the story would go), benefited from the redemption.  This adverse domination theory, however, fails for one reason:  on November 5, 1999 (that is, after Holdings redeemed its Class B shares), Thomas G. Hessley replaced Harry D. Rosequist as one of the union's three representatives on the boards of Holdings and NFC.  [Ex. A, Cashman Decl. ¶ 9, A7.]  Mr. Hessley attended his first board meeting on November 5, 1999.  [Id.]  At that meeting Mr. Hessley received Holdings' consolidated balance sheet for the period from June 30, 1997 through June 30, 2003 (actual and forcasted), and that financial statement clearly shows Holdings' and NFC's obligations to JP Morgan Chase under the heading of "Long-Term Debt." [Ex. F, Holdings' November 5, 1999 Board Minutes, A344.]  In short, no one was hiding the debt relating to the redemption from Mr. Hessley.

    Thus, with that *single* change in the boards' composition, the statute of limitations (*assuming* that it had been tolled from the date of the redemption forward) began to run. Resolution Trust Corp. v. Farmer, 865 F.Supp. 1143 (E.D. Pa. 1985) (holding that a statute of

limitations will not be tolled if an informed non-culpable person with standing to bring the action

exists). At the latest, then, any action under BCL § 1551 or 1553 had to be commenced no later

than November 4, 2001 (that is, two years after Mr. Hessley attended his first board meeting, and

that did not happen. Accordingly, even assuming that equitable tolling comes into play here,

Counts IV and V are nonetheless time-barred and must be dismissed.[20]

## B.    Dismissal of Count VI.

As to Count VI, the Plaintiff alleges that, by authorizing the redemption, the Moving

Defendants as "Officers and/or Directors of NFC and/or NFC Holdings," Amended Complaint

¶¶ 101 and 103, violated the fiduciary duty they owed NFC under BCL §§ 1712 and 1713.[21]

---

[20] The Plaintiff also alleges that both Counts are premised on §§ 544(b) and 550. If the Plaintiff is correct, the causes of action in Counts IV and V are barred by § 546(e). See pages 21 through 23, infra. As the Moving Defendants understand § 544(a), the Plaintiff does not need to rely on § 544(a) to bring Counts IV and V. To the extent the Plaintiff has a cause of action under either §§ 1551 or 1553, the Plaintiff's right to assert it on behalf of Holdings' and NFC's estates arises under § 541(a), not § 544(b). Moreover, because the Plaintiff brings these claims on behalf of the estates under § 541(a), § 550 by its express terms has no application here. See 11 U.S.C. § 550 ("Except as other wise provided in this section, to the extent a transfer is avoided under *section 544, 545, 547, 548, 549, 553(b) or 724(a). . . .*") (emphasis supplied).

[21] BCL § 1712 provides:

> (a) Directors.--A director of a business corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. In performing his duties, a director shall be entitled to rely in good faith on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

> (1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented.

> (2) Counsel, public accountants or other persons as to matters which the director reasonably believes to be within the professional or expert competence of such person.

> (3) A committee of the board upon which he does not serve, duly designated in accordance with law, as to matters within its designated authority, which committee the director reasonably believes to merit confidence.

> (b) Effect of actual knowledge.--A director shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would

That argument has one uncorrectable flaw: the claims are time-barred. As is the case with the Plaintiff's claims under BCL §§ 1551 and 1553, claims under BCL §§ 1712 and 1713 are subject to the two-year statute of limitations fixed by 42 Pa.C.S.A. § 5524(7). Moreover, even if that period were equitably tolled for some time because the Moving Defendants adversely dominated NFC, the statute certainly began to run, at the latest, when Mr. Hessley attended his first board meeting on November 5, 1999. As was the case with Counts IV and V, any action under BCL §§ 1712 and 1713 had to be brought no later than November 4, 2001 (that is, within two years after Mr. Hessley took his seat). Giving the Plaintiff every benefit of the doubt that this cause of action relates back to the date of the original Complaint (and the Moving Defendants do not concede that to be the case), the Plaintiff brought this cause of action, *at the earliest*, on January 30, 2003, that is, 25 months too late. Count VI, therefore, must also be dismissed.

---

cause his reliance to be unwarranted.

(c) Officers.**--**Except as otherwise provided in the bylaws, an officer shall perform his duties as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. A person who so performs his duties shall not be liable by reason of having been an officer of the corporation.

15 Pa.C.S.A. 1712 (West 1995). The relevant portion of BCL § 1713 states:

(a) General rule.**--**If a bylaw adopted by the shareholders of a business corporation so provides, a director shall not be personally liable, as such, for monetary damages for any action taken unless:

(1) the director has breached or failed to perform the duties of his office under this subchapter; and

(2) the breach or failure to perform constitutes self-dealing, willful misconduct or recklessness.

15 Pa.C.S.A. 1713(a) (West 1995).

## AS IS THE CASE WITH COUNTS
## I, II AND III, § 546(E) BARS COUNT VII

In Count VII of the Amended Complaint, the Plaintiff alleges that the Moving

Defendants (together with Messrs. Jackson and Olson) violated § 160(a)(1) of the Delaware

General Corporation Law (the "DGCL") either because "NFC and/or NFC Holdings" had no

surplus when they/it redeemed the Class B shares or, in the alternative, because the redemption

impaired the capital of "NFC and/or Holdings."[22]    Amended Complaint ¶ 108.[23]

The Plaintiff brings Count VII under § 544(b).  See Amended Complaint, p. 18.  And

while the Plaintiff can, in fact, use § 544(b) to bring an action under DGCL § 160, PHP

Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.), 291 B.R. 592, 596 (D. Del. 2003),

aff'd per curiam, 128 Fed. App. 839 (3d Cir. 2005) ("Under Section 544(b), a trustee or debtor-

---

[22] DGCL § 160(a)(1) provides that:

> (a) Every corporation may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares; provided, however, that no corporation shall:
>
> (1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation, except that a corporation may purchase or redeem out of capital any of its own shares which are entitled upon any distribution of its assets, whether by dividend or in liquidation, to a preference over another class or series of its stock, or, if no shares entitled to such a preference are outstanding, any of its own shares, if such shares will be retired upon their acquisition and the capital of the corporation reduced in accordance with §§ 243 and 244 of this title. Nothing in this subsection shall invalidate or otherwise affect a note, debenture or other obligation of a corporation given by it as consideration for its acquisition by purchase, redemption or exchange of its shares of stock if at the time such note, debenture or obligation was delivered by the corporation its capital was not then impaired or did not thereby become impaired;

[23] The Plaintiff also alleges that, by approving the redemption, the Moving Defendants (along with Messrs. Jackson and Olson) also violated DGCL § 173.  Section 173, however, deals with how dividends are to be paid.  According to the Plaintiff's own allegations, the transaction at issue involved what the Plaintiff refers to as a "cancellation of stock," not the payment of a dividend on account of those shares.  See Amended Complaint, ¶ 47.  By its plain language, then, DGCL § 173 has no application here.

21

in-possession is empowered to bring an avoidance action for a debtor's violation of Section 160 of the DGCL."), [24] the cause of action is plainly barred by § 546(e).

Before discussing why that is the case, two minor matters need to be addressed.  First, only Holdings is subject to the provisions of the DGCL.  PHP Healthcare, 128 Fed. App. at 843-44 (redemption issues governed by the internal affairs doctrine).  Second, DGCL § 160 was enacted to "prevent boards from draining corporations of assets to the detriment of creditors and the long-term health of the corporation.  Klang v. Smith's Food & Drug Centers, Inc., 702 A.2d 150, 154 (Del. 1997).  The DGCL provides for an appropriate remedy against directors that violate § 160:

> In case of any willful or negligent violation of § 160 or 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued.

8 Del. C. § 174(a) (2002).  Thus, § 174(a) makes directors liable for engaging in willful or negligent violations of § 160.  The only director of Holdings among the Defendants is Mr. Clark.  [Ex. A, Cashman Decl. ¶ 9, A7.]  Thus, because DGCL §§ 160 and 174 go to *director* (and only director) conduct, the only *proper* defendant in this Count is Mr. Clark.  Moreover, as between the Plaintiff and Mr. Clark, the Plaintiff cannot, as a matter of law, prevail here.

As the Moving Defendants observed in seeking judgment as to Counts I, II and III, § 546(e) bars an action to avoid a transfer that is a "settlement payment" made by or to a "financial

---

[24] The Plaintiff also alleges that, by approving the redemption, the Moving Defendants (along with Messrs. Jackson and Olson) also violated DGCL § 173.  Section 173, however, deals with how dividends are to be paid.  According to the Plaintiff's own allegations, this transaction at issue involved what the Plaintiff refers to as a "cancellation of stock," not the payment of a dividend on account of those shares.  See Amended Complaint, ¶ 47.  By its plain language, then, DGCL § 173 has no application here.

institution" that is made before the commencement of the case.  11 U.S.C. § 546(e).  Moreover,

as noted earlier, the payments at issue here are, in fact, settlement payments, and a financial

institution made those payments.  See pp. 13 through 16, supra.  Accordingly, even if we assume

that Holdings redeemed the Class B shares in violation of DGCL § 160, the simple fact is that

the Plaintiff is barred by § 546(e) from bringing an action under § 544(b) to recover any

payments made in connection with Holdings' redemption.  11 U.S.C. § 546(e) (2005)

("Notwithstanding sections *544*, 545, 547, 548(a)(1)(B) and 548(b) of this title . . . .") (emphasis

supplied).  The conclusion here is irrefutable:  Count VII must be dismissed.[25]

COUNT VIII MUST BE LIMITED TO THE
ACTUAL OFFICER AND DIRECTORS OF HOLDINGS

In its final count, the Plaintiff alleges that the officers and directors of Holdings, by

allowing the redemption to proceed, breached the fiduciary duty they owed it.  Of the

Defendants, however, only Mr. Clark was a director of Holdings.  [Ex. A, Cashman Decl. ¶ 9,

A7.]  Moreover, at the time of the redemption, only the Moving Defendants were officers of

Holdings.  Defendant Charles R. Olson, contrary to what the Plaintiff alleges in ¶15 of the

Amended Complaint, was not an officer of Holdings.  [Id.]  Accordingly, Count VIII should be

dismissed as to Mr. Olson.

---

[25] DGCL § 174(c) allows directors found liable under DGCL § 174(a) to be "subrogated to the rights of the corporation against stockholders who received the dividend on, or assets for the sale or redemption of, their stock with knowledge of facts indicating that such dividend, stock purchase or redemption was unlawful under this chapter . . . . 8 Del. C. § 174(c).  Although § 174(c) does not explicitly provide for a direct remedy, at least one court has held that stockholders with knowledge of the unlawful stock redemption can be liable to the extent of the amount received by the stockholder.  See In re Integra Realty Resources, Inc., 198 B.R. 352, 365 (Bankr. D. Colo. 1996).  Even if the Court were to agree with Integra Realty and allow the Plaintiff to assert a claim directly against the Defendants under § 174(c), the outcome is the same:  the cause of action does not survive § 546(e).  Moreover, while the Plaintiff may have plead sufficient facts against the Moving Defendants and Messrs. Jackson and Olson to impute the bad faith required under § 174(c) so as to defeat a motion for summary judgment, nowhere in the Amended Complaint does the Plaintiff allege that the other individual shareholder defendants redeemed their shares in bad faith.  Again, Count VII is a non-starter.

CONCLUSION

It is time for the Court to end this case. Based on the unassailable facts developed here, the only logical conclusion one can reach is that Counts I, II, III and VII of the Complaint are barred by § 546(e) and that Counts IV, V and VI are untimely. Accordingly, as to Counts I through VII, the Moving Defendants must be granted summary judgment, and the Plaintiff should be permitted to proceed only under Count VIII and only against the Moving Defendants.

Dated: September 26, 2005                Respectfully submitted,


                                         /s/ Erik Sobkiewicz
                                         Douglas A. Campbell
                                         PA I.D. No. 23143
                                         Erik Sobkiewicz
                                         PA I.D. No. 56836
                                         CAMPBELL & LEVINE, LLC
                                         1700 Grant Building
                                         Pittsburgh, PA 15219
                                         Telephone: (412) 261-0310

                                         Counsel for Defendants E. Roger
                                         Clark, Maurice J. Cashman, Dana
                                         Beyeler and Robert A. Kaemmerer

24