## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | ) |
| | ) |
| NATIONAL FORGE COMPANY, *et, al.* | ) |
| | ) |
| Debtor. | ) |
| | ) |
| OFFICIAL COMMITTEE OF | ) |
| UNSECURED CREDITORS OF | ) |
| NATIONAL FORGE COMPANY, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| And | ) |
| | ) |
| OFFICIAL COMMITTEE OF RETIREES | ) |
| OF NATIONAL FORGE COMPANY, | ) |
| | ) |
| Intervenors | ) |
| | )   C.A. No.  04-21 ERIE |
| v. | ) |
| | ) |
| E. ROGER CLARK, *et al.* | ) |
| | ) |
| Defendants | ) |

## BRIEF IN OPPOSITION TO SUMMARY JUDGMENT OF DEFENDANTS E. ROGER CLARK, MAURICE CASHMAN, DANA BEYELER AND ROBERT A. KAEMMERER  AND JOINED BY REMAINING DEFENDANTS DANIEL ANTOS, ET AL. AND J.P. MORGAN CHASE & CO., FLEET BUSINESS CREDIT CORPORATION, AND NATIONAL CITY BANK OF PENNSYLVANIA

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................. iii

Factual Summary ...................................................................................................... 2

Issues Presented ....................................................................................................... 5

Argument ................................................................................................................... 5

I.     AS A MATTER OF LAW, SECTION 546(e) OF THE
BANKRUTPCY CODE DOES NOT BAR THE PLAINTIFF'S
FRAUDULENT TRANSFER CLAIMS AGAINST THE
DEFENDANTS ............................................................................................... 5

     A.     AS A MATTER OF LAW, THE EVENTS THAT
CULMINATED IN THE REDEMPTION OF THE CLASS
B SHARES DID NOT CONSTITUTE AN
"INTEGRATED TRANSACTION" ........................................................... 5

     B.     COUNT II OF THE PLAINTIFF'S AMENDED
COMPLAINT ASSERTS AN "ACTUAL FRAUD"
CLAIM UNDER THE APPLICABLE STATE LAW
SUBSTANTIALLY SIMILAR TO THE FEDERAL
"ACTUAL FRAUD" CLAIM UNDER SECTION
548(a)(1)(A) OF THE BANKRUPTCY CODE, WHICH
CLAIM IS EXPLICITLY EXCEPTED FROM THE SAFE
HARBOR PROVISIONS OF SECTION 546(e) ...................................... 11

     C.     AS A MATTER OF LAW, BANKRUTPCY CODE §
546(e) DOES NOT BAR THE PLAINTIFF'S
FRAUDULENT TRANSFER CLAIMS AGAINST THE
MOVING DEFENDANTS. ALTERNATIVELY, THERE
ARE MATERIAL ISSUES OF FACT SURROUNDING
WHETHER THE STOCK CANCELLATION WAS A
"SETTLEMENT PAYMENT" MADE "BY OR TO A
FINANCIAL INSTITUTION" AND THUS, AS A
MATTER OF LAW, BANKRUPTCY CODE SECTION
546(e) DOES NOT BAR THE PLAINTIFF'S
FRAUDULENT TRANSFER CLAIMS AGAINST THE
MOVING DEFENDANTS ...................................................................... 12

          i.     Did the Stock Cancellation Constitute a "Settlement
Payment" Under Section 546(e)? ............................................... 13

    ii.    If the Stock Cancellation Constituted a "Settlement Payment" Under Section 546(e), Was the Settlement Made "By or To a Financial Institution"?.................................................................23

II.    COUNTS IV, V AND VI OF THE PLAINTIFF'S AMENDED COMPLAINT ARE NOT UNTIMELY ..............................................26

III.    AS A MATTER OF LAW SECTION 546(e) OF THE BANKRUPTCY CODE DOES NOT BAR COUNT VII OF THE PLAINTIFF'S AMENDED COMPLAINT.........................................30

IV.    AS A MATTER OF LAW COUNT VIII SHOULD NOT BE LIMITED TO THE OFFICERS OF NFC HOLDINGS .......................................31

Conclusion ...................................................................................................31

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*, 641 F. Supp. 271
(E.D. Pa. 1986)..............................................................................................................30

*Carey v. Beans*, 500 F. Supp. 580 (E.D. Pa. 1980), *aff'd*, 659 F.2d
1065 (3d Cir. 1981)........................................................................................................10

*Crouse v. Cyclops Indus.*, 745 A.2d 606 (Pa. 2000).............................................. 26-27

*Fiber-Lite Corp. v. Molded Acoustical Prods. (In re Molded Acoustical
Prods.)*, 150 B.R. 608 (Bankr. E.D. Pa. 1993)..................................................... 9-10

*Fine v. Checcio*, 870 A.2d 850 (Pa. 2005).............................................................. 29-30

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d 742
(3d Cir. 1989)......................................................................................................... 14-19

*In re Comark*, 971 F.2d 322 (9th Cir. 1991).................................................................18

*In re Grand Eagle Companies, Inc.*, 288 B.R. 484 (N.D. Ohio 2003) .........................20-21, 25-26

*In re Hechinger Invest. Co. of Delaware*, 274 B.R. 71 (D. Del. 2002) ....................7, 20-21, 23-25

*In re Kaiser Steel Corp.*, 913 F.2d 846 (10th Cir. 1990) ("Kaiser I") ...........................14

*In re Kaiser Steel Corp.*, 952 F.2d 1230 (10th Cir. 1991) ("Kaiser II")...................... 14, 18-21, 23

*In re Loranger Mfg. Corp.*, 324 B.R. 575 (Bankr. W.D. Pa. 2005).........................23-25

*In re MK Lombard Group I, Ltd.*, 301 B.R. 812 (Bankr. E.D. Pa. 2003) .......................9

*In re Munford, Inc.*, 98 F.3d 604 (11th Cir. 1996).......................................................20

*In re Mushroom Transp. Co.*, 382 F.3d 325 (3d Cir. 2004)................................... 27-28

*In re Resorts Int'l, Inc.*, 181 F.3d 505 (3d Cir. 1999), *cert. denied*,
528 U.S. 1021 (1999) .............................................................................. *passim*

*Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348 (N.D. Tex. 1996)................................21

*Massachusetts v. Morash*, 490 U.S. 107 (1989) .........................................................16

*Official Comm. Of Unsecured Creditors v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71 (D. Del. 2002) ........................................ 7

*Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468 (Pa. 1983) .......................... 26

*Seitz v. Detweiler, Hershey & Assocs., P.C. (In re CitX Corp.)*, 2004 U.S. Dist. LEXIS 24903 (E.D. Pa. 2004) ................................................................ 27-28

*Sheffield Steel Corp. v. HMK Enters. (In re Sheffield Steel Corp.)*, 320 B.R. 405 (Bankr. N.D. Okla. 2004) ........................................................................ 28-29

*United States v. Tabor Realty Corp.*, 803 F.2d 1288 (3d Cir. 1990) ........................................ 6-7

*Voerst-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 909 F.2d 206 (3d Cir. 1990) ........................................................................................... 6-7

*Zahn v. Yucaipa Capital Fund*, 218 B.R. 656 (D.R.I. 1998) ........................................ 21

**STATUTES**

11 U.S.C. § 101(51A) ........................................................................................... 13

11 U.S.C. § 544 ........................................................................................... 10-11, 16

11 U.S.C. § 546(e) ........................................................................................... *passim*

11 U.S.C. § 546(f) ........................................................................................... 15-17

11 U.S.C. § 548(a)(1)(A) ........................................................................................... 11-12

11 U.S.C. § 550 ........................................................................................... 6, 10, 22, 32

11 U.S.C. § 741(8) ........................................................................................... 14, 16

15 U.S.C. § 78q-1(a) ........................................................................................... 17, 19

12 Pa.C.S.A. § 5104 ........................................................................................... 11-12

12 Pa.C.S.A. § 5105 ........................................................................................... 11

**OTHER**

Fed. R. Civ. P. 15 ........................................................................................... 8-9

H. Rep. No. 97-420 ........................................................................................... 16, 19

iv

**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | ) |
| | ) |
| NATIONAL FORGE COMPANY, *et, al.* | ) |
| | ) |
|     Debtor. | ) |
| | ) |
| OFFICIAL COMMITTEE OF | ) |
| UNSECURED CREDITORS OF | ) |
| NATIONAL FORGE COMPANY, | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
|   And | ) |
| | ) |
| OFFICIAL COMMITTEE OF RETIREES | ) |
| OF NATIONAL FORGE COMPANY, | ) |
| | ) |
|     Intervenors | ) |
| | ) C.A. No. 04-21 ERIE |
|       v. | ) |
| | ) |
| E. ROGER CLARK, *et al.* | ) |
| | ) |
|     Defendants | ) |

<u>**BRIEF IN OPPOSITION TO SUMMARY JUDGMENT OF DEFENDANTS E. ROGER
CLARK, MAURICE CASHMAN, DANA BEYELER AND ROBERT A. KAEMMERER
AND JOINED BY REMAINING DEFENDANTS DANIEL ANTOS, ET AL. AND J.P.
MORGAN CHASE & CO., FLEET BUSINESS CREDIT CORPORATION, AND
NATIONAL CITY BANK OF PENNSYLVANIA**</u>

      AND NOW comes the Official Committee of Unsecured Creditors of National Forge

Company, *et al.,* the Plaintiff, and the Official Committee of Retirees of National Forge

Company, the Intervenor, (both the Committee and the Intervenor will hereafter be referred to

collectively as the "Committee" or the "Plaintiff"), by and through their undersigned counsel,

and submits the within Brief in Opposition to Summary Judgment filed by the Defendants E.

Roger Clark, Maurice Cashman, Dana Beyeler and Robert A. Kaemmerer ("E. Roger Clark, *et*

*al.*") and Joined by Remaining Defendants Daniel Antos, *et al.,* and J.P. Morgan Chase & Co., Fleet Business Credit Corporation and National City Bank of Pennsylvania (the "Lenders", together with E.Roger Clark, *et al.* and Daniel Antos, *et al.* the "Defendants"), respectfully representing as follows:

## FACTUAL SUMMARY

Plaintiff filed a Complaint against the Defendants on January 31, 2003 and filed an Amended Complaint on August 22, 2005, seeking among other things, to bring claims for fraudulent transfers under the Pennsylvania Uniform Fraudulent Transfer Act ("PAUFTA") and for breach of the Pennsylvania Business Corporation Law. Plaintiff's claims against the Defendants arise out of a transaction pursuant to which National Forge Company ("NFC") and/or National Forge Company Holdings ("NFC Holdings"), authorized the redemption/cancellation of Class B Stock of NFC Holdings held by certain officers, directors and management employees of NFC and NFC Holdings for an amount totaling $5,749,868.74 (the "Stock Cancellation").

Based upon the factual allegations contained in the Plaintiff's Amended Complaint and the factual allegations asserted by the Defendants in their Summary Judgment Motion, the following are the relevant circumstances surrounding the Stock Cancellation.

The Board of Directors of NFC and the Board of Directors of NFC Holdings were comprised of the same members and generally conducted joint board meetings. *See* Exhibits B and C to the Committee's Appendix to Brief in Opposition to Motion for Summary Judgment. Certain of the Defendants who received distributions from the Stock Cancellation sat on both NFC's and NFC Holdings' Board of Directors and were officers of NFC and NFC Holdings. NFC Holdings is the one hundred percent (100%) owner of the stock of NFC. At the time of the

Stock Cancellation, the ownership of NFC Holdings was comprised of two classes of equity: Class A Common Stock owned by NFC Holdings Employee Stock Ownership Plan ("ESOP") Trust; and Class B Stock owned by directors, officers and management employees of NFC and NFC Holdings – the Defendants.

On or about December 22, 1998, the Board of Directors of NFC Holdings and NFC held a meeting to allegedly consider, among other things, the approval of converting NFC Holdings, strictly a holding company, from a "C" corporation to an "S" corporation. During the same meeting, the Board of Directors of NFC Holdings and NFC approved the Stock Cancellation and the authorization to borrow funds sufficient to complete the Stock Cancellation. To that end, and in order to fund the Stock Cancellation, on or about March 29, 1999, NFC, NFC Holdings, National Forge Europe Limited, and the Lenders entered into Amendment No. 1 to Amended and Restated Credit Agreement dated April 6, 1998 which allowed NFC to borrow an amount not to exceed $4,000,000.00 (the "Loan") to accomplish the redemption/cancellation of the Class B Stock. *See* Exhibit A, D and E to the Defendants' Appendix. The Loan was to be secured by a lien upon substantially all the assets of NFC.

Upon information and belief NFC and NFC Holdings maintained operating accounts at Chase Manhattan Bank. On April 13, 1999, NFC directed Chase Manhattan Bank to transfer from its operating account into NFC Holdings' bank account at Chase Manhattan Bank the sum of $5,749,868.74. On or about April 13, 1999, NFC and/or NFC Holdings redeemed/cancelled all outstanding shares of Class B Stock from the Defendants at a price of $49.42 per share (the "Distributions"). The Stock Cancellation totaled $5,749,868.74 of which approximately $1,080,000 was paid directly to certain of the Defendants and approximately $4,670,000 million was paid to IRA accounts of certain of the Defendants.

Upon information and belief, NFC did not receive adequate consideration for the transfer of $5,749,868.74 to NFC Holdings. In point of fact, there appears to be no evidence of any consideration or legitimate business purpose (i.e. dividend payment, stock redemption, stock cancellation, etc.) provided by NFC Holdings to NFC to justify and warrant NFC's transfer of more than $5.7 million dollars to NFC Holdings, which money was then distributed to the Defendants. The officers and directors of NFC and NFC Holdings devised this scheme to redeem and/or cancel the Class B stock of NFC Holdings solely for their benefit and attempted to justify and legitimize the Stock Cancellation by converting NFC Holdings from a C-Corporation to an S-Corporation. At the time the Stock Cancellation was approved by the Board of Directors of NFC and/or NFC Holdings and subsequently carried out by the officers of NFC and/or NFC Holdings, the officers and directors of NFC and/or NFC Holdings knew NFC was ailing financially and that there equity interests were at serious risk.

On September 26, 2005 the Defendants filed a Motion for Summary Judgment (the "Summary Judgment") asserting three arguments that as a matter of law the Committee's Amended Complaint should be dismissed. First, the Defendants assert that the "safe harbor" provision of Section 546(e) bar the fraudulent transfer claims asserted by the Committee in Counts I, II, III and VII of its Amended Complaint. 11 U.S.C § 546(e). As set forth below, the Committee asserts that applying this safe harbor provision to the facts of the instant matter is factually and legally inconsistent with Congressional intent behind the application of the safe harbor provisions of Section 546(e) and would lead to an absurd result. Second, Counts IV, V and VI are untimely. As set forth below, the Committee asserts this argument is also without merit. Third, Count VIII must be limited to the actual officers and directors of NFC Holdings. The Plaintiff submits that this argument also lacks merit.

4

It must also be noted that no discovery has yet been conducted in this case, and the record remains largely undeveloped. Regardless of any positions advanced at this time, it is clear that the record in this matter is so undeveloped as to make Summary Judgment inappropriate at this time.

## ISSUES PRESENTED

I.   **AS A MATTER OF LAW, DOES SECTION 546(e) OF THE BANKRUPTCY CODE BAR THE PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS AGAINST THE DEFENDANTS?**

    **SUGGESTED ANSWER: NO**

II.   **AS A MATTER OF LAW, ARE COUNTS IV, V AND VI OF THE PLAINTIFF'S AMENDED COMPLAINT UNTIMELY?**

    **SUGGESTED ANSWER: NO**

III.   **AS A MATTER OF LAW, DOES SECTION 546(e) OF THE BANKRUPTCY CODE BAR COUNT VII OF THE PLAINTIFF'S AMENDED COMPLAINT?**

    **SUGGESTED ANSWER: NO**

IV.   **AS A MATTER OF LAW, SHOULD COUNT VIII BE LIMITED TO THE OFFICERS OF NFC HOLDINGS?**

    **SUGGESTED ANSWER: NO**

## ARGUMENT

I. **AS A MATTER OF LAW, SECTION 546(e) OF THE BANKRUPTCY DOES NOT BAR THE PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS AGAINST THE DEFENDANTS.**

    A.   **AS A MATTER OF LAW, THE EVENTS THAT CULMINATED IN THE REDEMPTION OF THE CLASS B SHARES DID NOT CONSTITUTE AN "INTEGRATED TRANSACTION"**

The Plaintiff prefaces its argument under this Section by stating that the Defendants' argument under Section A of its Opening Brief is unclear, nonsensical, self-serving, confusing and lacks support in both law and fact. Nonetheless, the Plaintiff will attempt to address what it

believes the Defendants' arguments to be under Section A to their Summary Judgment and try to make sense of what the Defendants are attempting to assert. It would appear by making the argument that the Stock Cancellation is a single integrated transaction, the Defendants are attempting to include the approximate $5.7 million dollar transfer from NFC to NFC Holdings under the umbrella of the safe harbor provisions of Section 546(e) of the Bankruptcy Code. Admittedly, the transfers from NFC Holdings to the Defendants are deserving of an analysis as to the applicability of Section 546(e)'s safe harbor provisions (which the Plaintiff will demonstrate below are not applicable).

While the Defendants have made great efforts to argue the extension of the safe harbor provisions of Section 546(e) to the transfers between NFC Holdings and the Defendants, there has been no evidence, argument, explanation and/or analysis as to the basis and justification for the transfer of approximately $5.7 million dollars from NFC to NFC Holdings that would warrant a defense under the provisions of Section 546(e). If the transfer between NFC and NFC Holdings is avoided, then pursuant to Section 550(a)(2) of the Bankruptcy Code, the Plaintiff is entitled to recover from the Defendants as immediate or mediate transferees of the avoided transfer. No further inquiry into the transfer between NFC Holdings and the Defendants is required. Thus, the safe harbor provisions of Section 546(e) become moot.

In support of their argument that the transfer at issue is an "integrated transaction", the Defendants cite to United States v. Tabor Realty Corp., 803 F2d. 1288, 1302 (3d Cir. 1990) and Voerst-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206, 212-13 (3d Cir. 1990). Without providing any analysis into either of these two cases, the Defendants blindly state that the Third Circuit in Tabor and Voerst recognized that "multi-step transactions like the one at issue here can be collapsed when the steps of that transaction are part of one integrated

transaction." *See Defendants' Motion for Summary Judgment* p.7. However a reading of both Tabor and Voerst reveal that while the Third Circuit did address the issue of integrated transactions, the facts of each of those cases are completely distinguishable from facts of the case at bar. Further, in determining whether the transfers at issue in Tabor and Voerst amounted to a single integrated transaction, the Third Circuit considered voluminous findings of fact of the United States District Courts from the trials that were held by the lower Courts. There have been no arguments or evidence presented that could warrant a finding by this Court as a matter of law that the Stock Cancellation is a single integrated transaction. The Defendants simply make the self-serving statement that the Plaintiff has characterized the transfer as an integrated transaction in its Amended Complaint. The Plaintiff submits that in fact it took great care, given the limited discovery that has occurred in the case, to make it clear in its Amended Complaint that there was: (i) a transfer from NFC to NFC Holdings; and (ii) later transfers from NFC Holdings to the Defendants.

The Defendants go on to further state that "when considering whether a series of transactions should be collapsed, the focus should be not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction." Official Committee of Unsecured Creditors v. Fleet Retail Fin.Group (In re Hechinger Inv. Co. of Del.), 274 B.R. 71, 91 (D. Del. 2002). There has been mere allegation and no evidence submitted by the Defendants as to the "knowledge and intent of the parties" surrounding the Stock Cancellation. The allegations submitted by the Defendants in Section A to their Summary Judgment regarding the knowledge and intent of the parties are replete with material issues of fact.

The Plaintiff submits that the transfers at issue, that is the transfer of $5,749,868.74 from NFC's operating account to an NFC Holdings' account and the transfers from NFC Holdings to

the Defendants are individual transfers subject to the scrutiny of applicable federal bankruptcy and state fraudulent transfer laws. At the very least, there are material issues of fact as to whether the transfers were an integrated transaction precluding a grant of summary judgment as a matter of law.

With regard to the Defendants assertions that the Plaintiff is time barred from asserting that the transfer between NFC and NFC Holdings is avoidable, the Plaintiff need only direct this Court to Federal Rule of Civil Procedure 15, which states in relevant part:

> (a) <u>Amendments</u>. A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.
>
> …
>
> (c) <u>Relation Back of Amendments</u>. An amendment of a pleading relates back to the date of the original pleading when
> (1)  relation back is permitted by the law that provides the statute of limitations applicable to the action, or
> (2)  **the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading**, or the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed. R. Civ. P. 15(a) (Emphasis added).    Federal Courts have liberally

construed the provisions of Rule 15, holding:

> The decision to grant or deny a post-bar date amendment to a
> timely filed claim rests within the sound discretion of the
> bankruptcy judge. *In re Hill*, 286 B.R. 612, 621 (Bankr. E.D. Pa.
> 2002). To be permitted, the amendment must relate back to the
> initial filing if filed after the bar date; otherwise, it will be deemed
> a "new" claim and will not be permitted.    *In re Metro
> Transportation Co.*, 117 B.R. 143, 147 (Bankr. E.D. Pa. 1990); *In
> re McMillan*, supra, 182 B.R. at 14; *In re Ben Franklin Hotel
> Associates*, 1998 WL 94808 3 (E.D. Pa. 1998) *aff'd* 186 F.3d 301
> (1999); *In re Pennsylvania Truck Lines, Inc.*, 189 B.R. 331, 335
> (Bankr. E.D. Pa. 1995); *In re Hanscom Foods, Inc.,* 96 B.R. 33, 35
> (Bankr. E.D. Pa. 1988).

In <u>In re MK Lombard Group I, Ltd.</u>, 301 B.R. 812 (Bankr. E.D. Pa. 2003).

Furthermore:

> If the initial proof did not "give fair notice of the conduct,
> transaction or occurrence that forms the basis of the claim asserted
> in the amendment" then the amendment asserts new claims and
> will not be allowed. *In re Owens*, 67 B.R. 418, 423 (Bankr. E.D.
> Pa. 1986) (quoting *In re Westgate-California Corp.*, 621 F.2d 983,
> 984 (9th Cir. 1980)). On the other hand, amendments that merely
> cure defects in the previously-filed claim, describe the claim in
> more detail, plead new theories of recovery on the same facts
> presented in the initial claim, or increase damages do not constitute
> new claims. *In re Hemingway Transport, Inc.*, 954 F.2d 1, 10 (1st
> Cir. 1992); *In re International Horizons, Inc.*, 751 F.2d 1213, 1216
> (11th Cir. 1985).

*Id.* at 817.

In <u>Fiber-Lite Corp. v. Molded Acoustical Prods.</u> (In re Molded Acoustical Prods.), 150 B.R.

608 (Bankr. E.D. Pa. 1993) the court emphasized a liberal standard by which the court may grant

a motion for leave to amend a complaint.  "A motion for leave to amend a complaint pursuant to

Fed. R. Civ. P. 15(a), incorporated by Bankruptcy Rule 7015, should be freely granted at any

stage of a case where the decision to allow amendment would prevent injustice and would cause

no prejudice to the non-moving party. See <u>Carey v. Beans</u>, 500 F. Supp. 580, 582-83 (E.D. Pa. 1980), *aff'd*, 659 F.2d 1065 (3rd Cir. 1981)." *Id.* at 612.

While the Plaintiff submits that the Stock Cancellation is adequately identified and noticed in its Original Complaint, the Amended Complaint merely provided more detail and corrected some factual understandings. The Amended Complaint did not raise new claims. NFC Holdings, through its officers and directors, was adequately placed on notice of the claims arising out of the Stock Cancellation. There has been no prejudice to NFC Holdings through the filing of the Amended Complaint.

Additionally, any argument regarding the Plaintiff's ability to <u>recover</u> against NFC Holdings as a transferee of an avoidable transfer is irrelevant. The Plaintiff seeks to recover the transfer from the Defendants pursuant to, among other things, Bankruptcy Code Section 550. Section 550 of the Code states in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from -

(1) the initial transferee of such transfer or the equity for whose benefit such transfer was made; or

(2)    any immediate or mediate transferee of such initial transfer.

11 U.S.C. §550. Thus, if the Plaintiff is able to establish that the transfer between NFC and NFC Holdings is avoidable, then the Plaintiff is able to recover from the Defendants under Section 550(a)(2) as immediate or mediate transferees of the NFC and NFC Holdings avoidable transfer. In this regard, the Plaintiff does not need to recover from NFC Holdings (which would be a futile effort considering NFC Holdings is a Debtor in a Chapter 11 Bankruptcy with little or no assets), but can recover from the immediate or mediate transferees.

10

In the event the Stock Cancellation is determined to be an integrated transaction and in defense of the assertion that the transfers between NFC Holdings and the Defendants are protected by the safe harbor provisions of Section 546(e), the Plaintiff provides the following analysis and argument in sections B and C on the applicability of Section 546(e) to the instant matter.

**B.    COUNT II OF THE PLAINTIFF'S AMENDED COMPLAINT ASSERTS AN "ACTUAL FRAUD" CLAIM UNDER THE APPLICABLE STATE LAW SUBSTANTIALLY SIMILAR TO THE FEDERAL "ACTUAL FRAUD" CLAIM UNDER SECTION 548(a)(1)(A) OF THE BANKRUPTCY CODE, WHICH CLAIM IS EXPLICITLY EXCEPTED FROM THE SAFE HARBOR PROVISIONS OF SECTION 546(e).**

In their first argument, the Defendants assert that the safe harbor provisions of Section 546(e) of the Bankruptcy Code completely bar the Plaintiff's fraudulent transfer claims raised pursuant to Section 544 of the Bankruptcy Code and Sections 5104 and 5105 of the Pennsylvania Uniform Fraudulent Transfer Act ("PAUFTA"). 11 U.S.C. § 544; 12 Pa.C.S.A §§ 5104 and 5105.

Initially, the Committee notes that the safe harbor provisions of Section 546(e) would not act to protect the avoidance of a fraudulent transfer claim under Section 548(a)(1)(A) of the Bankruptcy Code, which is often referred to as an "actual fraud" claim. Section 548(a)(1)(A) provides in relevant part:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, … , if the debtor voluntarily or involuntarily –
>
> > (A)    made such transfer or incurred such obligation with the actual intent to hinder, delay, or defraud any entity to which the debtor was or became, … indebted.

11 U.S.C. § 548(a)(1)(A). In Count II of its Amended Complaint the Committee asserts an "actual fraud" claim under Section 5104(a)(1) of the PAUFTA. The elements of Section 5104 of

the PAUFTA are substantially similar to that of Section 548(a)(1)(A) of the Bankruptcy Code

and state in relevant part:

> (a) General rule.—A transfer made or obligation  incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1)    with the actual intent to hinder, delay or defraud any creditor of the debtor

12 Pa.C.S.A. § 5104(a)(1).

The Committee submits that any argument that Section 546(e) bars the actual fraud claim

asserted under Section 5104(a)(1) of the PAUFTA and contained in Count II of the Plaintiff's

Amended Complaint fails.  It is clear from the language of Section 546(e) that Congress did not

intend to shield fraudulent transfer recipients from the avoidance powers of a trustee in cases of

actual fraud.  Thus, the Committee submits for this reason and the reasons set forth below, the

Defendants' request for Summary Judgment as to Count II of the Plaintiff's Amended Complaint

should be DENIED.

> **C.    AS A MATTER OF LAW, BANKRUPTCY CODE § 546(e) DOES NOT BAR THE PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS AGAINST THE MOVING DEFENDANTS.    ALTERNATIVELY, THERE ARE MATERIAL ISSUES OF FACT SURROUNDING WHETHER THE STOCK CANCELLATION WAS A "SETTLEMENT PAYMENT" MADE "BY OR TO A FINANCIAL INSTITUTION" AND THUS, AS A MATTER OF LAW, BANKRUPTCY CODE SECTION 546(e) DOES NOT BAR THE PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS AGAINST THE MOVING DEFENDANTS.**

In determining the applicability of the safe harbor provisions of Section 546(e) to the

fraudulent transfer claims asserted by the Committee in Counts I, II and III of its Amended

Complaint, the Committee submits that two questions must be answered in the affirmative by

this Court before Section 546(e) would act to bar the Plaintiff's fraudulent transfer claims.  First,

did    NFC's    and/or    NFC    Holdings'    (both    privately    held    companies)    simple    stock

redemption/cancellation of certain of their Class B Stock held by their directors, officers and management employees constitute a "settlement payment" under Section 546(e). Second, and only if the answer to the first question is yes, was the "settlement payment" made "by or to a financial institution". As evidenced by the argument below, the Committee submits that the answers to both these threshold questions is no.

> (i)    Did the Stock Cancellation constitute a "settlement payment" under Section 546(e)?

In addressing the question of whether the Stock Cancellation constituted a "settlement payment" under Section 546(e), the Court must first look to the definition of settlement payment under the Bankruptcy Code. The Committee notes that the Defendants erroneously cite to Section 101(51A) of the Bankruptcy Code in support of their contention that the Stock Cancellation was a "settlement payment". The Defendants cite to Section 101(51A) and assert that "Bankruptcy Code § 101(51A) defines a 'settlement payment' to include a 'preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the *securities trade.*" *See* Defendants Brief in Support pg. 7 (*emphasis added*). Actually, Section 101(51A) defines "settlement payment" as:

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, *or any other similar payment commonly used in the forward contract trade.*

11 U.S.C. § 101(51A) (*emphasis added*). Contrary to the Defendants' assertion, and as is clear from the language of Section 101(51A), the Committee submits that definition of "settlement payment" under Section 101(51A) of the Bankruptcy Code is not applicable in this case as there has been no assertion that the Stock Cancellation had anything to do with the "forward contract trade."

The Committee submits more appropriately, Section 741(8) of the Bankruptcy Code controls in this matter and defines "settlement payment" as:

> a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, *or any other similar payment commonly used in the securities trade.*

11 U.S.C. § 741(8) (*emphasis added*). Thus, the focus must then turn on what Congress intended to encompass by the term "settlement payment" under Section 741(8) and its application and use in the context of the safe harbor provisions of Section 546(e).

In support of their argument that the Stock Cancellation constituted a "settlement payment" under Section 546(e), the Defendants direct this court to the holdings of *In re Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846 (10th Cir. 1990)("Kaiser I"); *In re Kaiser Steel Corp., v. Pearl Brewing Co.*, 952 F.2d 1230 (10th Cir. 1991)("Kaiser II"); *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d 742 (3d Cir. 1989); and *In re Resorts Intl'l, Inc.*, 181 F.3d 505 (3d Cir. 1999), *cert. denied*, 528 U.S. 1021 (1999). However, these cases address the issue of "settlement payment" and its intended use by Congress in Section 546(e), each deals with a series of complex publicly traded securities transactions, either through complicated leveraged buyouts ("LBO") or transfers of securities to purchasers pursuant to federal government securities repurchase agreements and were afforded the protections of the national securities clearance and settlement system (discussed below). The Committee submits that the facts and circumstances of the above cited cases are completely distinguishable from the facts and circumstances in the instant matter. The transaction at issue in this case is not a complex security transaction between a publicly traded company and its shareholders. Further, the Stock Cancellation at issue did not involve any third party intermediaries, including clearing

houses, disbursing agents, stock brokers, etc, but was a simple stock redemption/cancellation of a privately held corporation's Class B Stock.

In determining Congress's intent on drafting Section 546(e) and offering safe harbor to recipients of "settlement payments", the Third Circuits analysis in the case of *In re Bevill, supra,* is instructive. In *Bevill,* a Chapter 11 trustee for securities dealer sought to avoid transfers of securities to purchasers pursuant to federal government securities repurchase agreements. The United States District Court for the District of New Jersey, denied the repo purchasers' joint motion to dismiss, and certified questions for interlocutory appeal. The questions certified for appeal were: (i) whether section 546(f) of the Bankruptcy Code, 11 U.S.C. § 546(f), bars Chapter 11 trustee from utilizing sections 547 and 548 to recover securities or their proceeds from a repo participant; and (ii) whether section 559 of the Code, 11 U.S.C. § 559, bars a Chapter 11 trustee from claiming the proceeds of a repurchase agreement liquidated by a repo participant. On appeal the Third Circuit held that prepetition transfers of securities by securities dealer to repo purchasers constituted "settlement payment" for purposes of Section 546(f) of the Bankruptcy Code precluding trustee from avoiding settlement payment transfers made prepetition by or to repo participant in connection with repurchase agreement. *Id.* at 742 and 743.

In attempting to determine the congressional purpose of Section 546(f) (the sub-section of 546 that deals specifically with repurchase agreements) and the proper meaning of "settlement payment" under Section 546(f), the Third Circuit turned to the intent of Congress in drafting the 1982 amendments and the fashioning of Section 546(e). The Third Circuit stated that Section 546(e) was "the model upon which section 546(f) of the 1984 amendments was based." *Id. at 747.* In addressing Congressional intent behind Section 546(e), the Third Circuit noted:

> Although our major concern is with the 1984 amendments to the Bankruptcy Reform Act,
> we must first consider the 1982 amendments. At the time of their passage, Congress was

concerned about the volatile nature of the commodities and securities markets, and decided that certain protections were necessary to prevent "the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market." H.Rep. No. 97-420, 97th Cong., 2d Sess. 1 (1982) ("1982 House report"), U.S.Code Cong. & Admin.News 1982, p. 583. As stated in the House Report on the 1982 amendments:

> The Bankruptcy Code now expressly provides certain protections to the commodities market to protect against such a 'ripple effect.' One of the market protections presently contained in the Bankruptcy Code, for example, prevents a trustee in bankruptcy from avoiding or setting aside, as a preferential transfer, margin payments made to a commodity broker.
> *Id.*

Congress wanted to go further to protect margin payments and settlement payments made by and to participants in the securities market generally. Accordingly, it added a new subsection to 11 U.S.C. § 546:

> Notwithstanding sections 544, 545, 547, 548(a)(2), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, or securities clearing agency, that is made before the commencement of the case, except under section 548(a)(1) of this title. 11 U.S.C. § 546(e).

*Id.* at 747. *See also* Committee's Appendix Exhibit A (For the convenience of the Court, the Committee has attached to its Appendix as Exhibit A a copy of House Report 97-420).

The Third Circuit recognized in *Bevill* that "...at issue in this case is whether AMC's [the Debtor] pre-petition transfer of the securities to appellants constituted a "settlement payment" as contemplated by Congress [presumably under section 546(e) and 546(f)]." *Id.* at 749. The Third Circuit held that "In expounding on a statute, we [are] not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *citing, Massachusetts v. Morash*, 490 U.S. 107, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39

(1987)). *Bevill*, 878 F.2d at 750. To that end, the Third Circuit looked for guidance on the Congressional intent in the Securities Exchange Act of 1934 noting:

> It is well understood in the securities market that the settlement process does not end with the purchaser's payment for the securities; rather, the process continues on to include the record transfer of the securities. Section 17A(a) of the Securities Exchange Act of 1934, ("1934 Act") 15 U.S.C. § 78q-1(a), mandating the establishment of a national securities clearance and settlement system, specifically recognizes that the transfer of record ownership of securities is an integral element in the securities settlement process. Section 17A(a)(1)(A)        of        the        1934        Act        provides        as        follows: The Congress finds that-(A) The prompt and accurate clearance and *settlement* of securities transactions, *including the transfer of record ownership and the safeguarding of securities and funds related thereto,* are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors. *15 U.S.C. 78q-1(a)(1) (emphasis supplied).*

*Id*. at 751.

In discussing the definition of "settlement payment" under Section 546(f), the Court looked to the entire law, and to its object and policy. Having done so, the Third Circuit found that the repurchase transaction at issuer in *Bevill* and the application of Section 546(e) in providing the transaction with safe harbor was consistent with Congress' intent in protecting the national securities market from the adverse consequences of allowing a trustee to avoid such transfers under the Bankruptcy Code. A similarly detailed analysis here, however, would yield the opposite result.

The Third Circuit again addressed the issue of the scope of Congressional intent behind Section 546(e) in the case of *In re Resorts International, Inc.*, 181 F.3d 505 (3d Cir. 1990). In *Resorts*, the Third Circuit was faced with the question of whether the definition of "settlement payment" could be extended to cover certain transfers arising out of a complex securities transaction by way of a leveraged buyout. In *Resorts*, the Third Circuit recognized its prior analysis and holding in *Bevill* regarding the scope and reach of the term "settlement payment" as intended by Congress under Sections 546(e) and 546(f), but found that "*Bevill* did not consider

payments made pursuant to a leveraged buyout, and therefore does not definitively determine the outcome here [in *Resorts*]." *Id.* at 515. The Third Circuit thus looked to other Courts who have addressed the application of Section 546(e) to LBO's. In so doing, the Third Circuit noted:

> The only other court of appeals to directly address this question, however, followed a *Bevill* analysis and held that payments to shareholders as part of an LBO were "settlement payments" under the statute. *citing, In re Kaiser Steel Corp. v. Pearl Brewing Co.,* 952 F.2d 1230, 1230-40 (10th Cir. 1991); *see also In re Comark,* 971 F.2d 322, 325 (9th Cir. 1992)*(citing Kaiser approvingly for the proposition that a "settlement is 'the completion of a securities transaction'").*

*Resorts,* 181 F.3d at 515.

Following the rationale and reasoning of *Kaiser, Bevill* and *Comark,* the Third Circuit held:

> Including payments made during LBO's within the scope of the definition [of settlement payment] is consistent with the broad meaning these cases [*Kaiser, supra*] discern. A payment for shares during an LBO is obviously a common securities transaction, and we therefore hold that it is also a settlement payment for the purposes of Section 546(e).
> The Third Circuit ultimately held that from application of the plain language of Section

*Id.* at 515 and 516.

The Third Circuit further held:

> Despite the fact that payments to shareholders in an LBO are not the most common securities transaction, we see no *absurd result from the application of the statute's plain language* and will not disregard it. We hold, therefore, that section 656 applies to the transaction and prevent its avoidance under section 548(a)(1)(B).

*Id.* at 516 (*emphasis added*).

The Courts in *Kaiser, Bevill* and *Resorts* utilized the same analysis finding that avoidance of large complex securities transactions that could gravely impact the national securities market is what Congress intended to protect against in fashioning Section 546(e). The important aspect of *Resorts* is that the Third Circuit recognized that the scope and application of Section 546(e) needs to be analyzed on a case by case basis as demonstrated by the Third Circuit's

unwillingness to rigidly apply its rationale and holding in *Bevill* to the distinguishing characteristics of the stock transfer it was faced with in *Resorts*. Additionally, the Third Circuit applied the plain language of Section 546(e) in the *Resorts* case because it saw no absurd result in so doing. *See Resorts, supra.* As demonstrated below, a rigid application of the plain language of Section 546(e) the facts of the case at bar would lead to an absurd result. Thus, the Committee submits that this Court must look to the facts of this case in determining whether Congress intended to protect transferees from transactions of this type under Section 546(e) and not rigidly apply, as the Defendants would have this Court do, the rationale and holding of *Bevill* and *Resorts*.

To that end, the Committee submits that unlike *Bevill, Resorts* and *Kaiser*, the instant matter does not involve a security transaction of a publicly traded company that would require "protection to prevent the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market." *Bevill*, 878 F.2d at 747. There has been no legal or factual allegation by the Defendants that the Stock Cancellation at issue in this case invoke the protections of the national securities clearance and settlement system or the concerns and protections discussed by Congress in House Report No. 97-420, *See Bevill, supra; See also Committee's Appendix Exhibit A.* Further, there are material issues of fact as to whether the Stock Cancellation of these privately held companies was even subject to SEC regulations and subject to the national securities clearance and settlement system as discussed in *Bevill, Kaiser* and *Resorts.* 15 U.S.C. 78q-1(a); *See Bevill, supra.* The Stock Cancellation was a very simple stock redemption/cancellation of Class B Stock held by directors, officers and management employees of NFC Holdings that would have absolutely no impact on the national securities market if avoided. Additionally, there remain factual issues as to whether the

recipients of the Distributions even presented their stock certificates to NFC or NFC Holdings in exchange for payment, or otherwise adhered to any other "settlement process" regarding the Stock Cancellation. As stated previously, there has been no legal or factual allegation by the Defendants that the Stock Cancellation at issue in this case invokes the protections of the national securities clearance and settlement system, which system Congress intended to protect under Section 546(e).

The Committee submits that to interpret the protections of Section 546(e) to shield the Defendants in the instant matter from fraudulent transfer claims leads to an absurd result. The Committee directs the Court's attention to the case of *In re Grand Eagle Companies, Inc. v. ASEA Brown Boveri, Inc.*, 288 B.R. 484 (N.D. Ohio 2003) as a case that is analogous to the instant matter. In *Grand Eagle* the Court was faced with the question of whether the definition of "settlement payment" and the applicability of Section 546(e) extended to securities transactions of privately held companies. The court summarized the analysis of *In re Kaiser Steel Corp.* to establish the function of the securities industry and the underlying Congressional intent behind § 546(e) as it related to the definition of settlement payments. *See Id.* at 492 – 494. After its analysis of *Kaiser,* the court stated:

> Against this backdrop, the protection of § 546(e) has been applied to the purchase and sale of stock of publicly traded companies. *Resorts Int'l, Inc.* (In re Resorts Int.'l, Inc.), 181 F.3d 505 (3d Cir. 1999)*; Kaiser Steel Corp. v. Pearl Brewing Co.* (In re Kaiser Steel Corp.), 952 F.2d 1230 (10th Cir. 1991)*; Official Comm. Of Unsec. Creditors v. Fleet Retail Fin. Group* (In re Hechinger Invest. Co. of Delaware), 274 B.R. 71 (D. Del. 2002). n12 In so doing, the intent of Congress to promote stable financial markets is achieved. However, against this same backdrop, it is unlikely that Congress intended the term "settlement payment" to encompass the payment made to ABB [the Defendant] in the April 2000 transaction.

*Id.* at 494. In note 12, the court referenced *Munford v. Valuation Research Corp.* (In re Munford, Inc.), 98 F.3d 604 (11th Cir. 1996) where the Eleventh Circuit applied the conduit

theory and declined to recognize a bank as a "transferee" under § 546(e) where the bank failed to acquire a beneficial interest in either the funds or shares of a pre-petition leverage buyout payment made to publicly-traded shareholders. *Id.* at note 12. However, the court in *Grand Eagle* did not address the issue of whether the disbursing entity took a beneficial interest in the funds or acted as mere conduit, but rather addressed ABB's [the Defendant's] argument that § 546(e) applies to the transaction between the two private parties because a "settlement payment" is simply "the transfer of cash made to complete a securities transaction". In addressing this issue, the *Grand Eagle* Court held:

> Such a simplistic reading of § 546(e) ignores the meaning of the term "settlement payment" within the securities industry and would, essentially, convert that statutory provision into a blanket transactional cleansing mechanism for any entity savvy enough to funnel payments for the purchase and sale of privately held stock through a financial institution. *Cf. Zahn v. Yucaipa Capital Fund,* 218 B.R. 656 (D.R.I.1998) (holding that § 546(e) did not apply to the sale of non-publicly traded stocks because the stock transfers had no connection with the clearance and settlement system and allowing avoidance would have no impact upon such system); *Jewel Recovery, L.P. v. Gordon,* 196 B.R. 348 (N.D.Tex.1996) (holding that § 546(e) did not apply to a strictly private stock transaction that did not implicate the clearance and settlement process)

*Id.* at 494.

Given that the facts and circumstances of *Grand Eagle* are more analogous to the facts and circumstances of the case at bar, at least with regard to the fact that the transaction at issue involved privately held companies, the Committee submits that this Court should be persuaded by *Grand Eagle* in its determination that the definition of "settlement payments" as used in Section 546(e) and as contemplated by Congress would not encompass and provide safe harbor to the Stock Cancellation currently before this Court. None of the cases cited by the Defendants in support of their argument that the transfer at issue constituted a "settlement payment" (*Bevill, Kaiser, Resorts* and *Hechinger*) address the issue of Section 546(e) and its application to stock transactions of privately held companies. As noted above, this Court must look to the

application of Section 546(e) on a case by case basis to ensure to capture the Congressional intent behind the safe harbor provisions of Section 546(e).

Further, in Paragraph 4 of the Declaration of Maurice J. Cashman in Support of Motion of Defendants E. Roger Clark, Maurice J. Cashman, Dana Beyeler and Robert A. Kaemmerer for Summary Judgment, Mr. Cashman states that on April 13, 1999, NFC directed Chase Manhattan Bank to transfer $5,749,868.74 from its operating account at Chase Manhattan Bank to a NFC Holdings bank account at Chase Manhattan Bank. See Defendants Appendix Exhibit, Paragraph 4, pg.3. There remains a material issue of fact as to why NFC transferred more than $5.7 million dollars to NFC Holding and what reasonably equivalent value was given to NFC in exchange. While the Defendants have alleged that the transfers from NFC Holdings to the individual shareholders were in settlement of their securities, there has been no allegation by the Defendants that the transfer of more than $5.7 million dollars from NFC to NFC Holdings was in settlement of a security covered by the safe harbor provisions of Section 546(e). As such, the remains factual issues of whether the initial transfer from NFC to NFC Holdings is subject to the safe harbor provisions of Section 546(e). Under Section 550 of the Bankruptcy Code a trustee may recover property or the value of the property that is the subject of a avoidable transfer from the initial transferee or any immediate or mediate transferee of such initial transfer. 11 U.S.C. § 550(a)(2). If in this case, the initial transfer is not subject to the protections of Section 546(e), the Committee may recover from the Defendants under Section 550 as subsequent transferee's without any consideration into whether the subsequent transfer is protected by Section 546(e).

For the reasons set forth above, the Committee submits that this Court should find that Stock Cancellation did not constitute a "settlement payment" as contemplated by Section 546(e), or at the very least, the Court should find there are material issues of fact as to whether the Stock

Cancellation constitutes a "settlement payment" as contemplated by Section 546(e). Therefore, the Defendants' Motion for Summary Judgment to Counts I, II and III should be DENIED.

**(ii)    If the Stock Cancellation constituted a "settlement payment" under Section 546(e), was the settlement payment made "by or to a financial institution"?**

Assuming, arguendo, that the Stock Cancellation constituted a "settlement payment" under Section 546(e), the Court must now determine whether the settlement payment was made by or to a financial institution. Initially, the Committee notes that each of the cases cited by the Defendants in support of their argument that the payment was made by a financial institution (with the exception of *In re Loranger Mfg. Corp*, 324 B.R. 575 (Bankr. W.D. Pa. 2005)) dealt with complex publicly traded security transactions involving third party intermediaries (including brokers, disbursing agents, transfer agents, etc., whom the securities were presented to directly for payment) and the national securities clearance and settlement system. *See Resorts, supra.; Kaiser II, supra.; Hechinger, supra.* In these cases, the transferee defendants were required to present their security to a transfer agent, broker and/or disbursing agent in exchange for payment by said transfer agent, broker and/or disbursing agent. In each of these cases, the Courts found that such transfers were "settlement payments" made "by or to a financial institution" under Section 546(e).

In the case at bar, it is undisputed that the Defendants did not present their stock to Chase Manhattan Bank in exchange for payment. The allegation of the Defendants is that in exchange for their Class B Stock, the Defendants received payment from NFC and/or NFC Holding at a price of $49.42 per share. There was no disbursing agent, transfer agent, broker, or any other third party intermediary involved in the transaction. The payment came from either NFC or NFC Holding, both of whom are not "financial institutions," or any other entity identified in Section

546(e). The Stock Cancellation was not subject to the national securities clearance and settlement system.

The Defendants would have this Court be persuaded by the reasoning and holding of the Court in *Loranger* that because the alleged fraudulent payments were received through a wire transfer drawn on the Debtor's bank account said payments were deemed to have been made "by a financial institution" for Section 546(e) purposes. *Loranger*, 324 B.R. at 585.

In *Loranger*, the Plaintiff, for reasons unknown, conceded that the payments received by the Defendants constituted a "settlement payment" as contemplated under Section 546(e). *Loranger*, 324 B.R. at 584. Thus, the *Loranger* Court did not conduct any analysis, as this Court is being asked to do, into whether in fact the payment made on account of the security transfer at issue in *Loranger* was in fact a "settlement payment." *Id.* As such, the *Loranger* Court moved directly into an analysis of the second condition of Section 546(e) and whether the settlement payment was made "by or to a financial institution." *Id.* In arriving at a conclusion that the payments were made by a financial institution, the *Loranger* Court relied upon the holdings and analysis in *Resorts* and *Hechinger*. However, rather than attempt to reconcile the distinguishing characteristics of the *Resorts* and *Hechinger* line of cases to the facts of *Loranger* (most importantly the fact that *Resorts* and *Hechinger* involved third party intermediaries to which the securities were presented in exchange for payment) the *Loranger* Court simply begins an analysis of: (i) whether PNC Bank, the institution were the Debtor's bank account was located was a financial institution; and (ii) whether payment by wire transfer from that account constituted payment "by a financial institution" for purposes of Section 546(e). *Id.* at 584 and 585.

As stated above, the Committee submits that an analysis of the distinguishing characteristics of the *Resorts* and *Hechinger* line of cases is critical to a determination whether a "settlement payment" was made "by or to a financial institution" so as to afford the recipient of a potential fraudulent transfer the benefit of the safe harbor provisions of Section 546(e) as contemplated by Congress. Contrary to the holding in *Loranger*, the decisions in *Resorts* and *Hechinger* do not stand for the rigid proposition that payments drawn on bank accounts constitute payment "by a financial institution" for purposes of Section 546(e). In fact, neither court even addresses the issue. *Resorts* and *Hechinger* stand for the proposition that in the event a third party intermediary is used in the transaction, such that the securities are presented to it in exchange for payment, then such payment can be found to have been made "by a financial institution." This would be consistent with Congressional intent and the Court's concern in protecting the national securities clearance and settlement system. Such a concern is not applicable in this case.

Because the *Loranger* Court failed to analyze the distinguishing characteristics of *Resorts* and *Hechinger* from the facts of *Loranger* in arriving at its conclusion, the Committee submits that this Court should not find *Loranger* persuasive. The Committee submits that the reasoning and holding in *Loranger* is incomplete and misguided, and that following such reasoning and holding would only lead to absurd results. For instance, and as discussed in *Grand Eagle, supra,* a savvy equity interest holder in a privately held company that is experiencing financial difficulty could devise a scheme to have the troubled company buy back his equity making sure only that the payment be drawn on the troubled company's bank account and then simply put the company into a bankruptcy proceeding. In so doing, the transferee could shield himself or herself from a fraudulent transfer claim under the safe harbor provisions of Section 546(e). This cannot be

what Congress intended in drafting Section 546(e), because it is tantamount to sanctioning actual fraud.

For this reason and the reasons stated above, the Committee submits that the Distributions received by the Defendants were not "settlement payments" made "by or to a financial institution" and therefore, should not be afforded the protection of the safe harbor provisions of Section 546(e). At the very least, there are unresolved material issues of fact as to whether the payments were made "by or to a financial institution" and therefore, the Defendants Motion for Summary Judgment as to Counts I, II and III should be DENIED.

## II.    COUNTS IV, V AND VI OF THE PLAINTIFF'S AMENDED COMPLAINT ARE NOT UNTIMELY.

Contrary to the Defendants' assertions, the Plaintiff submits that Counts IV, V and VI of its Amended Complaint were filed timely. In the case at bar, and as the allegations of the Original Complaint and Amended Complaint demonstrate, the officers and directors of NFC and NFC Holdings devised a scheme to effectuate the cancellation of certain Class B stock and to then transfer approximately $5.7 million dollars to Class B stockholders, including officers and directors of NFC and NFC Holdings. This scheme was not discovered until after the appointment of the Unsecured Creditors Committee in March of 2002, which Committee was charged with the duty of investigating, identifying and prosecuting certain claims against third parties, including insiders.

The accrual date of the statute of limitations indicates the date the statute of limitations period begins to run. The period begins to run as soon as a right to institute and maintain suit arises. Crouse v. Cyclops Indus., 745 A.2d 606, 611 - 612 (Pa. 2000) (See Pocono International Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983)). However:

> Under Pennsylvania's discovery rule, the statute of limitations will not begin to run until "the plaintiff reasonably knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *In re TMI Litig.,* 89 F.3d 1106, 1116 (3d Cir. 1996) (quoting *Cathcart v. Keene Indus. Insulation,* 471 A.2d 493, 500 (Pa. Super. 1984)) (internal quotation marks omitted). The discovery rule will only toll the statute of limitations where the plaintiff shows that he or she has exercised "'reasonable diligence' in ascertaining the existence of the injury and its cause." *Bohus v. Beloff,* 950 F.2d 919, 925 (3d Cir. 1991).
>
> Reasonable diligence is precisely that -- a reasonable effort to discover the cause of an injury under the facts and circumstances present in the case. This Court has long held that there are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence. *Deemer v. Weaver,* 187 A. 215, 217 (Pa. 1936). Although reasonable diligence is an objective rather than a subjective standard, 'it is sufficiently flexible . . . to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question.' *Burnside v. Abbott Laboratories,* 505 A.2d 973, 988 (Pa. Super. 1985), appeal denied, Pa., A.2d (Dec. 18, 1986)." *Crouse v. Cyclops Indus.,* 745 A.2d 606, 611 - 612 (Pa. 2000).

In re Mushroom Transp. Co., 382 F.3d 325, 338 (3d Cir. 2004).

In Seitz v. Detweiler, Hershey & Assocs., (In re CitX Corp.), 2004 U.S. Dist. LEXIS 24903, 11-12 (E. D. Pa. 2004). the court held that the discovery rule operated to toll the accrual date of the statute of limitations until the date of filing of bankruptcy where the bankruptcy trustee stepped into the shoes of the company.

> Although the Trustee steps into the shoes of the bankruptcy company, it is not in a position, prior to the filing of the bankruptcy action, to be aware of potential claims arising from injuries to the bankrupt company. A reasonable person in the Trustee's position could not be aware of, or reasonably be expected to discover, injuries to CitX prior to the filing of the bankruptcy petition. Therefore, the discovery rule applies to toll the statute of limitations until the filing of the bankruptcy petition on July 3, 2001, leaving the Trustee within the applicable statutory period

27

given its filing on July 2, 2003. See *Baehr v. Touche Ross & Co.*,
62 B.R. 793, 797 (E.D. Pa. 1986) (tolling the two-year limitation
of § 5524 until the bankruptcy filing).

<u>Seitz</u>, 2004 U.S. Dist. LEXIS 24903, 11-12 (E. D. Pa. 2004).

The Plaintiff submits that the claims and causes of action set forth in its Original

Complaint and Amended Complaint were not discovered until the Committee made a reasonable

inquiry into the matter in mid to late 2002. Until the filing of the Bankruptcy, there was no

reason for creditors or other parties to awaken inquiry and direct diligence into the issues

surrounding the Stock Cancellation. *See* <u>In re Mushroom Transp. Co.</u>, 382 F.3d 325, 338 (3d Cir.

2004. As the Committee filed its Original Complaint on January 30, 2003, the actions were

asserted well within the applicable statute of limitations period. At the very least, there remain

material issues of fact over the "discovery rule" and its application to this case not warranting a

grant of summary judgment as a matter of law.

Further, the Plaintiff asserts that the statute of limitations should be equitably tolled.

[E]quitable tolling will suspend the running of the statute of limitations
"(1) where the defendant has actively misled the plaintiff respecting the
plaintiffs cause of action; (2) where the plaintiff in some extraordinary
way has been prevented from asserting his or her rights; or (3) where the
plaintiff has timely asserted his or her rights mistakenly in [339] the
wrong forum." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d
1380, 1387 (3d Cir. 1994) (citations omitted). Like the discovery rule,
equitable tolling requires the plaintiff to demonstrate "that he or she could
not, by the exercise of reasonable diligence, have discovered essential
information bearing on his or her claim." Id. at 1390 (citation omitted).

<u>In re Mushroom Transp. Co.</u>, 382 F.3d 325, 338-339 (3d Cir. 2004).

In <u>Sheffield Steel Corp. v. HMK Enters.</u> (In re Sheffield Steel Corp.), 320 B.R. 405

(Bankr. N.D. Okla. 2004), the United States Bankruptcy Court for the Northern District of

Oklahoma denied the defendant's motion to dismiss on the basis that the plaintiffs established a

prima facie case for the equitable tolling of the statute of limitations for allegations of self-dealing by a fiduciary.

> [W]here a complaint satisfies the elements of a prima facie case for equitably tolling -- i.e., it contains allegations of self-dealing for profit by a fiduciary -- it is ordinarily inappropriate to summarily dismiss a claim as untimely under an otherwise applicable statute of limitations pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See, e.g., *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168, 170 (Del. 1976))(allegations in complaint that directors engaged in fraudulent self-dealing satisfied the minimum requirements of equitable tolling to preclude dismissal on statute of limitations grounds). In such cases, the resolution of a defendant's statute of limitations defense and the plaintiffs counter-defense of equitable tolling requires factual development and a full presentation of evidence relevant to the equities that must be assessed and balanced. Under the liberal rules of notice pleading, a plaintiff is not required to state all the evidence it would present in support of its equitable tolling claim in the complaint.

*Id.* at 419.

In the case at bar, both the Original Complaint and Amended Complaint clearly set forth claims of self-dealing for profit by a fiduciary. As in <u>Sheffield</u>, this Court should require the factual development and allow for a full presentation of evidence relevant to the equities that must be assessed and balanced in resolving the Defendants' statute of limitations defense and the Plaintiff's counter-defense of equitable tolling.

The Plaintiff submits that a further tolling of any statue of limitations should be invoked as the officers and directors fraudulently concealed the insolvency of NFC and NFC Holdings and misrepresented the true financial condition of NFC and NFC Holdings at the time of the Stock Cancellation:

> [T]he doctrine of fraudulent concealment serves to toll the running of the statute of limitations. The doctrine is based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance

or deviate from his right of inquiry into the facts. *Deemer*, 187 A. at 215. The doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception. *Id*. The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence. *Molineux v. Reed*, 532 A.2d 792, 794 (Pa. 1987). While it is for the court to determine whether an estoppel results from established facts, it is for the jury to say whether the remarks that are alleged to constitute the fraud or concealment were made. *Nesbitt*, 204 A.2d at 476.

    ...

[A] statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause.

Fine v. Checcio, 870 A.2d 850, 860 - 61(Pa. 2005).

If the **facts** establish "(1) wrongful concealment of its actions by defendant; (2) failure of the plaintiff to discover the operative facts or the basis of his cause of action within the limitations periods; and (3) plaintiff's due diligence until discovery of the facts," then the Committee may be successful in its fraudulent concealment claim. Bethlehem Steel Corp. v. Fischbach & Moore, Inc., 641 F. Supp. 271, 273 (E.D. Pa. 1986) (Emphasis added).

In the instant matter, the Plaintiff should be allowed to discover and develop facts that could support the tolling of the statute of limitations under the discovery rule or equitable tolling. Given the minimal discovery in this case, it would be premature for the Court to determine as a matter of law that Counts IV, V and VI are untimely.

**III.    AS A MATTER OF LAW SECTION 546(e) OF THE BANKRUPTCY CODE DOES NOT BAR COUNT VII OF THE PLAINTIFF'S AMENDED COMPLAINT.**

For the reasons set forth above, the Plaintiff submits that Count VII is not barred by Section 546(e), or there is at least material issues of fact as to whether Section 546(e) is applicable to Count VII. Therefore, Summary Judgment should be denied.

IV.    **AS A MATTER OF LAW COUNT VIII SHOULD NOT BE LIMITED TO THE OFFICERS OF NFC HOLDINGS.**

The Plaintiff submits that there are material issues of fact as to who the officers and directors were for both NFC and NFC Holdings. As evidenced by Exhibits B and C to the Committee's Appendix, there are material issues of fact that need to be resolved regarding which board of directors and which officers authorized the Stock Cancellation. The claims raised in each and every count of the Plaintiff's Amended Complaint include claims against the officers and directors of NFC and NFC Holdings. Given the limited discovery in this case and the material issues of fact regarding who were the officers and directors of NFC and NFC Holdings and which acted in authorizing the Stock Cancellation it would be premature to find as a matter of law that the claims contained in Count VIII to the Plaintiff's Amended Complaint should be limited to one Defendant. The Plaintiff hereby incorporates by reference as if fully set forth herein Argument I to its Original Brief in Opposition.

## CONCLUSION

As a matter of law, the Stock Cancellation was not an integrated transaction. As a matter of law, the safe harbor provisions of Section 546(e) do not extend to cases of actual fraud. As a matter of law, the payments made on account of the Stock Cancellation at issue in this case do not constitute a "settlement payment" under Section 546(e) and thus, the Defendants are not entitled to the safe harbor provisions of Section 546(e). Alternatively, there is at least a material issue of fact as to whether the payments are "settlement payments" as that term is used in Section 546(e). As a matter of law, the payments made on account of the Stock Cancellation at issue in this case were not made "by a financial institution" as contemplated under Section 546(e) and thus, the Defendants are not entitled to the safe harbor provisions of Section 546(e).

Alternatively, there is at least a material issue of fact as to whether the payments were made "by a financial institution" as contemplated by Section 546(e).

As a matter of law, Count IV, V and VI should not be dismissed as untimely. There exist material issues of fact as to whether the discovery rule or equitable tolling would act to toll any statute of limitation on claims arising out of or relating to the Stock Cancellation.

There is a material issue of fact as to why NFC transferred to NFC Holdings approximately $5.7 million dollars and what reasonably equivalent value was exchanged. There is a material issue of fact of whether the Committee may recover against the Defendants as subsequent transferee's of the initial avoidable transfer between NFC and NFC Holdings under Section 550 of the Bankruptcy Code. There exists a material issue of fact as to which Board of Directors authorized the Stock Cancellation.

For the above reasons, the Committee submits that the Defendants' Motion for Summary Judgment should be DENIED in its entirety.

Respectfully submitted,

Leech Tishman Fuscaldo & Lampl, LLC

David W. Lampl, Esquire
PA I.D. No. 28900
John M. Steiner, Esquire
PA I.D. No. 79390
525 William Penn Place, 30th Floor
Pittsburgh, Pennsylvania 15219
(412) 261-1600
Counsel for the Official Committee of
Unsecured Creditors

Quinn, Buseck, Leemhuis, Toohey & Kroto, Inc.

*/s/ Lawrence C. Bolla*
Lawrence C. Bolla, Esquire
Arthur Martinucci, Esquire
2222 West Grandview Blvd.
Erie, PA  16506-4508
Counsel for Retirees' Committee