**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br>**NATIONAL FORGE COMPANY, et al.,**<br><br>　　　　　**Debtor.**<br>_____<br><br>**OFFICIAL COMMITTEE OF**<br>**UNSECURED CREDITORS OF**<br>**NATIONAL FORGE COMPANY,**<br><br>　　　　　**Plaintiff,**<br>**and**<br><br>**OFFICIAL COMMITTEE OF RETIREES**<br>**OF NATIONAL FORGE COMPANY,**<br><br>　　　　　**Intervenors,**<br>　**v.**<br><br>**E. ROGER CLARK, et al.,**<br><br>　　　　　**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　**Civil Action No. 04-21 Erie**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., District J.,

Currently pending before the Court in this adversary proceeding is a motion for partial summary judgment filed and/or joined in by all of the Defendants. The adversary proceeding was originally commenced in the Bankruptcy Court, but the reference was withdrawn pursuant to our order dated March 1, 2004 upon the agreement of all parties. Consequently, this Court now has original jurisdiction over the matter pursuant to 28 U.S.C. § 157(d) and § 1334(b).

For the reasons set forth below, the Defendants' motion will be granted and judgment will be entered in favor of all Defendants on Counts 1 through 7 of the Amended Complaint. As to Count 8, judgment will be entered in favor of all Defendants, except for E. Roger Clark, Maurice J. Cashman, Dana Beyeler, Robert A. Kaemmerer, and Ashtok Khare.

1

# I. STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir.1990). The moving party has the initial burden of demonstrating that, given the evidence of record, no reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Wilson v. Lemington Home for the Aged, No. 99-1893, 2000 WL 33712287 at *1 (W.D. Pa. April 12, 2000). Entry of judgment is mandated against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322; Wilson, *supra,* at *1.

# II. BACKGROUND

The present dispute arises out of the redemption of certain shares of National Forge Company Holding Inc.'s stock which occurred on April 13, 1999. The Official Committee of Unsecured Creditors (the "Committee") seeks, *inter alia*, to set aside the

2

redemption and recover the payments made to shareholders in connection therewith.[1]
Some background information is essential to an understanding of the present dispute.[2]

Prior to its demise, National Forge Company ("NFC") was a Pennsylvania corporation engaged in the business of manufacturing heavy, precision-machined, forged steel components.  In 1995 NFC Holdings ("Holdings") was formed by an employee stock ownership plan and certain NFC employees as a vehicle to acquire the stock of NFC's then-owners.  The acquisition was partly funded through the employees' purchase of 116,347 shares of Class B stock in Holdings, which generated $1,284,470.88.  This sum, together with bank loans, funded Holdings' purchase of NFC's stock and supplied the companies' working capital needs.  Thus, in 1995 NFC became a wholly-owned subsidiary of Holdings, whose ownership, in turn, was comprised of two classes of common stock:  Class A shares, which were held exclusively by the National Forge Company Holdings, Inc. Employee Stock Ownership Plan (the "ESOP"), and Class B shares, which were held by certain directors, officers, and/or management-level employees of NFC – almost all of whom have been named as individual Defendants in this action.

_____

[1] The Bankruptcy Court granted the Committee retroactive derivative standing to pursue this action on behalf of the Debtor's estate.  See In re National Forge Co., 304 B.R. 214 (Bankr. W.D. Pa. 2004).  Following our withdrawal of the reference to the Bankruptcy Court, we reconsidered the issue and determined that the Bankruptcy Court's grant of retroactive derivative standing should stand.  See In re National Forge Co., 326 B.R. 532 (W.D. Pa. 2005).  The Official Committee of Retirees of National Forge Company have been granted intervenor status and they join in the prosecution of these claims as well as the defense of the instant Rule 56 motions.  For the sake of simplicity, both the Committee and the Intervenors will be referred to collectively as the "Committee" or the "Plaintiff" in this Memorandum Opinion.

[2] The background facts set forth herein are taken primarily from the September 26, 2005 sworn declaration of Maurice J. Cashman, formerly the Chief Financial Officer of NFC.  [See Cashman Decl. (9/26/05), Ex. A to Def.s' Appendix in Supp. of Mot. for Summ. Judg. (Doc. # 45)].  These facts stand undisputed, except as otherwise indicated in this memorandum opinion.

3

Defendants contend that the disputed redemption was the product of an important change in the federal corporate tax laws. In 1997, qualified retirement plan trusts like the ESOP became eligible to be shareholders in corporations that elected to be taxed under Subchapter S of the Internal Revenue Code of 1986. See Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1310, and the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1601. Because qualified retirement plan trusts were generally exempt from federal and state income taxes, this change in the law meant that a corporation wholly owned by an employee stock ownership plan could avoid federal and state income taxes by electing to be taxed under Subchapter S of the IRC, thereby allowing all of the corporate income to pass through to a tax-exempt shareholder.

Defendants maintain that, because the ESOP was Holdings' largest shareholder, these changes in the tax laws offered significant potential tax savings to Holdings. Having been advised by outside legal counsel, accounting professionals and valuation experts as to the benefits of electing Subchapter S status, Holdings on December 22, 1998 unanimously elected – through its full board of directors – to take Subchapter S status.[3]

On the other hand, a corporation electing Subchapter S status could have only one class of stock. See 26 U.S.C. § 1361(b)(1)(West 1998). Thus, Holdings could not eliminate its federal income tax liability until it eliminated its Class B (i.e. non-ESOP held) shares. Accordingly, in the same resolution by which it authorized Holdings to elect Subchapter S status, Holdings' Board of Directors also authorized the corporation

---

[3] Defendants contend, based on internally prepared calculations, that Holdings' federal income tax savings for fiscal years 1998 through 2003, as a result of electing Subchapter S status, was projected to total $5,517,000. Thus, they contend, in just six years Holdings would have recovered all but $233,000 of the approximately $5,750,000 that it paid to redeem its Class B shares.

4

to eliminate its outstanding Class B shares by redeeming the stock at a price of $49.42 per share. That redemption price was premised upon a December 14, 1998 report issued by Holdings' valuation expert, Valuemetrics, Inc., which fixed the value of the company's Class A and Class B shares at $49.42 per share as of June 30, 1998.

The Board further resolved that, in the event Class B shareholders did not agree to the terms of redemption, management was to take the steps necessary to merge Holdings into a new entity so that the outstanding Class B shares could be replaced with shares of a single class in the successor entity. The resolution further authorized Holdings to borrow funds as needed by drawing upon an existing credit facility with the Defendant Banks. Holdings subsequently obtained approval from the Banks to use up to $4 million to fund the redemption of the Class B share. These loans were secured by a lien upon substantially all of NFC's assets.

Ultimately, all of the Class B shareholders accepted Holdings' redemption offer. To effectuate the payment, NFC on April 13, 1999 directed The Chase Manhattan Bank to transfer $5,749,868.74 (the aggregate redemption price) from an NFC operating account to a Holdings' account at Chase. That same day, Holdings repurchased the outstanding Class B shares in one of two ways. For those 94,538 shares held in individual retirement accounts at National City Bank, Holdings directed Chase to wire transfer to National City Bank a single payment of $4,672,067.96, which was then distributed by National City Bank to the relevant IRA accounts according to the number of shares being redeemed. For those individuals holding shares outside of IRAs, Holdings issued each shareholder a check in the relevant amount drawn on a Holdings' account at Chase. The payments to redeem non-IRA shares totaled $1,077,800.78. Thus, following the redemption of its Class B shares, Holdings had only a single class of stock, all of which was owned by the ESOP.

On March 6, 2002 NFC, Holdings, and another affiliated company (NFC Components) each filed petitions for relief under Chapter 11 of the Bankruptcy Code. The Bankruptcy Court subsequently approved an amended joint plan of liquidation filed by NFC and NFC Components, pursuant to which substantially all of the companies' assets were sold and the proceeds and remaining assets re-vested in a new entity, Liquidating NFC, for distribution to creditors.

We have previously discussed the procedural history relative to the filing of this Adversary Proceeding, see In re National Forge Co., 326 B.R. 532 (W.D. Pa. 2005), and we need not repeat that discussion here. For present purposes, it is sufficient to note that the Committee filed its Amended Complaint on August 22, 2005 (see Doc. # 39), asserting eight causes of action against three groups of Defendants involved, directly or indirectly, with the stock redemption.[4]  Counts 1-3 assert claims against all Defendants for alleged violations of the Pennsylvania Uniform Fraudulent Transfer Act (UFTA).  Counts 4-6 assert claims against the Director and Officer Defendants for alleged violations of the Pennsylvania Business Corporation Law.  Counts 7 and 8 assert claims against the Director and Officer Defendants for alleged violations of, respectively, the Delaware General Corporation Law and Delaware common law breach of fiduciary duty.

Certain of the Director and Officer Defendants (i.e., Defendants Clark, Cashman, Beyeler and Kaemmerer, hereafter the "Moving Defendants") have filed a motion for

---

[4] The three groups of Defendants are:  (i) JPMorgan Chase & Co. (successor to The Chase Manhattan Bank), Fleet Business Credit Corporation, and National City Bank of Pennsylvania (collectively, the "Lenders"), (ii) E. Roger Clark, Maurice J. Cashman, Dana Beyeler, Robert A. Kaemmerer, Thomas H. Jackson, and Charles R. Olson, individually and in their capacities as Directors and/or Officers of NFC and/or Holdings (collectively, the "Director and Officer Defendants"); and (iii) nineteen other management level employees of NFC and/or Holdings who were shareholders of Holdings' Class B stock and who received various forms of payment in redemption of their Class B shares (collectively, the "Transferee Defendants").

summary judgment relative to Counts 1 through 7 in their entirety.  As to Counts 1-3 and Count 7, the Moving Defendants contend that the Committee's claims are barred by the provisions of 11 U.S.C. § 546(e).  In addition, they insist that Counts 4-6 are untimely as a matter of law and should therefore be dismissed.  With respect to Count 8, the Moving Defendants contend that the Committee's claim should proceed only against themselves and not against Defendants Olsen or Jackson, who were neither directors nor officers of Holdings during the time period in question.  The remaining Defendants have joined in the arguments of the Moving Defendants.  The Committee has filed its opposition to the instant motion and the issues, having been fully briefed, are now ripe for consideration.

## III.  DISCUSSION

A.    Counts 1 through 3

Pursuant to § 544(b)(1) of the Bankruptcy Code, the trustee (or in this case, the Committee) "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title ..."  11 U.S.C. § 544(b)(1).  This "strong arm" provision thus grants the trustee power to avoid fraudulent transfers under any applicable theories of state law.  Here, the Committee asserts three different theories in Counts 1 through 3 of the Amended Complaint as to how the stock redemption violated provisions of the Pennsylvania UFTA.

Nevertheless, §546(e) of the Code limits the trustee's (and thus, the Committee's) avoidance power under § 544(b) when the transfer in question is a "settlement payment ... made by or to a commodity broker, forward contract merchant, stockbroker, financial institution, or securities clearing agency, that is made before the commencement of the case..."  11 U.S.C. § 546(e).  Defendants contend that this "safe

7

harbor" provision (a/k/a the "settlement payment" defense) bars the Committee's claims in Counts 1 through 3.

This line of defense raises four issues for our consideration: first, whether the events culminating in the redemption of Holdings' Class B shares – including the transfer of approximately $5.75 million from NFC to Holdings and the subsequent distribution of those monies from Holdings to its Class B shareholders – should be viewed as a single, integrated transaction for purposes of the Committee's fraudulent transfer claims; second, whether the payments at issue constitute "settlement payments" within the meaning of § 546(e); third, whether these alleged "settlement payments" were made "by or to" a "financial institution"; and, fourth, whether Count 2 falls outside the scope of § 546(e) in any event. We address these issues in turn.

### 1.    Was the Stock Redemption a Single, Integrated Transaction?

The Moving Defendants assert that the events culminating in the redemption of Holdings' Class B shares must be viewed as one integrated transaction. By so arguing, the Defendants seek to bring the entirety of the transaction, including the transfer of approximately $5.7 million from NFC to Holdings, within the safe harbor provision of § 546(e).

The Committee, on the other hand, insists that, as a matter of law, the transfer of $5.7 million from NFC to Holdings and the subsequent distribution of those monies by Holdings to its Class B shareholders must be viewed as separate and distinct transactions. In so arguing, the Committee seeks to focus our attention exclusively on the NFC-to-Holdings transfer which, Plaintiff believes, is exempt from § 546(e)'s "settlement payment" defense. The Committee theorizes that, if the transfer between

8

NFC and Holdings is avoided, then pursuant to § 550(a)(2) of the Code,[5] the Committee can obtain recovery from the Defendants as immediate or mediate transferees of Holdings.  Analysis of the payments subsequently made by Holdings to the Transferee Defendants thereby becomes superfluous.

It is now widely accepted that multilateral transactions may under appropriate circumstances be "collapsed" and treated as phases of a single transaction for purposes of applying fraudulent conveyance principles.  HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995) (as amended on denial of pet. for reh'g en banc); Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993) (citing cases).  Under this "integrated transaction" doctrine (or "step transaction" doctrine as it is sometimes known), "[i]nterrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction."  In re Foxmeyer Corp., 286 B.R. 546, 573 (Bankr. D. Del. 2002) (quoting In re Big v. Holding Corp., 267 B.R. 71, 92-93 (Bankr. D. Del. 2001)).  "[B]y 'linking together all interdependent steps with legal or business significance, rather than taking them in isolation,' the result may be based 'on a realistic view of the entire transaction.'"  Id.

This doctrine has often been applied in the context of leveraged buyouts where the target company ultimately becomes insolvent.  See HBE Leasing, 48 F.3d at 635;

---

[5] Section 550 provides, in relevant part, that:

(a)  [T]o the extent that a transfer is avoided under section 544 .... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

9

Kupetz v. Wolf, 845 F.2d 842 (9th Cir. 1988); United States v. Tabor Court Realty Corp., 803 F.2d 1288 (3d Cir. 1986); Crowthers McCall Pattern, Inc. v. Lewis, 129 B.R. 992, 998 (S.D.N.Y. 1991); Wiebolt Stores, Inc. v. Schottenstein, 94 B.R. 488, 500-04 (N.D. Ill. 1988); In re Best Products Co., Inc., 168 B.R. 35, 56-57 (Bankr. S.D.N.Y. 1994). Typically, however, it is the plaintiff/trustee/creditor who seeks to invoke the "integrated transaction" doctrine, often for purposes of demonstrating that the insolvent target company did not, in the aggregate, receive fair consideration or reasonably equivalent value for the transfer in question.  See, e.g., Orr, 991 F.2d at 35-36; In re Best Products Co., 168 B.R. at 56-57; In re O'Day Corp., 126 B.R. 370, 394-95 (Bankr. D. Mass. 1991); In re Suburban Motor Freight, Inc., 124 B.R. 984, 998 (Bankr. S.D. Ohio 1990).

    In determining whether a series of transactions should be "collapsed" into a single integrated one, courts focus not on the form of the transaction but on its substance – especially the knowledge and intent of the parties involved in the transaction and whether there was an overall scheme to defraud creditors.  See HBE Leasing Corp., supra; Orr, 991 F.2d at 35-36; In re Hechinger Investment Co. of Delaware, 327 B.R. 537, 546 (D. Del. 2005); MFS/Sun Life Trust - High Yield Series v. Van Dusen Airport Serv. Co., 910 F. Supp. 913, 934 (S.D.N.Y. 1995); Wiebolt Stores, Inc., supra; In re OODC, LLC, 321 B.R. 128, 138 (Bankr. D. Del. 2005); Best Products Co., supra; O'Day Corp., supra; Suburban Motor Freight, supra.  Among other things, courts consider whether all of the defendants were aware of the multiple steps of the transaction.  See HBE Leasing Corp., supra, at 635-36; Hechinger Investment Co., supra, at 546-47; MFS/Sun Life Trust, 910 F. Supp. at 934; O'Day Corp., supra, at 394. Courts also consider whether each step would have occurred on its own or, alternatively, whether each step depended upon the occurrence of the additional steps in order to fulfill the parties' intent.  See Hechinger Investment Co. of Delaware, supra, at 546; MFS/Sun Life Trust, supra, at 934.

Two third circuit cases illustrate these general principles.  In <u>United States v.</u> <u>Tabor Realty Corp.</u>, 803 F.2d 1288 (3d Cir. 1986), the Third Circuit considered the applicability of the Pennsylvania UFTA in the context of a leveraged buy-out wherein the highly leveraged target companies, Raymond Colliery Co., Inc. and its subsidiaries (collectively, the "Raymond Group"), were acquired by Great American, a holding company formed by Raymond's president, James Durkin.  The millions of dollars needed to finance the acquisition were obtained through loans made by the Institutional Investors Trust ("IIT") at an extremely high rate of interest; these loans were secured by mortgages on substantially all of the assets of the Raymond Group.  The loan arrangement involved a two-part process whereby loan proceeds went from IIT to certain Raymond Group companies, which then immediately turned the funds over to Great American in exchange for an unsecured promissory note.  Great American then used the borrowed funds to effectuate the purchase of the Raymond Group.  Following a lengthy bench trial, the district court found that the two loans were, in reality, an integrated transaction and that the mortgages given by the borrowing Raymond Group companies to IIT were invalid fraudulent conveyances which had rendered the Raymond Group insolvent.

The Third Circuit Court of Appeals upheld these findings, including the district court's treatment of the IIT-Raymond Group-Great American transaction as a single, integrated transaction.  In so ruling, the Court of Appeals observed that:  Durkin, the president of Great American (and also president of Raymond), had solicited financing from IIT for the purchase; the loan negotiations had included representatives from all three parties; and immediately upon receipt of the IIT loan proceeds, the Raymond Group "loaned" Great American the cash needed for the buy-out, receiving in return only an unsecured promissory note.  803 F.2d at 1302.  The appellate court agreed with the district court that, "for purposes of determining IIT's knowledge of the use of the

proceeds under section 353(a) [of the Pennsylvania UFTA], there was one integral transaction." Id. at 1303.  Significantly, the evidence showed that IIT was "intimately involved" in formulating the agreement "whereby the proceeds of its loan were funneled into the hands of the purchasers of the stock of a corporation that was near insolvency." Id. at n. 8.

In Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206 (3d Cir. 1990), the court of appeals reviewed a district court's ruling that the foreclosure upon and resale of Paige Steel Corporation's assets to a newly formed transferee corporation, Vantage Steel Corporation, constituted a fraudulent conveyance.  In that case the plaintiff, Voest-Alpine Trading USA Corp. (VATCO), was an unsecured judgment creditor of Paige Steel Corporation, a company controlled by the Defendants Marvin and Holley Sue Stabler.  The evidence showed that the Stablers formed Vantage for the purpose of acquiring Paige's assets at less than fair market value while freezing out VATCO and other unsecured creditors of Paige.  The scheme was hatched through the planned foreclosure by New Jersey National Bank (NJNB) on an outstanding loan of some $1.5 million which NJNB had previously granted to Paige and secured through a lien on Paige's assets.  On August 8, 1986, NJNB foreclosed on all Paige's assets.  Simultaneously therewith, NJNB extended to Vantage various credit facilities through which Vantage was able to purchase from NJNB virtually all of Paige's assets at less than fair market value.  Thus, as the court noted, "on Monday morning August 11, 1986 Vantage opened for business with Stabler as an officer of Vantage and with the same address, staff, office, telephone number, and assets that Paige had closed with at the end of the day on Friday, August 8."  919 F.2d at 209.  The district court had concluded that the transactions of August 8, 1986 were effectively a single, integrated transaction that functioned as a subterfuge, the purpose of which was to

12

secure the Stabler's equity position in the new company while defrauding VATCO and other unsecured creditors.

On appeal, the Third Circuit concluded there was abundant evidence in the record to support the lower court's finding that the transactions of August 8 were, in reality, a single transaction functioning as a subterfuge.  919 F.2d at 212.  Of particular significance were the district court's well supported findings that each portion of the August 8 transaction was dependent upon the occurrence of the other and that both the Stablers' efforts to conceal the August 8 transaction as well as the structure of the transaction itself evidenced an intent by the defendants to hinder, delay and defraud unsecured creditors.  The court of appeals found that Tabor Court Realty was instructive and supported treatment of the various August 8 transactions as a unitary transaction.  Given the fact that NJNB had foreclosed at the request of the defendants and at a time and place convenient to them, the court found the situation in Voest-Alpine akin to that in Tabor, where the lender had been "intimately" aware of and involved with the defendants' use of the loan proceeds to accomplish the disputed stock buyout.  919 F.2d at 213 (quoting Tabor, 803 F.2d at 1303 n. 8).

The dispute in the case at bar involves a stock redemption rather than a leveraged acquisition or sale of corporate assets; thus, the facts involved in Tabor Court Realty and Voest-Alpine are not precisely on point.  Moreover, we recognize that the standard of review involved in those cases (a review of factual findings under the clearly erroneous standard) is different from the standard we employ on motions for summary judgment.  Nevertheless, we find their analyses instructive and consistent with the principles of the "integrated transaction" doctrine, as discussed in the above-cited cases.

We conclude that the transfers which culminated in the April 13, 1999 stock redemption must, as a matter of law, be viewed as one integrated transaction.  At all

13

times relevant to this litigation, NFC was the wholly owned subsidiary of Holdings. Ownership of Holdings (and therefore of NFC) was held by various company employees.  Not only were the Board of Directors for each company comprised of the same members, but (by the Committee's own assertions) those Boards generally conducted joint meetings.  In fact, it is the Committee's contention that the Boards of NFC and Holdings met "concurrently" on December 22, 1998 when all of the critical decisions relative to the stock redemption were made.  Thus, there was a strong identity of interests among the players in the disputed transaction.

Moreover, the Committee acknowledges that NFC, Holdings and the Lenders were all jointly involved in arranging the financing that would fund the stock redemption. It is undisputed on this record that, on or about March 29, 1999, NFC, Holdings, National Forge Europe Limited, and the Lenders entered into an agreement which permitted NFC and/or Holdings to borrow up to $4 million (secured by liens on NFC's assets) under an existing credit agreement in order to effectuate the stock redemption. (See Def.'s Append. in Supp. of Mot. for Summ. Judg. [Doc. # 45] at Ex. A-2.)  Those who received distributions under the stock redemption included individuals who were directors, officers or management-level employees of NFC and Holdings, and the mechanics of the stock redemption were spelled out in Holdings' corporate minutes. Given these uncontroverted facts, we conclude that all of the relevant parties to the disputed transfer had knowledge of the stock redemption plan.[6]  While the Committee insists that the Defendants' allegations regarding the knowledge and intent of the

---

[6] We also note that, pursuant to 11 U.S.C. § 550(a)(2), the Committee is attempting to recover from the Defendants as immediate or mediate transferees of the NFC-to-Holdings transfer.  However, recovery can only be obtained under § 550(a)(2) to the extent that the Defendants are *not* "transferee[s] that [took] for value... in good faith, and without knowledge of the voidability of the transfer avoided" (or immediate or mediate good faith transferees of such a transferee).  See § 550(b)(1) and (2). Accordingly, implicit in the Committee's theory of recovery is the assumption that the Defendants had knowledge that the challenged transfer was voidable.

14

parties are "replete" with material issues of fact, it provides nothing further by way of explanation or example to buttress its claim.

In addition, it appears undisputed that each critical step of the stock redemption plan would not have occurred on its own, but instead depended upon the occurrence of the others. For example, NFC would not have sought to borrow the additional $4 million from the Lenders (and the Lenders would not have lent those monies) if not for the purpose of financing the stock redemption. Similarly, NFC would not have undertaken the disputed transfer of $5.7 million to Holdings absent Holdings' intent to use the funds to accomplish the stock redemption. Again, it appears uncontroverted that all parties were aware of the ultimate purpose of loans to NFC, the transfer of loan proceeds from NFC to Holdings, and the distribution of those monies to Holdings' Class B shareholders – namely, the redemption of Holdings' Class B shares.

Finally, the timing of events further buttresses our conclusion that the NFC-to-Holdings transfer and the Holdings-to-shareholder distribution must be viewed as a single, integrated transaction. As noted, on or about March 29, 1999 the Lenders authorized the $4 million in loan monies which would fund the stock redemption. Approximately two weeks later, on April 13, 1999, NFC directed Chase Manhattan to transfer $5.7 million from NFC's operating account to Holdings' bank account at the same institution. That same day, Holdings directed Chase to disburse the funds in one of two ways: a) wire payment to National City Bank to redeem those Class B shares held in IRA accounts at National City and b) checks drawn upon Holdings' Chase account and issued directly to shareholders for the remaining non-IRA shares. Thus, the transfer of funds from NFC to Holdings and the distribution of those funds to Holdings' shareholders occurred on the same day and within approximately two weeks of the parties' agreement with the Lenders relative to the financing of the redemption.

15

In light of these facts, we reject the Committee's suggestion that the NFC-to-Holdings transfer can rationally be viewed in isolation, as a transaction separate and distinct from the Holdings-to-shareholder distributions.  "[W]here a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications.'"  Orr, 991 F.2d at 35 (citation omitted).

The Committee insists there is a genuine issue of material fact as to whether it was Holdings or NFC that authorized the stock redemption.  Referring us to a version of the December 22, 1998 corporate minutes which suggests that the Boards of NFC and Holdings met concurrently on that date, the Committee posits that it is unclear on whose behalf the Directors were acting when the resolutions of December 22, 1998 were passed.  We do not agree, however, that this creates a material issue of fact relative to our application of the "integrated transaction" doctrine.  On the contrary, if anything, it underscores the identity of interests between NFC and Holdings (as well as the commonality of their principle players) such that, for all intents and purposes, the stock redemption plan as conceived and executed must be viewed as an integrated one.

### 2.    Did the Stock Redemption Involve "Settlement Payments"?

The Committee further argues that, even if the events culminating in the stock redemption are viewed as an integrated transaction, § 546(e) does not bar its fraudulent transfer claims because the distributions of funds made to Class B shareholders in this case were not "settlement payments" within the meaning of § 546(e).  Defendants strongly disagree.

Because this dispute involves a question of statutory interpretation, we begin with the language of the statute itself.  See In re Resorts Int'l, Inc., 181 F.3d 505, 515 (3d Cir. 1999) ("We begin every statutory interpretation by looking to the plain language

16

of the statute."). Section 546(e) precludes the avoidance of any transfer that is a

"settlement payment, as defined in section ... 741 of this title." 11 U.S.C. § 546(e).

Section 741, in turn, provides the following definition:

> (8) "settlement payment" means a preliminary settlement payment,
> a partial settlement payment, an interim settlement payment, a
> settlement payment on account, a final settlement payment, or any
> other similar payment commonly used in the securities trade.

11 U.S.C. § 741(8).

The Defendants insist that the transfer of funds which occurred in relation to the

Holdings stock redemption constituted "settlement payments" within the meaning of

§§ 546(e) and 741(8). Such a conclusion, they argue, is inescapable under the

decision in Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Sav. &

Loan Ass'n, 878 F.2d 742 (3d Cir. 1989); Kaiser Steel Corp. v. Charles Schwab & Co.,

Inc., 913 F.2d 846 (10th Cir. 1990) ("Kaiser I"); In re Kaiser Steel Corp., 952 F.2d 1230

(10th Cir. 1991) ("Kaiser II"); In re Comark, 971 F.2d 322 (9th Cir. 1992); and In re

Resorts Int'l, Inc., 181 F.3d 505 (3d Cir. 1999). Because these cases are central to the

Defendant's theory, some discussion of their holdings is warranted.

In Bevill, Bresler & Schulman Asset Management Corp., the Third Circuit

addressed the meaning of "settlement payment" under § 546(f) of the Bankruptcy Code,

which provides a "settlement payment defense" nearly identical to that contained in

§ 546(e), except that § 546(f) applies to settlement payments "made by or to a repo

participant, in connection with a repurchase agreement..." See 11 U.S.C. § 546(f).

Bevill involved a dispute over repurchase agreements[7] that the debtor, AMC (a

---

[7] A standard "repurchase agreement," commonly referred to as a "repo," consists
of a two-part transaction: the first part is the transfer of specified securities by one party
(the dealer) to another party (the purchaser) in exchange for cash; the second part
consists of a contemporaneous agreement by the dealer to repurchase the securities at
the original price, plus an agreed upon additional amount (usually representing interest)
on a specified future date. See In re Bevill, 878 F.2d at 743 (citing 11 U.S.C. § 101(40)-

secondary dealer in government securities), had entered into with various lending institutions and municipalities.  Under the terms of the repurchase agreements, the lending institutions and municipalities agreed to purchase certain securities from AMC and simultaneously agreed to sell the securities back to AMC on an agreed upon date and for an agreed upon price.  The agreements at issue were known as "hold-in-custody" agreements,[8] which meant that AMC initially retained possession of the securities and the purchasers did not take physical custody of them until weeks after entering into the agreements.  Within 90 days following this physical transfer of the securities from AMC to the purchasers, AMC filed a Chapter 11 petition.

The trustee subsequently filed a complaint asserting that the transfers of securities to the purchasers were "fraudulent" under 11 U.S.C. § 548.  The purchasers countered that the trustee's claims were barred by § 546(f) of the Code.  Thus, the question before the court of appeals was whether the deliveries in question were "settlement payments" for purposes of § 546(f), such that they would be shielded from the trustee's avoidance powers.

In addressing this question, the Court of Appeals first reviewed the legislative history of § 546(e), the "model" provision upon which 546(f) was based:

---

(41); S. Rep. No. 65, 98th Cong., 1st Sess. 44 n. 1 (1983)); In re Comark, 971 F.2d 322, 323 (9th Cir. 1992).  Repo agreements thereby function as a kind of short-term investment vehicle for the purchaser.

[8] A "hold-in-custody" (HIC) repo is one where the dealer may retain control of the securities and earmark them on its own books as securities subject to a specific repo transaction rather than deliver them to the purchaser or to a third party custodian.  In a HIC repo, the securities will be subject only to the control of the dealer and its clearing bank, and the dealer may commingle the purchaser's securities with its own during the day so as to facilitate deliveries of securities to third parties as necessary.  See In re Bevill, 878 F.2d at 746 (citations omitted).  Thus, the Treasury Department has recognized that HIC repos represent "the greatest potential for loss on the part of the investors [i.e. purchasers] since the securities purchased remain in the control of the seller."  Id. (quoting 52 Fed. Reg. 5671(1987)) (other citations omitted).

...At the time [that the 1982 amendments enacting § 546(e) were passed], Congress was concerned about the volatile nature of the commodities and securities markets, and decided that certain protections were necessary to prevent "the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected market." H.Rep. No. 97-420, 97th Cong., 2d Sess. 1 (1982) ("1982 House Report"), U.S.Code Cong. & Admin. News 1982, p. 583. As stated in the House Report on the 1982 amendments:

> The Bankruptcy Code now expressly provides certain protections to the commodities market to protect against such a 'ripple effect.' One of the market protections presently contained in the Bankruptcy Code, for example, prevents a trustee in bankruptcy from avoiding or setting aside, as a preferential transfer, margin payments made to a commodity broker ...

*Id.*

Congress wanted to go further to protect margin payments and settlement payments made by and to participants in the securities market generally. Accordingly, it added a new subsection [§ 546(e)] to 11 U.S.C. § 546. ...

In re Bevill, 878 F.2d at 747.

Turning next to the legislative purpose behind § 546(f), the court of appeals made the following observations about the 1984 "Repo Amendments" to the Bankruptcy Code:

> After the 1982 amendments were in effect, Congress became concerned that the amendments did not "adequately [ ] protect liquidations of repos in the event of the insolvency of a dealer or other participant in the repo market, even though the principal objective of Public Law 97-222 (the 1982 amendments) was to prevent the insolvency of one commodities or securities firm from spreading to other firms and possibly threatening the stability of the affected market." 1983 Senate report at 47. Congress noted: "The repo market serves a crucial function for both parties to the repo transaction. The country's major institutional and fiduciary investors make heavy use of repos. For these investors, including such entities as state and local governments, public and private pension funds, money market and other mutual funds, banks, thrift institutions, and large corporations, repos have become a vital tool of cash management." Id. at 45. Moreover, Congress stated, "The repo is particularly well-suited to the needs of these investors. Receipts of taxes and the proceeds of bond issues in the case of state and local governments, cash flows from corporate operations, and liquidity needs of thrift institutions and money market funds often fail to coincide with the planned expenditures of such funds, thereby creating the need for such entities to invest idle funds for short periods in as risk-free a manner as possible." Id. Accordingly, Congress came to the decision that:

19

> The effective functioning of the repo market can only be assured if repo investors will be protected against open-ended market loss arising from the insolvency of a dealer or other counter-party in the repo market. The repo market is as complex as it is crucial. It is built upon transactions that are highly interrelated. A collapse of one institution involved in repo transactions could start a chain reaction, putting at risk hundreds of billions of dollars and threatening the solvency of many additional institutions.

Id. at 47.

> The uncertainty was highlighted when Lombard-Wall, Inc., filed a Chapter 11 bankruptcy petition in the Southern District of New York in August, 1982. A bench decision in the Lombard-Wall case held that the holder of securities subject to a repurchase agreement was subject to the automatic stay provision of the Code, and that the holder was precluded from closing out its position with the debtor without approval of the court. Lombard-Wall Inc. v. Columbus Bank & Trust Co. ( In re Lombard-Wall Inc.), No. 82 B 11556 (Bankr. S.D.N.Y. Sept. 16, 1982). ... Under [this] holding, the repo participant would be subjected "both to the unexpected inability to liquidate securities it holds and to the risk of capital loss should unfavorable interest rate changes occur; these risks impair the qualities that are the essence of the appeal of repo agreements." ...

> Congress, the Board of Governors of the Federal Reserve, the Public Securities Association, the Investment Company Institute and others, were concerned that if Lombard-Wall became the law governing repo transactions, the failure of one repo dealer, and the consequent inability of repo participants to promptly liquidate their investments to obtain cash to meet obligations, could have a ripple effect throughout the country's financial markets, causing an otherwise isolated financial problem to spread to many other entities.

***

> Congress determined to correct these "uncertainties" by amending the Code to "ensure there is no question that repo participants are afforded the same treatment with respect to the stay and avoidance provisions of the Code in connection with repurchase agreements" as is afforded other market participants under the 1982 amendments. 1983 Senate report at 44-45. ...

In re Bevill, 878 F.2d at 747-48 (alterations in the original) (internal citations omitted).

The result was the enactment of Bankruptcy Code §§ 546(f), 559, 101(41), 362(b)(7), and 548(d)(2)(C), the collective effect of which was to ensure that repo participants could liquidate their securities and also keep the proceeds of that liquidation to the

extent of their contract price.  Id. at 748.  As Robert C. Brown, Chairman of the Public

Securities Association explained:

> The ability of the repo market to serve all of its functions in the money
> market depends upon a high level of certainty about the ability of the
> various repo participants to close out repo transactions in the event of
> insolvency of the other party to the transaction, and to assure that repo
> transaction payments previously received from that party will not be
> reclaimed by the trustee under the Bankruptcy Code.

Id. at 749 (citation omitted).

With the legislative histories of the 1982 and 1984 amendments as its "guide,"

the Bevill court undertook to determine whether Congress had intended that the type of

pre-petition transfers at issue be treated as "settlement payments" under § 546(f).  The

court of appeals turned first to the statutory language, noting that "'[i]n expounding a

statute, we (are) not ... guided by a single sentence or member of a sentence, but look

to the provisions of the whole law, and to its object and policy.'"  878 F.2d at 750

(quoting Massachusetts v. Morash, 490 U.S. 107, 109 S. Ct. 1668, 1673 (1989)).

Indeed, the Bevill court felt it was presented with a "classic instance" where it would

need to "ascertain the precise congressional intent represented by the words, as well as

their literal meaning," because "two important national legislative policies [– i.e., the

bankruptcy policy giving the trustee broad powers to avoid preferential or fraudulent

transfers on one hand and, on the other, the intent of Congress to limit the trustee's

avoidance powers in certain circumstances, as reflected in the 1982 and 1984

amendments – ] are on a collision course here, and it behooves the courts of the Third

Article to decide which policy Congress intended must yield."  Id. at 751.

The district court in Bevill had equated the term "settlement payment" with the

concept of "settlement date" as it is commonly understood in traditional corporate

securities transactions – i.e., normally the date five days after a trade is executed.

Because the delivery of securities to the purchasers in Bevill occurred outside this 5-

21

day window, the district court concluded that the actual deliveries were not part of any "settlement" for purposes of § 546(f).

The court of appeals rejected this interpretation of "settlement payment" as contrary to both the realities of the repo market and congressional intent.  The court noted that it was "well understood" in the securities market that the settlement process includes not just the purchaser's payment for the securities, but also the record transfer of securities.  878 F.2d at 751.  As for Congress' intent to insure the liquidity of repurchase agreements, the court noted that Congress ensured liquidity in two respects – *to wit,* by limiting the trustee's authority to avoid repo transactions and by limiting the effect of the automatic stay so as to permit completion of the repo agreement.  Id. at 751-52.  From consideration of the overall statutory scheme, the court of appeals extrapolated "two significant observations" – "Congress intended (1) that the phrase 'settlement payment' include transfer or deposit of 'securities, or other property held by or due from such repo participant,' and (2) that the same interpretation of 'settlement payment' be applied in prohibiting avoidance as well as prohibiting the operation of the traditional stay order."  Id. at 752.  This interpretation, it concluded, was consistent with "two basic intentions of Congress:  that a 'settlement payment' may be the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer, and that it includes transfers which are normally regarded as part of the settlement process, whether they occur on the trade date, the scheduled settlement day, or any other date in the settlement process for the particular type of transaction at hand."  878 F.2d at 752.  The court noted that "Congress would not have found it necessary in the 1982 amendments to provide such an expansive list of possible types of settlement payments in section 741(8) if it intended that all of them would in effect have to been made on or before a scheduled 'settlement day' in order to qualify under the definition."  Id.  Thus, the Bevill court held that AMC's delivery of securities to the purchasing

22

lending institutions and municipalities was part of the settlement process, and thereby a "settlement payment" for purposes of § 546(f), notwithstanding the fact that the disputed transfer of securities had occurred outside of the traditional 5-day window.  Id. at 752-53.

In Kaiser Steel Corp. v. Charles Schwab & Co., Inc. ("Kaiser I"), 913 F.2d 846 (10th Cir. 1990), the Court of Appeals for the Tenth Circuit addressed the issue of whether corporate payments made in connection with a leveraged buyout were "settlement payments" within the meaning of § 546(e).  The dispute arose out of the acquisition of Kaiser Steel, a publicly traded corporation, pursuant to which Kaiser's common stock was converted into the right to receive $22 and two shares of preferred stock in the surviving entity.  The $162 million deal was financed from Kaiser's cash reserves and a loan secured by its assets.  Shareholders of Kaiser Steel were required to tender their common stock shares to Kaiser's disbursing agent (Bank of America), which distributed the cash and preferred stock.  Among the common stock shareholders were customers of Charles Schwab & Company, Inc., a securities broker. Some of the transfers were made directly between Schwab and Bank of America, but most of the certificates of Schwab customers were in the possession of a securities clearing house (Depository Trust Company or "DTC").  DTC tendered the shares of Kaiser common stock to Bank of America and, after receiving the cash and preferred stock in exchange, transferred the cash payment on to Schwab via a third party entity.  Schwab then credited its customers' accounts within a few days of receiving the funds.  Thus, Schwab's only role in the transaction was as an intermediary which delivered its customers' shares of Kaiser Steel stock for payment and transferred the payments it received back to the accounts of its customers.

23

After Kaiser filed for bankruptcy, the debtor-in-possession brought a fraudulent conveyance action against numerous defendants, including Schwab, seeking to avoid the LBO and recover the $162 million.  Schwab asserted that the LBO payments were exempt from avoidance as settlement payments under § 546(e).

The court of appeals agreed that the transfer of consideration in connection with the LBO constituted settlement payments.  The Tenth Circuit noted that § 741(8)'s definition of "settlement payment," while "somewhat circular," is also "extremely broad" and "clearly includes anything which may be considered a settlement payment."  913 F.2d at 848 (citations omitted).  Such an interpretation, the court found, was consistent with the congressional intent behind § 546 "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions."  Id. (citation omitted).  The court explained:

> Section 546 was first enacted in 1978, and applied only to commodities markets.  See 11 U.S.C. § 764(c) (repealed 1982). ... "Settlement payment" was not defined.  Congress sought to "promote customer confidence in commodity markets generally" via "the protection of commodity market stability."  S. Rep. No. 989, 95th Cong., 2d Sess. 8 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5794.  However, because the provision only applied to margin payments to brokers and settlement payments from clearing organizations, it could be said only to "protect() the ordinary course of business in the market."  H.R. Rep. No. 595, 95th Cong., 2d Sess. 392 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6348.  *But see* 124 Cong. Rec. 17,433 (1978) (the section "protect[s] all margin payments in the customer-broker-clearinghouse chain") (statement of Sen. Mathias).
>
> ***
>
> In 1982, "Congress was concerned about the volatile nature of the commodities and securities markets...," *Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Savings & Loan Ass'n*, 878 F.2d at 747, so former section 764(c) was replaced by sections 546(e) and 741(5) and (8) "to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market."  H.R. Rep. No. 420, 97th Cong., 2d Sess. 2 (1982), *reprinted in* 1982 U.S. Code Cong. & Admin. News 583, 583.  The protection was expanded beyond the ordinary course of business to include margin and settlement payments to and from brokers, clearing organizations, and financial institutions.  ... Again, Congress's purpose was "to minimize the displacement caused in the commodities and securities markets in the

24

event of a major bankruptcy affecting those industries." *Id*. at 1, *reprinted in* 1982 U.S. Code Cong. & Admin. News at 583. ...

913 F.2d at 848-49 (internal footnotes omitted). The court noted that "[t]he danger of a 'ripple effect,' ... on the entire market is at least as inherent in the avoidance of an LBO as it is in the avoidance of a routine stock sale." Id. at 849. The court further observed that interpreting "settlement payment" to include the transfer of consideration in an LBO is consistent with the way "settlement" is defined in the securities industry – *i.e.*, "the completion of a securities transaction." Id. (citation omitted). The court acknowledged the existence of some authority limiting the concept of "settlement" to routine securities transactions, but it rejected this view. "[B]ecause of the variety and scope of different securities transactions, and the absence of any restrictions in sections 546(e) and 741(8)," the court wrote, "it would be an act of judicial legislation to establish such a limitation." Id. at 850. The court of appeals concluded:

> What occurred in this case was "the delivery and receipt of funds and securities." *National Securities Clearing Corp.*, 42 Fed. Reg. 3916, 3920 n. 56 (1977). The LBO was a securities transaction. ... The transfer of money and preferred stock was the settlement of that transaction. Therefore, the transfers to Schwab were exempt from avoidance under section 546(e) as "settlement payment(s) ... to a ... stockbroker."

Id. (internal footnote omitted) (alterations in the original).

In In re Kaiser Steel Corp. ("Kaiser II"), 952 F.2d 1230 (10th Cir. 1991), the Tenth Circuit was asked to consider whether the holding of Kaiser I – that payments made by Kaiser's disbursing agent to Schwab or other financial intermediaries were "settlement payments" exempt from recovery under § 546(e) – should be extended so as to bring within the protection of § 546(e) payments made to shareholders or other beneficial owners of stock which had been tendered in connection with the LBO. Kaiser argued

that the such payments to beneficial shareholders should not be considered settlement payments, but the Tenth Circuit disagreed.

The court began by again noting the "extremely broad" definition of "settlement payment" set forth in § 741(8), the "clear aim" of which, the court found, was "to encompass all 'settlement payments' commonly used in the securities trade." 952 F.2d at 1237 (citations omitted).  In applying § 741(8)'s definition, the court wrote, "our task is to apply the term 'settlement payment' according to its plain meaning," giving due effect to the term "as it is plainly understood within the securities industry."  Id.  To that end, the court noted that, in the routine purchase and sale of a security, there are at least two opportunities for "settlement":  the first ("street-side" settlement) takes place between the brokers and the clearing agency during the process of clearance and settlement; the second ("customer-side" settlement) occurs between the broker and its customer.  Id. at 1237-38.  Thus, "settlement payments" logically encompass both the transfer of securities and funds between brokers and the clearing agency on the "street-side" and the payments made to settle a customer's account with its broker on the "customer-side."  Id. at 1238.

The court rejected Kaiser's assertion that the scope of § 546(e) and the "broad notion" that "settlement" is "the completion of a securities contract," 952 F.2d at 1239 (quoting Kaiser I, 913 F.2d at 849), only applies in the context of routine securities transactions.  As in Kaiser I, the Kaiser II court observed that neither §§ 546(e) nor 741(8) is facially limited to "securities contracts" or "trades," as opposed to the less routine exchange of stock for consideration in an LBO situation.  See id. at 1239 ("Given the wide scope and variety of securities transactions, we will not interpret the term 'settlement payment' so narrowly as to exclude the exchange of stock for consideration in an LBO. ... there is no reason to narrow the plain concept of "settlement" to a single type of securities transaction.").  The court concluded that:

> [w]hile the leveraged buy out may not be a "routine" securities trade, at least as viewed by Kaiser, we cannot deny what in substance took place here. The LBO was a securities transaction, varying only in form from the various other ways in which a shareholder's equity interest can be sold. The former Kaiser Steel shareholders effectively sold their equity interests to the new investors in exchange for money and a continuing stake in the new entity as preferred shareholders. In settlement of that transaction, the Kaiser Steel shareholders tendered their shares and received payment. These payments were "settlement payments." *Schwab,* 913 F.2d at 850.
>
> Consequently, those shareholders who tendered their shares one day after the LBO and received the LBO consideration are treated just the same under the Code as shareholders who sold their shares in the market one day prior to the LBO and received a settlement payment reflecting the market value of the LBO consideration. Neither type of investor will be forced to disgorge the payments several years later.

Id. at 1239-40.  The court noted that, "[f]or the public customer," this "symmetry of treatment" is justified not only by application of the "plain notion" of settlement, but also by the legislative policy interests in "promoting finality and in 'promoting speed and certainty in resolving complex financial transactions.'"  Id. at 1240 n. 10 (citation omitted).  The court felt its holding was further supported by Congress' policy of "promoting the health of the clearance and settlement system, which by all accounts is one of the fundamental aims of the 546(e) exemption."  Id.

In In re Comark, 971 F.2d 322 (9th Cir. 1992), the Ninth Circuit Court of Appeals joined the Tenth and Third Circuits in adopting a broad definition of the term "settlement payment."  The Comark court was faced with the question whether, upon cancellation of a reverse-repo transaction between the debtor and a lending institution, the debtor's return of government securities that had served as "additional margin" constituted a "settlement payment" for purposes of § 546(e).  Comark, the debtor, was engaged in the business of trading in government securities known as "Ginnie Maes" or "GNMAs."[9]

---

[9] As explained by the Comark court, each GNMA represents an interest in a pool of home mortgages.  971 F.2d at 323.

In 1982, Comark entered into six reverse-repo[10] agreements with the Great American Federal Savings & Loan Association, whereby GreatAmerican sold the GNMAs to Comark with the understanding that GreatAmerican would repurchase the GNMAs at a later time for the original purchase price, plus an additional interest payment.  For each of the reverse-repos, GreatAmerican also delivered to Comark additional GNMAs to serve as additional margin for the purchase price.  Shortly thereafter, Comark entered into six "matching" repo agreements, pursuant to which Comark sold the GNMAs to other third parties.  After Comark began to experience financial difficulties and withdrew from the securities market, it entered into an agreement with GreatAmerican and the firms that had "matched" the Comark-GreatAmerican reverse repos.  Under this new agreement, Comark withdrew as an intermediary and the remaining parties contracted to complete the repurchase transactions directly with each other; thus, GreatAmerican agreed to repurchase the original GNMAs directly from the third party firms who had purchased them from Comark.  Comark, however, remained in possession of the additional GNMAs that were meant to serve as additional margin and, shortly before filing for bankruptcy under Chapter 7, returned these additional GNMAs to GreatAmerican.

Comark's trustee subsequently tried to recover the value of the additional GNMAs as an avoidable preferential transfer.  Both the bankruptcy and district courts held that Comark's transfer of the additional securities were "settlement payments" exempt from avoidance under § 546, and the court of appeals affirmed.

---

[10] In a reverse-repo situation, the dealer buys securities and agrees to resell the securities to the seller/customer in the future.  The transaction thereby functions as a loan in which the seller receives cash for the securities, but must repurchase them in the future at a specified price, while the dealer essentially holds as collateral the securities which have been "sold" to it.  See Comark, 971 F.2d at 323.

The appellate court began by revisiting § 741(8)'s definition of a "settlement payment" and observing that "[g]enerally, a settlement is 'the completion of a securities transaction.'" 971 F.2d at 325 (quoting Kaiser I, 913 F.2d at 849). Citing In re Bevill and Kaiser I and II, the Ninth Circuit adopted a broad definition of the term "settlement payment":

> A settlement payment clearly includes a transfer of securities that completes a securities transaction. Bevill, 878 F.2d at 752. Therefore, a transfer of securities needed to complete a Repo transaction is a "settlement payment." Id. This includes any transfers that occur during the settlement process. Id. In the present case, Comark's withdrawal from the Reverse Repo agreement was a Repo "transaction" and the return of the Additional GNMAs was a transfer of securities necessary to complete the transaction and return Comark and GreatAmerican to a kind of status quo ante. Regardless of whether all the securities were transferred on June 18th as Comark now argues, or whether they occurred from June 18th until July 8th as the Bankruptcy Court found, the transfer occurred during the settlement process. Thus, the transfer was an unavoidable settlement payment.

971 F.2d at 326. Comark's trustee argued that no trade had "settled" when Comark merely withdrew itself from the reverse-repo transaction and, because Comark's rescission of the reverse-repo was unusual, the return of the additional GNMAs could not be considered "normally" part of a settlement payment. However, the court of appeals rejected this theory. "The return of the Additional GNMAs," the court wrote, "was a step in the process of 'settling' Comark's withdrawal from the Reverse Repo agreement. Neither party reasonably could consider Comark's withdrawal 'settled' until GreatAmerican received the over $9 million dollars [sic] worth of securities Comark had in its possession." Id. at 326.

Most relevant for our purposes and most heavily relied upon by the Defendants is the Third Circuit's decision in In re Resorts Int'l, Inc., 181 F.3d 505 (3d Cir. 1999), a case wherein the Court of Appeals had the opportunity to consider for the first time whether § 546(e)'s protection should apply to payments made in connection with the

29

leveraged buyout of the debtor.  The dispute in <u>Resorts</u> arose out of the debtor's errant payment for shares tendered by one Fred Lowenschuss, a Resorts shareholder who had previously demanded an appraisal of his shares in Delaware's Chancery Court. Instead of being properly tendered to the Chancery Court, Lowenschuss' shares were tendered, through his brokerage firm (Merrill-Lynch), to the debtor's transfer agent, Chase Manhattan.  Chase then forwarded a list of tendering shareholders to Resorts and Resorts wired funds to Chase in payment of the shares.  Upon its receipt of the wired funds, Chase delivered a check to Merrill Lynch for some $3.8 million (representing the proffered merger price for the shares) which was then paid over to Lowenschuss.  After Resorts realized that it had mistakenly paid Lowenschuss the merger price for his shares, it filed suit seeking to recover the payment under the theory (among others) that the payment was an avoidable, fraudulent transfer.  The question thus arose whether the payment to Lowenschuss was a "settlement payment" within the meaning of § 546(e).

        In addressing this question, the Third Circuit began by reviewing its holding in <u>Bevill</u> and observed that the "extremely broad" definition attributed to the term "settlement payment" indicated that it would likely encompass the payments at issue. Since <u>Bevill</u> did not involve an LBO situation, the court of appeals recognized that it did not definitively control the outcome of the <u>Resorts Int'l</u> dispute, so the court turned next to the relevant statutory language, recalling the well-established rule that "[w]hen the language is clear, no further inquiry is necessary unless applying the plain language leads to an absurd result."  181 F.3d at 515 (citing <u>Idahoan Fresh v. Advantage Produce, Inc.</u>, 157 F.3d 197, 202 (3d Cir. 1998)).  The court concluded that, under a literal application of § 546(e), the payments to Lowenschuss were "settlement payments":

> In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction.  <u>See</u>

> [Kaiser I, 913 F.2d at 849].  Here, the securities passed from
> Lowenschuss's broker, Merrill Lynch, to the transfer bank, Chase
> Manhattan.  Resorts wired funds to Chase which Chase then forwarded ...
> to Merrill Lynch who paid Lowenschuss.  Although no clearing agency was
> involved in this transfer, two financial institutions – Merrill Lynch and
> Chase – were.  Under a literal reading of section 546, therefore, this was
> a settlement payment "made by ... a financial institution."

Id.  Relying on Kaiser Steel, Bevill, and Comark, the Third Circuit observed that "[t]he

general thrust of [these cases] is that the term "settlement payment" is a broad one that

includes almost all securities transactions," id. at 515, and it reasoned that including

payments made in consideration of an LBO within this definition is "consistent with the

broad meaning these cases discern."  Id. at 515-16.  The court found that such

payments are "obviously [ ] common securities transaction[s]," although perhaps not the

*most* common type, and it concluded that no absurdity would result from applying the

plain language of the statute so as to extend § 546(e)'s protection to the payments

made for Lowenschuss's shares.  Id. at 516.


As our review of the foregoing cases illustrate, none is precisely on point with the

facts of the case at bar.  The parties therefore dispute the extent to which the rulings of

Bevill, Kaiser, Comark, and Resorts Int'l inform and/or control the application of

§ 546(e) in this case.  The Committee contends that these decisions are all completely

inapposite in that each involved a series of complex publicly traded securities

transactions – in the form of either complicated leveraged buyouts or transfers pursuant

to repurchase agreements – that were afforded the protections of the national securities

clearance and settlement system.  According to the Committee, the case at bar is

fundamentally distinguishable in that the disputed transfer here involved merely a

simple redemption of privately held corporate stock without the involvement of third

party intermediaries such as clearing houses, disbursing agents, or stock brokers.

The Committee urges this Court to follow the approach taken in Bevill, wherein

31

the Third Circuit, in attempting to discern the meaning of "settlement payment" for purposes of § 546(f), examined the congressional intent behind the statute (and its precurser, § 546(e)) by considering "the provisions of the whole law, and ... its object and policy." Bevill, 878 F.2d at 750. The Committee submits that this approach is consistent with that taken by the courts in Kaiser and Resorts, wherein the courts (according to the Committee) determined "that avoidance of large complex securities transactions that could gravely impact the national securities market is what Congress intended to protect against in fashioning Section 546(e)." (Pl.'s Br. in Opp. to Summ. Judg. [Doc. 57] at p. 18.) The Committee reads Resorts Int'l for the principle that the scope and application of § 546(e) needs to be analyzed on an individualized basis; while application of the statute's plain language led to no absurd result in Resorts, the Committee insists that a rigid application of the statute here *would* produce an absurd result.

In support of its position, the Committee relies on In re Grand Eagle Companies, Inc., 288 B.R. 484 (Bankr. N.D. Ohio 2003) as a case that is supposedly analogous to the matter before us. The Committee insists that, unlike the cases relied upon by the Defendants, Grand Eagle is relevant and persuasive authority because it addresses the applicability (or more accurately, the *non*-applicability) of § 546(e) to stock transactions concerning privately held companies. Like the Committee here, the court in Grand Eagle viewed the Kaiser and Resorts Int'l decisions as both (a) consistent with Congress' intent in enacting § 546(e), and (b) inapplicable to transactions involving only privately held companies. Unfortunately for the Committee, we do not agree that the relevant case law creates such a neat distinction in the application of § 546(e).

As we've noted, the most relevant authority for our present purposes is the Third Circuit's decision in Resorts Int'l which, to date, appears to be the only ruling from our circuit court of appeals applying § 546(e). We therefore take our guidance primarily

from that decision.  However, we interpret that decision in the context of <u>Bevill</u> and

<u>Kaiser</u>, which the <u>Resorts</u> court followed in rendering its ruling, as well as two district

court cases – <u>Zahn v. Yucaipa Capital Fund</u>, 218 B.R. 656 (D.R.I. 1998), and <u>Wieboldt</u>

<u>Stores, Inc. By and Through Raleigh v. Schottenstein</u>, 131 B.R. 655 (N.D. Ill. 1991) –

which adopted a narrower application of § 546(e) and which also factored into the

<u>Resort</u> court's analysis.  As <u>Bevill</u>, <u>Kaiser</u>, *et al.* have already been discussed, we now

briefly review the <u>Zahn</u> and <u>Wieboldt</u> decisions.

        In <u>Wieboldt</u> the U.S. District Court for the Northern District of Illinois held that

payments received by shareholders in exchange for their stock in connection with the

leveraged acquisition of the debtor corporation were not "settlement payments" and,

therefore, *could* be attacked as preferential transfers by the chapter 11 trustee.  In

attempting to apply § 546(e) and interpret the definition of "settlement payment" as set

forth in § 741(8), the district court found that the statutory definition lacked "plain

meaning"; it therefore turned to an examination of the legislative history.  In particular,

the district court focused upon Congress' concern that avoidance of settled securities

transactions might adversely impact the national securities clearance and settlement

chain.  <u>See</u> 131 B.R. at 664 ("A review of the legislative history of §546(e) reveals that

Congress exempted settlement payments in the commodities (and later the securities)

industry out of concern that the bankruptcy of one party in the clearance and settlement

chain could spread to other parties in that chain.") (citing <u>Bevill</u>, 878 F.2d at 747, 751;

<u>Kaiser Steel</u>, 913 F.2d at 849) (internal footnote omitted).  As the <u>Wieboldt</u> court noted,

this threat to other parties in the chain occurs because of the fact that the chain

depends upon a system of guarantees among brokers and other intermediaries on one

hand and the clearing agency on the other.  <u>See</u> <u>id</u>. at n. 10.  The <u>Wieboldt</u> court found

that requiring the shareholders to disgorge their payments would pose no significant

threat to those in the clearance and settlement chain, since the "inviolability of

payments to shareholders is simply not basic to the operation of the clearance and settlement systems." Id. at 664 and 665 n.11.  Quoting one commentator, the court noted that "while the flow of funds to and between financial intermediaries in the clearance and settlement chain must be protected in order to insure the stability of those systems, funds flowing from the intermediaries to the shareholders do not require protection, and section 546(e) should therefore not apply." Id. at 665 n. 11 (quoting Neil M. Garfinkel, Note, No Way Out:  Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO, 1991 Colum.Bus.L.Rev. 51, 66-67).  Thus, § 546(e)'s legislative history, together with consideration of the system which the statute was designed to protect, "convinced" the Wieboldt court that § 546(e) would not bar the trustee's avoidance claims. Id. at 665.

The Zahn case similarly involved a Chapter 11 trustee's attempt to set aside allegedly fraudulent transfer payments made to participants in a leveraged buyout of the debtor corporation.  Like the case at bar, the Zahn case involved payments made in exchange for shares of a privately held company.  The district court followed the reasoning in Wieboldt and held that the transfers at issue were not "settlement payments" within the meaning of § 546(e) even though they technically "settled" a purchase and sale of securities.  In arriving at this conclusion, the court noted that § 741(8)'s definition of "settlement payment" "defies plain meaning" and "is circular and cryptic."  218 B.R. at 675 (citations omitted).  Finding that a general understanding of the securities industry would be required to apply the statute as Congress intended, the Zahn court (like the Wieboldt court) focused its attention on the clearance and settlement system utilized by the securities industry:

> The intermediaries' role in this system is critical; typically there are several layers of brokers on each side of a trade, with a clearing agency positioned in the middle. ... The system depends upon a series of guarantees, made by all parties in the chain, that they will live up to their obligations regardless of a default by another party in the chain. .. These

> guarantees allow the parties to trade free of worry about events between the trade date and the settlement date.
>
> The need to preserve the stability of this system led Congress to create the § 546(e) exception to the trustee's avoidance powers. ... If the pre-bankruptcy trades by a bankrupt intermediary could be set aside, then the guarantees that allow the system to function would be threatened, the parties could not proceed with confidence, and a bankruptcy by one party in the chain could spread to other parties in the chain, threatening a collapse of the entire industry. ...

Id. at 676 (internal citations omitted).  In light of this background, the district court concluded that it was unlikely Congress intended § 546(e) to apply to the disputed transfers.  In fact, the Zahn court felt its facts compelled such a conclusion even more so than the facts involved in Wieboldt, because the disputed transaction in Zahn concerned privately held stock:

> The only possible link between this transaction and the securities industry is the fact that securities were sold; however, the stock at issue was not even publicly traded.  The stock transfers thus had no connection whatsoever to the clearance and settlement system, and allowing avoidance would have no impact at all on that system.

Id. at 676.

Thus, the analysis presently advocated by the Committee was previously articulated and adopted by the district courts that authored the decisions in Wieboldt and Zahn.  Significantly, the Third Circuit Court of Appeals expressly acknowledged these rulings in Resorts Int'l:

> A number of district courts have held that the term "settlement payment" does not include payments made for shares by a corporation as part of an LBO.  See, e.g., Zahn v. Yucaipa Capital Fund, 218 B.R. 656, 675 (D.R.I. 1998); Wieboldt Stores, Inc. v. Schottenstein, 131 B.R. 655, 664-65 (N.D. Ill. 1991).  The reasoning of these courts is essentially that "the system of intermediaries and guarantees" that normal securities transactions involve is not in play in an LBO.  See Zahn, 218 B.R. at 676.

181 F.3d at 515.  Nevertheless, the Third Circuit implicitly rejected the reasoning of Zahn and Wieboldt by holding that § 546(e) would apply to the payments made in

connection with the Resorts International buyout, despite the fact that no clearing agency was involved in the disputed transfer.  Id.

The court of appeals opted instead to follow the holding of Kaiser II, which applied § 546(e) to various LBO-related stock transactions, some of which had similarly occurred without the involvement of a clearing agency.  See id at 515 and 516 n. 9. The fact that some commentators had criticized Kaiser II for allegedly applying § 546 improperly to a transaction that did not implicate Congress' underlying concerns about the national securities clearance and settlement system was not lost on the Resorts court, see 181 F.3d at 516 n. 10, yet the Resorts court ultimately was not persuaded by that criticism.  Thus, it appears that consideration of the effect that the avoidance of settled stock transactions might have on the national clearance and settlement system was *not* a determinative factor in the Resorts court's analysis.

Moreover, while the Wieboldt and Zahn courts premised their respective analyses on the fundamental determination that § 741(8)'s definition of "settlement payment" lacks plain meaning – thereby necessitating an examination of the legislative history, reference to the securities industry, and consideration of congressional intent – the Third Circuit took a somewhat different approach in its analysis.  The Resorts court based its analysis on the approaches taken in Bevill, Kaiser, and Comark, focusing on what it viewed as the "general thrust" of those cases:  *i.e.,* "that the term 'settlement payment' is a broad one that includes almost all securities transactions."  181 F.3d at 515.  Indeed, the Third Circuit in Resorts cited Bevill for the proposition that the statute's "extremely broad" definition of "settlement payment" is consistent with Congress' intent

> that a "settlement payment" may be the deposit of cash ... or the deposit
> or transfer of the securities ... and that it includes transfers which are
> normally regarded as part of the settlement process, whether they occur
> on the trade date, the scheduled settlement day, or any other date in the
> settlement process for the particular type of transaction at hand.

36

Id. at 515 (quoting Bevill, 878 F.2d at 752).  Citing Kaiser I, the Resorts court acknowledged the general understanding within the securities industry that "a settlement payment is ... the transfer of cash or securities made to complete a securities transaction."  Id. (citing Kaiser I, 913 F.2d at 849 (citing various securities industry texts)).

In sum, the focus of the Resorts court was on the general breadth and inclusiveness of the term "settlement payment."  Applying the "plain language" of the statute and the definition of the term "settlement payment" as it is commonly understood in the securities industry, the Resorts court concluded that the disputed transfer fell within the literal definition of "settlement payments," and it found no absurdity in this result.  See 181 F.3d at 516 ("Despite the fact that payments to shareholders in an LBO are not the most common securities transaction, we see no absurd result from the application of the statute's plain language and will not disregard it.").

The Committee insists that applying §546(e) to our facts *would* lead to an absurd result and, in support of that argument, it relies on Grand Eagle.  That case involved an allegedly fraudulent pre-petition transfer in which the debtor had acquired a 100% equity interest in the defendant, ABB Services, Inc. – a privately held company –  by paying ABB some $42 million in cash, which the debtor had obtained through bank financing.  In defending the avoidance action, ABB argued that, since a settlement payment is "simply 'the transfer of cash made to complete a securities transaction,'" 288 B.R. at 494, and since the cash transfer to ABB had come from a "financial institution," therefore the protections afforded by § 546(e) should apply to the disputed transfer.  Rejecting this defense, the Grand Eagle court reasoned that:

> Such a simplistic reading of § 546(e) ignores the meaning of the term "settlement payment" within the securities industry and would, essentially, convert that statutory provision into a blanket transactional cleansing mechanism for any entity savvy enough to funnel payments for the

37

purchase and sale of privately held stock through a financial institution. *Cf. Zahn v. Yucaipa capital Fund*, 218 B.R. 656 (D.R.I. 1998) (holding that § 546(e) did not apply to the sale of non-publicly traded stocks because the stock transfers had no connection with the clearance and settlement system and allowing avoidance would have no impact upon such system); *Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348 (N.D. Tex. 1996) (holding that § 546(e) did not apply to a strictly private stock transaction that did not implicate the clearance and settlement process) [ ]; *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655 (N.D. Ill.1991) (holding that § 546(e) would not preclude the chapter 11 trustee from avoiding various pre-petition stock transfers because the undoing of such transactions posed no significant threat to the clearance and settlement chain).

288 B.R. at 494 (internal footnote omitted).  The <u>Grand Eagle</u> court therefore suggested, without definitively deciding, that the "settlement payment defense" would *not* apply to the buyout of ABB's privately held stock.

Unlike the Committee, we do not believe that <u>Grand Eagle</u>'s reasoning can be easily squared with the Third Circuit's decision in <u>Resorts Int'l</u>.  As the foregoing excerpt indicates, the theory articulated in <u>Grand Eagle</u> had previously been articulated in <u>Zahn</u>, a case which also concerned the transfer of cash in exchange for privately held stock. Again, however, the Third Circuit in <u>Resorts</u> expressly considered but (at least implicitly) rejected the holding in <u>Zahn</u>.  In so doing, the <u>Resorts</u> court did not attempt to distinguish <u>Zahn</u> on the bases that it involved privately held stock or that application of § 546(e) to <u>Zahn</u>'s facts would have led to an absurd result.  Instead, the <u>Resorts</u> court's analysis seemingly turned on its general preference for giving broad application to the term "settlement payment."  Accordingly, the holdings of <u>Zahn</u> and <u>Resorts</u> can not be easily reconciled.  <u>See</u>, <u>e.g.</u>, <u>Buckley v. Goldman, Sachs & Co.</u>, No. Civ. A. 02-cv-11497RGS, 2005 WL 1206865 at * 7 (D. Mass. May 20, 2005) (observing that <u>Zahn</u>'s holding is "unmistakably at odds" with those of <u>Kaiser</u> and <u>Resorts Int'l</u>).

The Committee's reliance on <u>Grand Eagle</u> is also unpersuasive in another respect.  Specifically, the <u>Grand Eagle</u> court apparently dismissed as too "simplistic" the defendant's straightforward interpretation of the term "settlement payment" as "the

transfer of cash made to complete a securities transaction." See 288 B.R. at 494. Yet this definition is consistent with the one originally set forth in Kaiser I and applied by the Third Circuit in Resorts. See Kaiser I, 913 F.2d at 849 ("[s]ettlement is 'the completion of a securities transaction'") (citing various securities industry texts); Resorts Int'l, 181 F.3d at 515 ("In the securities industry, a settlement payment is generally the transfer of cash or securities made to complete a securities transaction.") (citing Kaiser I).

In sum, the characteristics of the Holdings stock redemption which the Committee identifies as materially distinguishable factors do not appear to hold legal significance under the reasoning of Resorts Int'l. The fact that Bevill, Kaiser, Comark, and Resorts addressed more complex transactions involving publicly traded securities that were allegedly afforded protection under the national securities clearance and settlement system does not appear to have been a determinative factor, at least as those cases have been interpreted or decided by the Third Circuit. In fact, as we have already discussed, it does not appear that the clearance and settlement system was even implicated in the case of Resorts. Nor is it of any apparent legal significance under Resorts that the Holdings stock redemption occurred without the involvement of third party intermediaries such as clearing houses, disbursing agents, or stock brokers; the Resorts court did not base its own analysis on that factor, but instead noted only that the challenged LBO payment involved "two financial institutions" as intermediaries, which sufficed to bring the transaction within the literal reading of § 546(e). See In re Hechinger Investment Co. of Delaware, 274 B.R. 71, 87 (D. Del. 2002) (noting that Resorts court did not rely on Merrill Lynch's status as a "stockbroker" in applying § 546(e), but rather treated it like a financial institution). Nor, again, is it legally significant that the Holdings shareholders were directors, officers, and management level employees. See Hechinger, 274 B.R. at 87(fact that LBO involved payments to shareholders that were corporate insiders, while a factual distinction vis-a-vis Resorts,

was not one that held legal significance under § 546(e); <u>Resorts</u> court did not rely on shareholder's non-insider status in applying § 546(e), but instead relied on the plain meaning of the statute).  And, for the reasons discussed, we do not agree that <u>Grand Eagle</u>, or the cases supporting its logic (e.g., <u>Zahn</u> and <u>Wieboldt</u>) can be easily reconciled with the holding of <u>Resorts Int'l</u>.

Finally, the Committee insists that there are material issues of fact on this record which preclude a finding that the payments to Holdings' Class B shareholders were "settlement payments" within the meaning of § 546(e).  The Committee claims, for example, that there remains a material issue of fact as to why NFC transferred more than $5.7 million dollars to NFC Holding and what reasonably equivalent value was given to NFC in exchange.  Because Defendants have not alleged that the NFC-to-Holdings transfer was in settlement of a security, the Committee reasons, there remains a factual issue as to whether the initial NFC-to-Holdings transfer is subject to the protections of § 546(e).  To the extent this issue is actually in dispute, we do not view it as material given our previous conclusion that, as a matter of law, the initial NFC-to-Holdings transfer and the subsequent Holdings-to-shareholder transfers must be viewed as one integrated transaction for purposes of the Committee's fraudulent transfer claims.

The Committee also contends that there are material issues in dispute as to whether the stock redemption was subject to SEC regulations or the national securities clearance and settlement system as discussed in <u>Bevill</u>, <u>Kaiser</u>, and <u>Resorts</u>.  For reasons previously explained, however, whether a disputed stock transaction implicates or affects the national securities clearance and settlement system does not appear to have been a driving factor in the <u>Resorts</u> court's analysis; consequently, it does not materially affect our analysis here.

40

Last, the Committee argues that it is unclear from the record whether the shareholders who were cashed out ever presented stock certificates to Holdings or otherwise adhered to any "settlement process" in connection with the stock redemption. Unlike the Committee, we do not perceive this dispute, if there is one, as material.  If the broad, general concept of "settlement payment" – *i.e.,* "a transfer of cash or securities made to complete a securities transaction" – as adopted in <u>Resorts Int'l</u> is applied here, it appears that the redemption meets this definition.  We perceive no real dispute as to the fact that cash transfers were made to the Defendant shareholders in order to consummate the redemption of their Class B shares.  As in <u>Resorts</u>, no clearing agency was involved, but financial institutions were.  (<u>See</u> Part III (A) (3), *infra.*) Under a literal application of § 546(e), then, the redemption payments constituted "settlement payments."  <u>See</u> <u>Resorts</u>, 181 F.3d at 515.

### 3.    Were the Payments "By or To a Financial Institution?"

The Committee next argues that, even if the payments in question were settlement payments, they were not made "by or to a financial institution" for purposes of § 546(e).  Here again, the Committee attempts to distinguish the holdings of <u>Kaiser II</u>, *supra,* <u>Resorts</u>, *supra,* and <u>In re Hechinger Investment Co.</u>, 274 B.R. 71 (D. Del. 2002) – another case involving the defendants' successful application of § 546(e) – on the ground that each of those decisions "dealt with complex publicly traded security transactions involving third party intermediaries (including brokers, disbursing agents, transfer agents, etc., whom the securities were presented to directly for payment) and the national securities clearance system."  (Pl.'s Br. in Opp. [Doc. # 57] at p. 23.)  Thus, the Committee reads <u>Resorts</u> and <u>Hechinger</u> for the proposition that, "in the event a third party intermediary is used in the transaction[ ] such that the securities are

41

presented to it in exchange for payment, then such payment can be found to have been made 'by a financial institution.'"  (Pl.'s Br. in Opp. at p. 25.)

We disagree with the Committee's interpretation of the Resorts Int'l and Hechinger decisions.  The holdings in those cases did not depend necessarily upon the shareholders' physical presentation of securities to a third party intermediary in exchange for payment, nor did they depend upon the involvement of the national securities clearance and settlement system.  In fact, as we previously discussed, the plaintiff in Resorts Int'l sought, unsuccessfully, to preclude application of § 546(e) by pointing out that the disputed payment in that case did *not* implicate the national securities clearance and settlement system.

Instead, the rulings in Resorts Int'l and Hechinger turned on the courts' straightforward application of the plain language of the statute to determine whether the settlement payments at issue had been made "by or to a financial institution."  In Resorts, the plaintiff had urged the court to follow the decision of the Eleventh Circuit Court of Appeals in Munford v. Valuation Research Corp., 98 F.3d 604, 610 (11th Cir. 1996), which held that § 546(e) is inapplicable if the paying agent acquired no beneficial interest in the subject funds or the shares and acted merely as a conduit in the transaction.  The Third Circuit rejected this authority on the ground that it appeared to read into § 546(e) "the requirement that the ... financial institutions ... obtain a 'beneficial interest' in the funds they handle," a requirement "not explicit in section 546." The Resorts court resolved instead to follow the reasoning of the Munford dissent which, the court found, "relied, as we do, on the plain language of the statute."  Because the payment at issue in Resorts had been wired from Resorts to Chase Manhattan to Merrill Lynch to the shareholder, the court of appeals found that "two financial institutions – Merrill Lynch and Chase –" were involved in the transfer and,

thus, the payment was "made by ... a financial institution" under a literal reading of § 546. Id. at 515.

The Hechinger court was similarly presented with the argument that the disbursing agent, Chase Mellon Financial, was not a "financial institution" within the meaning of § 546(e) because it had acted solely as an intermediary and never acquired a beneficial interest in the subject shares. The Hechinger court noted that this "intermediary or conduit" exception to § 546(e) had been expressly rejected by the Resorts Int'l court "based on its reading of the plain language of the statute." 274 B.R. at 87. "Section 546(e) does not require the financial institution to acquire a beneficial interest," the court continued, "rather, it broadly protects from trustee's avoidance powers settlement payments made 'by ... a financial institution.'" Id. (citation omitted). The Hechinger court further held that it was of no moment whether a stock broker was involved in the transfer of monies; "[s]o long as a financial institution is involved," the court noted, "the payment is an unavoidable 'settlement payment.'" Id. at 87.

Applying the plain language of § 546(e), we conclude that it is of no legal moment whether the Defendants here ever physically presented their stock certificates to Chase Manhattan in exchange for the redemption payments they received. The undisputed factual record shows that, on April 13, 1999, NFC directed Chase Manhattan to transfer the aggregate redemption price (approximately $5.75 million) from an NFC account at Chase to a Holdings' account at Chase. From there, Holdings consummated the redemption that same day by one of two methods: some shareholders received checks drawn on Holdings' account at Chase, while other shareholders received payment to their IRAs at National City Bank via a wire transfer of funds from Holdings' account at Chase Manhattan to National City Bank. Under either method, the shareholder payments came from funds that Chase held in trust for Holdings. And, in the case of the IRA payments, the funds released by Chase went

43

directly to National City Bank and, from there, directly to shareholders' accounts.  Under a straightforward reading of § 546(e), these were payments "by a financial institution."[11]

In support of this conclusion, Defendants refer us to In re Loranger Manufacturing Corp., 324 B.R. 575 (Bankr. W.D. Pa. 2005).  In that case the debtor, Loranger Manufacturing Corporation ("LMC"), asserted fraudulent transfer claims against a former officer, director and shareholder (John P. Loranger) arising out the pre-petition redemption of Loranger's shares of LMC, which amounted to 50% ownership of the debtor company.  To effectuate the transaction, LMC had borrowed some $16.6 million from PNC Bank, $9 million of which was wire transferred to Loranger in payment for his shares.  In attempting to avoid this payment, the debtor asserted that, even though PNC Bank had facilitated the wire transfer payment, LMC, and *not* the Bank, had paid the $9 million to Loranger; consequently, the debtor reasoned, § 546(e) did not apply because the settlement payments had not been made "by a financial institution."  The bankruptcy court found that these arguments could not "overcome the clear counsel of the Court of Appeals for the Third Circuit in Resorts that the plain meaning of § 546(e) governs its interpretation."  324 B.R. at 585.  The bankruptcy court went on to reason that, because a wire transfer was involved, and because only banks can perform wire transfers, the $9 million payment to Loranger was a securities settlement payment made by PNC Bank, "a financial institution."  Id. at 585-86.

The Committee urges us to disregard Loranger as unpersuasive.  According to the Committee, the Loranger court should have distinguished its facts from those involved in Resorts and Hechinger – "most importantly the fact that Resorts and Hechinger involved third party intermediaries to which the securities were presented in

_____

[11] There is no dispute that both Chase Manhattan Bank and National City Bank are "financial institutions" for purposes of § 546(e).

exchange for payment." (Pl.'s Br. in Opp. at 24.)  As we have already discussed, however, we do not view this factual nuance as legally material to the holdings of Resorts and Hechinger.  Rather, we agree with the Loranger court's interpretation that the "clear counsel" of Resorts Int'l is that the "plain meaning of § 546(e) governs its interpretation."  324 B.R. at 585.

The Committee goes on to argue that the reasoning of Loranger is incomplete, misguided, and would lead in this case to an absurd result.  "For instance," the Committee writes:

> as discussed in *Grand Eagle, supra*, a savvy equity interest holder in a privately held company that is experiencing financial difficulty could devise a scheme to have the troubled company buy back his equity making sure only that the payment be drawn on the troubled company's bank account and then simply put the company into a bankruptcy proceeding.  In so doing, the transferee could shield himself or herself from a fraudulent transfer claim under the safe harbor provisions of Section 546(e).

(Pl.'s Br. in Opp. at 25.)  As we have previously observed, a similar argument was laid out in Zahn.  See 218 B.R. at 677 (quoting Jewel Recovery, L.P. v. Gordon, 196 B.R. 348, 353 (N.D. Tex. 1996)).  The Third Circuit panel that decided Resorts was clearly aware of this decision, see 181 F.3d at 515, but apparently was not persuaded by its reasoning.  For the reasons previously discussed, we do not find that the facts of Loranger are materially distinguishable from those at issue in Resorts Int'l and Hechinger.  We therefore hold that the plain language of § 546(e) compels the conclusion that the payments at issue here were made "by a financial institution" within the meaning of § 546(e).

45

### 4.    Is Count 2 Exempt from the Purview of § 546(e)?

Finally, the Committee submits that, even if § 546(e) is otherwise generally applicable in this case, it is not a defense to Count 2 of the Amended Complaint, which asserts a claim under § 5104(a)(1) of the Pennsylvania Uniform Fraudulent Transfer Act (UFTA).  As the Committee notes, § 546(e) expressly exempts from its scope avoidance actions brought under § 548(a)(1)(A) of the Bankruptcy Code, which are sometimes referred to as "actual fraud" claims.  In relevant part, § 548(a)(1)(A) provides:

> (a)(1)  The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, ..., if the debtor voluntarily or involuntarily –
>
> > (A)      made such transfer or incurred such obligation with the actual intent to hinder, delay, or defraud any entity to which the debtor was or became ... indebted.

11 U.S.C. § 548(a)(1)(A).

In Count 2 of the Amended Complaint, the Committee asserts a claim under § 5104(a)(1) of the Pennsylvania UFTA, which contains language substantially similar to that of Bankruptcy Code § 548(a)(1)(A):

> (a)  General Rule. — A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1)  with the actual intent to hinder, delay or defraud any creditor of the debtor.

12. Pa. C.S.A. § 5104(a)(1).  It is the Committee's allegation in Count 2, among other things, that "NFC and/or Holdings, under the direction of their Officers and/or Directors, made the NFC Holdings Transfer and each of the Distributions to the Transferee Defendants with the actual intent to hinder, delay and/or defraud NFC and/or NFC Holdings' creditors."  (Amended Complaint [Doc. 39] at ¶ 71.)

46

The Committee maintains "[i]t is clear from the language of Section 546(e) that Congress did not intend to shield fraudulent transfer recipients from the avoidance powers of a trustee in cases of actual fraud."  (Pl.'s Br. in Opp. to Summ. Judg. [Doc. 57] at p. 12.)  Accordingly, the Committee contends that § 546(e) should not bar its prosecution of the Pennsylvania UFTA claim in Count 2 of the Amended Complaint.

Notably, the Committee cites no authority in support of its argument that, for purposes of applying § 546(e), we should treat its "actual fraud claim" under the Pennsylvania UFTA as the equivalent of an intentional fraud claim brought under § 548(a)(1)(A).  We have similarly been unable to locate any authority in support of this approach and, in fact, basic principles of statutory construction would seem to militate against it.  In essence, Plaintiff would have this Court read into the statute terms that are presently absent.  However, to do so "would result 'not [in] a construction of [the] statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope."  Lamie v. United States Trustee, 540 U.S. 526, 538 (2004) (alterations in the original) (quoting Iselin v. United States, 270 U.S. 245, 251 (1926)).  Such an approach is unwarranted when a statute may be sensibly interpreted according to its plain terms.  See id. ("With a plain, nonabsurd meaning in view, we need not proceed in this way [by reading an absent word into the statute].")  See also In re Cavanaugh, 306 F.3d 726, 738 (9th Cir. 2002) ("We are bound by what Congress did, and we may not add to the statute terms that Congress omitted even if we believe they would serve the statutory purpose.").

Here, there is good reason to limit § 546(e) to its plain terms and not treat § 548(a)(1)(A) and § 5104(a)(1) of the Pennsylvania UFTA as interchangeable. While the elements of an actual fraud claim under § 548(a)(1)(A) may well be similar to the elements of a Pennsylvania UFTA § 5104(a)(1) claim, there is at least one important difference between the two causes of action:  § 548(a)(1)(A) applies a one-

year statute of limitations, see 11 U.S.C.A. § 548(a)(1), while § 5104 utilizes a four-year statute of repose. See 12 Pa.C.S.A. § 5109 (Purdon's 1999); In re Dolata, 306 B.R. 97, 115 (Bankr. W.D. Pa. 2004) (noting that transfers generally remain assailable under Pennsylvania statute for four years following transfer, as opposed to one-year look-back period of bankruptcy fraudulent transfer provision.)  Thus, the scope of transactions potentially captured by § 548(a)(1)(A) is much narrower than that potentially within the scope of the Pennsylvania UFTA.  We presume that, if Congress had intended to exempt from § 546(e)'s protection allegations of actual fraud under state law fraudulent transfer theories, it could have easily done so. See Lamie, 540 U.S. at 538 ("There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted.") (quoting Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625 (1978)).

Moreover, we note that at least two courts have declined to read into § 546(e) an exception for state law fraudulent transfer claims. See In re Hechinger Investment Co. of Delaware, 274 B.R. at 98 (finding it "clear" that Congress did not intend to exempt from § 546(e) state law fraudulent conveyance claims brought under § 544 of the Bankruptcy Code – "the only section of the Code that provides for the avoidance of transactions occurring more than a year before bankruptcy"); In re Hamilton Taft & Co., 176 B.R. 895, 901-02 (Bankr. N.D. Cal. 1995) (finding that § 546(e) does not bar actions brought under § 548(a)(1) of the Code to recover a transfer made within one year of the bankruptcy petition date with actual intent to defraud, but it "does bar actions brought under section 544 (using state fraudulent conveyance statutes) to recover transfers made more than one year prepetition with actual intent to hinder, delay, or defraud creditors"), aff'd, 196 B.R. 532 (N.D. Cal. 1995), and aff'd, 114 F.3d 991 (9th Cir. 1997).  We likewise conclude that the Committee's claim for actual fraud under the Pennsylvania UFTA is barred by § 546(e).

B.    Counts 4 Through 6

In Counts 4, 5, and 6 of the Amended Complaint, the Committee asserts that Defendants committed various violations of §§ 1551 and 1712 of the Pennsylvania Business Corporation Law of 1988 (PBCL), 15 Pa. C.S.A. §§ 1101, *et seq.*  Counts 4 and 5 allege that the Director and Officer Defendants engaged in unlawful distributions of corporate funds in violation of (respectively) §§ 1551(b)(1) and (2)[12], the theory being that, at the time the redemption was undertaken, NFC and/or Holdings were unable to pay their debts as they became due in the usual course of business (see Amended Compl. [Doc. 39] at Count 4, ¶¶ 87-92), and the total assets of NFC and/or Holdings were less than the sum of their total liabilities (see Amended Compl. at Count 5, ¶¶ 98-98).  In Count 6, the Committee alleges that, by undertaking the redemption at a time when the total assets of NFC and/or Holdings were less than the sum of their total liabilities, the Directors and Officers of NFC and/or Holdings breached their respective fiduciary duties in violation of § 1712.[13]  (See Amended Compl. at Count 6, ¶¶ 99-104.)

---

[12] Those provisions limit the corporation's and the board of directors' general power to authorize distributions to shareholders as follows:

(b) Limitation. – A distribution may not be made if, after giving effect thereto:

(1) the corporation would be unable to pay its debts as they become due in the usual course of its business; or

(2) the total assets of the corporation would be less than the sum of its total liabilities plus (unless otherwise provided in the articles) the amount that would be needed, if the corporation were to be dissolved at the time as of which the distribution is measured, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

15 Pa. C.S.A. § 1551.

[13] Section 1712 provides, in relevant part:

(a) Directors.--A director of a business corporation shall stand in a

In each of these counts, the Committee seeks to recover the full amount of the redemption price (i.e. approximately $5.75 million) from the Director and Officer Defendants.

As a preliminary matter, the scope of potential liabilities implicated by these claims must be clarified. Defendants accurately point out that, because NFC is a Pennsylvania corporation and Holdings is a Delaware corporation, only NFC is subject to the mandates of the PBCL.[14] Moreover, because the statutory violations alleged in Counts 4 and 5 establish liability only on the part of corporate directors (*not* officers),

---

fiduciary relation to the corporation and shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. ...

\*\*\*

(c) Officers.--Except as otherwise provided in the bylaws, an officer shall perform his duties as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances. A person who so performs his duties shall not be liable by reason of having been an officer of the corporation.

15 Pa. C.S.A. § 1712.

[14] Defendants note that, under the "internal affairs doctrine," courts must look to the law of the state of formation to resolve issues involving the internal affairs of a corporation. See CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 89-93 (1987); First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983). As this court sits in the Commonwealth of Pennsylvania, we apply Pennsylvania conflict-of-law principles. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941). The Commonwealth, as Defendants note, has adopted the "internal affairs doctrine" by statute. See 15 Pa. C.S.A. § 4145(a). The Committee does not appear to dispute either the Defendants' analysis or their conclusions concerning this point.

see 15 Pa. C.S.A. § 1551, *supra*, and § 1553,[15] only those named Defendants who

served as Directors of NFC can be liable for purposes of Counts 4 and 5.  The only

named Defendants meeting those qualifications are E. Roger Clark and Ashok K.

Khare.[16]  Thus, to the extent the Committee could establish liability under Counts 4 and

---

[15] Section 1553 provides, in relevant part:

(a) Directors.--Except as otherwise provided pursuant to section 1713
(relating to personal liability of directors), a director who votes for or
assents to any dividend or other distribution contrary to the provisions of
this subpart or contrary to any restrictions contained in the bylaws shall, if
he has not complied with the standard provided in or pursuant to section
1712 (relating to standard of care and justifiable reliance), be liable to the
corporation, jointly and severally with all other directors so voting or
assenting, for the amount of the dividend that is paid or the value of the
other distribution in excess of the amount of the dividend or other
distribution that could have been made without a violation of the
provisions of this subpart or the restrictions in the bylaws.

15 Pa. C.S.A. §1553(a).

[16] For reasons not clear to the Court, the Committee has identified Ashtok Khare
as a Transferee Defendant only and not as a Director.  However, the record is clear that
Mr. Khare served as a Director for both NFC and Holdings at all times relevant to the
Committee's claims.  (See Pl.'s Surreply Br. [Doc. # 79] at Ex. D.)  Like Mr. Clark, Mr.
Khare voted to approve the redemption and received corporate payments in exchange
for his personal shares of Holdings' Class B stock.  (See id.; Def.s' Append. to Mot. for
Partial Summ. Judg. [Doc. # 45] at ¶¶ 7-8.)  The Defendants insist that, because Mr.
Khare has not been specifically named in the Amended Complaint as a Director
Defendant, it is too late for the Committee to further amend its pleading and do so now.
     We do not agree.  Mr. Khare has been identified as a Defendant since the
commencement of this lawsuit, albeit as a Transferee Defendant only.  He has been
properly served, has had ample notice of the nature of the Committee's claims, and
therefore was at all times in a position to know that, but for the Committee's inadvertent
mistake, he would likely have been named as a Director Defendant for purposes of
Counts 4 through 8 of the Amended Complaint.  The claims asserted in Counts 4-8
arise out of the same transaction which has heretofore served as the basis of the
Committee's claims against Mr. Khare and the other named Transferee Defendants.
We can perceive no possible prejudice to Mr. Khare by allowing the Committee to treat
him as a Director Defendant.  Thus to the extent Counts 4 through 8 are *not* otherwise
barred as a matter of law, see our discussion infra, we conclude that the requirements
of Fed.R.Civ.P. 15(c)(2) and (3) are satisfied and the Committee may pursue its claims

5 of the Amended Complaint, it appears that Mr. Clark and Mr. Khare are the only individuals whom the Committee has properly named as defendants.

More fundamentally, however, Defendants contend that Counts 4 through 6 cannot survive because they were not asserted within the applicable statute of limitations period.  Violations of § 1551 of the PCBL (Counts 4 and 5) are governed by a 2-year statute of limitations.  See 15 Pa.C.S.A. § 1553(d) (claims for unlawful dividends and distributions are governed by 2-year limitations period set forth in 42 Pa. C.S.A. § 5524(5) relative to actions upon a statute for a civil penalty or forfeiture). Violations of § 1712 are likewise governed by a 2-year statute of limitations.  See 42 Pa.C.S.A. § 5524(7) (2-year limitations period applies to personal injury actions founded upon negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud); Maillie v. Greater Delaware Valley Health Care, Inc., 628 A.2d 528, 532 (Pa. Cmwlth. 1993) (applying two year statute of limitations period to breach of fiduciary duty claim).  Because the stock redemption occurred on April 13, 1999, Defendants calculate that the statute of limitations expired on April 13, 2001.  However, the instant litigation was not commenced until January 30, 2003.  Thus, Defendants maintain that Count 4-6 are now time-barred.

The Committee does not dispute the applicability of a 2-year statute of limitations, but it does dispute the assertion that Counts 4-6 are untimely.  It posits two alternative theories as to why the statute of limitations had not expired as of the date the original complaint was filed.

First, the Committee contends that the statute of limitations accrual date was tolled by Pennsylvania's "discovery rule."  Under Pennsylvania law, "a cause of action accrues when the plaintiff could have first maintained the action to a successful

---

against Mr. Khare as a Director Defendant.

conclusion"; consequently, "the statute of limitations begins to run as soon as the right to institute and maintain a suit arises." Fine v. Checcio, 870 A.2d 850, 857 (Pa. 2005). Nevertheless, the "discovery rule" operates to toll the limitations period in situations where the plaintiff is reasonably unaware of his injury. Id. at 858. Under the rule, the limitations period will not begin to run "until 'the plaintiff reasonably knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct.'" In re Mushroom Transp. Co., Inc., 382 F.3d 325, 338 (3d Cir. 2004) (quoting In re TMI Litig., 89 F.3d 1106, 1116 (3d Cir. 1996)). Thus, the "salient point" giving rise to application of the discovery rule is "the inability of the injured, despite the exercise of reasonable diligence, to know that he is injured and by what cause." Fine, 870 A.2d at 858.

The Committee cites In re CITX Corp., Inc., Nos. 01-19604, 03-727, & 03-CV-6766, 2004 WL 2850046 at * 3 (E.D. Pa. Dec. 8, 2004), for the proposition that, where the bankruptcy trustee steps into the shoes of the debtor company, the discovery rule tolls the statute of limitations accrual date until the filing of the bankruptcy petition. In CITX, the trustee in bankruptcy brought claims of malpractice and negligent misrepresentation against a firm that had provided pre-petition accounting services for the debtor. The defendants argued that the claims were time-barred by virtue of the fact that they had been filed more than two years after the allegedly deficient financial statements had been issued by the firm. The district court rejected this defense, noting that a "strict application" of the limitations period would produce an inequitable result:

> While a strict application of the limitations period would commence at the time the Defendants issued their compiled financial statements, this would not yield an equitable result, given a practical understanding of the position and responsibilities of a bankruptcy Trustee. Although the Trustee steps into the shoes of the bankruptcy company, it is not in a position, prior to the filing of the bankruptcy action, to be aware of potential claims arising from injuries to the bankrupt company. A reasonable person in the Trustee's position could not be aware of, or reasonably be expected to discover, injuries to CitX prior to the filing of the bankruptcy petition. Therefore, the discovery rule applies to toll the

statute of limitations until the filing of the bankruptcy petition on July 3, 2001, leaving the Trustee within the applicable statutory period given its filing on July 2, 2003.  *See* Baehr v. Touche Ross & Co., 62 B.R. 793, 797 (E.D. Pa.1986) (tolling the two-year limitation of § 5524 until the bankruptcy filing).

In re CITX Corp., Inc., *supra*, at * 4.

To the extent Plaintiff relies on CITX Corp. for the proposition that the limitations period for pre-bankruptcy injuries is *per se* tolled until the filing of a bankruptcy petition, we are not persuaded that CITX Corp. accurately states the controlling legal principles. Similarly, we are not persuaded by the Committee's reliance on In re Mushroom Transp. Co., 382 F.3d at 338, to support its assertion that, "[u]ntil the filing of the Bankruptcy, there was no reason for creditors or other parties to awaken inquiry and direct diligence into the issues surrounding the Stock Cancellation."  (Pl.'s Br. in Opp. at 28.)  In re Mushroom Transp. is distinguishable from the case at bar in that it involved alleged *post-petition* malfeasance in the form of wrongful transfer and embezzlement of bankruptcy estate property; therefore, it did not implicate the analysis we undertake below.

Rather, the statute of limitations issue in the instant case appears to be governed by § 108(a) of the Bankruptcy Code,[17] which provides:

---

[17] We note that the Committee purports to bring Counts 4 and 5 pursuant to §§ 1551 and 1553 of the PBCL *and § 544(b) of the Bankruptcy Code*.  (The Committee does not expressly refer to § 544(b) in Count 6.)  Defendants contend, and we agree, that Counts 4 and 5 are not properly brought under § 544(b) of the Code, since that provision pertains only to avoidance claims which the trustee (or here, the Committee) is empowered to bring in its capacity as a putative creditor.  See 4 Collier on Bankruptcy ¶ 554.03, at 544-17 (15th ed. 1986) ("[S]ection 544(b) does not create in the trustee any independent right or power of action with which to challenge an allegedly invalid transfer.  Like Prometheus bound, the trustee is chained to the rights of creditors in the case under title 11.  If there are not creditors within the terms of section 544(b) against whom the transfer is voidable under applicable law, the trustee is powerless to act so far as section 544(b) is concerned.") (footnotes omitted), cited in In re Kenval Marketing Corp., 69 B.R. 922, 925 (Bankr. E.D. Pa., 1987).  The breach of fiduciary duty claims set forth in Counts 4-6 are causes of action belonging not to

54

(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of–

---

creditors, but to the debtor corporation itself.  See 42 Pa. C.S.A. § 1553(a) (a director who authorizes any unlawful distribution in violation of his fiduciary duties shall be liable to the corporation for the amount of the unlawful distribution); id. at § 1717 (directors' duties of care and loyalty under § 1712 run solely to the business corporation and may be enforced directly by the corporation or by a shareholder on behalf of the corporation).  Thus, § 544(b) does not provide the Committee a vehicle for pursuing its breach of fiduciary duty claims.  Accord In re Bliss Technologies, Inc., 307 B.R. 598, 608 (Bankr. E.D. Mich. 2004) (holding that §544(b)(1) does not apply to claims of alleged breach of fiduciary duty).

We mention this distinction because, if § 544(b) does not apply to the breach of fiduciary duty claims in Counts 4-6, then § 550 is unavailable as a means of recovering from mediate transferees.  See 11 U.S.C. § 550 ("to the extent a transfer is avoided under section 544 ...," the trustee may obtain recovery from the initial transferee or any immediate or mediate transferee).  Moreover, if the claims in Counts 4-6 were ones properly asserted under § 544(b), then they would be subject to a different statute of limitations provision – to wit, 11 U.S.C. § 546(a), which provides:

(a) An action or proceeding under section 544... of this title may not be commenced after the earlier of--

(1) the later of–

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).  While § 546(a) might render the Committee's PBCL claims timely, Defendants contend that the Counts 4-6, if properly asserted under § 544(b), would nevertheless fall prey to the "settlement payment defense" under subsection 546(e). Although this argument has some appeal, we need not definitively decide the issue because we are satisfied that § 544(b) is inapplicable to Counts 4-6 of the Amended Complaint.

> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) two years after the order for relief.

11 U.S.C. § 108(a).  Thus, § 108(a) allows for an extension of the state law limitations period upon the filing of a bankruptcy petition, but only if "the [applicable] period has not expired before the date of the filing of the petition."  Our inquiry, therefore, necessarily focuses on whether Pennsylvania's 2-year statute of limitations period expired before March 6, 2002, when the underlying bankruptcy proceedings were commenced.

The disputed redemption which is the subject of these claims occurred on April 13, 1999.  Under a straightforward application of the 2-year limitations period, the Committee's breach of fiduciary duty claims would be untimely because the statute of limitations would have expired on April 13, 2001.  Yet the Committee insists that, under the "discovery rule," the statute of limitations did not begin running until well after April 13, 1999.  As previously noted, the "salient point" giving rise to application of the discovery rule is the plaintiff's inability to know that he is injured and by what cause, despite the exercise of reasonable diligence.  Fine, 870 A.2d at 858.  Stated differently, the relevant inquiry is "what might [the plaintiff] have known, by the use of the means of information within his reach, with the vigilance the law requires of him?"  Id. (quoting Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co., 31 A. 484, 485 (Pa. 1895)). See also Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1390 (3d Cir. 1994) ("The discovery rule keys on a plaintiff's cognizance, or imputed cognizance, of the actual injury.")

We must assess the Committee's "discovery rule" argument in light of the present record construed, where disputed, in the light most favorable to the Committee. The parties agree that the Board of Directors for NFC and the Board of Directors for Holdings were comprised of the same members and generally conducted joint

meetings.  (See Amended Compl. [Doc. # 39-1] at ¶ 45; Answer [Doc. # 80] at ¶ 45.)

Defendants have presented unrebutted evidence that Holdings' Boards (and therefore,

NFC's Board) was comprised, during the relevant time period, of the following nine

members:  Defendant E. Roger Clark and Defendant Ashok Khare (both of whom

represented management); Patrick A. Flanagan, Charles C. Judd, John G. Koedel, and

Stan Lundine (all of whom were independent); and Robert W. Richards, Harry D.

Rosequist, and Dennis L. Peterson (all of whom represented labor interests).  (See

Decl. of Maurice Cashman at ¶ 4, n. 1, Appendix in Supp. of Def.'s Mot. for Summ.

Judg. [Doc. # 45].)  During its meeting of December 22, 1998, upon the advice of

Holdings' outside accounting firm and valuation expert, the Board unanimously voted in

favor of converting Holdings to a Subchapter S corporation and eliminating Holdings'

Class B shares, either through a redemption at a price of $49.42 per share or through a

merger designed to eliminate the Class B shares.  (See Cashman Decl. at ¶ 4.)  The

proposed redemption price was established by the corporation's valuation expert,

Valuemetrics, Inc.  (Id.)  Of the nine Board members who approved the redemption,

only two – Messrs. Clark and Khare – received payments in connection with the

redemption.  (See Cashman Decl. at ¶¶ 7-8.)  Messrs. Clark and Khare also happen to

be the only two Board members named as Defendants in this litigation.[18]

Given these facts, it is difficult to discern how the discovery rule has any valid

application with respect to Counts 4-6.  The Committee theorizes that "the officers and

directors of NFC and NFC Holdings devised a scheme to effectuate the cancellation of

certain Class B stock and to then transfer approximately $5.7 million dollars to Class B

stockholders, including officers and directors of NFC and NFC Holdings."  (Pl.'s Br. in

---

[18] The Amended Complaint incorrectly identifies Defendants Cashman, Beyeler,
and Kaemmerer as both officers *and directors* of NFC and/or Holdings.  (Amended
Complaint at ¶¶ 11-13.)  As discussed in n. 16, *supra*, Defendant Khare is identified
only as a Transferee Defendant, rather than a director.  (See id. at ¶ 26.)

Opp. at 26.)  The Committee insists that, until the bankruptcy proceedings were commenced, there was no reason for creditors or other parties to awaken inquiry and direct diligence into the issues surrounding the redemption.  (Id. at p. 28.)  Yet seven directors approved the disputed stock redemption without any obvious self-interest and in the absence of any alleged wrongdoing.  Pursuant to § 1712, these directors had a fiduciary responsibility to perform their duties in good faith, in a manner consistent with the company's best interests, and with such care, skill and diligence – including reasonable inquiry – as a person of ordinary prudence would use under similar circumstances.  15 Pa.C.S.A. § 1712(a).  They were, in short, under a fiduciary obligation to investigate and satisfy themselves of the soundness of the stock redemption from a business judgment perspective.  The Committee has failed to produce any evidence to explain why the allegedly unlawful nature of the stock redemption and the alleged malfeasance of the Director and Officer Defendants was not discoverable by these seven untainted directors.

For example, the evidence does not support an inference that the named Director and Officer Defendants were controlling shareholders of Holdings; on the contrary, the record suggests that the Director and Officer Defendants did *not* own a majority of the Class B stock.  Nor is there any evidence to suggest that the named Director and Officer Defendants somehow dominated or controlled the actions of the Board as a whole.

Alternatively, if it were the Committee's theory that *all nine* directors conspired together to effectuate the allegedly unlawful stock redemption in breach of their respective duties, then the Committee might conceivably state a claim of adverse domination.  Even under this scenario, however, the discovery rule would be inapplicable because the guilty knowledge of the conspiring directors would be imputed to the corporation which they dominate.  See In re Loranger, 324 B.R. at 580 (discovery

rule did not toll statute of limitations for breach of fiduciary duty, negligence, and unjust enrichment claims where corporation's sole owner, director and officer allegedly knew of injury to corporation arising from disputed stock redemption; dominant principle's knowledge was imputed to the corporate debtor itself); PNC Bank, Kentucky, Inc. v. Housing Mortgage Corp., 899 F. Supp. 1399, 1405 (W.D. Pa. 1994) (knowledge of wrongdoing of agents who "dominated" a corporation would be imputed to the corporation).[19]

Instead, it appears to be the Committee's theory that the named Director and Officer Defendants somehow duped the other Board members into voting for the stock redemption by fraudulently concealing information about the nature of the company's true financial position. Thus, the Committee seeks to avoid a limitations bar by invoking the alternative doctrine of equitable estoppel. See Fine v. Checcio, 870 A.2d at 860 (doctrine of fraudulent concealment serves to toll the running of the statute of limitations based on a theory of estoppel).

Generally speaking, equitable tolling will suspend the running of the statute of limitations where (1) the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) the plaintiff in some extraordinary way has been prevented from asserting his rights; or (3) the plaintiff has timely asserted his rights mistakenly in the wrong forum. In re Mushroom Transp. Co., 382 F.3d at 338-39 (quoting Oshiver, supra, 38 F.3d at 1387). The doctrine of fraudulent concealment provides that the defendant may not assert the statute of limitations "if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of

---

[19] While a claim of adverse domination might establish a basis for equitable tolling, see Loranger, 324 B.R. at 580-81, this theory has no relevance here because the Committee has not asserted wrongdoing or conspiracy on the part of the seven non-management/non-shareholder directors who voted in favor of the stock redemption and supported the company's transition to Subchapter S status.

inquiry into the facts." <u>Fine</u>, *supra*, at 680 (citation omitted).  "Fraud" in this context, does not require an intent to deceive, but is used in the broadest sense, encompassing "unintentional deception."  <u>Id</u>.  It is the plaintiff's burden to prove fraudulent concealment "by clear, precise, and convincing evidence."  <u>Id</u>. (citing <u>Molineux v. Reed</u>, 532 A.2d 792, 794 (Pa. 1987)).  Moreover, application of this doctrine (as with the discovery rule) requires the plaintiff to demonstrate reasonable diligence.  <u>Id</u>. at 861.  Thus, "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause."  <u>Id</u>.

In its brief, the Committee asserts that the statute of limitations should be tolled "as the officers and directors fraudulently concealed the insolvency of NFC and NFC Holdings and misrepresented the true financial condition of NFC and NFC Holdings at the time of the Stock Cancellation."  (Pl.'s Br. in Opp. at 29.)  However, the Committee has proffered no theory, much less any supporting evidence, to establish how this concealment might have occurred.  No specific theory is laid out in the Committee's Amended Complaint to explain why the true financial ramifications of the redemption were not reasonably discoverable, other than the Committee's single allegations that "[t]he book value of NFC and/or NFC Holdings was depleted by approximately 45%, from $17,764,000 to $9,679,000, as a result of the Stock Cancellation.  Intangible assets, including goodwill, were valued at approximately $19,000,000 and included in book value."  (Amended Compl. at ¶ 54.)

The moving Defendants, on the other hand, have proffered undisputed evidence that, as of November 1999, the Board of Directors acquired a new member in Thomas G. Hessley.  Mr. Hessley attended his first board meeting on November 5, 1999 and received at that time a consolidated balance sheet (actual and projected) for Holdings covering the period from June 30, 1997 through June 30, 2003 in which the

corporation's long-term debt to JP Morgan Chase was laid out.  (See Cashman Decl. at ¶ 9; Def.'s Append. [Doc. 45] at Ex. F.)  Defendants therefore contend that, at least by November 5, 1999, there was information on record, and available to a neutral source, indicating the corporation's debt obligation relative to the redemption such that the statute would have expired, at the latest, on November 5, 2001.  The Committee has proffered nothing in rebuttal to this point, except for its suggestion that if, upon further discovery, the facts establish "'(1) wrongful concealment of its actions by defendant; (2) failure of the plaintiff to discover the operative facts or the basis of his cause of action within the limitations periods; and (3) plaintiff's due diligence until discovery of the facts,' then the Committee may be successful in its fraudulent concealment claim."  (Pl.'s Br. in Opp. at 30 (quoting Bethlehem Steel Corp. v. Fischbach & Moore, Inc., 641 F. Supp. 271, 273 (E.D. Pa. 1986)).)

The Committee also invokes the doctrine of equitable tolling on the alternative basis that "both the Original Complaint and Amended Complaint clearly set forth claims of self-dealing for profit by a fiduciary."  (Pl.'s Br. in Opp. at 28-29.)  The Committee relies on In re Sheffield Steel Corp., 320 B.R. 405 (Bankr. N.D. Okla. 2004), wherein the bankruptcy court denied the defendants' motion to dismiss on the basis that the plaintiffs had established a prima facie case for equitable tolling based on allegations of self-dealing by a fiduciary:

> where a complaint satisfies the elements of a prima facie case for equitably tolling- i.e., it contains allegations of self-dealing for profit by a fiduciary-it is ordinarily inappropriate to summarily dismiss a claim as untimely under an otherwise applicable statute of limitations pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See, e.g., Laventhol, Krekstein, Horwath & Horwath v. Tuckman, 372 A.2d 168, 170 (Del. 1976) (allegations in complaint that directors engaged in fraudulent self-dealing satisfied the minimum requirements of equitable tolling to preclude dismissal on statute of limitations grounds). In such cases, the resolution of a defendant's statute of limitations defense and the plaintiff's counter-defense of equitable tolling requires factual development and a full presentation of evidence relevant to the equities that must be assessed and balanced. Under the liberal rules of notice pleading, a

> plaintiff is not required to state all the evidence it would present in support
> of its equitable tolling claim in the complaint.

320 B.R. at 419.

What the Committee overlooks, however, is the fact that this case is presently postured not at the Rule 12(b)(6) stage but at the Rule 56 summary judgment stage. When a defendant makes an initial showing that there is no genuine dispute as to a material issue of fact, the plaintiff "may not rest upon the mere allegations or denials of the... pleading," but must, through affidavits or otherwise, set forth specific facts showing that there is a genuine issue for trial." Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

In essence, the Committee contends that the record here requires further factual development relative to its counter-defense of equitable tolling, but it has not adhered to the requirements of Rule 56. Under Rule 56(f), a court may order a continuance for further discovery if it appears "from the affidavits of a party opposing [summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed. R. Civ. P. 56(f). Here, the Committee has failed to file a Rule 56(f) affidavit and has failed to identify "with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." Bradley v. U.S., 299 F.3d 197, 206-07 (3d Cir. 2002) (quoting St. Surin v. Virgin Island Daily News, Inc., 21 F.3d 1309, 1314 (3d Cir. 1994)).

The Court recognizes that formal discovery has not been completed at this stage of the proceedings. However, it cannot be said that the Committee's claims are in their infancy. The Committee first engaged in due diligence relative to the investigation of its claims back in early 2002 and it initiated this lawsuit in January of 2003. The Court recognizes that it did not formally approve the Committee's standing to pursue this

litigation until the entry of its memorandum opinion and order on May 26, 2005. However, the Court held an initial case management conference shortly thereafter on June 8, 2005, at which time the Court set a discovery schedule and directed the immediate commencement of discovery notwithstanding the fact that Defendants were contemplating filing Rule 56 motions early in the proceedings. The Defendants did, in fact, file their Rule 56 motions but later withdrew them after we allowed the Committee to file its Amended Complaint on August 22, 2005. Defendants thereafter re-filed their Rule 56 motions – i.e., the instant motions – on September 26, 2005, and the Committee responded on October 17, 2005. In sum, while it may be true that discovery has not been fully completed in this case, nevertheless the Committee has had significant time to flesh out its theories insofar as they concern alleged self-dealing and/or fraudulent concealment by the Director and Officer Defendants.

Moreover, it was obvious that the statute of limitations would be an issue in this case: the defense was first invoked by the Transferee Defendants in their January 27, 2004 motion to dismiss (see Doc. # 1); it was raised again in the course of the derivative standing proceedings and, during a June 22, 2004 status conference, it was specifically contemplated by the Court and the parties that the statute of limitations issue could be handled at a future point in time and resolved by way of Rule 56 motions. (See Doc. # 13; Mem. Op. dated 5/26/05 [Doc. # 15] at pp. 19-20.) To the extent that the Committee requires specific information to establish its proof relative to the equitable tolling counter-defense, the Committee is required to set forth its requirements in a Rule 56(f) affidavit which, again, it has failed to do. Based on all the foregoing considerations, we conclude that the claims set forth in Counts 4 through 6 of the Amended Complaint are time-barred.

C.    <u>Count 7</u>

Count 7 of the Amended Complaint alleges that the Director and Officer Defendants violated §§ 160[20] and 173[21] of the Delaware General Corporation Law ("DGCL") by authorizing and effectuating the stock redemption at a time when the total assets of NFC and/or Holdings were less than the sum of their total liabilities and at a time when the companies' capital was either impaired or caused to be impaired as a result of the redemption.  Based on these alleged violations, the Committee asserts that

---

[20]  Section 160 of the DGCL provides, in relevant part:

(a) Every corporation may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares; provided, however, that no corporation shall:

    (1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation ...

8 Del. C. § 160(a)(1).

[21] Section 173 of the DGCL provides:

No corporation shall pay dividends except in accordance with this chapter. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock. If the dividend is to be paid in shares of the corporation's theretofore unissued capital stock the board of directors shall, by resolution, direct that there be designated as capital in respect of such shares an amount which is not less than the aggregate par value of par value being declared as a dividend and, in the case of shares without par value being declared as a dividend, such amount as shall be determined by the board of directors. No such designation as capital shall be necessary if shares are being distributed by a corporation pursuant to a split-up or division of its stock rather than as payment of a dividend declared payable in stock of the corporation.

8 Del. C. § 173.

the Director and Officer Defendants are jointly and severally liable for the full value of the redemption.  (Amended Compl. at ¶¶ 107-111.)

Preliminarily, the Moving Defendants point out that only Holdings is subject to the mandates of the DGCL, as only Holdings (and not NFC) is a Delaware corporation. Defendants further note that, under 8 Del. C. § 174, liability for violations of §§ 160 or 173 runs only to corporate directors, as opposed to officers.[22]  Thus, the only individuals properly named as Defendants for purposes of Count 7 are those Defendants who, in their capacities as directors of Holdings, approved the disputed redemption.  The record reflects that the only named Defendants meeting these requirements are E. Roger Clark and Ashtok Khare.  (See n. 16, *supra*.)

More fundamentally, however, Defendants contend that Count 7 cannot survive summary judgment because, like Counts 1-3, it is barred by the settlement payment defense under 11 U.S.C. § 546(e).  We agree.

We begin by observing that the Committee has asserted Count 7 under both the Delaware General Corporation Law *and* § 544(b) of the Bankruptcy Code.  Significantly, director liability for violations of §§ 160 and 173 of the DGCL runs not only to the corporation itself, but also to the corporation's creditors in the event of dissolution or insolvency.  See 8 Del. C. § 174(a).  Thus, it appears that a trustee-in-bankruptcy or debtor-in-possession (or in this case, the Committee through derivative standing) *does* acquire a right of action under § 544(b) to prosecute violations of §§ 160 and 173 of the DGCL in its capacity as a putative creditor.  See PHP Liquidating, LLC v. Robbins, 291 B.R. 592, 596 (D. Del. 2003) ("Under Section 544(b), a trustee or debtor-in-possession

--------------------------------

[22] Although § 174(c) allows directors to be subrogated to the rights of the corporation against stockholders who receive the payment with knowledge of its unlawfulness, see 8 Del. C. § 174(c), the Committee does not allege that the Transferee Defendants were possessed of such knowledge.

is empowered to bring an avoidance action for a debtor's violation of Section 160 of the DGCL."), aff'd per curiam, 128 Fed. App. 839 (3d Cir. 2005).

Nevertheless, as the Court previously discussed in detail, see Part III(A) supra, § 546(e) of the Bankruptcy Code prohibits the trustee (or, here, the Committee) from utilizing § 544(b) to avoid any transfer that is a "settlement payment ... made by or to a ... financial institution ... that is made before the commencement of the case." 11 U.S.C. § 546(e). For all of the reasons set forth in Part III(A) above, we have concluded that the payments at issue here constitute "settlement payments" made "by or to a financial institution" within the meaning of § 546(e). Accordingly, Count 7 of the Amended Complaint, like Counts 1 through 3, cannot survive summary judgment.

D.    Count 8

Finally, Count 8 of the Amended Complaint asserts that the Director and Officer Defendants breached their fiduciary duties under Delaware common law in approving and/or consummating the redemption at a time when the total assets of NFC and/or Holdings were allegedly less than the sum of their total liabilities. Here again, the Committee seeks to recover from the Director and Officer Defendants, jointly and severally, the full value of the redeemed shares.

The Moving Defendants have not sought summary judgment as to this particular claim, but they maintain that any potential liability must be limited to those named Defendants who actually served as officers or directors of Holdings (as opposed to NFC) during the relevant time period. According to the Moving Defendants, of those individuals named in this lawsuit, only E. Roger Clark, Maurice J. Cashman, Dana Beyeler, and Robert A. Kaemmerer were officers or directors of Holdings. In addition, though, we have observed that Ashtok Khare, though named only as a Transferee Defendant by the Committee, did in fact serve as a director of Holdings during the

relevant time period and therefore could properly be named as a defendant for purposes of Count 8.  (See n. 16, *supra*.)  Accordingly, we conclude that the Committee's claim based on breach of fiduciary duty under Delaware common law is properly limited to these individuals.

The Moving Defendants further assert that, contrary to the Committee's allegation (see Amended Compl. at ¶ 15), Defendant Charles R. Olson was *not* an officer of Holdings.  The Committee has not factually rebutted this point.  Defendant Thomas H. Jackson is alleged by the Committee to have served as an officer of *NFC* but, because NFC is a Pennsylvania corporation rather than a Delaware corporation, Mr. Jackson could not be liable for purposes of Count 8.  Accordingly, we agree with the Moving Defendants that Count 8 should be dismissed as against these two individuals.

The Committee insists that there are material issues of fact as to who the officers and directors were for both NFC and Holdings and which directors or officers authorized the redemption.  We do not agree.  Defendants Cashman, Beyeler and Kaemmerer have acknowledged their status as officers of Holdings for purposes of count 8.  It stands unrebutted on this record that, for the time period relevant to these claims, the Boards of NFC and Holdings were comprised of the same directors and included Defendants Clark and Khare.  The fact that the two boards may have conducted a joint meeting on December 22, 1998, the date on which the stock redemption was approved, does not create a genuine issue of material fact as to which individuals can be liable for purposes of Count 8.  Only Holdings was subject to the Delaware General Corporation Law, and only Holdings' officers and directors would be authorized to act on Holdings' behalf.  Only the officers and directors of Holdings can be properly named as defendants for purposes of Count 8.

## IV.  CONCLUSION

Based upon the foregoing discussion, Defendants' motion for partial summary judgment will be granted.  Counts 1 through 7 of the Amended Complaint will be dismissed in their entirety, and Count 8 will proceed only as against Defendants Clark, Cashman, Beyeler, Kaemmerer, and Khare.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

In re:                                                  )
**NATIONAL FORGE COMPANY, et al.,**       )
                                                        )
                Debtor.                                 )
_____                     )
                                                        )
**OFFICIAL COMMITTEE OF**                   )          **Civil Action No. 04-21 Erie**
**UNSECURED CREDITORS OF**                  )
**NATIONAL FORGE COMPANY,**                 )
                                                        )
                **Plaintiff,**                          )
**and**                                                 )
                                                        )
**OFFICIAL COMMITTEE OF RETIREES**          )
**OF NATIONAL FORGE COMPANY,**              )
                                                        )
                **Intervenors,**                        )
        **v.**                                          )
                                                        )
**E. ROGER CLARK, et al.,**                 )
                                                        )
                **Defendants.**                         )

<u>**ORDER OF JUDGMENT**</u>

AND NOW, *to wit*, this 9th day of June, 2006, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion for Summary Judgment as to Counts I Through VII of the Amended Complaint filed by Defendants E. Roger Clark, Maurice J. Cashman, Dana Beyeler and Robert A. Kaemmerer [Doc. # 46] is GRANTED.

JUDGMENT is hereby entered in favor of all Defendants and against Plaintiff as to Counts 1 through 7 of the Amended Complaint. As to Count 8 of the Amended Complaint, JUDGMENT is hereby entered in favor of all Defendants except for E. Roger Clark, Maurice J. Cashman, Dana Beyeler, Robert A. Kaemmerer, and Ashtok Khare.

                                        s/    Sean J. McLaughlin
                                              United States District Judge
cm:    All counsel of record.