Memorandum Opinion

Exhibit 1

[P]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In re:                                          )
                                                )
NATIONAL FORGE COMPANY, et al.,    )
                                                )
      Debtor.                               )
------------------------------------------      )
                                                )
OFFICIAL COMMITTEE OF              )        Civil Action No. 04-21Erie
UNSECURED CREDITORS OF             )
NATIONAL FORGE COMPANY,            )
                                                )
      Plaintiff,                            )
                                                )
      v.                                    )
                                                )
E. ROGER CLARK both Individually   )
and as an Officer and Director of   )
National Forge Company, et al.,     )
                                                )
      Defendants.                           )

## MEMORANDUM OPINION

McLAUGHLIN, J.

      This matter originally came before the Court as: (1) related appeals from an order of the Bankruptcy Court, dated November 26, 2003, which retroactively approved the filing of Adversary Proceeding No. 03-1014 (the "Adversary Proceeding") by the Official Committee of Unsecured Creditors (the "Committee") in the underlying Chapter 11 proceedings; and (2) a motion to withdraw reference of the Adversary Proceeding from the Bankruptcy Court. The Adversary Proceeding asserts fraudulent transfer and breach of fiduciary duty claims arising out of a 1999 transaction in which the Debtor redeemed shares of its preferred stock.

      More specifically, in 1999 the controlling shareholders of the Debtor undertook a reorganization of the company from a "C" corporation to an "S" corporation, ostensibly to achieve certain tax benefits. As part of its conversion to an "S" corporation, the Debtor reorganized its stock shares into a single class of stock. In doing so, the controlling shareholders implemented a redemption of the Debtor's preferred stock shares at prices that, according to the Committee, were unjustifiably high. To fund the redemption, it is alleged, the Debtor borrowed

some $4 million from various lending institutions and secured these loans with liens against the Debtor's assets. The Committee contends that the lenders were aware the loans were being used to redeem the shares at inflated prices. The Committee further avers that the Debtor was either insolvent at the time of the stock redemption or was rendered insolvent as a result of it.

Based on the foregoing allegations, the Committee commenced the Adversary Proceeding in the Bankruptcy Court, asserting fraudulent transfer claims against three groups of defendants, all of whom were allegedly involved, directly or indirectly, in the 1999 stock buyout, i.e.: (i) JPMorgan Chase Bank, National City Bank of Pennsylvania, and Fleet Business Credit, LLP (collectively, the "Banks"), (ii) E. Roger Clark, Maurice J. Cashman, Dana Beyeler, and Robert A. Kaemmerer (collectively, the "Directors"); and (iii) twenty-one other individuals[1] who had previously held management-level positions with the Debtor (collectively, the "Remaining Individual Defendants" or the "Antos Group"). By order dated November 26, 2003, the Bankruptcy Court retroactively authorized the Committee's prosecution of the Adversary Proceeding. The Banks, Directors and Remaining Individual Defendants each filed separate appeals from the Bankruptcy Court's order, and those three appeals were consolidated.

After the parties submitted their initial briefs on the consolidated appeals, this Court, upon agreement of the parties, granted the Antos Group's motion to withdraw our reference of the Adversary Proceeding in its entirety. As a result of our order granting the motion to withdraw the reference, we now have original jurisdiction over the Adversary Proceeding pursuant to 28 U.S.C. § 157(d) and § 1334(b). Accordingly, we construe the Defendants' consolidated appeals as a motion to reconsider the Bankruptcy Court's ruling. For the reasons set forth below, we conclude that the Bankruptcy Court did not err in granting the Creditors' Committee permission to prosecute Adversary Proceeding No. 03-1014. The Bankruptcy

---

[1] Those individuals include: Daniel Antos, William D. Bailey, Richard A. Brewster, James E. Caldwell, Larry Campbell, James C. Confer, Richard D'Alessandro, Donald Fissel, James B. Harris, Thomas H. Jackson, Ashok K. Khare, Carl J. Luppino, Clarence E. Mason, Harold Murphy, Philip R. Novosel, Charles R. Olson, James D. Ruhlman, Phillip R. Simons, Glenn E. Turk, Ronald L. Young, and Barry Zischkau.

2

Court's Order of November 26, 2003 therefore stands and the Committee has derivative standing to pursue its claims.

## I. BACKGROUND

National Forge Company ("NFC") and National Forge Components, Inc. ("NFC Components") are companies previously engaged in the business of manufacturing heavy, precision-machined, forged steel components of high metallurgical quality, including crankshafts used in diesel locomotives and power generation systems, pipemolds for use in centrifugal casting of ductile pipe, and hard target warhead casings for use by the U.S. armed forces. NFC is a wholly owned subsidiary of NFC Holdings ("Holdings"), which was formed in 1995 to facilitate the acquisition of a British plant and corporation by NFC's employees. On March 6, 2002 NFC, NFC Holdings, and NFC Components (collectively, the "Debtor") each filed petitions for relief under Chapter 11 of the Bankruptcy Code. These petitions were later consolidated for joint administration. As is common in Chapter 11 cases, the Debtor remained in control of the assets of the companies as Debtor-in-Possession.

Prior to filing its Chapter 11 petition, the Debtor was indebted to the Banks under a credit agreement dated April 6, 1998. Pursuant to this pre-petition credit agreement, the Banks agreed to provide the Debtor with loans and various other financial accommodations which were secured by first priority liens and security interests in substantially all of the Debtor's assets.

As of the Chapter 11 filing date, the Debtor lacked sufficient funds to continue the operation of its business. Accordingly, simultaneously with the filing of its Chapter 11 petition, the Debtor filed a motion for permission to obtain interim post-petition financing via revolving credit and guarantee agreements (the "DIP Financing Agreement") with JP Morgan Chase Bank, acting as the agent for the Banks. [Bankr. Doc. 6.] As an inducement for the Banks to provide this post-petition financing, the Debtor admitted in its motion that the Banks possessed valid, first priority secured liens in substantially all of the Debtor's assets and waived any defenses or challenges to those liens. In addition, the DIP Financing Agreement secured the post-petition financing, in part, by providing the Banks senior liens and priority administrative expense status.

3

On March 12, 2002, the Bankruptcy Court entered an interim order (the "Interim DIP Order") authorizing the Debtor to enter into the DIP Financing Agreement and to secure post-petition financing on a super-priority basis. The Order gave the as-yet-inchoate unsecured creditors committee ninety (90) days from the date of its appointment in which to "properly file" an adversary proceeding challenging the validity, enforceability or priority of the Banks' security interest and liens and/or asserting any other claims or causes of action. [Bankr. Doc. 25]. In the absence of a timely filed action, the Committee would be bound by the Debtor's admissions concerning the liens.

On March 21, 2002, the Committee was appointed to represent the interests of the Debtor's unsecured creditors. [Bankr. Doc. No. 44.] A meeting was held immediately thereafter and the Committee retained its present legal counsel. On April 1, 2002, the Committee filed an application to employ financial advisors and accountants to assist in its due diligence review. [Bankr. Doc. No. 75].

On April 2, 2002, the Bankruptcy Court signed an order (the "Final DIP Order") finalizing the Interim DIP Order and, upon the Committee's request, extending its time for action from ninety (90) to one hundred twenty (120) days. [Bankr. Doc. No. 78.] Thereafter, between July of 2002 and January of 2003, the Banks and the Committee entered into a number of stipulations which acknowledged the Committee's on-going investigations relative to possible claims or avoidance actions against the Banks and further extended the 120-day deadline for the filing of such claims or actions. The fifth and final stipulation extended the time for action to January 31, 2003.

Meanwhile, on November 27, 2002, NFC and NFC Components filed a Joint Plan of Liquidation and a related Disclosure Statement.[2] The Plan contemplated the sale of substantially all the Debtor's assets with the proceeds and any remaining assets re-vesting in an entity to be known as Liquidating NFC for distribution to creditors. Among the assets to be acquired by

---

[2] NFC Holdings did not join in the "Joint Plan of Liquidation," having concluded that it could not propose a confirmable plan of reorganization. Accordingly, it filed a motion to dismiss its Chapter 11 case, which the Bankruptcy Court denied pending the resolution of this matter.

4

Liquidating NFC under the Plan were the Debtor's "Rights of Action," defined broadly to include:

> a claim, demand, right, defense, action, cause of action, suit, damage, offset, power, or privilege of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on, or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by NFC or Components against any Person, including but not limited to: (i) all avoidance powers, actions, rights, or remedies under Sections 544 through 553 and 724 of the Bankruptcy Code or any similar or related law...

The Plan and Disclosure Statement, as later amended, contemplated that Liquidating NFC would act through "Responsible Officers," subsequently identified by the Debtor as Defendant Cashman (Debtor's Vice President, Treasurer, Secretary and CFO) and Defendant Kaemmerer (Debtor's Assistant Treasurer and Assistant Secretary). The Amended Disclosure Statement identified Cashman and Kaemmerer, along with Defendants Clark (Debtor's Chairman, President and CEO) and Beyeler (Debtor's Vice President and Director of Marketing and Quality) as the Debtor's "key employees."

The terms of the Debtor's Joint Plan were substantially impacted by the impending sale of its assets. On January 7, 2003, the Debtor's assets were sold for $30,700,000 at a public auction conducted by the Bankruptcy Court. Because the auction generated some $5.7 million more in revenue than originally anticipated, it was projected that the unsecured creditors would perhaps receive as much as ninety-five percent (95%) satisfaction of their claims once the sale was closed.

At a hearing held on January 15, 2003, the Bankruptcy Court addressed the Committee's position concerning the possible filing of the Adversary Proceeding in light of these events. [Bankr. Doc. No. 554.] The fifth and final stipulation between the Committee and the Banks had extended the Committee's time for filing to January 31, 2003, the date by which the Debtor's sale of assets was to be consummated. According to the Banks' counsel, this extension of time served merely as a "placeholder," i.e. – something to preserve the Committee's right of action until the Committee was satisfied that its constituency would receive a favorable distribution under the Plan. (Id. at pp. 23-24.) Apparently, the Banks had anticipated that the fraudulent

5

conveyance action would be abandoned by the Committee following the closing on the sale in light of the substantial distribution that the unsecured creditors expected to receive. At the January 15 hearing, counsel for the Committee acknowledged that, while due diligence had been completed relative to the 1999 stock redemption and a complaint against the Banks drafted, the Committee had intentionally held off filing the complaint in order to allow the parties to focus on completing the sales process and determining the ultimate distribution to be made to the unsecured creditors. Counsel for the Committee posited that "[t]he reason we extended [the filing deadline] to January 31st is because we would know at that point whether or not a closing would have occurred on what is proposed before this court right now in terms of dollar figures, to get us to a 95-percent distribution." (Id. at p. 26.)

On January 31, 2003, the closing on the sale of Debtor's assets was consummated. From the sale proceeds, the Banks were paid some $12 million in satisfaction of their preferred claims against the Debtor. On that date, the Committee evidently sought a further extension of time in order to preserve its fraudulent transfer claims, but the Banks declined the request. Faced with the possibility of forever forfeiting its cause of action against the Banks, the Committee on January 31, 2003 filed the Adversary Proceeding. Because it viewed the Directors and Remaining Individual Defendants as potentially indispensable parties, the Committee sued them as well.

As the Debtor sought confirmation of its Amended Joint Plan of Liquidation following the sale of its assets, the parties endeavored to resolve their remaining disputes. Given the Committee's filing of the Adversary Proceeding, the Banks now objected to the Amended Plan on the ground that it failed to provide for the reimbursement of those legal fees which would be incurred in their defense of the Adversary Proceeding – fees which the Banks claimed they were entitled to recover under the terms of their loan documents. The Committee objected to the provision of the Amended Plan giving Liquidating NFC the authority to pursue "Rights of Action" previously belonging to NFC and NFC Components. The Committee's concern was that this language could be used to undermine its prosecution of the Adversary Proceeding under the theory that the right of action belonged solely to Liquidating NFC. In addition, the Committee

6

objected to the Amended Plan's inclusion of language broadly purporting to release "[the Debtor], their Banks, affiliates and shareholders, directors, principles, partners, officers, employees, agents, representatives and professionals" from any "suits. ... causes of action, and liabilities whatsoever ... that NFC, Components, their Estates, or the Creditor's Committee is entitled to assert." The Committee feared that this language, too, might be interpreted to bar its prosecution of the Adversary Proceeding.

In response to the Banks' objection, the Debtor maintained that: (a) the Banks were not entitled to reimbursement of their legal fees under the relevant loan documents, and (b) all legitimate claims by the Banks were otherwise being fully satisfied under the Plan. As for the Committee's objections, the Debtor asserted that the Committee lacked standing to prosecute the Adversary Proceeding due to its failure to obtain prior approval from the Bankruptcy Court and that the Committee had both violated the automatic stay and usurped the Debtor's power.

The Director Defendants similarly challenged the Committee's standing to pursue the Adversary Proceeding. They argued that all "rights of action" vested with Liquidating NFC under the Plan, that the designated "responsible officers" of Liquidating NFC (later officially designated as Cashman and Kaemmerer) should be in charge of such matters, and that any party dissatisfied with their performance could seek relief with the Bankruptcy Court.

The parties attempted to resolve their outstanding objections at the confirmation hearing held on February 28, 2003. Ultimately, however, all parties agreed that, in the interest of achieving confirmation of the Plan, the disputes concerning the Adversary Proceeding could, and should, be reserved for another day. As for the Banks' claims for indemnification, the parties agreed to set aside a $450,000.00 reserve for the reimbursement of such legal fees as the Bankruptcy Court might ultimately allow. In addition, the parties agreed to strike from the Plan the disputed release provision and include in the proposed Confirmation Order a clause specifically preserving all parties' rights with regard to the Adversary Proceeding.

The parties next determined that the most appropriate way to frame the issue of the Committee's standing was for the Committee to file an "emergency motion" seeking clarification of its standing or, if necessary, retroactive authority to prosecute the Adversary Proceeding.

7

Accordingly, on March 7, 2003, the Committee filed its "Emergency Motion" for a court order clarifying that it has the authority to investigate, assert, pursue and settle the adversarial claims or, in the alternative, granting such authority *nunc pro tunc* to January 31, 2003.

On April 1, 2003 the Bankruptcy Court held a status conference relative to the Committee's Emergency Motion. At the conference it was noted that NFC and the union had reached a proposed universal settlement of $650,000 to resolve claims previously asserted by NFC's former hourly employees arising out of the rejection of their collective bargaining agreement. Upon the Union's formal endorsement and the Bankruptcy Court's approval of this proposed settlement, the last major impediment to plan confirmation would be resolved. However, the Committee projected that approval of the settlement would result in a distribution to general unsecured creditors of approximately 60 percent of their claims, as opposed to the 95 percent distribution that had been previously projected. Given this disparity, the Committee professed a continued interest in prosecuting the Adversary Proceeding.

The Banks, Debtor, and Directors disputed the Committee's authority to pursue the Adversary Proceeding, disputed the merits of the Committee's claims, and asserted that the costliness of the litigation made any grant of derivative standing improvident. Nevertheless, the Debtor urged the Bankruptcy Court to forego resolution of the Committee's Emergency Motion until after the Joint Plan of Liquidation was confirmed. The Banks and Directors also advocated delaying resolution of the Committee's Emergency Motion pending the Third Circuit's rehearing en banc of The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery, 304 F.3d 316 (3d Cir. 2002) (holding that an official creditors committee in a chapter 11 case lacks derivative capacity to sue an alleged transferee of a fraudulent conveyance under 11 U.S.C. § 544), vacated and reh'g en banc granted, 310 F.3d 785 (3d Cir. 2002).

On April 30, 2003, the Bankruptcy Court entered an order confirming the Joint Plan of Liquidation. The Confirmation Order incorporated a reservation of all parties' rights to assert their respective positions regarding the Committee's authority, or lack thereof, to file and prosecute the Adversary Proceeding. In addition, the Confirmation Order approved a

8

$450,000.00 reserve for the payment of such indemnification claims by the Banks as might ultimately be allowed by the Bankruptcy Court.

On July 17, 2003, the Bankruptcy Court held a hearing on the Debtor's Emergency Motion to Approve Initial Distributions [Bankr. Doc. No. 1027]. The motion was filed because Cashman and Kaemmerer, the designated "Responsible Officers" of Liquidating NFC, wanted to ensure that, in making initial distributions to creditors, sufficient reserves were maintained to cover the costs of the Adversary Proceeding. In filing its motion, the Debtor expressed concern, *inter alia*, that the Creditors' Committee had not formally set any cap on its anticipated counsel fees relative to the Adversary Proceeding. In response, the Committee's counsel agreed to cap their fees and expenses at $300,000 and accept a contingency fee arrangement of 1/3 of any future recovery (less any fee amounts recovered as part of the $300,000 cap). The Bankruptcy Court ordered that a reserve of $2,000,000.00 be set aside to cover the expense of the Adversary Proceeding.

In the meantime, on May 29, 2003, the Third Circuit rendered its en banc opinion in Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery ("Cybergenics II"), 330 F.3d 548 (3d Cir. 2003), pet. for cert. dismissed, 540 U.S. 1001 (2003) and 540 U.S. 2002 (2003). In Cybergenics II, the en banc court held that bankruptcy courts have the equitable power to authorize creditors' committees to sue derivatively to avoid fraudulent transfers for the benefit of the estate. The Bankruptcy Court entered an order on August 1, 2003 directing the parties to address the impact of Cybergenics II on the Committee's Emergency Motion. Following the parties' submission of their respective briefs, the Bankruptcy Court entertained oral argument on September 18, 2003.

On November 26, 2003, the Bankruptcy Court issued an order granting the Committee "nunc pro tunc to January 31, 2003, the authority to assert, pursue and/or settle those claims raised in the Adversary Proceeding filed by the Committee against the banks and certain other individual Defendants." [Bankr. Doc. No. 703.] Separate appeals were then taken from this Order by the Banks, the Directors, and the Remaining Individual Defendants. Those appeals were consolidated and the relevant issues have been fully briefed. Because we have since

9

withdrawn our prior reference of the Adversary Proceeding to the Bankruptcy Court, we will construe the Defendants' arguments as motions to reconsider the Bankruptcy Court's ruling.

## II. STANDARD OF REVIEW

Normally, motions for reconsideration are decided under Federal Rules of Civil Procedure 59(e) or 60(b). Neither of those rules pertains here because the Defendants are seeking reconsideration of an interlocutory ruling, rather than a final judgment or order.[3] See Bausch & Lomb Inc. v. Moria S.A., 222 F. Supp. 2d 616, 669 (E.D. Pa. 2002); Jairett v. First Montauk Sec. Corp., 153 F. Supp. 2d 562, 579 (E.D. Pa. 2001); American Guarantee and Liability Ins. Co. v. Fojanini, 99 F. Supp. 2d 558, 560 (E.D. Pa. 2000). Nonetheless, as a federal district court exercising original jurisdiction, we have the "inherent power to reconsider interlocutory orders 'when it is consonant with justice to do so.'" Bausch & Lomb Inc., supra, at 669 (quoting Walker by Walker v. Pearl S. Buck Fd., Inc., No. Civ. A. 94-1503, 1996 WL 706714 at *2 (E.D. Pa. Dec. 3, 1996)); Jairett, supra, at 579; American Guarantee and Liability Ins. Co., supra, at 560-61. See also United States v. Jerry, 487 F.2d 600, 605 (3d Cir. 1973) (in both civil and criminal matters, "so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so.") (citations omitted); Smithkline Beecham Corp v. Apotex Corp., No. Civ. A. 99-CV-4304 et al., 2004 WL 1615307 at *11 (E.D. Pa. July 16, 2004) (court could sua sponte reconsider its prior interlocutory order denying Rule 54(b) certification). Reconsideration is appropriate as a mechanism by which to "correct manifest errors of law or fact or to present newly discovered evidence." Bausch & Lomb Inc., supra, at 669 (quoting Confer v. Custom

---

[3] Because the Bankruptcy Court's November 26, 2003 Order did not finally dispose of the Adversary Proceeding, the appeals from that order were interlocutory in nature and could only be litigated with leave of this Court. 28 U.S.C. § 158(a). As noted, however, our withdrawal of the Adversary Proceeding from the Bankruptcy Court rendered the appeals technically moot, and Appellants' arguments will therefore be construed as a motion for reconsideration of the November 26, 2003 Order.

10

Eng'r Co. Employee Health Benefit Plan, 760 F. Supp. 75, 77 (W.D. Pa.1991)); Jairett, *supra*, at 579-80; American Guarantee and Liability Ins. Co., *supra*, at 561.

### III. DISCUSSION

At the heart of this matter is the following issue: under what circumstances, if any, a court may grant *nunc pro tunc* authorization to a creditors' committee to pursue an avoidance action on behalf of a Chapter 11 debtor's estate. In addressing this issue, we begin by recalling some of the basic policy concerns implicated in derivative standing cases.

Section 544(b) of the Bankruptcy Code gives the trustee – and by extension, a debtor-in-possession in Chapter 11 cases -- both the power and the responsibility to bring fraudulent transfer actions so as to maximize the value of the bankruptcy estate.[4] See Louisiana World Exposition v. Federal Ins. Co. ("LWE II"), 858 F.2d 233, 249-50 (5th Cir. 1988). In Cybergenics II, the Third Circuit held that bankruptcy courts, pursuant to their equitable powers, can confer upon creditors' committees derivative standing to bring avoidance actions for the benefit of the estate when the debtor fails to do so in violation of its fiduciary duties. See 330 F.3d at 580.

The ability of a creditors' committee to obtain derivative standing is often critical to the preservation of estate assets and serves important interests, particularly in the context of a Chapter 11 reorganization:

> ... In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, *i.e.*, the debtor's management, enjoys the powers that would

---

[4] Section 544(b)(1) provides:

> Except as provided in paragraph (2) [relating to charitable contributions], the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). In Chapter 11 cases, where trustees are rarely appointed and the debtor commonly remains in possession of the estate assets, these avoidance powers are conferred upon the debtor-in-possession by § 1107(a). See Cybergenics II, 330 F.3d at 558 n.4 and 560.

11

otherwise vest in the bankruptcy trustee. Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.

This situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor – really, the debtor's management – bears a fiduciary duty to avoid fraudulent transfers that it itself made. One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it. ... For that reason, courts and commentators have acknowledged that the debtor-in-possession "often acts under the influence of conflicts of interest." ... These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin. For example, a debtor may be unwilling to pursue claims against individuals or businesses, such as critical suppliers, with whom it has an ongoing relationship that it fears damaging. ... Finally, even if a bankrupt debtor is willing to bring an avoidance action, it might be too financially weakened to advocate vigorously for itself. In any of these situations, the real losers are the unsecured creditors whose interests avoidance actions are designed to protect.

The possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions. ... [P]arties to bankruptcy workouts are typically sophisticated, and ... they understand that their actions will likely be scrutinized after the fact. ... They also understand that, even though a debtor's management may be reluctant to pursue an avoidance action, a creditors' committee will not be so hesitant. Therefore, the mere threat of a creditors' committee suit is often a potent deterrent to overreaching by creditors and insiders....

330 F.3d at 573-74 (internal citations omitted).

Despite its importance to the proper functioning of the bankruptcy scheme, however, the ability of creditors' committees to sue derivatively is not without limits. As the en banc court noted in Cybergenics II, the right of creditors' committees to file suits on behalf of the Debtor is a qualified right:

The policy concern evident in § 544(b) is the need to channel avoidance actions through the trustee [or the Chapter 11 debtor-in-possession], who acts as a gatekeeper and prevents independent avoidance actions by creditors that might prejudice the estate and rival creditors. The Supreme Court stated as much in Hartford Underwriters when it expressed concern about the parties "usurp(ing) the trustee's role as representative of the estate." 530 U.S. at 8-9, 120 S. Ct. 1942. This representative role explains why § 544(b) allows the trustee [or Chapter 11 DIP], but not a creditors' committee, to bring an avoidance action on its own authority, *i.e.*, without court permission. But that provision does not foreclose a bankruptcy court's equitable power to substitute *itself* as gatekeeper when the trustee [or debtor] is delinquent, and to allow a creditors' committee to pursue an avoidance action *for the estate's direct benefit* rather than its own. The end result of this equitable remedy – the estate's recovery of fraudulently transferred property – is precisely what Congress envisioned...

330 F.3d at 568-69 (emphasis in the original).

12

To ensure that the Chapter 11 debtor's gate-keeping role is not arbitrarily usurped, courts have generally recognized derivative standing only where: (i) the creditor has alleged a colorable claim that would benefit the estate (ii) the debtor has unjustifiably refused to pursue the claim itself; and (iii) the creditors' committee has obtained permission from the bankruptcy court to initiate the action on behalf of the estate. See generally Fogel v. Zell, 221 F.3d 955, 965 (7th Cir. 2000); In re Gibson Group, Inc., 66 F.3d 1436, 1438 (6th Cir. 1995); In re Louisiana World Exposition, Inc. ("LWE I"), 832 F.2d 1391, 1397 (5th Cir. 1987) (citing cases); In re Tennessee Valley Steel Corp., 183 B.R. 795, 800 (Bankr. E.D. Tenn. 1995); In re First Capital Holdings Corp., 146 B.R. 7, 11 (Bankr. C.D. Cal. 1992); In re Toledo Equipment Co., Inc., 35 B.R. 315, 320 (Bankr. N.D. Ohio 1983).

In this case the Committee did not formally petition the Debtor to bring the Adversary Proceeding, nor did the Committee formally petition the Bankruptcy Court for, or obtain, an express grant of derivative standing prior to filing the Adversary Proceeding. The Bankruptcy Court excused the Committee's failure to petition the Debtor on the ground that any request to file suit, under the facts of this case, would have been futile. As for the Committee's failure to formally petition the Bankruptcy Court for a grant of derivative standing, the Bankruptcy Court found that the Committee already possessed the requisite authority to sue the Banks by virtue of certain language contained in the Final DIP Order and the subsequent Stipulations. With regard to the Committee's claims against the Directors and Remaining Individual Defendants, the Bankruptcy Court granted the Committee derivative standing *nunc pro tunc* to the January 31, 2003 date of filing. We now consider whether the Bankruptcy Court erred in so ruling.

### A.   IS THE COMMITTEE'S COMPLAINT BARRED BY ITS FAILURE TO HAVE FORMALLY PETITIONED THE DEBTOR TO FILE SUIT AND/OR ITS FAILURE TO HAVE OBTAINED FORMAL LEAVE OF COURT PRIOR TO FILING THE ADVERSARY PROCEEDING?

We first address the argument that, in filing Adversary Proceeding No. 03-1014, the Committee violated well-established procedures relative to obtaining derivative standing. The Committee's failure to make a formal demand upon the Debtor to pursue the avoidance action,

13

coupled with its failure to formally petition the Bankruptcy Court for leave to file suit,
Defendants argue, is fatal to the Committee's claims.

As to the first point, the Bankruptcy Court excused the Committee's failure to petition the
Debtor to file suit on the ground that any such request, under the circumstances of this case,
would have been futile. Other federal courts have recognized such an exception where it is plain
from the record that no action on the part of the debtor would have been forthcoming. See, e.g.,
LWE I, 832 F.2d at 1397-98 (court would not remand so that committee could make formal
demand upon debtor where conflicts would likely prevent debtor from pursuing litigation adverse
to its directors and officers and where, in any event, committee's claims lacked merit); In re First
Capital Holdings Corp., 146 B.R. at 13 (creditors' committee would be excused from making a
demand on a debtor to pursue action against its officers, directors and controlling shareholders
where such a demand would be futile).

We agree that courts can, under appropriate circumstances, excuse a creditors'
committee's failure to formally request a debtor to file suit. We further find that the Bankruptcy
Court did not abuse its discretion or commit any manifest error of law in excusing the Committee
in this case. The policy concerns underlying the general requirement of a formal demand are to
ensure that the debtor is (i) informed of the committee's intent to assert the subject claims and
(ii) afforded an opportunity to explain its reasons, if any, for declining to pursue the claims itself.
See In re Catwil Corp., 175 B.R. 362, 364-65 (Bankr. E.D. Cal. 1994); In re Chemical
Separations Corp., 32 B.R. 816, 819 (Bankr. E.D. Tenn. 1983). In this way, courts can more
effectively oversee adversary proceedings and thereby promote "the fair and orderly
administration of the bankruptcy estate." Catwil, 175 B.R. at 364.

In this case, both of the foregoing concerns were satisfied. Language in both the Interim
and Final DIP Orders as well as the numerous Stipulations put all parties on notice that the
Creditors' Committee would be charged with the responsibility of investigating the legitimacy of
the Banks' claims and, if appropriate, challenging those claims through litigation. At all times,
the Debtor was well aware of the Committee's involvement in investigating the 1999 stock
redemption with an eye toward possibly filing an avoidance action. Furthermore, the Debtor

14

(through its key employees) at all times fervently opposed the action and had ample opportunity to articulate to the Bankruptcy Court its disagreement with the Committee's theory and its reasons for opposing the litigation. Thus, the Debtor was in no way prejudiced by the Committee's failure to formally request that suit be filed.

Moreover, the Bankruptcy Court was fully justified in concluding that the Debtor would have declined to file the Adversary Proceeding had a formal request been made by the Committee. At the commencement of this Chapter 11 case, the Debtor waived all rights it had to contest the Bank's claims by express language in the Interim and Final DIP Orders. Thus, the Debtor clearly could not have pressed the Adversary Proceeding against the Banks. Instead, the responsibility to investigate and challenge the Banks' claims passed directly to the Creditors' Committee as set forth in the Interim and Final DIP Orders. There were also obstacles effectively preventing the Debtor from bringing avoidance and/or breach of fiduciary claims against the Individual Defendants. The Debtor's "key employees" – Clark, Cashman, Beyeler, and Kaemmerer – who presumably would have been instrumental in asserting such claims, are all named defendants in the Adversary Proceeding as well as beneficiaries of the 1999 stock redemption and, thus, would have been operating under a patent conflict of interest if faced with a demand to file suit.[5] The remaining Individual Defendants likewise are corporate insiders and/or beneficiaries of the 1999 stock redemption and, at all times, they have opposed the filing of the Adversary Proceeding. And, as the Bankruptcy Court observed, the "Debtor attempted to protect the Banks and its [own] Key Employees who are also the Individual Defendants by including inappropriate releases in the Amended [Confirmation] Plan, which it removed after the Court advised that the Amended Plan could not be confirmed with the inappropriate release language." (Mem. Op. of 1/ 29/04 at p. 15.)

---

[5] Under Defendants' theory, following confirmation of the Debtor's plan, Liquidating NFC would have been the entity charged with prosecuting the Adversary Proceeding. However, Liquidating NFC's designated "responsible officers" are Cashman and Kaemmerer, both named Defendants in the Adversary Proceeding.

In sum, the record here amply supports the Bankruptcy Court's finding that a formal request upon the Debtor to file an avoidance action would have been futile. There is no assertion by any named Defendant that the Debtor would have seriously entertained the idea of asserting the claims now pressed by the Committee. Accordingly, we agree with the Bankruptcy Court that the Committee's failure to have formally petitioned the Debtor to file suit should not stand as an impediment to its prosecution of the Adversary Proceeding.

The Defendants also contend that the Committee's failure to obtain formal leave of court *prior* to filing the lawsuit bars its claims. Simply stated, they appear to advocate a *per se* rule that derivative standing must *always* be formally obtained prior to the commencement of an adversary proceeding.

Numerous federal courts have allowed retroactive grants of derivative standing under appropriate circumstances. See generally In re Spaulding Composites Co., Inc., 207 B.R. 899 (9th Cir. B.A.P. 1997); In re YES! Entertainment Corp., 316 B.R. 141, 145 (D. Del. 2004) (reversing bankruptcy court on the ground that it should have retroactively granted creditor derivative standing); In re Valley Media, Inc., No. 01-11353 (PJW), Adv. 02-04553, 2003 WL 21956410 (Bankr. D. Del. Aug. 14, 2003); In re KDI Holdings, Inc., 277 B.R. 493 (Bankr. S.D.N.Y. 1999); In re America's Hobby Center, Inc., 223 B.R 275 (Bankr. S.D.N.Y. 1998); In re Catwil Corp., 175 B.R. 362 (Bankr. E.D. Cal. 1994); In re S. Rachles, Inc., 131 B.R. 782 (Bankr. D.N.J. 1991); In re J. Lynn Jones, 37 B.R. 969 (Bankr. N.D. Tex. 1984); In re Chemical Separations Corp., 32 B.R. 816 (Bankr. E.D. Tenn. 1983). We find ourselves in agreement with these courts insofar as they do not, as a matter of law, foreclose the possibility that a grant of derivative standing may be obtained retroactively. "While the better practice is for the plaintiff to secure [court] approval before filing the complaint," In re Spauling Composites, Co., Inc., 207 B.R. at 905, we, like the aforementioned courts, will not apply this general requirement formalistically. Instead, we will

16

consider the underlying policy objectives at issue to determine whether the Bankruptcy Court's grant of derivative standing was appropriate in the circumstances of this case.[6]

### B.  DID THE BANKRUPTCY COURT ERR IN GRANTING THE COMMITTEE DERIVATIVE STANDING NUNC PRO TUNC TO JANUARY 31, 2003?

While the Bankruptcy Court's November 26, 2003 Order generally granted the Committee *nunc pro tunc* authority to prosecute the Adversary Proceeding, the court's memorandum opinion of January 29, 2004 explains that the retroactive grant of derivative standing really pertains only to the Committee's claims against the Directors and the Antos Group, as the Bankruptcy Court believed that the claims against the Banks had been previously authorized by certain language contained in the Final DIP Order and the subsequent Stipulations. Initially, then, we will consider the Bankruptcy Court's decision to retroactively allow the Committee to pursue its claims against the Directors and the Remaining Individual Defendants.

The Bankruptcy Court made its grant of approval retroactive to January 31, 2003, the date on which the Committee filed its Adversary Proceeding. Assuming that such retroactive relief is not barred as a matter of law, the Defendants nevertheless contend that the Bankruptcy Court committed procedural error by applying the wrong legal standard for the granting of *nunc pro tunc* relief. According to Defendants, *nunc pro tunc* relief is available only in "extraordinary circumstances" which, according to Defendants, are not present here. The Antos Group further claims, irrespective of the *nunc pro tunc* issue, that the Bankruptcy Court erred as a substantive

---

[6] The Court finds no inconsistency between this approach and the Third Circuit's teaching in Cybergenics II. It is true that the creditors' committee in Cybergenics sought court approval to assert its derivative claims *prior* to filing its fraudulent conveyance action. As we have acknowledged, this is a preferable practice and one in keeping with the procedure generally sanctioned by federal courts. However, the Third Circuit did not have any occasion to address in Cybergenics II the issue presently before us: *i.e.*, whether a court may retroactively authorize an adversary proceeding filed by a creditors' committee on behalf of a Chapter 11 debtor. Consequently, we find nothing in Cybergenics II which is contrary to our ruling today.

matter in determining that the Committee has standing to prosecute the Adversary Proceeding. We consider the latter issue first.

1.    Was the Bankruptcy Court's Grant of Derivative Standing Appropriate as a Substantive Matter?

The Antos Group contends that, as a matter of substantive law, the Committee should not have been permitted to prosecute the Adversary Proceeding because the Committee has not asserted colorable claims and because a refusal by the Debtor to bring the action would not have been unreasonable.  We agree that Defendants have raised issues relevant to a bankruptcy court's inquiry when entertaining a request for derivative standing.  See, e.g., In re Commodore Internat'l Ltd., 262 F.3d 96, 100 (2d Cir. 2001) (creditors' committee may sue on behalf of the debtors, with the approval and supervision of a bankruptcy court, where, *inter alia*, the debtor in possession unreasonably fails to bring suit on its claims); Fogel v. Zell, 221 F.3d at 965 ("If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee.") (citing cases).  See also In re Gibson Group, Inc., 66 F.3d at 1438-39, 1446 (single creditor can bring fraudulent or preferential transfer claim if creditor has alleged a colorable claim that would benefit the estate, creditor has made a demand on DIP to file the avoidance action, Debtor refuses, and debtor's refusal is unjustified in light of its statutory obligations and fiduciary duties); LWE II, 858 F.2d at 247 (creditors' committee is generally authorized to file suit where it has alleged colorable claims, debtor has refused unjustifiably to pursue the claim, and the committee has received leave to sue from the bankruptcy court); In re STN Enterprises, 779 F.2d 901, 904 (2d Cir. 1985) (courts have allowed creditors committees to initiate proceedings only when the trustee or debtor unjustifiably fails to bring suit or abuses its discretion in not suing to avoid a preferential transfer); In re Toledo Equipment Co., Inc., 35 B.R. at 319 (creditors' committee is impliedly authorized to bring to bring action if it would benefit and debtor-in-possession has unjustifiably failed to prosecute the case).

18

We conclude that the Bankruptcy Court did not err in granting the Committee derivative standing. First, it is evident that the Bankruptcy Court found the Committee's claims to be colorable. Accepting as true the Committee's averments, the Bankruptcy Court considered the legal sufficiency of those claims:

> The Creditors' Committee asserts that in March, 1999, the Controlling Class B shareholders implemented a shareholder reorganization under which the Debtor corporation redeemed the shares of Class B stock in the Debtor at unjustified prices. The $5.7 million which was needed in order to redeem the controlling shareholders' stock was not fully available and $4 million was borrowed frm the Banks. The Banks were aware that the loan was being used to fund the redemption and the loan was secured by liens on the Debtor's assets. Within three years, on March 6, 2002, the Debtor was forced to file bankruptcy under Chapter 11. The Creditors' Committee asserts that the Debtor was insolvent when the stock redemption was accomplished, or was rendered insolvent thereby, thus creating fraudulent transfer claims against the Banks and certain transferees and breach of fiduciary duty claims against the Debtor's officers. The above bare-bones facts state, at least, a colorable claim. While there may be adequate defenses which come to light when answers to the Complaint are filed, the claim in its present form is colorable.

(Mem. Op. of 1/ 29/04 [Bankr. Doc. No. 1461] at pp. 13-14.)

We find no manifest legal error in the Bankruptcy Court's assessment of the Committee's claims. The Antos Group and the Banks take issue with the Committee's factual assertions that: (1) the Debtor was rendered "insolvent" by virtue of the 1999 stock redemption, and (2) at the time of the stock redemption, there existed a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502. Both of these challenged assertions relate to elements that are essential to certain of the Committee's claims.[7] The Individual Defendants have also raised challenges in the nature of statutes-of-limitations and/or statutes-of-repose defenses. However,

---

[7] For example, Count 1 of the Committee's Complaint asserts that the 1999 stock redemption constituted a fraudulent transfer in violation of 11 U.S.C. § 544(b)(1) and § 5105 of the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. C.S.A. § 5105. (See Bankr. Doc. No. 605 at ¶¶ 55-63.) The former provision permits the avoidance of "any transfer ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title." 11 U.S.C. § 544(b)(1). Under the latter provision, a transfer is deemed fraudulent as to any pre-existing creditors if the transfer was made without the transferor receiving a reasonably equivalent value in exchange and if the transferor was either insolvent at the time of the transaction or rendered insolvent as a result of it. See 12 Pa. C.S.A. § 5105.

19

during a status conference held on June 22, 2004, the parties agreed that all challenges premised on statute-of-limitations or statute-of-repose arguments are in the nature of affirmative defenses which can be appropriately asserted at a future point and resolved, if necessary, by way of a Rule 56 motion. Similarly, Defendants' challenges to the Committee's "insolvency" and "pre-existing creditor" assertions are in the nature of factual disputes more appropriately resolved on a fully developed record. Accordingly, we conclude, as did the Bankruptcy Court, that the claims asserted by the Committee are facially colorable for present purposes.

The Antos Group further contends that, even if the Committee's claims are colorable, the Debtor would have been justified in refusing to bring such claims. In determining whether a Debtor's refusal is unjustified, court generally perform a cost-benefit analysis of the claims to determine whether the creditors' claims have colorable merit and whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued. See In re America's Hobby Center, Inc., 223 B.R. at 282. In conducting this cost/benefit analysis, courts consider the probability of success and the potential costs of the litigation, including attorneys' fees, and whether it is preferable to appoint a trustee to bring suit instead of the creditors' committee. Id. Other relevant considerations include whether there exists a conflict of interest between the debtor and the parties against whom the derivative action is directed and whether the creditors' interest are otherwise protected in view of the debtor's refusal. See LWE II, 858 F.2d at 248-52; STN Enterprises, Inc., 779 F.2d at 905-06; In re Tennessee Valley Steel Corp., 183 B.R. at 806. See also In re McKeesport Steel Castings. Co., 799 F.2d 91, 94 (3d Cir. 1986) (creditor had standing to pursue payment for post-petition gas service where creditor had a colorable claim and no other party would zealously pursue the claim on its behalf).

In this case, because the Committee never requested the Debtor to file suit, there was no formal refusal by the Debtor, and the Bankruptcy Court therefore had no occasion to formally assess whether the Debtor's refusal was unjustified. Nevertheless, it is evident that the Bankruptcy Court undertook a cost/benefit analysis of the Adversary Proceeding consistent with the aforementioned factors and, to that end, it made the following observations:

20

* the recovery for unsecured creditors under the terms of the Debtor's Plan, which at one point was anticipated to be approximately 95 percent, now is expected to be much less;

* the Committees' fraudulent transfer claims are facially colorable;

* the funds which would be incurred by the Committee in prosecuting the Adversary Proceeding were monies which would have benefitted the Committee's constituency;

* no other parties would be adversely affected by the expenditure of funds by the Committee (as the secured creditors were being paid in full under the Plan);

* the Key Employees of the Debtor and/or responsible persons controlling Liquidating NFC who would have been responsible for pursing the avoidance action on behalf of the Debtor were also named Defendants in the suit; thus, they had an obvious interest in opposing the litigation;

* the Debtor had early on waived any challenges it might have made as against the Banks' claims;

* as a result of the foregoing, the Creditors' Committee was the only appropriate party to pursue the avoidance claims;

* the Debtor had taken inconsistent positions with respect to whether the avoidance action would or would not impact the Debtor's proposed Plan;

* the Debtor had attempted to protect the Banks and its Key Employees from the avoidance action by attempting to include inappropriate release language in the proposed plan.

Implicit in the Bankruptcy Court's grant of derivative standing is a finding that the Debtor's opposition to the filing of the Adversary Proceeding was contrary to the best interests of the estate and, therefore, unjustified. We find no fault with the Bankruptcy Court's conclusion. Through this Adversary Proceeding, the Committee is pursuing a potential recovery of approximately $5.7 million. The Banks have estimated that their counsel fees and expenses may total $450,000, while the Committee has essentially agreed to cap its fees at $300,000 (the remainder, if any, to be recovered in the form of a 1/3 contingency fee, assuming the unsecured creditors prevail). A reserve of $2 million has been established to cover potential expenses, including professional fees and indemnity claims. As to the latter, we make no present judgment as to the viability of the Banks' and Directors' indemnification claims but merely note that they are contested claims and, consequently, it may turn out that the costs of suit fall short of the $2

21

million reserve. It appears the Committee's constituency supports prosecution of the Adversary Proceeding, notwithstanding the fact that it will be financed, ultimately, with their funds.[8] There is no other party that can adequately protect the interests of the unsecured creditors: Liquidating NFC has a conflict of interest relative to the Adversary Proceeding and the appointment of a trustee would involve additional cost and delays making it a less feasible alternative. Although collectability of the judgment is an issue for consideration, we note that the Banks, at present, remain potentially viable Defendants. We also note that a substantial portion of the disputed monies reportedly went into the retirement accounts of the Individual Defendants where, we presume, some amounts remain, albeit subject to possible market deflation. Considering the totality of circumstances, the Bankruptcy Court was justified in determining that the Committee's claims were worth pursuing. Accordingly, because the Committee asserted claims that are facially colorable and of significant potential benefit to the unsecured creditors, and because the Debtor and/or its successor in liquidation were not in a position to effectively prosecute those claims, it was appropriate and consistent with the best interests of the estate for the Bankruptcy Court to authorize the Committee's lawsuit.

---

[8]Defendants attempt to distinguish this case from Cybergenics II on the ground that, in Cybergenics, there was no risk of dissipating estate assets because the creditors' committee had offered to bear all of the litigation costs. Here, by contrast, the Committee seeks to recover as much as $300,000 from the estate in professional fees. In addition there are potential indemnification claims which could be raised by the Banks and the Individual Defendants, all of which caused the Bankruptcy Court to establish the $2,000,000 reserve. The Antos Group contends that these costs, which will partially dissipate the estate, justify the Debtor's refusal to bring the action. We disagree. While it is true that this case presents potential costs not present in Cybergenics, we do not interpret Cybergenics II's holding as precluding a grant of derivative standing in these circumstances. For the reasons set forth above, we find that the Bankruptcy Court acted within its discretion and without any manifest error in determining that the potential benefits to be derived from this litigation outweigh the anticipated costs.

2.    Did the Bankruptcy Court Err in Granting Derivative Standing Nunc Pro Tunc to January 31, 2003?

Having determined that the Bankruptcy Court did not err in allowing the Committee to pursue its fraudulent transfer claims, we next consider whether the Bankruptcy Court erred in making its grant of derivative standing retroactive to January 31, 2003, the date on which the Adversary Proceeding was filed. Defendants cite In re Arkansas Co., Inc., 798 F.2d 645 (3d Cir. 1986) and In re F/S Airlease II, Inc., 844 F.2d 99 (3d Cir. 1988), among other cases, for the proposition that a *nunc pro tunc* grant of derivative standing is reserved for extraordinary circumstances. Defendants contend that no extraordinary circumstances are present in this case to justify the Committee's failure to obtain court approval prior to filing the Adversary Proceeding. Accordingly, the Defendants argue, the Bankruptcy Court erred in making its grant of authority retroactive to January 31, 2003. We do not agree that such a conclusion is mandated by Arkansas Co. and F/S Airlease.

In Arkansas Co., the Third Circuit Court of Appeals considered the appeal of a law firm which had been retained as legal counsel for a creditors' committee but, through its own oversight, had failed to obtain the return of an affidavit certifying its retention and had also failed to file an application for court approval of its employment as required by 11 U.S.C. § 1103(a).[9] After some thirteen months of performing legal services for the committee, the law firm realized its mistake and promptly filed the requisite application for court approval, which was granted prospectively. However, the bankruptcy court denied the law firm's request for retroactive court approval covering its initial thirteen months of services, and the district court affirmed the denial. The law firm then appealed and the court of appeals affirmed the district court.

The court of appeals first rejected the view that such retroactive grants of approval are *per se* barred under federal bankruptcy law. Noting that "bankruptcy courts have traditionally been governed by equitable principles rather than statutory technicalities," 798 F.2d at 648, the court

---

[9] Section 1103(a) states that "with the court's approval, [a creditors'] committee may select and authorize the employment by such committee of one or more attorneys." 11 U.S.C. § 1103(a).

23

held that bankruptcy courts have the inherent power to grant retroactive approval of professional services "[w]here equitable concerns weigh in favor of granting [such relief] to enable deserving professionals to recover compensation for work actually done." Id. Nevertheless, the court held that such *nunc pro tunc* approval should be limited to cases where extraordinary circumstances are present. In arriving at this conclusion, the court found it "significant that Congress chose to place the requirement of court approval for the employment of an attorney, accountant, or other professional by the creditors committee directly in the Bankruptcy Code." 798 F.2d at 649. According to the court, "[t]he legislative history makes clear that the 1978 Code was designed to eliminate the abuses and detrimental practices that had been found to prevail [under the previous Act]. Among such practices was the cronyism of the 'bankruptcy ring' and attorney control of bankruptcy cases." Id. (citing H.R. No. 595, 95th Cong., 2d Sess. 92, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5787, 5963, 6053). The requirement of prior court approval thus acts as "a means of ensuring 'that the court may know the type of individual who is engaged in the proceeding, their integrity, their experience in connection with work of this type, as well as their competency concerning the same.'" Id. at 648 (quoting In re Hydrocarbon Chem., Inc., 411 F.2d 203, 205 (3d Cir. 1969) (en banc). In the court's view, a "complete and thorough post-application review" was generally an inadequate substitute for prior court approval because such an approach "would render meaningless the structure of the Bankruptcy Code and Rules which contain provisions requiring *both* prior approval of employment *and* after the fact approval of compensation." Id. at 649 (citing 11 U.S.C. §§ 327(a), 1103(a), 330; Bankr. Rules 2014(a), 2016, 2017). The court also expressed concern that, if the availability of *nunc pro tunc* relief was not strictly circumscribed, courts might be overly inclined to grant such relief so as not to prejudice counsel's ability to recover compensation for past work performed. In addition, the court expressed concern that "a more lenient approach would reward laxity by counsel and might encourage circumvention of the statutory requirement." Id. at 650.

Accordingly, while the court in Arkansas Co. recognized the bankruptcy courts' discretion to grant retroactive approval of the appointment of a professional, it held that they should do so only under "extraordinary circumstances" which, according to the court, "do not

24

include the mere neglect of the professional who was in a position to file a timely application."
798 F.2d at 650.  Instead, the court held, retroactive approval may be granted only if the
bankruptcy court, after a hearing, finds that it would have granted approval in the first instance
and that the services performed were necessary under the circumstances.  Id.

> Thereafter, in exercising its discretion, the bankruptcy court must consider
> whether the particular circumstances in the case adequately excuse the
> failure to have sought prior approval.  This will require consideration of
> factors such as whether the applicant or some other person bore
> responsibility for applying for approval; whether the applicant was under
> time pressure to begin service without approval; the amount of delay after
> the applicant learned that initial approval had not been granted; the extent
> to which compensation to the applicant will prejudice innocent third
> parties; and other relevant factors.

Id.  The court of appeals agreed with the district court that the law firm's mere inadvertence in
failing to obtain prior court approval was insufficient to warrant retroactive approval of its
employment.  Id. at 650 ("[T]he prophylactic statutory rule that approval must be sought in
advance of performance of services is too strong to be overcome by a mere showing of
oversight.")

    The Third Circuit Court of Appeals had occasion to again consider the propriety of
retroactive approval of a professional's employment in In re F/S Airlease II, Inc., 844 F.2d 99 (3d
Cir. 1988).  The debtor in F/S Airlease was a corporation engaged in the business of buying,
selling, financing, and leasing a Boeing airplane.  In July of 1984, the lessee of the debtor's
airplane commenced Chapter 11 proceedings and, consequently, terminated its lease with the
debtor.  Just prior to filing its own voluntary Chapter 11 petition, the debtor enlisted a broker by
the name of Lewis Simon to remarket the airplane.  Simon ultimately was successful in
negotiating a ten-year lease agreement with another airline in late 1984.  In June of 1985, some
ten months after he began his re-marketing efforts, and seven months after the bankruptcy court
had approved the lease agreement, Simon filed a petition for payment of administrative expenses
under 11 U.S.C. § 503.  The bankruptcy court approved Simon's employment *nunc pro tunc*

25

pursuant to 11 U.S.C § 327(a)[10] and awarded him his requested fee. The district court affirmed the retroactive approval of Simon's employment but vacated the fee award and remanded the case for further record development on that issue.

On appeal, the Third Circuit reversed the lower courts' rulings approving Simon's appointment *nunc pro tunc*. Applying the standard set forth in Arkansas Co. Inc., the court concluded that there were no extraordinary circumstances to support Simon's *nunc pro tunc* appointment. Of particular importance to the court's analysis were two of the considerations laid out in Arkansas Co., *to wit*, (a) who bore the responsibility for compliance with the statutory mandate of prior court approval and (b) whether the applicant was under such time pressure to begin services that prior approval could not reasonably be sought. As to the first factor, the court found that Simon, a sophisticated businessman with legal representation, bore some responsibility for ensuring that the application for his employment was timely filed. 844 F.2d at 107. As for the second factor, i.e., the "time pressure" factor, the court clarified that this "relates solely to whether there is sufficient time to request court approval before the professional's services must begin." Id. Significantly, the court noted, Simon had waited almost a year from when he had commenced his services, and a full seven months from the date on which he had concluded them, to petition the court for payment of administrative expenses. The estate's need to have the plane expeditiously remarketed could not, in the court's view, excuse Simon's "extreme laxity" in seeking court approval. Id. Thus, the court found that the case did not implicate the sort of exigencies contemplated by Arkansas Co. as would justify the retroactive

---

[10] Section 327(a) states:

Except as otherwise provided in this section, the trustee, *with the court's approval*, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a)(1982) (emphasis supplied). Under 11 U.S.C. § 1107(a), the debtor in possession has substantially the same rights, powers, functions, and duties as a trustee and is therefore similarly entitled to employ professional persons.

26

approval of Simon's employment. While the court acknowledged that Simon's efforts had been beneficial to the estate, it found this fact immaterial to the *nunc pro tunc* analysis. The resulting element of unjust enrichment, the court found, was the "unavoidable consequence of the statutory requirement of prior approval." Id.

Defendants maintain that the teachings of <u>Arkansas Co.</u> and <u>F/S Airlease</u> apply in this case and thus, the Bankruptcy Court could not have retroactively authorized the Committee to pursue the Adversary Proceeding absent "extraordinary circumstances" which, Defendants argue, were lacking here. Otherwise stated, Defendants insist that, in *any* context where *nunc pro tunc* relief is being sought, such relief can only be justified upon a showing of "extraordinary circumstances." Moreover, Defendants urge that a finding of "extraordinary circumstances" must be premised upon the considerations outlined in <u>Arkansas Co.</u>, *to wit*: (i) whether the applicant or some other person bore responsibility for applying for approval; (ii) whether the applicant was under time pressure to begin service without approval; (iii) the amount of delay after the applicant learned that initial approval had not been granted; and (iv) the extent to which retroactive relief will prejudice innocent third parties. Consistent with the teachings of <u>Arkansas Co.</u> and <u>F/S Airlease</u>, Defendants argue, the delay in seeking court approval must be occasioned by circumstances beyond the applicant's control and cannot be the result of the applicant's mere inadvertence or laxity.

Neither the parties nor this Court have located a Third Circuit case applying the "extraordinary circumstances" doctrine in the precise context at issue here. Other courts within this circuit have applied that standard, in some fashion, outside of the context of retroactive approval of professional employment. See, e.g., <u>In re Lehigh Valley Professional Sports Clubs, Inc.</u>, 260 B.R. 745 (Bankr. E.D. Pa. 2001) (debtor seeking authority, *nunc pro tunc*, to obtain secured post-petition financing); <u>In re City Wide Press, Inc.</u>, 102 B.R. 431 (Bankr. E.D. Pa. 1989) (nunc pro tunc approval of financing agreement sought), <u>aff'd</u>, 110 B.R. 710 (E. D. Pa. 1990). Nevertheless, it remains undecided in this circuit under what circumstances a creditors' committee may retroactively obtain permission to pursue an action on behalf of a debtor's estate.

While this Court acknowledges the binding authority set forth in <u>Arkansas Co.</u> and <u>F/S Airlease</u>, we do not agree with Defendants' view that the factors identified in those cases are to be rigidly applied to the circumstances presented here. As our previous discussion illustrates, <u>Arkansas Co.</u> and <u>F/S Airlease</u> involved specific policy considerations quite distinct from those with which we are presently concerned. Specifically, <u>Arkansas Co.</u> and <u>F/S Airlease</u> dealt with requests for the retroactive approval of professional employment in the face of *express statutory provisions* requiring prior court approval. <u>See</u> 11 U.S.C. §§ 327(a) and 1103(a). Section 1103(a) of the Bankruptcy Code – the statute at issue in <u>Arkansas Co.</u> – had been incorporated into the Code as one of many provisions designed by Congress to curb perceived abuses in bankruptcy practice and procedure. <u>See</u> 798 F.2d at 649-50. Thus, the Third Circuit wisely sought to avoid creating an exception to this express requirement that might encourage laxity on the part of professionals and effectively undermine the substantive corrections Congress had intended to bring about:

> ... In *Arkansas*, we explained our formulation of the "extraordinary circumstances" standard by reference to the legislative history and the important policies at stake. We noted that without such a standard, "the bankruptcy court may be overly inclined to grant such approval influenced by claims of hardship due to work already performed." 798 F.2d at 649. We stated that, "[i]f retroactive approval were freely granted, it would subvert the prophylactic purpose underlying the statutory requirement of prior approval." *Id.* Our holding in this case reiterates and reinforces that bright-line position.

<u>F/S Airlease</u>, 844 F.2d at 109.

Given that these express statutory requirements were central to the <u>Arkansas Co.</u> and <u>F/S Airlease</u> decisions, it is questionable whether the "extraordinary circumstances" standard even applies in situations where no express statutory mandate is implicated. In fact, some courts have suggested that the "extraordinary circumstances" standard should not apply where the retroactive relief being sought is relief from a less clearly defined judge-made requirement. <u>See</u> <u>In re Catwil Corp.</u>, 175 B.R. at 365-66 ("The reason courts have limited *nunc pro tunc* appointment of counsel to cases involving 'extraordinary circumstances'... is to discourage the general non-observance of Code requirements while still allowing for equitable relief. ... In this case, the

28

potential danger of non-observance of statutory requirements is not present since ... the issue of prior court approval [for derivative standing] has not yet been definitively settled and is judicial gloss.") (internal footnote and citation omitted) (emphasis in the original). See also In re City Wide Press, Inc., 102 B.R. at 436 (since Bankruptcy Code includes specific procedural requirements which must be followed before a debtor's request to obtain credit can be granted, as compared to the former Bankruptcy Act under which the procedural requirements were relatively unclear and judge-made, "[w]e would therefore expect authorizations of credit in derogation of the Code's express provisions to be more difficult to obtain than *nunc pro tunc* applications in [Bankruptcy] Act cases.") (emphasis in the original).

In any event, even the somewhat stringent standard set forth in Arkansas Co. allows room for consideration of additional, "relevant factors" that might form the basis of an "extraordinary circumstances" finding. See Arkansas Co., 798 F.2d at 650 (court's analysis of whether to retroactively approve a committee's retention of professional services requires consideration of whether the applicant or some other person bore responsibility for applying for court approval, etc., "*and other relevant factors*")(emphasis supplied). In sum, then, Arkansas Co. and F/S Airlease are informative to our present inquiry, but we do not consider their holdings amenable to a rigid or formalistic application in this case.

Instead, we find it useful to consider the policy interest underlying the general prerequisite of prior court approval in derivative standing actions which, as we see it, is the recognized need to involve the bankruptcy court as a "gatekeeper." Judicial oversight is considered critical in order to avoid a multiplicity of piecemeal litigation, particularly "independent avoidance actions by creditors which might prejudice the estate and rival creditors." Cybergenics II, 330 F.3d at 568. See also In re Monsour Medical Center, 5 B.R. 715, 718-19 (Bankr. W.D. Pa. 1980) (requirement of court intervention is necessary to prevent multiplicity of piecemeal litigation).

Prejudice can occur in numerous ways if creditors are permitted to file avoidance actions *carte blanche*. Piecemeal avoidance actions cause confusion among the parties and can interfere with the orderly administration of the bankruptcy estate. See In re Curry and Sorensen, Inc., 57

29

B.R. 824, 828 (9th Cir. B.A.P. 1986) (petitioning the court whenever creditors perceive that DIP has abused its discretion in failing to file suit promotes the fair and orderly administration of the bankruptcy estate by providing judicial supervision over the litigation to be undertaken and avoid confusion that would result if creditors could act on their own discretion); In re Monsour Medical Center, supra, at 719 (involvement of court in creditors' avoidance actions is necessary in order to avoid a multiplicity of piecemeal litigation that may otherwise prevent the equitable settlement of the debtor's estate). In addition, because the fees of professionals retained by a creditors' committee are typically borne by the estate, there is a danger that a committee's unsupervised litigation "may saddle the debtor in possession with expenses which threaten its reorganization prospects or, where the debtor is liquidating, will consume much of the estate, yet promise insufficient return to creditors." In re America's Hobby Center, Inc., 223 B.R. at 280. In other contexts, an ill-advised suit by a creditors' committee may interfere with a debtor's efforts to reorganize by compromising important creditor-debtor relationships or by removing a source of the debtor's bargaining power. See In re Amarex, Inc., 36 B.R. 59, 62 (Bankr. W.D. Ok. 1984) (the right to bring avoidance actions may be an instrumental tool in large reorganization cases; its use as a negotiating factor can have more value than a judgment in the overall picture of an effective reorganization); In re Toledo Equipment Co., Inc., 35 B.R. at 320 ("If the unsecured creditor's [sic] committee were permitted to institute a suit against a creditor without a prior determination as to the propriety of the debtor-in-possession's failure to sue, the resulting suit could seriously jeopardize the debtor's relationship with the creditor, and thereby jeopardize the chances for a successful reorganization.").

As we have previously discussed, supra, the court approval process is intended to ferret out situations in which the debtor, in failing to file suit, has abused its discretion or otherwise acted in derogation of its fiduciary duties to the estate. See In re Gibson Group, Inc., 66 F.3d at 1442 (perhaps the most important prerequisite to derivative standing is that the debtor-in-possession has abused its discretion in failing to avoid a preferential or fraudulent transfer). In making this determination, the court considers any reasons the debtor might have for opposing the avoidance action. See In re Catwil Corp., 175 B.R. at 364-65 (explaining that, at a hearing on

committee's petition for derivative standing, both the debtor-in-possession and the defendant are informed of the committee's intent to assert the right of the debtor-in-possession and debtor-in-possession is also afforded an opportunity to explain to the court the reasons, if any, for declining to prosecute the claim the creditors' committee seeks to assert). See also In re Chemical Separations Corp., 32 B.R. at 819. "This judicial intervention is crucial," because the determination of whether or not the debtor's failure to sue is unjustified and, therefore, an abuse of its discretion, involves "resolution of the conflict between the creditor and the debtor-in-possession" and a "balancing of [their] competing interests." In re Curry and Sorensen, Inc., 57 B.R. at 828.

Thus, the judicial requirement that bankruptcy courts act as "gatekeepers" in derivative standings cases is premised upon the duel goals of promoting the best interests of the bankruptcy estate (and ultimately, therefore, the creditors) while preventing undue usurpation of the debtor's/trustee's powers. Because bankruptcy courts "have traditionally been governed by equitable principles rather than statutory technicalities," Arkansas Co., supra, at 648, it seems appropriate to permit retroactive grants of derivative standing where equitable concerns so warrant and where the foregoing goals will not be compromised. At the same time, and consistent with the principles of Arkansas Co. and F/S Airlease, we think it is appropriate for courts to examine the committee's conduct in failing to obtain prior court approval so as not to encourage laxity on the part of counsel or foster disregard for the judicially recognized preference for prior court approval. To that end, we find the following factors informative:

> (i) whether the court would have granted derivative standing prospectively in the first instance if court approval had been sought prior to the filing of the lawsuit;
>
> (ii) whether retroactive approval of the claims would perpetuate confusion, undermine the Debtor's efforts to reorganize, or otherwise compromise the orderly and efficient administration of the estate;
>
> (iii) whether the plaintiff was under time pressure to commence suit before leave of court could formally be obtained,
>
> (iv) the length of time that the plaintiff delayed in seeking court approval for the action,
>
> (v) the extent to which retroactive approval would unfairly prejudice other parties,

31

(vi) whether the delay in seeking court approval was caused by something more than mere neglect or oversight on the part of the plaintiff;

(vii) whether, under the totality of circumstances, retroactive approval of the lawsuit would likely encourage laxity on the part of creditors or their counsel or a disregard for the general requirement of prior court authorization; and

(viii) whether overriding principles of fairness require an examination of the plaintiff's claims notwithstanding the plaintiff's failure to obtain prior leave of court before commencing the lawsuit.[11]

Applying these factors to the circumstances of this case, we find no error in the

Bankruptcy Court's decision granting the Committee permission, *nunc pro tunc*, to proceed with

its lawsuit. We can safely infer, based on the Bankruptcy Court's ruling, that it would have

granted derivative standing in the first instance if the Committee had sought formal approval

prior to filing its lawsuit. For the reasons set forth *supra*, we find no error in this regard, having

previously determined that the Bankruptcy Court's grant of derivative standing was appropriate

as a substantive matter. Specifically, we have found that the Bankruptcy Court was justified in

concluding that the Committee's claims were colorable and of significant potential benefit to the

unsecured creditors and that the Debtor's actions in opposing the filing of the Adversary

Proceeding were contrary to the best interests of the estate. We have further found that the

Committee is the only party in a position to adequately advance the interests of the unsecured

creditors. Thus, the record supports a finding that the Bankruptcy Court would have authorized

the Committee's avoidance action if such authorization had been sought prior to the January 31,

2003 filing deadline.

Turning to the other factors, we note that the Court's approval of the claims on a *nunc pro tunc* basis did not in any manner undermine the Debtor's successful reorganization because the

---

[11] While we find these factors relevant, we do not consider them exhaustive, nor do we believe that all of the aforementioned factors will apply in every case. We merely conclude that courts should not be foreclosed from taking these factors into consideration in determining whether to retroactively permit a creditors' committee to file suit on behalf of a debtor's estate. Thus, to the extent that Defendants suggest the Bankruptcy Court was confined to a narrow analysis of "extraordinary circumstances" based solely on the considerations enumerated in Arkansas Co. and F/S Airlease, we disagree. We find no legal error on the part of the Bankruptcy Court in this regard.

32

Plan called for the Debtor's assets to be liquidated and reorganization is therefore not an issue. Moreover, there was no danger that the Bankruptcy Court's retroactive authorization would somehow perpetuate confusion among the parties or otherwise impede the orderly and efficient administration of the estate. On the contrary, at all relevant times it was clear to the parties that the Creditors' Committee was conducting due diligence of the 1999 stock redemption with an eye toward possibly filing an avoidance action. Since the Debtor had waived its right to pursue such a claim, and because the Interim and Final DIP Orders gave the Committee the responsibility of asserting any challenges to the Banks' liens, it should have been evident that the Committee was the logical party to pursue the Adversary Proceeding.

Defendants make much of the fact that the Committee reportedly had its complaint prepared prior to October 1, 2002 and therefore, the argument goes, the Committee was under no time constraints which prevented it from seeking court approval prior to the filing of the Adversary Proceeding. It does indeed appear that there was a window of opportunity, prior to the January 31, 2003 filing deadline, within which the Committee could have sought court authorization for the lawsuit. To some extent, this fact weighs against retroactive approval of the action. However, we note that the Committee sought court approval within about six months from the time its complaint was drafted and less than two months after it had filed the Adversary Proceeding and no party appears to have been seriously prejudiced by the delay.

Moreover, it appears that counsel's delay in seeking the requisite court authorization was borne of more than mere neglect and oversight. In this case, the Committee's assessment of the advisability of the Adversary Proceeding was impacted somewhat by the sale of the Debtor's assets. The record reflects that the Committee delayed commencing the Adversary Proceeding in part because it wanted to allow the parties to focus on the sale of the Debtor's assets, after which point it could make a more meaningful assessment of the likely return on claims submitted by the unsecured creditors. Unfortunately, the closing occurred on the last day for filing the avoidance claims and the Committee, having been unable to secure from the Banks a stipulation for further extension of the deadline, proceeded to file its lawsuit.

33

It is true that the Committee's failure to seek prior court approval for the action was in part due to its misconception that, as to the claims against the Banks,[12] it *already possessed* the requisite court authorization to pursue the Adversary Proceeding by virtue of certain language contained in the Interim and Final Dip Orders and the Stipulations with the Banks. Although, for reasons discussed *infra*, we conclude that this theory is misguided, it is not unreasonable under the circumstances and, notably, it is a view which the Bankruptcy Court shared. Accordingly, to the extent the Committee's failure to seek formal court approval was the result of "oversight," the oversight is more defensible than the failure to conform to express statutory requirements involved in <u>Arkansas Co.</u> and <u>F/S Airlease</u>.

We do not think this is a case where retroactive approval of the Committee's lawsuit will likely encourage future laxity on the part of creditors and their counsel, nor do we think it will foster a disregard of the generally recognized practice of obtaining prior leave of court. On the whole, the record reflects that, from its inception, the Committee and its counsel diligently investigated the merits of the avoidance claims and took appropriate action to protect the interests of the Committee's constituency. This was not a case of the Committee simply sitting on its hands.

Further, the concern of the <u>Arkansas Co.</u> Court that *nunc pro tunc* relief might result in the application of lenient standards is not implicated here. In <u>Arkansas Co.</u>, the Third Circuit expressed reservation that, if *nunc pro tunc* approval of counsel were not limited to cases involving extraordinary circumstances, "the bankruptcy court may be overly inclined to grant such approval influenced by claims of hardship due to work already performed." 798 F.2d at 649. It may indeed be possible for professionals hired by the estate to accumulate substantial fees while their engagement continues undetected; however, it is unlikely that a creditors' committee can prosecute an unauthorized avoidance action for significant lengths of time without the lack of court approval being brought to the bankruptcy court's attention. And, even if

---

[12] The Committee joined the Directors and Remaining Individual Defendants in the lawsuit because it believed them to be indispensable parties.

34

substantial (albeit unauthorized) fees are incurred by a committee in conducting due diligence prior to the filing of an avoidance action, we doubt that bankruptcy courts will be tempted to approve litigation that is otherwise ill-advised out of sympathy for professionals who desire to be paid. Certainly in this case we are satisfied that, in retroactively authorizing the Committee's lawsuit, the Bankruptcy Court did not apply lenient standards or authorize a lawsuit that was otherwise inadvisable.

Finally, this Court is satisfied that overriding principles of equity and fairness support retroactive authorization of the Adversary Proceeding. The Committee has asserted that various insiders and/or principals of the Debtor, with assistance from the Banks, redeemed shares of the Debtor's preferred stock at inflated prices at a time when the Debtor was headed toward Chapter 11 proceedings. For reasons previously discussed, we have upheld the Bankruptcy Court's finding that the claims are both colorable and of substantial potential benefit to the unsecured creditors under a cost/benefit analysis. The Committee is the only logical party to pursue these claims, having been charged since its inception with the responsibility of investigating and prosecuting possible avoidance actions against the Banks, and having acquired knowledge of the underlying factual bases for the claims. Thus, if the Committee's claims do not go forward, the transaction of the Debtors and its pre-petition lenders will go unscrutinized. Yet "the overall 'fairness' concept of bankruptcy laws mandates that the debtor's transactions should not pass without examination." In re Rachels, Inc., 131 B.R. at 786.

In America's Hobby Center, Inc., 223 B.R. 275 (Bankr. S.D.N.Y. 1998), the court was presented with a factual scenario not entirely unlike our own. In that case, the debtor, shortly after filing its bankruptcy petition, sought court approval of a proposed cash collateral agreement which the debtor had entered into with one of its pre-petition lenders. Pursuant to the agreement, the debtor waived all challenges to the lender's pre-petition security interest in return for the lender' agreement to the debtor's use of the lender's cash collateral. The order approving the agreement allowed the unsecured creditors' committee thirty days in which "to object to the validity of" the bank's security interests. By the time the committee had completed its investigation, the 30-day deadline was about to expire. In order to protect its ability to contest

the bank's security interests, the committee filed an adversary proceeding, without formal leave of court, seeking (among other things) to equitably subordinate the bank's claim to those of the unsecured creditors. The bank later moved to dismiss the complaint on the ground that the committee, having failed to obtain court permission, lacked standing to pursue the claim. The committee responded that it was vested with the authority to file the action by virtue of the court-approved stipulation giving it thirty days in which to object to the bank's security interests. The bankruptcy court first noted that, in approving the cash collateral agreement, the court did not cede its authority to determine whether the proceeding should be filed. However, the court determined that leave to pursue the action could appropriately be granted retroactively.

In granting the committee derivative standing *nunc pro tunc,* the court in America's Hobby Center considered several factors. It noted that the "overall 'fairness' concept of bankruptcy laws mandates that the debtor's transaction should not pass without examination." 223 B.R. at 281 (quoting In re Rachles, Inc., *supra*). In the case before it, there was no other party that could have brought the action:

> Even assuming that our debtor had not waived its right to bring an avoidance action against the bank, it is unlikely that it would have done so, for some of the Committee's claims involve the debtor's guarantee of its non-debtor affiliate's debt to the bank, as to which debt the debtor's insiders are alternative guarantors. Thus, to the extent that the debtor's exposure were eliminated, the insiders' exposure would be augmented. If the Committee cannot bring an action to avoid the guarantee and the resulting security interest, the inherent conflict of the debtor's insiders makes it unlikely that the debtor will plug the gap. In any event, whatever the motivations of those in control of the debtor, the debtor gave up the ability to sue the bank. Therefore, "overall fairness" would require the grant of retroactive approval. In re Rachles, Inc., 131 B.R. at 786.

Id. at 282. Second, the court considered the fact that "there can be no confusion as to who would bring the adversary proceeding, the debtor having contracted away its right to sue and more importantly, the bank having agreed that the Committee had a period of time in which to challenge its liens." Id. (citing In re Catwil Corp., 175 B.R. at 365). Third, the court noted that the committee had acted under an apparent good faith belief that it was empowered to file its suit by virtue of the court-approved cash collateral agreement. Id. ("Although procedurally flawed, the filing of the Committee's adversary proceeding was a good faith attempt to object to [the]

36

bank's liens or security interest fully within the spirit of the cash collateral agreement and order.") (citation omitted). Finally, the court considered that "'time was of the essence' as the Committee would have jeopardized its right to receive reimbursement from the estate (in the face of the grant by the debtor of a lien on proceeds of the bank's collateral) had the Committee not filed its adversary proceeding." Id. (citing Catwil). The court observed that "while some might argue that the evaporation of a source of payment is not a relevant consideration, if the Committee's professionals could not receive payment over the bank's objection out of the bank's collateral, which here constitutes the bulk of the estate's available assets, potentially beneficial actions might not be undertaken, to the estate's and unsecured creditors' detriment." Id. (citation omitted). Based on these considerations, the court concluded that, if the avoidance action were otherwise warranted based on a colorability and cost/benefit analysis, retroactive approval would be appropriate. Id.

Like the court in America's Hobby Center, we find that retroactive approval of the Committee's avoidance claims was and is appropriate. We find no error in the Bankruptcy Court's ruling allowing the Committee's claims against the Directors and the Remaining Individual Defendants.

### C. DID THE BANKRUPTCY COURT ERR IN AUTHORIZING THE COMMITTEE'S CLAIMS AGAINST THE BANKS?

In its memorandum opinion of January 29, 2004, the Bankruptcy Court gave the following explanation relative to the Committee's authority to pursue its fraudulent transfer claims against the Banks:

> As to the Banks, the Debtor waived all rights it had to contest the Banks' claims [against the Estate] at the beginning of the case by language in the Interim and Final DIP Orders. The Creditors' Committee was charged with the task of investigating the legitimacy of the Banks' claims and pursuit of any cause of action that might be brought against the Banks. The language of those Orders and the subsequent Stipulations put the Banks on notice that the Creditors' Committee was investigating the Redemption Transaction. The prior Orders provide sufficient authority for the filing of the Complaint as against the Banks.

(Mem. Op. of 1/24/04 at [Bankr. Doc. No. 1461] p. 13.)

On appeal, the Banks contend that the DIP Orders and Stipulations did not provide the requisite court authorization for the Committee's avoidance action. They claim that the Bankruptcy Court's contrary conclusion amounts to reversal error.

The operative provision of the Final DIP Order, § 17, states as follows:

> The findings contained in paragraphs C and D [concerning the Debtor's admissions as to its pre-petition obligations and encumbrances] shall be binding upon all parties, including but not limited to, the Debtor[], the Committee and any other statutory committee appointed herein, unless, and only to the extent that, (a) a party in interest (including the Committee and any other statutory committee) *has properly filed an adversary proceeding* or contested matter ... *no later than the date that is one hundred twenty (120) days after the date of appointment of the Committee* (i) challenging the validity, enforceability, or priority of the Prepetition Obligations or the Prepetition agent's and the Prepetition Banks' security interest and liens on the Prepetition Collateral in respect thereof or (ii) otherwise asserting any claims or causes of action against the Prepetition Agent or the Prepetition Banks and (b) the Court rules ... in favor of the plaintiff in any such adversary proceeding or contested matter properly filed ...

(DIP Order of 4/2/02 [Bankr. Doc. No. 78] at ¶ 17 (emphasis added).) The highlighted language has caused the parties to debate what is meant by a "properly filed" adversary proceeding. According to the Banks, a "properly filed" proceeding is one either endorsed by the Debtor or specifically approved by the Bankruptcy Court following a hearing and a determination that the claims are facially valid and of likely benefit to the estate. The Committee contends, on the other hand, that "properly filed" simply means an adversary proceeding filed in compliance with the Federal Rules of Bankruptcy Procedure.

Unfortunately, the language in the Stipulations is no more illuminating. The First Stipulation, which is characteristic of the others,[13] provides, in relevant part, as follows:

---

[13]The Second - Fifth Stipulations further extend the deadline for filing and provide, in relevant part, as follows:

> WHEREAS    The Committee and the Banks have further AGREED and STIPULATED regarding the Due Diligence Deadline as follows:
> 1.    As the Committee's work is still proceeding with respect to possible claims or avoidance actions against the Banks relating to the stock redemption and "hard dollar payout" to preferred stock holders executed by the Debtors in Fiscal Year 1999 ("stock redemption and hard dollar payout"), the

WHEREAS   The Committee and the Banks have AGREED and STIPULATED to the following with regard to the Due Diligence Deadline contained in Paragraph 17 of the Final DIP Order:

1.       As the Committee's investigation is still proceeding with respect to possible avoidance actions, including, but not limited to, actions that may be brought under Chapter 5 of Title 11 of the United States Code and relevant and applicable State fraudulent transfer statutes ("Avoidance Actions") against the Banks, the Committee and the Banks have agreed to extend the Due Diligence Deadline referenced in Paragraph 17 of the Final Dip Order and the time within which the Committee must file any Avoidance Actions against the Banks for a period of one hundred (120) days commencing from the date of this Stipulation; and

2.       Except as set forth in the preceding paragraph, all other claims, causes of action and/or objections covered under the provisions of Paragraph 17 of the Final DIP Order shall be barred if not brought on or before July 19, 2002.

(Stipulation for Extension of Time in Which The Official Committee of Unsecured Creditors Has to Complete its Due Diligence Pursuant to the [Final DIP Order] [Bankr. Doc. No. 298] at pp. 3-4.) Although the first stipulation was not signed by the Bankruptcy Court, the other four were.

We can easily agree with the Bankruptcy Court's determination that the foregoing language put the Banks on notice that the Creditors' Committee was investigating the 1999 stock redemption with an eye toward a possible avoidance action. The Bankruptcy Court's conclusion that, by virtue of the foregoing language, it had officially given its imprimatur to the Committee's Adversary Proceeding is somewhat less self-evident. Nevertheless, for present purposes we will take the Bankruptcy Court at its word and assume that, in entering DIP Order and approving the Stipulations, the Bankruptcy Court intended to convey to the Committee a grant of derivative standing. See In re Fine Paper, 695 F.2d 494, 498 (3d Cir.1982)("We must give particular deference to the district court's interpretation of its own order.").

---

Committee and the Banks have agreed to further extend the Due Diligence Deadline referenced in Paragraph 17 of the Final DIP Order and the time within which the Committee must file any claim and/or action against the Banks relating to the stock redemption and hard dollar payout until [the new deadline date]...

(See second, third and fourth stipulation between the Committee and the Banks for an extension of time [Final DIP Order] [Bankr. Doc. 437 & 442] at pp. 3-4; [Bankr. Doc. No. 456 & 465] at p. p. 4); [Bankr. Doc. No. 478] at p. 4; [Bankr. Doc. No. 550 at p. 4].

To the extent the Bankruptcy Court intended, by virtue of the Final DIP Order and subsequent stipulations, to judicially approve the filing of the Adversary Proceeding, we find that it abused its discretion. Significantly, the Adversary Proceeding was not filed until some two weeks after the fifth and final stipulation was approved by the Bankruptcy Court. At the time the Adversary Proceeding was commenced, the court had not yet reviewed the complaint, nor had it entertained any argument as to the viability or cost-effectiveness of the litigation, points which have since been hotly contested by the parties.[14] In essence, the Bankruptcy Court's ruling amounts to a determination that it had pre-approved the Adversary Proceeding without having expressly considered the viability of the Committee's claims, the likely costs of litigation, or the reasons for the Debtor's opposition. Yet to "pre-approve" litigation in this fashion is an abdication of the Bankruptcy Court's gate-keeping role. As the court in America's Hobby Center, Inc. observed:

> there is good and sufficient reason to hold that a creditors' committee does not have unfettered discretion to sue simply on its own say-so. ... Prior approval of committee-commenced adversary proceedings is required because it "promotes the fair and orderly administration of the bankruptcy estate by providing judicial supervision over the litigation to be taken. See Catwil Corp. v. Derf II (In re Catwil Corp.), 175 B.R. 362, 364 (Bankr. E.D. Cal. 1994) (quoting In re Curry and Sorensen, Inc., 57 B.R. 824, 828 ((th Cir. BAP 1994)). It must be remembered that the fees of a creditors' committees' professionals are generally absorbed by the debtor in possession pursuant to the statutory scheme. See 11 U.S.C. § 330(a)(1). The debtors' professionals are circumscribed by the willingness of the debtor to pay the expenses of litigation. The committee's professionals are not so circumscribed, however, in the absence of a requirement for court approval, because the debtor need not agree with the decision to sue. To allow such unsupervised litigation may saddle the debtor in possession with expenses which threaten its reorganization prospects or, where the debtor is liquidating, will consume much of the estate, yet promise insufficient return to creditors. In other words, careful analysis may suggest that imposition of a suit is unwarranted for any one of a number of reasons.

---

[14] That the Bankruptcy Court had not had the opportunity to review the complaint prior to its filing is evident from the transcript of the confirmation hearing held on February 28, 2003. [Bankr. Doc. No. 809.] During that hearing, the Bankruptcy Judge indicated that he was aware of the filing of the Adversary Proceeding but had not yet reviewed the Committee's complaint because he did not perceive that it would have any impact on the then-pending confirmation hearing.

223 B.R. at 280 (internal footnote omitted).

In sum, then, we agree with the Banks that the DIP Order and Stipulations could not have constituted the kind of court-authorized grant of derivative standing as would have allowed the Bankruptcy Court to properly fulfill its gate-keeping function. The Bankruptcy Court's determination to the contrary amounts to an abdication of its responsibility and constitutes an abuse of its discretion.

Nevertheless, that raises the question whether the Bankruptcy Court could have properly granted the Committee *nunc pro tunc* authority to pursue its claims against the Banks, just as it did with respect to the claims against the Directors and the Remaining Individual Defendants. Ordinarily, a remand would perhaps be appropriate in order to give the Bankruptcy Court the first opportunity to address this issue. However, we have already withdrawn our reference of the Adversary Proceeding to the Bankruptcy Court and, consequently, we presently have original jurisdiction over the proceeding. It is therefore appropriate for this Court to determine, in the first instance, whether *nunc pro tunc* relief is proper.

This Court has previously addressed at length our reasons for concluding that the Bankruptcy Court did not err in retroactively approving the Committee's claims against the Directors and the Remaining Individual Defendants. For those same reasons, we now conclude that retroactive approval of the Committee's claims against the Banks is likewise appropriate.

## IV. CONCLUSION

In sum, we conclude that the Bankruptcy Court did not commit any manifest error of law or abuse its discretion in retroactively authorizing the Committee's claims against the Directors and Remaining Individual Defendants. We find that the Bankruptcy Court *did* commit legal error to the extent it sought to "pre-approve" the Committee's claims against the Banks through the Interim and Final DIP Orders and the stipulations between the Committee and the Banks. Nevertheless, sitting now as the Court of original jurisdiction, we conclude that retroactive approval of the Committee's claims against the Banks is, and would have been, appropriate for

41

the same reasons that we approve retroactive authorization of the claims against the Directors and Remaining Individual Defendants.

The Committee can proceed with the Adversary Proceeding. An appropriate Order follows.